W

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

JAMES JACOBS, on Behalf of Himself
and All Others Similarly Situated,

Plaintiff.

vs.

ROBERT P. BREMNER, LAWRENCE H.
BROWN, JACK B. EVANS, WILLIAM
C. HUNTER, WILLIAM J. SCHNEIDER,
TIMOTHY R. SCHWERTFEGER,
JUDITH M. STOCKDALE, NUVEEN
INVESTMENTS, INC., NUVEEN
INSTITUTIONAL ADVISORY
CORPORATION, INSTITUTIONAL
CAPITAL CORPORATION, NWQ
INVESTMENT MANAGEMENT
COMPANY, LLC, RITTENHOUSE
ASSET MANAGEMENT, INC., and
JOHN DOES NO. 1 THROUGH 100.

Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

**FILED**

MAR 1 4 2005

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

No. 05C 0143

Judge Honorable Milton I. Shadur

## MEMORANDUM IN SUPPORT OF NUVEEN DEFENDANTS' MOTION TO DISMISS

## MEMORANDUM IN SUPPORT OF NUVEEN DEFENDANTS' MOTION TO DISMISS

Plaintiff's Complaint should be dismissed under Rule 12(b)(6) because it fails to allege basic, fundamental facts about Plaintiff, his standing, and his claim. The equivocal nature of the Complaint's allegations demonstrates that Plaintiff has not adequately determined that facts exist to support any claim. Instead, he has filed suit in hopes of discovering if there are facts that might support a claim, by some person or entity, against some mutual fund or its management. Not only are the Complaint's allegations hopelessly and impermissibly imprecise but, even more importantly, this Court should dismiss the Complaint, with prejudice, because it does not and cannot plead any claim which would entitle Plaintiff to relief from the Nuveen Defendants.[1]

### INTRODUCTION

Plaintiff's basic legal theory is simple. Plaintiff asserts that various persons and entities associated with the Nuveen family of funds breached their duty to fund shareholders by failing to cause certain Funds to participate in class action settlements involving shares held by those Funds.

Putting aside the problem that Plaintiff's claim is, at best, a derivative claim belonging to the supposedly aggrieved Funds, Plaintiff's Complaint here is so factually deficient that it should be dismissed on that basis alone. Plaintiff claims to own an interest in one Nuveen Fund that invests in equity securities (Compl. ¶ 10), but he never identifies that Fund. Nor does Plaintiff allege facts establishing when he owned Fund shares -- and whether he held shares during any period relevant to the class action settlements in which Nuveen Funds supposedly were entitled to participate. Plaintiff claims that six Nuveen-affiliated funds invest in equities (Compl. ¶ 23), but he fails to identify any of those funds. Although he refers to more than 130 class action settlements, he never identifies which Fund(s) supposedly owned shares in which of the relevant companies, or whether the Fund(s) actually participated in the settlements. Although Plaintiff

---

[1] The Nuveen Defendants, on whose behalf this motion is filed, consist of all named defendants other than Institutional Capital Corporation.

sues seven directors -- six of whom are outside directors -- and the corporate parent, Nuveen Investments, Inc., he alleges no facts linking those defendants to the challenged conduct.

More important than the factual deficiencies in Plaintiff's Complaint are the legal deficiencies, which cannot be cured by additional pleading. Plaintiff purports to assert five causes of action -- Investment Company Act of 1940 ("ICA") §§ 36(a), 36(b), 47(b), common law breach of fiduciary duty, common law negligence -- against defendants associated with six different funds. None of those claims are viable.

Because Plaintiff alleges that he owns shares in only one of the six Nuveen funds, his claims involving any other funds must be dismissed for lack of standing. It is a basic principle of constitutional standing that a plaintiff may not bring claims against a defendant with whom plaintiff has no dealings.

Assuming that Plaintiff may have standing to bring claims relating to one fund -- and ignoring all other legal and factual deficiencies -- the claims he has asserted are clearly derivative and four of them must be dismissed. (The dismissable derivative counts are Counts I, II, III, and V -- all counts except Count IV, under ICA § 36(b), 15 U.S.C. 80a-35(b).) Because Plaintiff has neither pleaded his claims derivatively nor complied with Fed.R.Civ.P. 23.1 and applicable state law governing derivative claims, Counts I, II, III and V must fail.

Finally, the only possibly viable claim, Count V under § 36(b), also is deficient. Although § 36(b) permits certain shareholder actions on behalf of funds, the claims that Plaintiff has asserted are not § 36(b) claims. Federal courts uniformly hold that § 36(b) is a narrow provision with a specific focus -- excessive advisory fees. If a plaintiff does not assert that the advisory fees received by a fund advisor are excessive or tainted by a conflict of interest, the plaintiff cannot state a claim under § 36(b). Here, Plaintiff makes no allegations about the size, nature, or alleged impropriety of any advisory fees, while the claims he does assert have nothing to do with advisory fees. Accordingly, the § 36(b) claims must be dismissed.

2

## ARGUMENT

## I.    JURISDICTIONAL DEFECTS IN THE COMPLAINT WARRANT DISMISSAL

### A.    Plaintiff Lacks Standing To Assert Claims Relating To Funds In Which He Holds No Interest.

Plaintiff alleges that the Defendants acted improperly when they "failed to ensure that the Funds participated in (or opted out of)" more than 100 class action settlements. (Compl. ¶ 5.) "If the Defendants had submitted Proof of Claim forms on behalf of the Funds in these cases . . ., the settlement funds would have increased the total assets held by the Funds, and such increase would have been allocated immediately to the then-current investors[.]" (Compl. ¶ 25.) Plaintiff alleges that six Nuveen funds were eligible to participate in such settlements (although Plaintiff fails to identify the funds or settlements). Plaintiff purports to advance claims on behalf of "all persons who owned one of the [six unidentified Nuveen] Funds at any time between January 10, 2000 through January 10, 2005 and who suffered damages thereby." (Compl. ¶ 6.)

However, Plaintiff also alleges only that he "owned one of the Funds." (Compl. ¶ 10.) This creates an insurmountable jurisdictional problem for Plaintiff; he lacks standing to litigate claims relating to Funds in which he holds no stake. In order to satisfy Article III's "case or controversy" requirement, a party invoking the court's authority must "show that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant . . . ." *Franchise Tax Bd. of California v. Alcan Aluminum Ltd.*, 493 U.S. 331, 335 (1990) (quoting *Valley Forge Christian College v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 472 (1982) (internal quotation marks, citations omitted)).

Federal courts routinely have rejected attempts by fund shareholders to assert causes of action on behalf of mutual funds in which they have not invested. For example, in *Kauffman v. Dreyfus Fund, Inc.*, 434 F.2d 727 (3d Cir. 1970), plaintiff Kauffman owned shares in four mutual funds, but filed ICA claims on behalf of 65 mutual funds. The Court held that plaintiff lacked standing to assert claims relating to funds in which he had no interest. "[O]ne who does not own shares in a corporation is not qualified to bring a derivative action in his behalf." *Id.* at 735.

This Court applied these same principles in *Williams v. Bank One Corp.*, No. 03 C 8561, 2003 WL 22964376 (N.D. Ill. Dec. 15, 2003). There, plaintiff attempted to bring a derivative shareholder claim not only on behalf of mutual funds in which he owned shares, but also against all funds within the One Group Family of Funds. Plaintiff argued that he had standing to proceed against all funds because the individual One Group funds were "not separately incorporated," but instead represented "a separate series of beneficial interests in One Group Mutual Funds." *Id.* at *1. This Court rejected plaintiff's logic. Because the plaintiff in *Williams* had beneficial interests in only two of the funds, the Court concluded that there was "no justification for using them as a springboard for [the plaintiff] to act on behalf of the umbrella Massachusetts trust" and rejected the notion of plaintiff "being able to bootstrap upstream to the business trust and thence downstream to the other separate funds." *Id. See also, Herman v. Steadman*, 50 F.R.D. 488, 489-90 (S.D.N.Y. 1970) (rejecting shareholder's attempt to pursue ICA claims on behalf of three mutual funds because he owned an interest in only one of them).

Under *Kauffman* and *Williams*, Plaintiff lacks Article III standing to pursue claims relating to any funds in which he did not own an interest at the relevant time.[2] All claims relating to funds other than the one in which Plaintiff invested are thus fatally deficient and should be dismissed.

### B. Plaintiff's Claims Are Derivative And He May Not Assert Claims On Behalf Of Any Fund.

Plaintiff fares no better if the Court focuses solely on the claims relating to the one unidentified Fund in which Plaintiff allegedly invested. It is well settled that a "plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." *Franchise Tax Board of California,* 493 U.S. 331, 336 (1990) (quoting *Warth v. Seldin,* 422 U.S. 490, 499 (1975) Here, Plaintiff claims that the assets of the Funds were diminished because the Defendants did not participate in certain class action

---

[2] According to the Complaint, the relevant time period for fund ownership is January 10, 2000 through January 10, 2005. (Compl. ¶¶ 1, 6.)

settlements. Thus, the alleged harm is an injury to the Funds. Those claims are quintessentially derivative -- the rights Plaintiff is seeking to vindicate are those of the Fund in which he invested, not those of its individual shareholders -- and Plaintiff may not pursue such relief.

### 1. Plaintiff's claims are derivative.

The question of whether a plaintiff's claims are direct or derivative is one of state law. *Frank v. Hadesman and Frank, Inc.*, 83 F.3d 158, 159 (7th Cir. 1996). The relevant state law is the law of the state in which the relevant business entity was organized. *Green v. Nuveen Advisory Corp.*, 186 F.R.D. 486, 489 (N.D. Ill. 1999) (citing *Kamen v. Kemper Fin. Servs.*, 500 U.S. 90, 108-09 (1991)). In the case at bar, Massachusetts law governs.[3]

Under Massachusetts law, an "action is derivative if the gravamen of the complaint is injury to the corporation, or to the whole body of its stock or property without any severance or distribution among individual shareholders, or it seeks to recover assets for the corporation or to prevent the dissipation of its assets." *Farragut Mortgage Co., Inc. v. Arthur Andersen LLP*, No. 95-6231-B, 1999 WL 823656 at *17 (Mass. Super. Ct. Aug. 5, 1999) (citing 12B Fletcher *Cyclopedia of the Law of Private Corporations*, § 5911). In *Hurley v. Federal Deposit Ins. Co.*, 719 F.Supp. 27, 30 (D. Mass. 1989), the court stated that "corporate mismanagement ... resulting in lower stock prices cannot form the basis for an individual shareholder lawsuit against the wrongdoer. Similarly, in *Blasberg v. Oxbow Power Corp.*, 934 F. Supp. 21, 26 (D. Mass. 1996) the court ruled that a claim that a defendant breached a fiduciary duty, thereby causing a

---

[3] Plaintiff has not identified the Fund in which he has an ownership interest, nor the state under whose laws that Fund is organized. However, because all six Nuveen Funds that invest in equity securities are organized as components of Massachusetts business trusts, Massachusetts law applies. A court may take judicial notice of information in publicly filed, available filings, like company annual reports. *Lambert v. Calprotrack, Inc.*, No. 95 C 4076, 1996, WL 224515, at *23 (N.D. Ill. May 1, 1996); *Ruca Hardware, Ltd. v. Chien*, No. 94 C 3635, 1995 WL 307172 at *8 n.3 (N.D. Ill. May 17, 1995). Attached as Exhibit A are the relevant portions of the Funds' most recent Annual Reports, reflecting each Fund's organization as part of a Massachusetts business trust.

diminution in the value of corporate stock or assets, is a claim that is "held by the corporation itself, and is thus derivative if brought by an investor").

The foregoing authority establishes that all of Plaintiff's claims -- the common law claims for negligence and breach of fiduciary duty, along with the ICA claims -- are derivative because they all are based exclusively on an alleged injury to the Fund.[4] This law is well developed under the ICA, as several courts have addressed breach of fiduciary duty claims under the ICA and uniformly have held that such claims are derivative in character. Thus, in *In re Nuveen Fund Litigation*, 855 F.Supp. 950, 954 (N.D. Ill. 1994), Judge Conlon dismissed plaintiffs' ICA § 36(a) claim where plaintiffs' "alleged injuries [were] not distinct from the alleged injuries to all the Nuveen funds' shareholders." Similarly, the court in *Marcus v. Putnam*, 60 F.R.D. 441, 444 (D. Mass. 1973), applied Massachusetts law in dismissing ICA claims because they improperly had been asserted as direct, rather than derivative, claims. *Accord Green v. Nuveen Advisory Corp.*, 186 F.R.D. 486 (N.D. Ill. 1999); *King v. Douglass*, 973 F. Supp. 707 (S.D. Tex. 1996).

The gravamen of Plaintiff's Complaint is that the Defendants acted wrongly when they did not file claim forms that would have allowed the Fund to recover settlement proceeds. It is undisputed that any proceeds from the class actions would have benefited the Fund. Plaintiff concedes this point, alleging that if Defendants had submitted the proofs of claim they allegedly neglected to file, "the settlement funds would have increased the total assets held by the Funds," thereby increasing Fund NAV. (Compl. ¶ 25.) Any benefit Plaintiff would have derived from an increase in assets to the Fund would have been proportionately identical to the benefit enjoyed by all other investors in the Fund. Such claims are quintessentially derivative.

---

[4] The fact that the claims belong to the Fund highlights yet another defect with Plaintiff's Complaint -- his failure to join the Fund in which he invested as a party to this action. In a derivative action, the party on whose behalf a suit is brought is indispensable. *Blasberg*, 934 F. Supp. at 23. "When an indispensable party is absent from a case, the court should not proceed to a decision on the merits." *Feen v. Ray*, 487 N.E.2d 619, 622 (Ill. 1985). This defect affects all Complaint claims, including the claim under ICA § 36(b).

## 2.    Plaintiff has not complied with Rule 23.1.

To pursue derivative claims, a plaintiff must comply with Fed. R. Civ. P. 23.1. That rule requires a plaintiff bringing a derivative action either to make a demand on the entity on whose behalf he wishes to proceed or, alternatively, to plead with particularity the reasons why demand should be deemed excused under governing state law.

In the present case, however, Plaintiff did not and cannot escape the demand requirement by pleading excuse. The Supreme Court has recognized that "although Rule 23.1 clearly *contemplates* ... the possibility that demand may be excused, ... [it] cannot be construed to 'abridge, enlarge or modify any substantive right.'" *Kamen,* 500 U.S. at 96 (emphasis in original) (quoting 28 U.S.C. § 2072(b)). Thus, to determine whether the demand requirement may be excused, one must look to the law of the relevant state. *Id.* at 108. Massachusetts law mandates that demand be made in every case. Mass. G.L.ch. 156D § 7.42 ("No shareholder may commence a derivative proceeding until: (1) a written demand has been made upon the corporation to take suitable action; and (2) 90 days have elapsed from the date the demand was made . . . .") As a Massachusetts court recently recognized, "a demand must be made prior to the commencement of every derivative case, whether or not the directors are independent with respect to the matter subject to the demand." *Demoulas v. Demoulas Super Markets, Inc.,* No. 033741865, 2004 WL 1895052 at *1 (Mass. Super. Ct. Aug 2, 2004).[5] Plaintiff may not proceed with any derivative claim until he makes a demand in accordance with Massachusetts law. This defect is fatal to all of Plaintiff's claims except his ICA § 36(b) claim, as § 36(b) allows individual shareholders to assert claims, on behalf of funds, relating to advisory fees.

---

[5] Although § 7.42 is from Massachusetts' statute dealing with corporations, it has been firmly established that the demand rules governing corporations apply with equal force to entities organized as Massachusetts business trusts. *Green v. Nuveen Advisory*, 186 F.R.D. at 488 n.2 ("Courts applying Massachusetts law to shareholder suits against business trusts have uniformly required the shareholder to follow Massachusetts law regarding derivative suits."); *Greenspun v. Lindley*, 36 N.Y. 2d 473, 478-9 (N.Y. 1975) (same).

## II.  EVEN IF PLAINTIFF HAD STANDING, HIS FEDERAL CLAIMS NEVERTHELESS WOULD FAIL.

### A.  Plaintiff Cannot Assert a Viable 36(b) Claim.

As discussed above, in the present setting the only ICA or common law claim that a fund shareholder may assert directly is a claim under ICA § 36(b). However, Plaintiff does not and cannot allege the requisite elements of a claim under ICA § 36(b).[6]

ICA § 36(b) recognizes a "fiduciary duty with respect to the receipt of compensation for services." 15 U.S.C. § 80a - 35(b). Courts construing § 36(b) uniformly recognize that § 36(b) creates a narrow duty, limited to breaches of fiduciary duty relating to investment advisory fees, and that plaintiffs may not use § 36(b) to bring general breach of fiduciary duty claims.

Thus, the Seventh Circuit has stated that "Congress enacted § 36(b) to provide a narrow federal remedy that is significantly more circumscribed than common law fiduciary duty." *Green v. Nuveen Advisory Corp.*, 295 F.3d 738, 743 (7th Cir. 2002) (citations and internal quotation marks omitted). Courts in this District have dismissed § 36(b) claims that attack investment advisor performance, noting that § 36(b) "does not provide a cause of action challenging the propriety of an investment adviser's financial counsel." *In re Nuveen Fund Litig.*, No. 94 C 360, 1996 WL 328006, at 15 (N.D. Ill. June 11, 1996); *see also Migdal v. Rowe Price-Fleming Int'l, Inc.*, 248 F.3d 321, 329 (4th Cir. 2001) (dismissing § 36(b) claim because "[g]eneral breach of fiduciary duty claims which involve merely an incidental or speculative effect on advisory fees are not properly within the scope of Section 36(b)"). A claim that fund advisors made poor decisions or mismanaged the fund simply is not cognizable under § 36(b).

Courts consistently have construed § 36(b) as requiring "the federal courts to decide whether the fees charged by investment advisers are 'excessive'." *Kamen v. Kemper Fin. Servs.*, 908 F.2d 1338, 1339-1340 (7th Cir. 1990) (citing *Daily Income Fund, Inc. v. Fox*, 464 U.S. 523, 534-41 (1984)), rev'd on other grounds, 500 U.S. 90 (1991) ); *see also Migdal*, 248 F.3d at 328 ("Section 36(b) is sharply focused on the question of whether the fees themselves were

---

[6] Plaintiff asserts § 36(b) claims against only Advisor Defendants and the Parent Company Defendant (the "§ 36(b) Defendants"). The § 36(b) arguments address only those defendants.

excessive."); *Gartenberg v. Merrill Lynch Asset Mgmt., Inc.*, 694 F.2d 923, 928 (2d Cir. 1982 ) ("To be guilty of a violation of § 36(b) . . . the advisor-manager must charge a fee that is so disproportionately large that it bears no reasonable relationship to the services rendered and could not have been the product of arm's-length bargaining."). The *Migdal* case specifically stated that a § 36(b) plaintiff must assert specific facts demonstrating that the fees are excessive. 248 F.3d at 327.

The law on § 36(b) is well-developed in this District. In *In re Nuveen Fund Litig.*, 1996 WL 328006, at *14, the court stated that "every court addressing a § 36(b) claim has required the plaintiff to demonstrate that the compensation or payment received by the investment adviser was disproportionate to the services rendered." Plaintiffs in *In re Nuveen* challenged rights offerings, pursuant to which funds sold more shares, even alleging that the challenged conduct caused fund assets, and thus advisor compensation, to increase. *Id.* at *2. The *In re Nuveen* court dismissed the plaintiffs' § 36(b) claim because the conduct challenged in the complaint was fund management, not the relation between fees received and service provided; 36(b) focuses on the fee agreement between advisors and funds, and the plaintiffs failed to challenge any aspect of that fee agreement. *Id.* at *14-15. Subsequent cases are to the same effect. *Prescott v. Allstate Life Ins. Co.*, 341 F. Supp. 2d 1023, 1029-30 (N.D. Ill. 2004) (pleadings do not state a claim under § 36(b) where plaintiffs failed to plead compensation disproportionate to services rendered); *McDonnell v. Allstate Life Ins. Co.*, No 04 C 3076, 2004 WL 2392169, at *2 n.1 (N.D. Ill. Oct. 25, 2004) ("Plaintiff has not sufficiently alleged a claim under § 36(b), due to his failure to allege that [defendant's] compensation was disproportionate to services rendered."). *See also Green*, 295 F.3d at 743 n.8 (for purposes of stating a claim under § 36(b), plaintiff must allege that fee is excessive or, at a minimum, result from an improper conflict of interest.)

Under these controlling authorities, Plaintiff's § 36(b) claim is irreparably defective. Plaintiff focuses exclusively on an alleged breach of general fiduciary duties -- purported mismanagement of the Funds by failing to complete and submit claim forms. The Complaint says nothing about the compensation paid to the §36(b) Defendants. Indeed, the Complaint not

only does not allege excessiveness, it does not even allege that the Advisor Defendants or the Parent Company Defendant received compensation. Moreover, no connection between the challenged conduct and fees is even possible here, because doing as Plaintiff suggests -- participating in class action settlements -- would result in increased fund assets and, thus, higher advisory fees. Plaintiff simply cannot allege any breach of "fiduciary duty with respect to the receipt of compensation for services."[7]

### B. Plaintiff's Other Federal Claims Are Substantively Defective.

#### 1. Plaintiff fails to state claims against non-advisor defendants.

Plaintiff's Complaint names twelve different persons and entities as Defendants. Along with four Defendants alleged to be investment advisors -- NIAC, ICAP, NWQ, and Rittenhouse - - Plaintiff also has sued Nuveen Investments, the parent of certain Advisor Defendants, and seven individuals who serve as directors of Nuveen funds. Aside from baldly stating that such parent and directors owe fiduciary duties to Fund shareholders (Compl. ¶¶ 1, 5, 27), the Complaint nowhere alleges facts to establish that the non-advisor Defendants acted with gross negligence, or even that they had any responsibility for the conduct challenged in the Complaint.

Even assuming, *arguendo*, that Plaintiff had alleged sufficient facts to establish that the Advisor Defendants breached their duties in managing the relevant Fund or Funds, the Complaint includes absolutely no facts that would support claims against the Director Defendants. Like many other jurisdictions, Massachusetts recognizes the business judgment rule, which establishes a presumption that director actions were taken in good faith, on an informed basis, and in an honest belief that the challenged action would benefit the corporation.

---

[7] Plaintiff also fails to allege facts supporting liability of the Parent Company Defendant under § 36(b). Only an investment advisor or an affiliate of such advisor may be liable under § 36(b). Plaintiff alleges neither that the Parent Company Defendant is an investment advisor, nor that it qualifies as an affiliate under § 36(b). Affiliate liability under § 36(b) is limited to situations where "the investment adviser . . . tr[ies] to evade liability by arranging for payments to be made not to the adviser itself but to an affiliated person of the adviser." *Green v. Fund Asset Mgmt., L.P.*, 147 F. Supp. 2d 318, 330 (D.N.J. 2001) (quoting S. Rep. No. 91-184 (1970)). Plaintiff makes no such allegations.

Mass. G.L. ch. 156B § 65; *Seidman v Cent. Bancorp, Inc.*, Nos. 030547865, 030544865, 032287865, 2003 WUL 21528509, at *7-10. (Mass. Super Ct. June 30, 2003); *see also In re Abbott Lab. Derivative Shareholders Litig.*, 325 F.3d 795, 808 (7th Cir. 2001); Knepper & Bailey, <u>Liability of Corporate Officers and Directors</u>,§ 2.01 (2004).[8] The business judgment rule applies with equal force to directors or trustees of investment companies. *Burks v. Lasker*, 441 U.S. 471-484-85 (1979) (business judgment rule applicable in the context of ICA cases). Courts applying the business judgment rule recognize that claims against directors may not survive unless the plaintiff alleges facts rebutting the presumption, and establishing that directors engaged in bad faith, self-dealing, fraud, or otherwise acted improperly. *See e.g. Panter v. Marshall Field & Co.*, 646 F.2d 271, 296 (7th Cir. 1981).

Plaintiff's Complaint here provides no such facts. There are no facts suggesting that Director Defendants had improper motives relating to the issue of Fund participation in class action settlements. The Complaint does not even allege that the Director Defendants were aware of the general issue of Fund participation in settlements, or involved in evaluating whether particular Funds had potential claims in particular class actions. Indeed, given that the advisor is responsible for day-to-day Fund management, with directors providing oversight and strategic guidance, it would not be surprising if Fund directors were not notified each time that shares held by a Nuveen-affiliated Fund were affected by class action litigation. This is particularly true of the outside Director Defendants --all Director Defendants other than Schwertfeger -- who have even less familiarity with operational issues.[9] The Complaint contains no facts establishing involvement of the Director Defendants in the challenged conduct.

---

[8] Indeed, Massachusetts law expressly authorizes corporations to indemnify its directors for any liability relating to less than grossly negligent conduct. Mass. G.L. ch 156B § 67. In *In re: Nuveen Fund Litigation*, the court recognized that ICA and common law fiduciary duty claims based solely on allegations of negligence would be precluded by a comparable state law exoneration provision and ICA § 17(h). *In re Nuveen Fund Litig.*, No. 94 C 360, 1995 U.S. Dist. LEXIS 19482, * 23-25 (N.D. Ill. Dec. 21, 1995).

[9] See Ex. A, identifying Schwertfereger as sole interested director.

Finally, the Complaint contains no allegations establishing the liability of Parent Company Defendant Nuveen Investments. Under the ICA (§ 2(a)(3)) and the common law, a controlling person may sometimes be liable for breaches of duty committed by a controlled person. Here, however, the Complaint says nothing about Nuveen Investments, other than identifying it as "the ultimate parent of Nuveen Institutional Advisory Corporation." (Compl. ¶ 11.) The rest of the Complaint refers exclusively to actions by the Advisor Defendants, or simply lumps all Defendants together. Unless Plaintiff can offer facts demonstrating that the Parent Defendant actively participated in the challenged conduct, or somehow controlled the activities of all Advisor Defendants, there is no basis for any claim against Nuveen Investments.

### 2. There is no private right of action under §§ 36(a) or 47(b).

Neither ICA § 36(a) nor ICA § 47(b) contains an express private right of action. Indeed, the only express private right of action in the ICA is in § 36(b). Recent U.S. Supreme Court jurisprudence holds that federal courts should refuse to read a private right of action into a securities statute where, as here, the statute's plain language does not support such a right. *See Central Bank of Denver v. First Interstate Bank of Denver*, 511 U.S. 164, 177, 185-187 (1994) (private rights of action should be based upon express statutory authority; courts should not rely on congressional inaction in the face of prior court decisions implying private rights of action); *Alexander v. Sandoval*, 532 U.S. 275, 287 (2001) (past decisions reflecting judicial willingness to make statutory purpose effective in the context of implied rights of action belong to an "ancien regime"); *Correctional Services Corp. v. Malesko*, 534 U.S. 61, 67 n.3 (2001) (Supreme Court has "retreated from our previous willingness to imply a cause of action where Congress has not provided one").

The Seventh Circuit has expressed doubt as to whether implied rights of action exist under the ICA. *See Boland v. Engle*, 113 F.3d 706, 715 n.19 (7th Cir. 1997) (in the context of the ICA, "[m]ore recent Supreme Court precedent, however, has cast doubt on the type of analysis that courts have used to find implied rights of action") (citing *Central Bank*). In

*Olmsted v. Pruco Life Ins. Co*, 283 F.3d 429 (2d. Cir. 2002), the Second Circuit refused to imply private rights of action under the ICA. The *Olmsted* court held that where a provision of the ICA does not explicitly provide for a private right of action, "we must presume that Congress did not intend one." *Id.* at 432; *White v. Heartland High-Yield Mun. Bond Fund*, 237 F. Supp. 2d, 982, 987 (E.D. Wis. 2002) (refusing to find a private right of action under the ICA). Although certain courts have implied private rights of action under § 36(a), proper application of *Central Bank, Correctional Services Corp.*, and the strong presumption against implied private rights of action preclude implication of such rights §§ 36(b) or 47(b)).

### 3. Plaintiff fails to allege "personal misconduct" under § 36(a).

Even if Plaintiff had the right to bring a claim under § 36(a), Plaintiff's § 36(a) claim still would fail because Plaintiff has not alleged that Defendants engaged in personal misconduct. Section 36(a) creates a cause of action for "breach of fiduciary duty involving personal misconduct." 15 U.S.C. § 80a-35(a). Courts in this District have held that "a cognizable claim [under § 36(a)] must contain allegations of a breach involving personal misconduct." *Prescott*, 341 F. Supp. 2d at 1029. Under § 36(a), "personal misconduct refers to misconduct that involves self-dealing by investment company or other insiders." Id. (quoting *In re Nuveen Fund Litig.*, 1996 WL 328006, at *11). The *Prescott* court dismissed the plaintiff's § 36(a) claim where the plaintiff made no allegation of self-dealing or personal impropriety. *Id. See also McDonnell*, WL 2392169 at *2 n.1 (failure to state § 36(a) claim where plaintiff did not allege defendant's self-dealing or personal impropriety). Here, Plaintiff makes no allegations of self-dealing or personal impropriety. The § 36(a) claim fails because Plaintiff attacks only the failure to participate in settlements, but nowhere alleges that this conduct somehow benefited or enriched the Defendants personally.

### 4. Plaintiff lacks standing under ICA § 47(b).

There are other defects unique to Plaintiff's remaining federal claim -- Count V, under ICA § 47(b). As a threshold matter, Plaintiff lacks standing to assert a § 47(b) claim. Section 47(b) states: "A contract that is made, or whose performance involves, a violation of this

13

subchapter . . . is unenforceable by either party (or by a nonparty to the contract who acquired a right under the contract with knowledge of the facts by reason of which the making or performance violated or would violate any provision of this subchapter . . . ." In *Lessler v. Little*, 857 F.2d 866, 874 (1st Cir. 1988), the court dismissed a claim seeking to void an investment company sales contract under § 47(b) because the plaintiff was not a party to the contract. The plaintiff had brought the action not as a derivative action but as a direct action. Id. Similarly here, Plaintiff is not a party to any alleged agreements between any Defendants or Funds. Thus Plaintiff has no standing to bring a § 47(b) claim, and Count V should be dismissed.

### 5.   Section 47(b) creates a remedy, not a claim, and plaintiff does not allege facts that would entitle him to relief under § 47(b).

Finally, Plaintiff's § 47(b) claim fails because § 47(b) establishes an equitable remedy regarding contract enforcement, not a cause of action. To the extent a plaintiff can establish the impropriety of an advisory fee contract under another section of the ICA, § 47(b) creates an equitable remedy that court may consider. *See Tarlov v. Paine Webber Cash Fund, Inc.*, 559 F. Supp. 429, 438 (D. Conn. 1983) ("plaintiff can seek relief under Section 47 only by showing a violation of some other section of the Act"); *Galfand v. Chestnutt Corp.*, 545 F.2d 807, 813-814 (2d Cir. 1976) (invoking equitable remedy of § 47(b) only after finding defendant violated § 20(a) of the ICA). Here, Plaintiff cannot invoke § 47(b) as an independent cause of action.

In addition, the remedy of § 47(b) may be sought only where a contract covered by the ICA was illegally entered or necessarily requires violation of the ICA through its performance. Here, Plaintiff does not assert that there is anything improper about the advisory fee contract, but alleges merely that Defendants acted improperly in carrying out their fiduciary duties under §§ 36(a) or (b).[10]  Plaintiff has not alleged the advisory fee contract was made in

---

[10] A violation of §§ 36(a) or (b) has never been used as a successful basis for a remedy under § 47(b). *See* H. Norman Knickle, The Investment Company Act of 1940: SEC Enforcement and Private Actions, 23 Ann. Rev. Banking & Fin. L. 777, 847 n.461 (2004) (§ 47(b) may

violation of the ICA or necessarily entailed or even caused a violation of the ICA, so § 47(b) does not apply and Count V should be dismissed.

## CONCLUSION

WHEREFORE, for the above-stated reasons, the Defendants respectfully request that this Court enter an order dismissing, with prejudice, all counts in Plaintiff's complaint.

Date: March 14, 2005

Respectfully submitted,

By: _____
One of Defendants' Attorneys

J. Kevin McCall (3125685)
James L. Thompson (6199621)
Avidan J. Stern (6201978)
JENNER & BLOCK LLP
One IBM Plaza
Chicago, Illinois 60611-7603
Telephone: (312) 222-9350
Facsimile: (312) 527-0484

---

successfully be invoked where plaintiff demonstrates violation under §§ 13, 15(c), 17, 20, 26, or 27 of the ICA).

# EXHIBIT A

# Nuveen Investments
# Value and Balanced Funds

Annual Report dated June 30, 2004

For investors seeking long-term growth potential.



Nuveen NWQ Multi-Cap Value Fund
Nuveen Large-Cap Value Fund
Nuveen Balanced Municipal and Stock Fund
Nuveen Balanced Stock and Bond Fund



NUVEEN
*Investments*

# FASTER INFORMATION

**RECEIVE YOUR**

## NUVEEN INVESTMENTS FUND REPORT

# ELECTRONICALLY

By registering for electronic delivery, you will receive an e-mail as soon as your Nuveen Investments Fund information is available. Click on the link and you will be taken directly to the report. Your Fund report can be viewed and saved on your computer. Your report will arrive faster via e-mail than by traditional mail.

Registering is easy and only takes a few minutes (see instructions at right).

**SOME COMMON CONCERNS:**

**Will my e-mail address be distributed to other companies?**
No, your e-mail address is strictly confidential and will not be used for anything other than notification of shareholder information.

**What if I change my mind and want to receive investor materials through regular mail delivery again?**
If you decide you do not like receiving your reports electronically, it's a simple process to go back to regular mail delivery.

**If your Nuveen Investments Fund dividends and statements COME FROM YOUR FINANCIAL ADVISOR OR BROKERAGE ACCOUNT, follow the steps outlined below:**

1 Go to www.investordelivery.com and follow the simple instructions, using the address sheet that accompanied this report as a guide.

2 You'll be taken to a page with several options. Select the New Enrollment-Create screen and follow the simple instructions.

3 Click Submit. Confirm the information you just entered is correct, then click Submit again.

4 You should get a confirmation e-mail within 24 hours. If you do not, go back through these steps to make sure all the information is correct.

5 Use this same process if you need to change your registration information or cancel Internet viewing.

**If your Nuveen Investments Fund dividends and statements COME DIRECTLY TO YOU FROM NUVEEN INVESTMENTS, follow the steps outlined below:**

1 Go to www.nuveen.com

2 Select Access Your Account. Select the E-Report Enrollment section. Click on Enrollment Today.

3 You'll be taken to a screen that asks for your Social Security number and e-mail address. Fill in this information, then click Enroll.

4 You should get a confirmation e-mail within 24 hours. If you do not, go back through these steps to make sure all the information is correct.

5 Use this same process if you need to change your registration information or cancel Internet viewing.

**Must be preceded by or accompanied by a prospectus.** NOT FDIC INSURED | MAY LOSE VALUE | NO BANK GUARANTEE

# Dear Shareholder,



Detailed information on your Fund's performance can be found in the Portfolio Managers' Comments and Fund Spotlight sections of this report. The value funds feature portfolio management by NWQ Investment Management Company, LLC (NWQ) and Institutional Capital Corporation (ICAP), while the balanced funds are sub-advised by ICAP, with Nuveen Institutional Advisory Corp. managing the municipal portion of the Nuveen Balanced Municipal and Stock Fund. I urge you to take the time to read the portfolio managers' comments.

With the recent gains in the stock market, many have begun to wonder which way the market is headed, and whether they need to adjust their holdings of investments. No one knows what the future will bring, which is why we think a well-balanced portfolio that is structured and carefully monitored with the help of an investment professional is an important component in achieving your long-term financial goals. A well-diversified portfolio may actually help to reduce your overall investment risk, and we believe that investments like your Nuveen Investments Fund can be important building blocks in a portfolio crafted to perform well through a variety of market conditions.

I would also like to direct your attention to the inside front cover of this report, which explains the quick and easy process to begin receiving Fund reports like this via e-mail and the internet. Thousands of Nuveen Investments Fund shareholders already have signed up, and they are getting their Fund information faster and helping to lower Fund expenses. I urge you to consider joining them.

Since 1898, Nuveen Investments has offered financial products and solutions that incorporate careful research, diversification, and the application of conservative risk-management principles. We are grateful that you have chosen us as a partner as you pursue your financial goals. We look forward to continuing to earn your trust in the months and years ahead.

Sincerely,

*Tim Schwertfeger*

Timothy R. Schwertfeger
Chairman of the Board

August 17, 2004

*"No one knows what the future will bring, which is why we think a well-balanced portfolio. . . is an important component in achieving your long-term financial goals."*

## Statement of Assets and Liabilities
*June 30, 2004*

| | Multi-Cap Value | Large-Cap Value | Municipal and Stock | Stock and Bond |
|---|---|---|---|---|
| **Assets** | | | | |
| Investments, at market value (cost $127,357,126, $450,556,028, $80,829,851 and $55,464,689, respectively) | $146,546,548 | $553,930,122 | $ 88,805,208 | $63,659,006 |
| Cash | 332 | — | — | — |
| Receivables: | | | | |
|   Dividends | 183,642 | 596,243 | 45,059 | 42,054 |
|   Interest | 460 | 199 | 912,330 | 345,479 |
|   Investments sold | 342,459 | 11,548,482 | 2,154,008 | 685,653 |
|   Reclaims | 837 | 237,862 | 20,188 | 15,361 |
|   Shares sold | 2,402,601 | 173,381 | 9,137 | 12,485 |
| Other assets | 49 | 145,379 | 29,092 | 14,794 |
|     Total assets | 149,476,928 | 566,631,668 | 91,975,022 | 64,774,832 |
| **Liabilities** | | | | |
| Cash overdraft | — | — | 401,249 | — |
| Payables: | | | | |
|   Investments purchased | 4,951,605 | 9,776,330 | 1,838,178 | 731,112 |
|   Shares redeemed | 141,955 | 1,024,916 | 601,459 | 81,036 |
| Accrued expenses: | | | | |
|   Management fees | 93,180 | 378,407 | 66,278 | 49,301 |
|   12b-1 distribution and service fees | 39,890 | 171,458 | 37,572 | 24,182 |
|   Other | 18,904 | 533,659 | 68,246 | 45,263 |
| Dividends payable | — | — | 119,653 | 323,778 |
|     Total liabilities | 5,245,534 | 11,884,770 | 3,132,635 | 1,254,672 |
| Net assets | $144,231,394 | $554,746,898 | $ 88,842,387 | $63,520,160 |
| **Class A Shares** | | | | |
| Net assets | $ 58,278,701 | $434,120,679 | $ 56,787,667 | $33,311,927 |
| Shares outstanding | 3,139,699 | 18,541,368 | 2,585,593 | 1,356,377 |
| Net asset value per share | $ 18.56 | $ 23.41 | $ 21.96 | $ 24.56 |
| Offering price per share (net asset value per share plus maximum sales charge of 5.75% of offering price) | $ 19.69 | $ 24.84 | $ 23.30 | $ 26.06 |
| **Class B Shares** | | | | |
| Net assets | $ 9,321,745 | $ 56,486,102 | $ 23,109,915 | $12,459,231 |
| Shares outstanding | 505,362 | 2,460,964 | 1,005,327 | 507,266 |
| Net asset value and offering price per share | $ 18.45 | $ 22.95 | $ 22.99 | $ 24.56 |
| **Class C Shares** | | | | |
| Net assets | $ 30,085,239 | $ 43,607,036 | $ 8,228,759 | $ 8,632,133 |
| Shares outstanding | 1,630,567 | 1,902,693 | 358,324 | 351,255 |
| Net asset value and offering price per share | $ 18.45 | $ 22.92 | $ 22.96 | $ 24.58 |
| **Class R Shares** | | | | |
| Net assets | $ 46,545,709 | $ 20,533,081 | $ 716,046 | $ 9,116,869 |
| Shares outstanding | 2,513,940 | 874,148 | 33,197 | 371,242 |
| Net asset value and offering price per share | $ 18.52 | $ 23.49 | $ 21.57 | $ 24.56 |
| **Net Assets Consist of:** | | | | |
| Capital paid-in | $123,869,492 | $508,478,985 | $ 92,856,082 | $57,728,350 |
| Undistributed (Over-distribution of) net investment income | 52,792 | 1,529,016 | 328,880 | (247,776) |
| Accumulated net realized gain (loss) from investments and foreign currency transactions | 1,119,688 | (58,635,197) | (12,317,932) | (2,154,731) |
| Net unrealized appreciation of investments and translation of assets and liabilities denominated in foreign currencies | 19,189,422 | 103,374,094 | 7,975,357 | 8,194,317 |
| Net assets | $144,231,394 | $554,746,898 | $ 88,842,387 | $63,520,160 |

*See accompanying notes to financial statements.*

## Statement of Operations
*Year Ended June 30, 2004*

| | Multi-Cap Value | Large-Cap Value | Municipal and Stock | Stock and Bond |
|---|---|---|---|---|
| **Investment income** | | | | |
| Dividends (net of foreign tax withheld of $6,198, $165,457, $12,304 and $11,661, respectively) | $ 1,154,241 | $10,877,382 | $ 811,299 | $ 757,941 |
| Interest | 80,898 | 121,205 | 2,686,566 | 1,140,675 |
| Total investment income | 1,235,139 | 10,998,587 | 3,497,865 | 1,898,616 |
| **Expenses** | | | | |
| Management fees | 634,131 | 4,753,246 | 698,468 | 479,238 |
| 12b-1 service fees – Class A | 67,094 | 1,127,050 | 147,586 | 87,380 |
| 12b-1 distribution and service fees – Class B | 35,621 | 569,902 | 246,769 | 126,877 |
| 12b-1 distribution and service fees – Class C | 102,758 | 445,090 | 87,173 | 81,433 |
| Shareholders' servicing agent fees and expenses | 99,438 | 949,896 | 95,020 | 91,602 |
| Custodian's fees and expenses | 34,666 | 150,402 | 64,611 | 57,659 |
| Trustees' fees and expenses | 2,548 | 17,622 | 4,914 | 2,931 |
| Professional fees | 17,974 | 58,116 | 30,187 | 11,041 |
| Shareholders' reports – printing and mailing expenses | 51,564 | 338,531 | 27,813 | 27,446 |
| Federal and state registration fees | 72,830 | 57,877 | 38,960 | 38,124 |
| Other expenses | 3,746 | 9,280 | 3,159 | 2,438 |
| Total expenses before custodian fee credit and expense reimbursement | 1,122,370 | 8,477,012 | 1,444,660 | 1,006,169 |
| Custodian fee credit | (356) | (46) | (2,875) | (16) |
| Expense reimbursement | — | — | (31,826) | (71,482) |
| Net expenses | 1,122,014 | 8,476,966 | 1,409,959 | 934,671 |
| Net investment income | 113,125 | 2,521,621 | 2,087,906 | 963,945 |
| **Realized and Unrealized Gain (Loss)** | | | | |
| Net realized gain from investments and foreign currency transactions | 2,554,924 | 63,970,155 | 5,028,663 | 4,828,811 |
| Net change in unrealized appreciation (depreciation) of investments and translation of assets and liabilities denominated in foreign currencies | 15,906,174 | 28,299,786 | (71,855) | 333,581 |
| Net gain | 18,461,098 | 92,269,941 | 4,956,808 | 5,162,392 |
| Net increase in net assets from operations | $18,574,223 | $94,791,562 | $7,044,714 | $6,126,337 |

*See accompanying notes to financial statements.*

## Statement of Changes in Net Assets

| | Multi-Cap Value | | | Large-Cap Value | |
|---|---|---|---|---|---|
| | Year Ended 6/30/04 | For the Period 4/01/03 through 6/30/03 | Year Ended 3/31/03* | Year Ended 6/30/04 | Year Ended 6/30/03 |
| **Operations** | | | | | |
| Net investment income | $ 113,125 | $ 38,548 | $ 145,183 | $ 2,521,621 | $ 1,798,484 |
| Net realized gain (loss) from investments and foreign currency transactions | 2,554,924 | 122,796 | 304,040 | 63,970,155 | (102,927,030) |
| Net change in unrealized appreciation (depreciation) of investments and translation of assets and liabilities denominated in foreign currencies | 15,906,174 | 5,973,382 | (5,274,898) | 28,299,786 | 43,579,772 |
| Net increase (decrease) in net assets from operations | 18,574,223 | 6,134,726 | (4,825,675) | 94,791,562 | (57,548,774) |
| **Distributions to Shareholders** | | | | | |
| From net investment income: | | | | | |
| Class A | (27,797) | — | (4) | (1,759,497) | (1,595,633) |
| Class B | — | — | — | — | — |
| Class C | — | — | — | — | — |
| Class R | (98,740) | — | (210,892) | (114,953) | (101,587) |
| From accumulated net realized gains from investments: | | | | | |
| Class A | (650,859) | — | — | — | — |
| Class B | (61,582) | — | — | — | — |
| Class C | (178,376) | — | — | — | — |
| Class R | (810,096) | — | — | — | — |
| Decrease in net assets from distributions to shareholders | (1,827,450) | — | (210,896) | (1,874,450) | (1,697,220) |
| **Fund Share Transactions** | | | | | |
| Proceeds from sale of shares | 103,762,702 | 5,366,743 | 10,856,508 | 24,601,805 | 87,633,689 |
| Proceeds from shares issued to shareholders due to reinvestment of distributions | 1,620,555 | — | 209,644 | 1,179,716 | 1,104,303 |
| | 105,383,257 | 5,366,743 | 11,066,152 | 25,781,521 | 88,737,992 |
| Cost of shares redeemed | (10,016,717) | (1,494,636) | (9,423,469) | (123,063,525) | (192,651,951) |
| Net increase (decrease) in net assets from Fund share transactions | 95,366,540 | 3,872,107 | 1,642,683 | (97,282,004) | (103,913,959) |
| Net increase (decrease) in net assets | 112,113,313 | 10,006,833 | (3,393,888) | (4,364,892) | (163,159,953) |
| Net assets at the beginning of period | 32,118,081 | 22,111,248 | 25,505,136 | 559,111,790 | 722,271,743 |
| Net assets at the end of period | $144,231,394 | $32,118,081 | $22,111,248 | $ 554,746,898 | $ 559,111,790 |
| Undistributed (Over-distribution of) net investment income at the end of period | $ 52,792 | $ 66,204 | $ 27,656 | $ 1,529,016 | $ 915,032 |

* Information represents the changes in net assets of the PBHG Special Equity Fund prior to the Reorganization and the Nuveen NWQ Multi-Cap Value Fund subsequent to the Reorganization.

*See accompanying notes to financial statements.*

28

| | Municipal and Stock | | Stock and Bond | |
|---|---|---|---|---|
| | Year Ended 6/30/04 | Year Ended 6/30/03 | Year Ended 6/30/04 | Year Ended 6/30/03 |
| **Operations** | | | | |
| Net investment income | $ 2,087,906 | $ 2,160,209 | $ 963,945 | $ 972,480 |
| Net realized gain (loss) from investments and foreign currency transactions | 5,028,663 | (10,792,040) | 4,828,811 | (6,256,468) |
| Net change in unrealized appreciation (depreciation) of investments and translation of assets and liabilities denominated in foreign currencies | (71,855) | 7,224,223 | 333,581 | 4,273,544 |
| Net increase (decrease) in net assets from operations | 7,044,714 | (1,407,608) | 6,126,337 | (1,010,444) |
| **Distributions to Shareholders** | | | | |
| From net investment income: | | | | |
| Class A | (1,393,216) | (1,755,276) | (696,093) | (737,489) |
| Class B | (249,910) | (376,218) | (161,329) | (145,321) |
| Class C | (88,677) | (123,905) | (104,733) | (89,537) |
| Class R | (19,798) | (24,004) | (189,179) | (137,291) |
| From accumulated net realized gains from investments: | | | | |
| Class A | — | — | — | (104,998) |
| Class B | — | — | — | (33,635) |
| Class C | — | — | — | (19,497) |
| Class R | — | — | — | (16,128) |
| Decrease in net assets from distributions to shareholders | (1,751,801) | (2,279,403) | (1,151,334) | (1,283,896) |
| **Fund Share Transactions** | | | | |
| Proceeds from sale of shares | 11,626,916 | 5,250,088 | 10,317,373 | 9,965,412 |
| Proceeds from shares issued to shareholders due to reinvestment of distributions | 1,182,513 | 1,560,296 | 716,257 | 850,593 |
| | 12,809,429 | 6,810,384 | 11,033,630 | 10,816,005 |
| Cost of shares redeemed | (25,388,210) | (20,873,670) | (16,083,175) | (12,911,626) |
| Net increase (decrease) in net assets from Fund share transactions | (12,578,781) | (14,063,286) | (5,049,545) | (2,095,621) |
| Net increase (decrease) in net assets | (7,285,668) | (17,750,297) | (74,542) | (4,389,961) |
| Net assets at the beginning of period | 96,128,055 | 113,878,352 | 63,594,702 | 67,984,663 |
| Net assets at the end of period | $ 88,842,387 | $ 96,128,055 | $63,520,160 | $ 63,594,702 |
| Undistributed (Over-distribution of) net investment income at the end of period | $ 328,880 | $ (7,029) | $ (247,776) | $ (214,448) |

*See accompanying notes to financial statements.*

## Notes to Financial Statements

### 1. General Information and Significant Accounting Policies

The Nuveen Investment Trust (the "Trust") is an open-end management investment company registered under the Investment Company Act of 1940, as amended. The Trust is comprised of the Nuveen NWQ Multi-Cap Value Fund ("Multi-Cap Value"), Nuveen Large-Cap Value Fund ("Large-Cap Value"), Nuveen Balanced Municipal and Stock Fund ("Municipal and Stock") and Nuveen Balanced Stock and Bond Fund ("Stock and Bond") (collectively, the "Funds"). The Trust was organized as a Massachusetts business trust in 1996.

After the close of business on December 6, 2002, Multi-Cap Value acquired all of the net assets of the PBHG Special Equity Fund ("PBHG Fund") pursuant to a Plan of Reorganization ("Reorganization") previously approved by the shareholders of the PBHG Fund. The acquisition was accomplished by a one for one tax-free exchange of Class R Shares of Multi-Cap Value for the 1,915,116 outstanding shares of the PBHG Fund on December 6, 2002. The PBHG Fund's net assets of $22,711,952 at that date, including $1,704,328 of net unrealized depreciation, were combined with Multi-Cap Value's net assets of $4,000 ($1,000 of each Class A, B, C and R shares). The aggregate net assets of Multi-Cap Value immediately following the acquisition were $22,715,952. Multi-Cap Value commenced operations on December 9, 2002. For accounting purposes, Multi-Cap Value retained the performance and accounting history of the PBHG Fund and its predecessor fund, the NWQ Special Equity Portfolio (a series of the UAM Funds, Inc.). As part of the Reorganization, and as previously approved by the Board of Trustees, Multi-Cap Value changed its fiscal year-end from March 31 to June 30 upon completion of the March 31, 2003 fiscal year-end.

Multi-Cap Value ordinarily invests at least 80% of its assets in equity securities of companies with large, medium and small capitalizations that are selected on an opportunistic basis in an attempt to provide long-term capital appreciation.

Large-Cap Value invests primarily in a diversified portfolio of large and mid-cap equities of domestic companies in an attempt to provide capital growth. In addition to investments in equity securities, the Fund may invest in cash equivalents and short-term fixed income investments in an attempt to preserve capital, enhance returns or as a temporary defensive measure.

Municipal and Stock invests in a mix of equities and tax-exempt securities in an attempt to provide capital growth, capital preservation and current tax-exempt income. During temporary defensive periods, the Fund may invest any percentage of its assets in temporary investments.

Stock and Bond invests in a mix of equities, taxable bonds and cash equivalents in an attempt to provide capital growth, capital preservation and current income. During temporary defensive periods, the Fund may invest any percentage of its assets in temporary investments.

The following is a summary of significant accounting policies followed by the Funds in the preparation of their financial statements in accordance with accounting principles generally accepted in the United States.

*Securities Valuation*

Exchange-listed securities are generally valued at the last sales price on the securities exchange on which such securities are primarily traded. Securities traded on a securities exchange for which there are no transactions on a given day or securities not listed on a securities exchange are valued at the mean of the closing bid and asked prices. Securities traded on Nasdaq are valued at the Nasdaq Official Closing Price. The prices of fixed-income securities are provided by a pricing service approved by the Funds' Board of Trustees and based on the mean between the bid and asked prices. When price quotes are not readily available (which is usually the case for municipal securities), the pricing service establishes fair market value based on yields or prices of comparable securities, indications of value from securities dealers, evaluations of anticipated cash flows or collateral and general market conditions. If it is determined that market prices for a security are unavailable or inappropriate, the Board of Trustees of the Funds, or its designee, may establish a fair value for the security. Short-term securities are valued at amortized cost, which approximates market value.

*Securities Transactions*

Securities transactions are recorded on a trade date basis. Realized gains and losses from such transactions are determined on the specific identification method. Securities purchased or sold on a when-issued or delayed delivery basis may have extended settlement periods. Any securities so purchased are subject to market fluctuation during this period. The Funds have instructed the custodian to segregate assets with a current value at least equal to the amount of the when-issued and delayed delivery purchase commitments. At June 30, 2004, Municipal and Stock had an outstanding delayed delivery purchase commitment of $1,059,693. There were no such outstanding purchase commitments in any of the other Funds.

*Investment Income*

Dividend income is recorded on the ex-dividend date or, for foreign securities, when information is available. Interest income, which includes the amortization of premiums and accretion of discounts for financial reporting purposes, is recorded on an accrual basis.

*Professional Fees*

Professional fees presented in the Statement of Operations consist of legal fees incurred in the normal course of operations, audit fees, tax consulting fees and, in some cases, workout expenditures. Workout expenditures are incurred in an attempt to protect or enhance an investment, or to pursue other claims or legal actions on behalf of the Fund's shareholders.

*Dividends and Distributions to Shareholders*
Net ordinary taxable income is declared and distributed to shareholders annually for Multi-Cap Value, Large-Cap Value, and Municipal and Stock, and quarterly for Stock and Bond. Tax-exempt net investment income is declared as a dividend monthly for Municipal and Stock. Net realized capital gains from investment transactions, if any, are declared and distributed to shareholders not less frequently than annually. Furthermore, capital gains are distributed only to the extent they exceed available capital loss carryforwards.

Distributions to shareholders of ordinary taxable income, tax-exempt net investment income and net realized capital gains, if any, are recorded on the ex-dividend date. The amount and timing of distributions are determined in accordance with federal income tax regulations, which may differ from accounting principles generally accepted in the United States.

*Federal Income Taxes*
Each Fund is a separate taxpayer for federal income tax purposes. Each Fund intends to distribute all income and capital gains to shareholders and to otherwise comply with the requirements of Subchapter M of the Internal Revenue Code applicable to regulated investment companies. Therefore, no federal tax provision is required. In addition, Municipal and Stock intends to satisfy conditions which will enable interest from municipal securities, which is exempt from regular federal income tax when received by the Fund, to retain such tax-exempt status when distributed to shareholders of the Fund. All monthly tax-exempt income dividends paid by Municipal and Stock during its fiscal year ended June 30, 2004, have been designated Exempt Interest Dividends. Net realized capital gains and ordinary income distributions made by the Funds are subject to federal taxation.

*Flexible Sales Charge Program*
Each Fund offers Class A, B, C and R Shares. Class A Shares are sold with a sales charge and incur a .25% annual 12b-1 service fee. Class A Share purchases of $1 million or more are sold at net asset value without an up-front sales charge but may be subject to a contingent deferred sales charge ("CDSC") if redeemed within 18 months of purchase. Class B Shares are sold without a sales charge but incur a .75% annual 12b-1 distribution fee and a .25% annual 12b-1 service fee. An investor purchasing Class B Shares agrees to pay a CDSC of up to 5% depending upon the length of time the shares are held by the investor (CDSC is reduced to 0% at the end of six years). Class B Shares convert to Class A Shares eight years after purchase. Class C Shares are sold without a sales charge but incur a .75% annual 12b-1 distribution fee and a .25% annual 12b-1 service fee. An investor purchasing Class C Shares agrees to pay a CDSC of 1% if Class C Shares are redeemed within one year of purchase. Class R Shares are not subject to any sales charge or 12b-1 distribution or service fees. Class R Shares are available only under limited circumstances.

*Derivative Financial Instruments*
The Funds may invest in options, forward and futures contracts, which are sometimes referred to as derivative transactions. Although the Funds are authorized to invest in such financial instruments, and may do so in the future, they did not make any such investments during the fiscal year ended June 30, 2004.

*Repurchase Agreements*
In connection with transactions in repurchase agreements, it is the Funds' policy that its custodian take possession of the underlying collateral securities, the fair value of which exceeds the principal amount of the repurchase transaction, including accrued interest, at all times. If the seller defaults, and the fair value of the collateral declines, realization of the collateral by the Funds may be delayed or limited.

*Expense Allocation*
Expenses of the Funds that are not directly attributable to a specific class of shares are prorated among the classes based on the relative net assets of each class. Expenses directly attributable to a class of shares, which presently only include 12b-1 distribution and service fees, are recorded to the specific class.

*Foreign Currency Translations*
To the extent that each Fund invests in securities that are denominated in a currency other than U.S. dollars, each Fund will be subject to currency risk, which is the risk that an increase in the U.S. dollar relative to the foreign currency will reduce returns or portfolio value. Generally, when the U.S. dollar rises in value against a foreign currency, the Fund's investments in securities denominated in that currency will lose value because its currency is worth fewer U.S. dollars; the opposite effect occurs if U.S. dollars fall in relative value. Investments and other assets and liabilities denominated in foreign currencies are converted into U.S. dollars on a spot (i.e. cash) basis at the spot rate prevailing in the foreign currency exchange market at the time of valuation. Purchases and sales of investments and dividend income denominated in foreign currencies are translated into U.S. dollars on the respective dates of such transactions. The gains or losses resulting from changes in foreign exchange rates are included with net realized and unrealized gain (loss) of investments.

*Foreign Currency Transactions*
The Funds may engage in foreign currency exchange transactions in connection with their portfolio investments and assets and liabilities denominated in foreign currencies. Each Fund may engage in foreign currency forward, options and futures contracts. Each Fund will enter into foreign currency transactions for hedging and other permissible risk management purposes only. If the Fund invests in a currency futures or options contract, it must make a margin deposit to secure performance of such contract. With respect

## Notes to Financial Statements (continued)

to investments in currency futures contracts, each Fund may also be required to make a variation margin deposit because the value of futures contracts fluctuates daily. In addition, each Fund may segregate assets to cover its futures contracts obligations.

The objective of each Fund's foreign currency hedging transactions is to reduce the risk that the U.S. dollar value of the Fund's foreign currency denominated securities and other assets and liabilities will decline in value due to changes in foreign currency exchange rates. All foreign currency forward contracts, options and futures transactions are "marked-to-market" daily at the applicable market rates and any resulting unrealized gains or losses are recorded in the Fund's financial statements. Each Fund records realized gains and losses at the time the forward contract is offset by entering into a closing transaction or extinguished by delivery of the currency. The contractual amounts of forward foreign currency exchange contracts does not necessarily represent the amounts potentially subject to risk. Risks may arise upon entering into these contracts from the potential inability of counterparties to meet the terms of their contracts and from unanticipated movements in the value of a foreign currency relative to the U.S. dollar. The measurement of the risks associated with these instruments is meaningful only when all related and offsetting transactions are considered. The Funds did not enter into any foreign currency forward, options or futures contracts during the fiscal year ended June 30, 2004.

*Custodian Fee Credit*
Each Fund has an arrangement with the custodian bank whereby certain custodian fees and expenses are reduced by credits earned on each Fund's cash on deposit with the bank. Such deposit arrangements are an alternative to overnight investments.

*Indemnifications*
Under the Trust's organizational documents, its Officers and Trustees are indemnified against certain liabilities arising out of the performance of their duties to the Trust. In addition, in the normal course of business the Trust enters into contracts that provide general indemnifications to other parties. The Trust's maximum exposure under these arrangements is unknown as this would involve future claims that may be made against the Trust that have not yet occurred. However, the Trust has not had prior claims or losses pursuant to these contracts and expects the risk of loss to be remote.

*Use of Estimates*
The preparation of financial statements in conformity with accounting principles generally accepted in the United States requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities at the date of the financial statements and the reported amounts of increases and decreases in net assets from operations during the reporting period. Actual results may differ from those estimates.

### 2. Fund Shares

Transactions in Fund shares were as follows:

| | Multi-Cap Value | | | | | |
| | Year Ended 6/30/04 | | For the Period 4/01/03 through 6/30/03 | | Year Ended 3/31/03* | |
| | Shares | Amount | Shares | Amount | Shares | Amount |
|---|---|---|---|---|---|---|
| **Shares sold:** | | | | | | |
| Class A | 2,942,277 | $ 49,738,681 | 300,816 | $ 4,078,246 | 54,681 | $ 658,284 |
| Class B | 507,105 | 8,634,935 | 12,529 | 177,169 | 1,703 | 20,270 |
| Class C | 1,663,150 | 28,549,111 | 28,279 | 398,477 | 161 | 1,993 |
| Class R | 972,508 | 16,839,975 | 51,612 | 712,851 | 791,727 | 10,175,961 |
| **Shares issued to shareholders due to reinvestment of distributions:** | | | | | | |
| Class A | 37,794 | 603,000 | — | — | — | — |
| Class B | 3,213 | 50,990 | — | — | — | — |
| Class C | 5,328 | 84,612 | — | — | — | — |
| Class R | 55,180 | 881,953 | — | — | 17,874 | 209,644 |
| | 6,186,555 | 105,383,257 | 393,236 | 5,366,743 | 866,146 | 11,066,152 |
| **Shares redeemed:** | | | | | | |
| Class A | (164,430) | (2,802,564) | (2,271) | (33,729) | (29,168) | (333,415) |
| Class B | (18,157) | (315,720) | (1,031) | (15,063) | — | — |
| Class C | (66,351) | (1,133,029) | — | — | — | — |
| Class R | (352,086) | (5,765,404) | (107,396) | (1,445,844) | (747,605) | (9,090,054) |
| | (601,024) | (10,016,717) | (110,698) | (1,494,636) | (776,773) | (9,423,469) |
| **Net increase** | 5,585,531 | $ 95,366,540 | 282,538 | $ 3,872,107 | 89,373 | $ 1,642,683 |

* Information represents the share transactions of the PBHG Special Equity Fund prior to the Reorganization and the Nuveen NWQ Multi-Cap Value Fund subsequent to the Reorganization.

# Trustees and Officers

The management of the Funds, including general supervision of the duties performed for the Funds by the Adviser, is the responsibility of the Board of Trustees of the Funds. The number of trustees of the Funds is currently set at seven. None of the trustees who are not "interested" persons of the Funds has ever been a director or employee of, or consultant to, Nuveen or its affiliates. The names and business addresses of the trustees and officers of the Funds, their principal occupations and other affiliations during the past five years, the number of portfolios each oversees and other directorships they hold are set forth below.

The Funds' Statement of Additional Information ("SAI") includes more information about the Trustees. To request a free copy, call Nuveen Investments at (800) 257-8787.

| Name, Birthdate and Address | Position(s) Held with the Funds | Year First Elected or Appointed(2) | Principal Occupation(s) Including other Directorships During Past 5 Years | Number of Portfolios in Fund Complex Overseen by Trustee |
|---|---|---|---|---|
| Trustee who is an interested person of the Funds: | | | | |
| Timothy R. Schwertfeger (1) 3/28/49 333 W. Wacker Drive Chicago, IL 60606 | Chairman of the Board and Trustee | 1994 | Chairman and Director (since 1996) of Nuveen Investments, Inc. and Nuveen Investments, LLC; Director (since 1992) and Chairman (since 1996) of Nuveen Advisory Corp. and Nuveen Institutional Advisory Corp.; Chairman and Director (since 1997) of Nuveen Asset Management, Inc.; Director (since 1996) of Institutional Capital Corporation; Chairman and Director (since 1999) of Rittenhouse Asset Management, Inc.; Chairman of Nuveen Investments Advisers Inc. (since 2002). | 145 |
| Trustees who are not interested persons of the Funds: | | | | |
| Robert P. Bremner 8/22/40 333 W. Wacker Drive Chicago, IL 60606 | Trustee | 1997 | Private Investor and Management Consultant. | 145 |
| Lawrence H. Brown 7/29/34 333 W. Wacker Drive Chicago, IL 60606 | Trustee | 1993 | Retired (1989) as Senior Vice President of The Northern Trust Company; Director, Community Advisory Board for Highland Park and Highwood, United Way of the North Shore (since 2002). | 145 |
| Jack B. Evans 10/22/48 333 W. Wacker Drive Chicago, IL 60606 | Trustee | 1999 | President, The Hall-Perrine Foundation, a private philanthropic corporation (since 1996); Director and Vice Chairman, United Fire & Casualty Company; formerly Director, Federal Reserve Bank of Chicago; formerly, President and Chief Operating Officer, SCI Financial Group, Inc., a regional financial services firm. | 145 |
| William C. Hunter 3/16/48 333 W. Wacker Drive Chicago, IL 60606 | Trustee | 2004 | Dean and Distinguished Professor of Finance, School of Business at the University of Connecticut (since 2003); previously Senior Vice President and Director of Research at the Federal Reserve Bank of Chicago (1995-2003); Director, Credit Research Center at Georgetown University; Director of Xerox Corporation (since 2004). | 145 |
| William J. Schneider 9/24/44 333 W. Wacker Drive Chicago, IL 60606 | Trustee | 1997 | Senior Partner and Chief Operating Officer, Miller-Valentine Group, Vice President, Miller-Valentine Realty, a construction company; Chair, Miami Valley Hospital; Chair, Dayton Development Coalition; formerly, Member, Community Advisory Board, National City Bank, Dayton, Ohio and Business Advisory Council, Cleveland Federal Reserve Bank. | 145 |
| Judith M. Stockdale 12/29/47 333 W. Wacker Drive Chicago, IL 60606 | Trustee | 1997 | Executive Director, Gaylord and Dorothy Donnelley Foundation (since 1994); prior thereto, Executive Director, Great Lakes Protection Fund (from 1990 to 1994). | 145 |

| Name, Birthdate and Address | Position(s) Held with the Funds | Year First Elected or Appointed(3) | Principal Occupation(s) During Past 5 Years | Number of Portfolios in Fund Complex Overseen by Trustee |
|---|---|---|---|---|
| **Officers of the Funds:** | | | | |
| Gifford R. Zimmerman 9/9/56 333 W. Wacker Drive Chicago, IL 60606 | Chief Administrative Officer | 1988 | Managing Director (since 2002), Assistant Secretary and Associate General Counsel, formerly, Vice President and Assistant General Counsel of Nuveen Investments, LLC; Managing Director (since 2002), General Counsel and Assistant Secretary, formerly, Vice President of Nuveen Advisory Corp. and Nuveen Institutional Advisory Corp.; Managing Director (since 2002), Assistant Secretary and Associate General Counsel, formerly, Vice President (since 2000), of Nuveen Asset Management, Inc. Assistant Secretary of Nuveen Investments, Inc. (since 1994); Assistant Secretary of NWQ Investment Management Company, LLC (since 2002); Vice President and Assistant Secretary of Nuveen Investments Advisers Inc. (since 2002); Managing Director, Associate General Counsel and Assistant Secretary of Rittenhouse Asset Management, Inc. (since 2003); Chartered Financial Analyst. | 145 |
| Michael T. Atkinson 2/3/66 333 W. Wacker Drive Chicago, IL 60606 | Vice President and Assistant Secretary | 2000 | Vice President (since 2002), formerly, Assistant Vice President (since 2000), previously, Associate of Nuveen Investments, LLC. | 145 |
| Peter H. D'Arrigo 11/28/67 333 W. Wacker Drive Chicago, IL 60606 | Vice President and Treasurer | 1999 | Vice President of Nuveen Investments, LLC (since 1999), prior thereto, Assistant Vice President (since 1997); Vice President and Treasurer of Nuveen Investments, Inc. (since 1999); Vice President and Treasurer of Nuveen Advisory Corp. and Nuveen Institutional Advisory Corp (since 1999); Vice President and Treasurer of Nuveen Asset Management, Inc. (since 2002) and of Nuveen Investments Advisers Inc. (since 2002); Assistant Treasurer of NWQ Investment Management Company, LLC (since 2002); Vice President and Treasurer of Nuveen Rittenhouse Asset Management, Inc. (since 2003); Chartered Financial Analyst. | 145 |
| Jessica R. Droeger 9/24/64 333 W. Wacker Drive Chicago, IL 60606 | Vice President and Secretary | 2000 | Vice President (since 2002) and Assistant General Counsel (since 1998); formerly, Assistant Vice President (since 1998) of Nuveen Investments, LLC; Vice President (since 2002) and Assistant Secretary (since 1998), formerly Assistant Vice President of Nuveen Advisory Corp. and Nuveen Institutional Advisory Corp. | 145 |
| Lorna C. Ferguson 10/24/45 333 W. Wacker Drive Chicago, IL 60606 | Vice President | 1998 | Managing Director (since 2004) formerly, Vice President of Nuveen Investments, LLC; Managing Director (since 2004) formerly, Vice President (since 1998) of Nuveen Advisory Corp. and Nuveen Institutional Advisory Corp. | 145 |
| William M. Fitzgerald 3/2/64 333 W. Wacker Drive Chicago, IL 60606 | Vice President | 1995 | Managing Director (since 2002) of Nuveen Investments, LLC; Managing Director (since 2001), formerly Vice President of Nuveen Advisory Corp. and Nuveen Institutional Advisory Corp. (since 1995); Managing Director of Nuveen Asset Management, Inc. (since 2001); Vice President of Nuveen Investment Advisers Inc. (since 2002); Chartered Financial Analyst. | 145 |
| Stephen D. Foy 5/31/54 333 W. Wacker Drive Chicago, IL 60606 | Vice President and Controller | 1998 | Vice President (since 1993) and Funds Controller (since 1998) of Nuveen Investments, LLC and Vice President and Funds Controller (since 1998) of Nuveen Investments, Inc.; Certified Public Accountant. | 145 |

# Trustees and Officers (continued)

| Name, Birthdate and Address | Position(s) Held with the Funds | Year First Elected or Appointed(3) | Principal Occupation(s) During Past 5 Years | Number of Portfolios in Fund Complex Overseen by Trustee |
|---|---|---|---|---|
| David J. Lamb 3/22/63 333 W. Wacker Drive Chicago, IL 60606 | Vice President | 2000 | Vice President (since 2000) of Nuveen Investments, LLC, previously Assistant Vice President (since 1999); prior thereto, Associate of Nuveen Investments, LLC; Certified Public Accountant. | 145 |
| Tina M. Lazar 8/27/61 333 W. Wacker Drive Chicago, IL 60606 | Vice President | 2002 | Vice President (since 1999), previously, Assistant Vice President (since 1993) of Nuveen Investments, LLC. | 145 |
| Larry W. Martin 7/27/51 333 W. Wacker Drive Chicago, IL 60606 | Vice President and Assistant Secretary | 1988 | Vice President, Assistant Secretary and Assistant General Counsel of Nuveen Investments, LLC; Vice President and Assistant Secretary of Nuveen Advisory Corp. and Nuveen Institutional Advisory Corp.; Assistant Secretary of Nuveen Investments, Inc. and (since 1997) Nuveen Asset Management, Inc.; Vice President (since 2000), Assistant Secretary and Assistant General Counsel (since 1998) of Rittenhouse Asset Management, Inc.; Vice President and Assistant Secretary of Nuveen Investments Advisers Inc. (since 2002); Assistant Secretary of NWQ Investment Management Company, LLC (since 2002). | 145 |
| Edward F. Neild, IV 7/7/65 333 W. Wacker Drive Chicago, IL 60606 | Vice President | 1996 | Managing Director (since 2002) of Nuveen Investments, LLC; Managing Director (since 1997, formerly Vice President (since 1996) of Nuveen Advisory Corp. and Nuveen Institutional Advisory Corp.; Managing Director of Nuveen Asset Management, Inc. (since 1999). Chartered Financial Analyst. | 145 |

(1) Mr. Schwertfeger is an "interested person" of the Funds, as defined in the Investment Company Act of 1940, because he is an officer and trustee of the Adviser.

(2) Trustees serve an indefinite term until his/her successor is elected. The year first elected or appointed represents the year in which the Trustee was first elected or appointed to any fund in the Nuveen Complex.

(3) Officers serve one year terms through July of each year. The year first elected or appointed represents the year in which the Officer was first elected or appointed to any fund in the Nuveen Complex.

48

# Fund Information

**Fund Manager**
Nuveen Institutional Advisory Corp.
333 West Wacker Drive
Chicago, IL 60606

**Sub-Advisers**
NWQ Investment Management
Company, LLC
2049 Century Park East
Los Angeles, CA 90067

Institutional Capital Corporation
225 West Wacker Drive
Chicago, IL 60606

**Legal Counsel**
Chapman and Cutler LLP
Chicago, IL

**Independent Registered
Public Accounting Firm**
PricewaterhouseCoopers LLP
Chicago, IL

**Custodian**
State Street Bank & Trust
Boston, MA

**Transfer Agent and
Shareholder Services**
Boston Financial
Data Services, Inc.
Nuveen Investor Services
P.O. Box 8530
Boston, MA 02266-8530
(800) 257-8787

---

**Glossary of Terms Used in this Report**

**Average Annual Total Return:** This is a commonly used method to express an investment's performance over a particular, usually multi-year time period. It expresses the return (including change in NAV and reinvested dividends) that would have been necessary on an annual basis to equal the investment's actual performance over the time period being considered.

**Average Market Capitalization:** The market capitalization of a company is equal to the number of the company's common shares outstanding multiplied by the current price of the company's stock. The average market capitalization of a mutual fund's portfolio gives a measure of the size of the companies in which the fund invests.

**Duration:** Duration is a measure of a bond or bond fund's sensitivity to changes in interest rates. Generally, the longer a bond or fund's duration, the more the price of the bond or fund will change as interest rates change.

**SEC 30-Day Yield:** A standardized measure of a fund's yield that accounts for the future amortization of premiums or discounts of bonds held in the fund's portfolio.

**Net Asset Value (NAV):** A Fund's NAV is the dollar value of one share in the fund. It is calculated by subtracting the liabilities of the fund from its total assets and then dividing the remainder by the number of shares outstanding. Fund NAVs are calculated at the end of each business day.

---

**Unaudited Information:** The Balanced Stock and Bond Fund designates 77% of dividends declared from net investment income as dividends qualifying for the 70% dividends received deduction for corporations and 90% as qualified dividend income for individuals under the Jobs and Growth Tax Relief Reconciliation Act of 2003.

---

**Proxy Voting Policies and Procedures:** A description of the policies and procedures that the Funds use to determine how to vote proxies relating to portfolio securities is available (i) without charge, upon request, by calling Nuveen Investments at (800) 257-8787; and (ii) on the Commission's website at http://www.sec.gov.

---

NASD Regulation, Inc. provides a Public Disclosure Program which supplies certain information regarding the disciplinary history of NASD members and their associated persons in response to either telephone inquiries at (800) 289-9999 or written inquiries at www.nasdr.com. NASD Regulation, Inc. also provides an investor brochure that includes information describing the Public Disclosure Program.

# Serving
## Investors
### for Generations

Since 1898, financial advisors and their clients have relied on Nuveen Investments to provide dependable investment solutions. For the past century, Nuveen Investments has adhered to the belief that the best approach to investing is to apply conservative risk-management principles to help minimize volatility.

Managing $102 billion in assets, Nuveen Investments provides high-quality investment services that contribute to the building of well diversified investment portfolios. The Company serves institutional clients, financial advisors and high-net-worth investors. The firm's asset management capabilities are marketed through four distinct brands, each with an independent investment team and area of expertise: Nuveen, focused on fixed-income investments; NWQ, specializing in value-style equities; Rittenhouse, dedicated to conservative growth-style equities; and Symphony, with expertise in alternative investment portfolios.

To learn more about the products and services Nuveen Investments offers, talk to your financial advisor, or call us at (800) 257-8787.

*Distributed by*
**Nuveen Investments, LLC** | 333 West Wacker Drive | Chicago, Illinois 60606 | www.nuveen.com

MAN-GRINC-0604D

# Nuveen Investments Equity Funds

Annual Report dated July 31, 2004

For investors seeking long-term capital appreciation.




Nuveen NWQ International Value **Fund**
Nuveen Rittenhouse Growth Fund



NUVEEN
*Investments*

# FASTER INFORMATION

## RECEIVE YOUR

## NUVEEN INVESTMENTS FUND REPORT

# ELECTRONICALLY

By registering for electronic delivery, you will receive

an e-mail as soon as your Nuveen Investments Fund

information is available. Click on the link and you will

be taken directly to the report. Your Fund report can

be viewed and saved on your computer. Your report

will arrive faster via e-mail than by traditional mail.

Registering is easy and only takes a few minutes

(see instructions at right).

**If your Nuveen Investments Fund dividends and statements COME FROM YOUR FINANCIAL ADVISOR OR BROKERAGE ACCOUNT, follow the steps outlined below:**

1. Go to www.investordelivery.com and follow the simple instructions, using the address sheet that accompanied this report as a guide.

2. You'll be taken to a page with several options. Select the **New Enrollment-Create** screen and follow the simple instructions.

3. Click Submit. Confirm the information you just entered is correct, then click Submit again.

4. You should get a confirmation e-mail within 24 hours. If you do not, go back through these steps to make sure all the information is correct.

5. Use this same process if you need to change your registration information or cancel internet viewing.

**If your Nuveen Investments Fund dividends and statements COME DIRECTLY TO YOU FROM NUVEEN INVESTMENTS, follow the steps outlined below:**

1. Go to www.nuveen.com

2. Select Access Your Account. Select the E-Report Enrollment option. Click on Enrollment Today.

3. You'll be taken to a screen that asks for your Social Security number and e-mail address. Fill in this information, then click Enroll.

4. You should get a confirmation e-mail within 24 hours. If you do not, go back through these steps to make sure all the information is correct.

5. Use this same process if you need to change your registration information or cancel internet viewing.

### SOME COMMON CONCERNS:

**Will my e-mail address be distributed to other companies?**

No, your e-mail address is strictly confidential and will not be used for anything other than notification of shareholder information.

**What if I change my mind and want to receive investor materials through regular mail delivery again?**

If you decide you do not like receiving your reports electronically, it's a simple process to go back to regular mail delivery.

**Must be preceded by or accompanied by a prospectus.**

NOT FDIC INSURED | MAY LOSE VALUE | NO BANK GUARANTEE

# Dear Shareholder,



Throughout most of the period covered by this report, your Fund benefited from a rising stock market. The Nuveen NWQ International Value Fund provided an attractive total return on net asset value compared to its benchmarks, while the Nuveen Rittenhouse Growth Fund also posted a positive total return on net asset value for the year, but lagged behind several widely watched equity indexes. For more details about your Fund's performance, please see the Portfolio Manager's Comments and Fund Spotlight sections of this report.

With the recent gains in the stock market, it is natural for some investors to consider increasing or decreasing their positions in particular investments. While we encourage you to take a strong interest in the performance of your investment portfolio, we urge you to discuss any investment changes with your financial advisor before you act. We remain convinced that maintaining a well-balanced portfolio, structured and monitored with the help of an investment professional, is an important way to help you reduce overall investment risk and position yourself to achieve your long-term financial goals. In this context, your Nuveen Investments Fund can be an important building block in a portfolio crafted to perform well through a variety of market conditions.

I'd also like to direct your attention to the inside front cover of this report, which explains the quick and easy process to begin receiving Fund reports like this via e-mail and the internet. Thousands of Nuveen Investments Fund shareholders already have signed-up, and they are getting their Fund information faster and helping to lower fund expenses. I urge you to consider joining them.

Since 1898, Nuveen Investments has offered financial products and solutions that incorporate careful research, diversification, and the application of conservative risk-management principles. We are grateful that you have chosen us as a partner as you pursue your financial goals. We look forward to continuing to earn your trust in the months and years ahead.

Sincerely,

*Tim Schwertfeger*

Timothy R. Schwertfeger
Chairman of the Board

September 15, 2004

> "We remain convinced that maintaining a well-balanced portfolio, ... is an important way to help you reduce overall investment risk ..."

## Statement of Assets and Liabilities
*July 31, 2004*

| | NWQ International Value | Rittenhouse Growth |
|---|---|---|
| **Assets** | | |
| Investments, at market value (cost $31,130,873 and $289,778,729, respectively) | $ 37,934,123 | $272,931,885 |
| Cash | 820 | 11 |
| Receivables: | | |
| Dividends and interest | 278,037 | 206,567 |
| Reclaims | 70,738 | — |
| Shares sold | 14,650 | 54,061 |
| Other assets | 35 | 91,503 |
| Total assets | 38,298,403 | 273,284,027 |
| **Liabilities** | | |
| Payables: | | |
| Investments purchased | 360,793 | 737,532 |
| Shares redeemed | 23,675 | 605,743 |
| Accrued expenses: | | |
| Management fees | 32,264 | 185,839 |
| 12b-1 distribution and service fees | 10,703 | 185,925 |
| Other | 75,007 | 382,812 |
| Total liabilities | 502,442 | 2,097,851 |
| Net assets | $ 37,795,961 | $271,186,176 |
| **Class A Shares** | | |
| Net assets | $ 5,579,870 | $ 53,804,136 |
| Shares outstanding | 268,055 | 2,769,057 |
| Net asset value per share | $ 20.82 | $ 19.43 |
| Offering price per share (net asset value per share plus maximum sales charge of 5.75% of offering price) | $ 22.09 | $ 20.62 |
| **Class B Shares** | | |
| Net assets | $ 5,378,250 | $114,954,154 |
| Shares outstanding | 267,204 | 6,213,258 |
| Net asset value and offering price per share | $ 20.13 | $ 18.50 |
| **Class C Shares** | | |
| Net assets | $ 6,133,135 | $ 86,375,669 |
| Shares outstanding | 304,452 | 4,665,788 |
| Net asset value and offering price per share | $ 20.14 | $ 18.51 |
| **Class R Shares** | | |
| Net assets | $ 20,704,706 | $ 16,052,217 |
| Shares outstanding | 990,344 | 812,855 |
| Net asset value and offering price per share | $ 20.91 | $ 19.75 |
| **Net Assets Consist of:** | | |
| Capital paid-in | $ 44,751,109 | $380,709,068 |
| Undistributed net investment income | 349,576 | — |
| Accumulated net realized gain (loss) from investments and foreign currency transactions | (14,116,962) | (92,676,048) |
| Net unrealized appreciation (depreciation) of investments | 6,803,250 | (16,846,844) |
| Net unrealized appreciation on translation of assets and liabilities denominated in foreign currencies | 8,988 | — |
| Net assets | $ 37,795,961 | $271,186,176 |

*See accompanying notes to financial statements.*

16

## Statement of Operations
*Year Ended July 31, 2004*

|  | NWQ International Value | Rittenhouse Growth |
|---|---:|---:|
| **Investment Income** |  |  |
| Dividends (net of foreign tax withheld of $135,562 and $14,295, respectively) | $ 942,695 | $ 3,479,839 |
| Interest | 20,253 | 68,228 |
| Total investment income | 962,948 | 3,548,067 |
| **Expenses** |  |  |
| Management fees | 344,155 | 2,595,447 |
| 12b-1 service fees – Class A | 11,759 | 156,124 |
| 12b-1 distribution and service fees – Class B | 48,475 | 1,328,916 |
| 12b-1 distribution and service fees – Class C | 49,489 | 981,383 |
| Shareholders' servicing agent fees and expenses | 29,552 | 841,369 |
| Custodian's fees and expenses | 28,608 | 84,247 |
| Trustees' fees and expenses | 1,016 | 11,577 |
| Professional fees | 19,302 | 15,486 |
| Shareholders' reports – printing and mailing expenses | 17,987 | 212,782 |
| Federal and state registration fees | 45,476 | 30,920 |
| Other expenses | 3,531 | 18,402 |
| Total expenses before custodian fee credit and expense reimbursement | 599,350 | 6,276,653 |
| Custodian fee credit | (989) | (35) |
| Expense reimbursement | — | (155,774) |
| Net expenses | 598,361 | 6,120,844 |
| Net investment income (loss) | 364,587 | (2,572,777) |
| **Realized and Unrealized Gain (Loss)** |  |  |
| Net realized gain (loss): |  |  |
| Investments | 3,878,537 | (4,015,943) |
| Foreign currencies | (669) | — |
| Net change in unrealized appreciation (depreciation) of investments | 3,852,472 | 21,291,257 |
| Net change in unrealized appreciation on translation of assets and liabilities denominated in foreign currencies | 2,248 | — |
| Net gain | 7,732,588 | 17,275,314 |
| Net increase in net assets from operations | $8,097,175 | $14,702,537 |

*See accompanying notes to financial statements.*

## Statement of Changes in Net Assets

| | NWQ International Value | | Rittenhouse Growth | |
|---|---|---|---|---|
| | Year Ended 7/31/04 | Year Ended 7/31/03 | Year Ended 7/31/04 | Year Ended 7/31/03 |
| **Operations** | | | | |
| Net investment income (loss) | $ 364,587 | $ 266,741 | $ (2,572,777) | $ (2,882,649) |
| Net realized gain (loss): | | | | |
| Investments | 3,878,537 | 612,170 | (4,015,943) | (18,032,703) |
| Foreign currencies | (669) | 50,644 | — | — |
| Net change in unrealized appreciation (depreciation) of investments | 3,852,472 | 1,553,817 | 21,291,257 | 34,463,331 |
| Net change in unrealized appreciation on translation of assets and liabilities denominated in foreign currencies | 2,248 | 3,198 | — | — |
| Net increase in net assets from operations | 8,097,175 | 2,486,570 | 14,702,537 | 13,547,979 |
| **Distributions to Shareholders** | | | | |
| From net investment income: | | | | |
| Class A | (40,994) | — | — | — |
| Class B | (14,578) | — | — | — |
| Class C | (14,836) | — | — | — |
| Class R | (198,532) | — | — | — |
| Decrease in net assets from distribution to shareholders | (268,940) | — | — | — |
| **Fund Share Transactions** | | | | |
| Proceeds from shares issued in the reorganization of European Value | — | 6,358,876 | — | — |
| Proceeds from shares issued in the reorganization of Innovation | — | — | — | 21,232,852 |
| Proceeds from sale of shares | 8,798,677 | 14,327,738 | 21,115,748 | 27,572,422 |
| Proceeds from shares issued to shareholders due to reinvestment of distributions | 92,264 | — | — | — |
| | 8,890,941 | 20,686,614 | 21,115,748 | 48,805,274 |
| Cost of shares redeemed | (4,705,416) | (17,043,424) | (83,628,277) | (88,820,307) |
| Redemption fees | 9,050 | 12,449 | — | — |
| Net increase (decrease) in net assets from Fund share transactions | 4,194,575 | 3,655,639 | (62,512,529) | (40,015,033) |
| Net increase (decrease) in net assets | 12,022,810 | 6,142,209 | (47,809,993) | (26,467,054) |
| Net assets at the beginning of period | 25,773,151 | 19,630,942 | 318,996,168 | 345,463,222 |
| Net assets at the end of period | $37,795,961 | $ 25,773,151 | $271,186,176 | $318,996,168 |
| Undistributed net investment income at the end of period | $ 349,576 | $ 253,929 | $ — | $ — |

## Notes to Financial Statements

### 1. General Information and Significant Accounting Policies

The Nuveen Investment Trust II (the "Trust") is an open-end management investment company registered under the Investment Company Act of 1940, as amended. The Trust is comprised of the Nuveen NWQ International Value Fund ("NWQ International Value") and Nuveen Rittenhouse Growth Fund ("Rittenhouse Growth") (collectively, the "Funds"). The Trust was organized as a Massachusetts business trust in 1997.

After the close of business on June 13, 2003, NWQ International Value acquired all of the net assets of Nuveen European Value Fund ("European Value") pursuant to a plan of reorganization previously approved by the shareholders of European Value. The acquisition was accomplished by a tax-free exchange of Class A, B, C and R Shares of European Value for the outstanding Class A, B, C and R Shares of European Value, respectively. European Value's net assets of $6,358,876 at that date included $741,833 of net unrealized appreciation which was combined with that of NWQ International Value. The combined net assets of NWQ International Value immediately after the acquisition were $25,666,987.

After the close of business on July 28, 2003, Rittenhouse Growth acquired all of the net assets of Nuveen Innovation Fund ("Innovation") pursuant to a plan of reorganization previously approved by the shareholders of Innovation. The acquisition was accomplished by a tax-free exchange of Class A, B, C and R Shares of Rittenhouse Growth for the outstanding Class A, B, C and R Shares of Innovation, respectively. Innovation's net assets of $21,232,852 at that date included $1,587,425 of net unrealized appreciation which was combined with that of Rittenhouse Growth. The combined net assets of Rittenhouse Growth immediately after the acquisition were $322,478,740.

Effective October 7, 2002, the Nuveen International Growth Fund changed its name to the Nuveen NWQ International Value Fund as a result of the Board of Trustees and Shareholders' approval of NWQ Investment Management Company, LLC ("NWQ") as the Fund's new sub-adviser. Nuveen Investments, Inc. owns a controlling interest in NWQ, while key management of NWQ owns a non-controlling minority interest. NWQ International Value primarily invests in U.S.-traded American Depositary Receipts in an attempt to provide long-term capital appreciation.

Rittenhouse Growth ordinarily invests at least 65% of its total assets in equity securities of large-capitalization companies with a high financial strength rating and a history of consistent earnings and predictable earnings growth ("blue chip companies") in an attempt to provide long-term growth of capital.

The following is a summary of significant accounting policies followed by the Funds in the preparation of their financial statements in accordance with accounting principles generally accepted in the United States.

*Securities Valuation*
Exchange-listed securities are generally valued at the last sales price on the securities exchange on which such securities are primarily traded. Securities traded on a securities exchange for which there are no transactions on a given day or securities not listed on a securities exchange are valued at the mean of the closing bid and asked prices. Securities traded on Nasdaq are valued at the Nasdaq Official Closing Price. The prices of fixed-income securities are provided by a pricing service approved by the Funds' Board of Trustees and based on the mean between the bid and asked prices. When price quotes are not readily available, the pricing service establishes fair market value based on prices of comparable securities, indications of value from securities dealers, evaluations of anticipated cash flows or collateral and general market conditions. If it is determined that market prices for a security are unavailable or inappropriate, the Board of Trustees of the Funds, or its designee, may establish a fair value for the security. Short-term securities are valued at amortized cost, which approximates market value.

*Securities Transactions*
Securities transactions are recorded on a trade date basis. Realized gains and losses from such transactions are determined on the specific identification method. Securities purchased or sold on a delayed delivery basis may have extended settlement periods. Any securities so purchased are subject to market fluctuation during this period. The Funds have instructed the custodian to segregate assets with a current value at least equal to the amount of the when-issued and delayed delivery purchase commitments. At July 31, 2004, there were no such outstanding purchase commitments in either of the Funds.

*Investment Income*
Dividend income is recorded on the ex-dividend date or, for foreign securities, when information is available. Interest income, which includes the amortization of premiums and accretion of discounts for financial reporting purposes, is recorded on an accrual basis.

*Dividends and Distributions to Shareholders*
Dividends from net investment income and net realized capital gains from investment transactions, if any, are declared and distributed to shareholders annually. Furthermore, capital gains are distributed only to the extent they exceed available capital loss carryforwards.

Distributions to shareholders of net investment income and net realized capital gains, if any, are recorded on the ex-dividend date. The amount and timing of distributions are determined in accordance with federal income tax regulations, which may differ from accounting principles generally accepted in the United States.

19

## Notes to Financial Statements (continued)

*Federal Income Taxes*

Each Fund is a separate taxpayer for federal income tax purposes. Each Fund intends to distribute all income and capital gains to shareholders and to otherwise comply with the requirements of Subchapter M of the Internal Revenue Code applicable to regulated investment companies. Therefore, no federal tax provision is required. Net realized capital gains and ordinary income distributions made by the Funds are subject to federal taxation.

*Flexible Sales Charge Program*

Each Fund offers Class A, B, C and R Shares. Class A Shares are sold with a sales charge and incur a .25% annual 12b-1 service fee. Class A Share purchases of $1 million or more are sold at net asset value without an up-front sales charge but may be subject to a contingent deferred sales charge ("CDSC") if redeemed within 18 months of purchase. Class B Shares are sold without a sales charge but incur a .75% annual 12b-1 distribution fee and a .25% annual 12b-1 service fee. An investor purchasing Class B Shares agrees to pay a CDSC of up to 5% depending upon the length of time the shares are held by the investor (CDSC is reduced to 0% at the end of six years). Class B Shares convert to Class A Shares eight years after purchase. Class C Shares are sold without a sales charge but incur a .75% annual 12b-1 distribution fee and a .25% annual 12b-1 service fee. An investor purchasing Class C Shares agrees to pay a CDSC of 1% if Class C Shares are redeemed within one year of purchase. Class R Shares are not subject to any sales charge or 12b-1 distribution or service fees. Class R Shares are available only under limited circumstances.

NWQ International Value imposes a 2% redemption fee on certain redemptions or exchange transactions within 30 days of acquisition. During the fiscal year ended July 31, 2004, $9,050 of redemption fees were imposed on shares redeemed and recorded as an increase to the Fund's capital paid-in.

*Derivative Financial Instruments*

The Funds may invest in options, forward and futures contracts, which are sometimes referred to as derivative transactions. Although the Funds are authorized to invest in such financial instruments, and may do so in the future, they did not make any such investments during the fiscal year ended July 31, 2004.

*Repurchase Agreements*

In connection with transactions in repurchase agreements, it is the Funds' policy that its custodian take possession of the underlying collateral securities, the fair value of which exceeds the principal amount of the repurchase transaction, including accrued interest, at all times. If the seller defaults, and the fair value of the collateral declines, realization of the collateral by the Funds may be delayed or limited.

*Expense Allocation*

Expenses of the Funds that are not directly attributable to a specific class of shares are prorated among the classes based on the relative net assets of each class. Expenses directly attributable to a class of shares, which presently only include 12b-1 distribution and service fees, are recorded to the specific class.

*Foreign Currency Translations*

To the extent that NWQ International Value invests in securities that are denominated in a currency other than U.S. dollars, the Fund will be subject to currency risk, which is the risk that an increase in the U.S. dollar relative to the foreign currency will reduce returns or portfolio value. Generally, when the U.S. dollar rises in value against a foreign currency, the Fund's investments in securities denominated in that currency will lose value because its currency is worth fewer U.S. dollars; the opposite effect occurs if U.S. dollars fall in relative value. Investments and other assets and liabilities denominated in foreign currencies are converted into U.S. dollars on a spot (i.e. cash) basis at the spot rate prevailing in the foreign currency exchange market at the time of valuation. Purchases and sales of investments and dividend income denominated in foreign currencies are translated into U.S. dollars on the respective dates of such transactions.

*Foreign Currency Transactions*

NWQ International Value may engage in foreign currency exchange transactions in connection with its portfolio investments and assets and liabilities denominated in foreign currencies. The Fund may engage in foreign currency forward, options and futures contracts. The Fund will enter into foreign currency transactions for hedging and other permissible risk management purposes only. If the Fund invests in a currency futures or options contract, it must make a margin deposit to secure performance of such contract. With respect to investments in currency futures contracts, the Fund may also be required to make a variation margin deposit because the value of futures contracts fluctuates daily. In addition, the Fund may segregate assets to cover its futures contracts obligations.

The objective of the Fund's foreign currency hedging transactions is to reduce the risk that the U.S. dollar value of the Fund's foreign currency denominated securities and other assets and liabilities will decline in value due to changes in foreign currency exchange rates. All foreign currency forward contracts, options and futures transactions are "marked-to-market" daily at the applicable market rates and any resulting unrealized gains or losses are recorded in the Fund's financial statements. The Fund records realized gains and losses at the time the forward contract is offset by entering into a closing transaction or extinguished by delivery of the currency. The contractual amounts of forward foreign currency exchange contracts does not necessarily represent the amounts potentially subject to risk. Risks may arise upon entering into these contracts from the potential inability of counterparties to meet the terms of their contracts and from unanticipated movements in the value of a foreign currency relative to the U.S. dollar. The measurement of the risks associated with these instruments is meaningful only when all related and offsetting transactions are considered. The Fund did not enter into any foreign currency forward, options or futures contracts during the fiscal year ended July 31, 2004.

20

*Custodian Fee Credit*
Each Fund has an arrangement with the custodian bank whereby certain custodian fees and expenses are reduced by credits earned on each Fund's cash on deposit with the bank. Such deposit arrangements are an alternative to overnight investments.

*Indemnifications*
Under the Trust's organizational documents, its Officers and Trustees are indemnified against certain liabilities arising out of the performance of their duties to the Trust. In addition, in the normal course of business the Trust enters into contracts that provide general indemnifications to other parties. The Trust's maximum exposure under these arrangements is unknown as this would involve future claims that may be made against the Trust that have not yet occurred. However, the Trust has not had prior claims or losses pursuant to these contracts and expects the risk of loss to be remote.

*Use of Estimates*
The preparation of financial statements in conformity with accounting principles generally accepted in the United States requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities at the date of the financial statements and the reported amounts of increases and decreases in net assets from operations during the reporting period. Actual results may differ from those estimates.

### 2. Fund Shares

Transactions in Fund shares were as follows:

| | NWQ International Value | | | |
|---|---|---|---|---|
| | Year Ended 7/31/04 | | Year Ended 7/31/03 | |
| | Shares | Amount | Shares | Amount |
| Shares issued in the reorganization of European Value: | | $ | | |
| Class A | — | — | 70,059 | $ 1,098,633 |
| Class B | — | — | 89,684 | 1,367,606 |
| Class C | — | — | 17,844 | 272,074 |
| Class R | — | — | 229,382 | 3,620,563 |
| Shares sold: | | | 754,221 | 10,381,734 |
| Class A | 122,676 | 2,409,109 | 11,938 | 178,853 |
| Class B | 51,471 | 972,586 | 193,093 | 2,598,482 |
| Class C | 151,074 | 2,888,459 | 79,946 | 1,168,669 |
| Class R | 130,486 | 2,526,543 | | |
| Shares issued to shareholders due to reinvestment of distributions: | | | | |
| Class A | 1,204 | 23,614 | — | — |
| Class B | 395 | 7,536 | — | — |
| Class C | 238 | 4,548 | — | — |
| Class R | 2,874 | 56,566 | — | — |
| | 460,418 | 8,890,941 | 1,446,167 | 20,686,614 |
| Shares redeemed: | | | | |
| Class A | (99,345) | (1,877,747) | (868,191) | (12,015,984) |
| Class B | (30,537) | (582,439) | (44,777) | (605,934) |
| Class C | (104,436) | (1,930,169) | (294,495) | (3,977,502) |
| Class R | (15,777) | (315,061) | (32,428) | (444,004) |
| Redemption fees: | | | | |
| Class A | — | 7,826 | — | 9,798 |
| Class B | — | 246 | — | 237 |
| Class C | — | 260 | — | 2,414 |
| Class R | — | 918 | | |
| | (250,095) | (4,696,366) | (1,239,891) | (17,030,975) |
| Net increase | 210,323 | $ 4,194,575 | 206,276 | $ 3,655,639 |

# Trustees and Officers

The management of the Funds, including general supervision of the duties performed for the Funds by the Adviser, is the responsibility of the Board of Trustees of the Funds. The number of trustees of the Funds is currently set at seven. None of the trustees who are not "interested" persons of the Funds has ever been a director or employee of, or consultant to, Nuveen or its affiliates. The names and business addresses of the trustees and officers of the Funds, their principal occupations and other affiliations during the past five years, the number of portfolios each oversees and other directorships they hold are set forth below.

The Funds' Statement of Additional Information ("SAI") includes more information about the Trustees. To request a free copy, call Nuveen Investments at (800) 257-8787.

| Name, Birthdate and Address | Position(s) Held with the Funds | Year First Elected or Appointed (2) | Principal Occupation(s) Including other Directorships During Past 5 Years | Number of Portfolios in Fund Complex Overseen by Trustee |
|---|---|---|---|---|
| **Trustee who is an interested person of the Funds:** | | | | |
| Timothy R. Schwertfeger (1) 3/28/49 333 W. Wacker Drive Chicago, IL 60606 | Chairman of the Board and Trustee | 1994 | Chairman and Director (since 1996) of Nuveen Investments, Inc. and Nuveen Investments, LLC; Director (since 1992) and Chairman (since 1996) of Nuveen Advisory Corp. and Nuveen Institutional Advisory Corp.; Chairman and Director (since 1997) of Nuveen Asset Management, Inc.; Director (since 1998) of Institutional Capital Corporation; Chairman and Director (since 1999) of Rittenhouse Asset Management, Inc.; Chairman of Nuveen Investments Advisers Inc. (since 2002). | 145 |
| **Trustees who are not interested persons of the Funds:** | | | | |
| Robert P. Bremner 8/22/40 333 W. Wacker Drive Chicago, IL 60606 | Trustee | 1997 | Private Investor and Management Consultant. | 145 |
| Lawrence H. Brown 7/29/34 333 W. Wacker Drive Chicago, IL 60606 | Trustee | 1993 | Retired (1989) as Senior Vice President of The Northern Trust Company; Director, Community Advisory Board for Highland Park and Highwood, United Way of the North Shore (since 2002). | 145 |
| Jack B. Evans 10/22/48 333 W. Wacker Drive Chicago, IL 60606 | Trustee | 1999 | President, The Hall-Perrine Foundation, a private philanthropic corporation (since 1996); Director and Vice Chairman, United Fire & Casualty Company; formerly Director, Federal Reserve Bank of Chicago; formerly, President and Chief Operating Officer, SCI Financial Group, Inc., a regional financial services firm. | 145 |
| William C. Hunter 3/16/48 333 W. Wacker Drive Chicago, IL 60606 | Trustee | 2004 | Dean and Distinguished Professor of Finance, School of Business at the University of Connecticut (since 2003); previously Senior Vice President and Director of Research at the Federal Reserve Bank of Chicago (1995-2003); Director, Credit Research Center at Georgetown University; Director of Xerox Corporation (since 2004). | 145 |
| William J. Schneider 9/24/44 333 W. Wacker Drive Chicago, IL 60606 | Trustee | 1997 | Senior Partner and Chief Operating Officer, Miller-Valentine Group, Vice President, Miller-Valentine Realty, a construction company; Chair, Miami Valley Hospital; Chair, Dayton Development Coalition; formerly, Member, Community Advisory Board, National City Bank, Dayton, Ohio and Business Advisory Council, Cleveland Federal Reserve Bank. | 145 |
| Judith M. Stockdale 12/29/47 333 W. Wacker Drive Chicago, IL 60606 | Trustee | 1997 | Executive Director, Gaylord and Dorothy Donnelley Foundation (since 1994); prior thereto, Executive Director, Great Lakes Protection Fund (from 1990 to 1994). | 145 |

| Name, Birthdate and Address | Position(s) Held with the Funds | Year First Elected or Appointed(3) | Principal Occupation(s) During Past 5 Years | Number of Portfolios in Fund Complex Overseen by Trustee |
|---|---|---|---|---|
| **Officers of the Funds:** | | | | |
| Gifford R. Zimmerman 9/9/56 333 W. Wacker Drive Chicago, IL 60606 | Chief Administrative Officer | 1988 | Managing Director (since 2002), Assistant Secretary and Associate General Counsel of Nuveen Investments, LLC; Managing Director (since 2002), General Counsel and Assistant Secretary, formerly, Vice President of Nuveen Advisory Corp. and Nuveen Institutional Advisory Corp.; Managing Director (since 2002), Assistant Secretary and Associate General Counsel, formerly, Vice President (since 2000), of Nuveen Asset Management, Inc. Assistant Secretary of Nuveen Investments, Inc. (since 1994); Assistant Secretary of NWQ Investment Management Company, LLC (since 2002); Vice President and Assistant Secretary of Nuveen Investments Advisers Inc. (since 2002); Managing Director, Associate General Counsel and Assistant Secretary of Rittenhouse Asset Management, Inc. (since 2003); Chartered Financial Analyst. | 145 |
| Michael T. Atkinson 2/3/66 333 W. Wacker Drive Chicago, IL 60606 | Vice President and Assistant Secretary | 2000 | Vice President (since 2002), formerly, Assistant Vice President (since 2000), previously, Associate of Nuveen Investments, LLC. | 145 |
| Peter H. D'Arrigo 11/28/67 333 W. Wacker Drive Chicago, IL 60606 | Vice President and Treasurer | 1999 | Vice President of Nuveen Investments, LLC (since 1999), prior thereto, Assistant Vice President (since 1997); Vice President and Treasurer of Nuveen Investments, Inc. (since 1999); Vice President and Treasurer of Nuveen Advisory Corp. and Nuveen Institutional Advisory Corp (since 1999); Vice President and Treasurer of Nuveen Asset Management, Inc. (since 2002) and of Nuveen Investments Advisers Inc. (since 2002); Assistant Treasurer of NWQ Investment Management Company, LLC (since 2002); Vice President and Treasurer of Nuveen Rittenhouse Asset Management, Inc. (since 2003); Chartered Financial Analyst. | 145 |
| Jessica R. Droeger 9/24/64 333 W. Wacker Drive Chicago, IL 60606 | Vice President and Secretary | 2000 | Vice President (since 2002) and Assistant General Counsel (since 1998); formerly, Assistant Vice President (since 1998) of Nuveen Investments, LLC; Vice President (since 2002) and Assistant Secretary (since 1998), formerly Assistant Vice President of Nuveen Advisory Corp. and Nuveen Institutional Advisory Corp. | 145 |
| Lorna C. Ferguson 10/24/45 333 W. Wacker Drive Chicago, IL 60606 | Vice President | 1998 | Managing Director (since 2004) formerly, Vice President of Nuveen Investments, LLC; Managing Director (since 2004) formerly, Vice President (since 1998) of Nuveen Advisory Corp. and Nuveen Institutional Advisory Corp. | 145 |
| William M. Fitzgerald 3/2/64 333 W. Wacker Drive Chicago, IL 60606 | Vice President | 1995 | Managing Director (since 2002) of Nuveen Investments, LLC; Managing Director (since 2001), formerly Vice President of Nuveen Advisory Corp. and Nuveen Institutional Advisory Corp. (since 1995); Managing Director of Nuveen Asset Management, Inc. (since 2001); Vice President of Nuveen Investment Advisers Inc. (since 2002); Chartered Financial Analyst. | 145 |
| Stephen D. Foy 5/31/54 333 W. Wacker Drive Chicago, IL 60606 | Vice President and Controller | 1998 | Vice President (since 1993) and Funds Controller (since 1998) of Nuveen Investments, LLC and Vice President and Funds Controller (since 1998) of Nuveen Investments, Inc.; Certified Public Accountant. | 145 |

# Trustees and Officers (continued)

| Name, Birthdate and Address | Position(s) Held with the Funds | Year First Elected or Appointed(3) | Principal Occupation(s) During Past 5 Years | Number of Portfolios in Fund Complex Overseen by Trustee |
|---|---|---|---|---|
| David J. Lamb 3/22/63 333 W. Wacker Drive Chicago, IL 60606 | Vice President | 2000 | Vice President (since 2000) of Nuveen Investments, LLC, previously Assistant Vice President (since 1999); prior thereto, Associate of Nuveen Investments, LLC; Certified Public Accountant. | 145 |
| Tina M. Lazar 8/27/61 333 W. Wacker Drive Chicago, IL 60606 | Vice President | 2002 | Vice President (since 1999), previously, Assistant Vice President (since 1993) of Nuveen Investments, LLC. | 145 |
| Larry W. Martin 7/27/51 333 W. Wacker Drive Chicago, IL 60606 | Vice President and Assistant Secretary | 1988 | Vice President, Assistant Secretary and Assistant General Counsel of Nuveen Investments, LLC; Vice President and Assistant Secretary of Nuveen Advisory Corp. and Nuveen Institutional Advisory Corp.; Assistant Secretary of Nuveen Investments, Inc. and (since 1997) Nuveen Asset Management, Inc.; Vice President (since 2000), Assistant Secretary and Assistant General Counsel (since 1998) of Rittenhouse Asset Management, Inc.; Vice President and Assistant Secretary of Nuveen Investments Advisers Inc. (since 2002); Assistant Secretary of NWQ Investment Management Company, LLC (since 2002). | 145 |
| Edward F. Neild, IV 7/7/65 333 W. Wacker Drive Chicago, IL 60606 | Vice President | 1996 | Managing Director (since 2002) of Nuveen Investments, LLC; Managing Director (since 1997), formerly Vice President (since 1996) of Nuveen Advisory Corp. and Nuveen Institutional Advisory Corp.; Managing Director of Nuveen Asset Management, Inc. (since 1999). Chartered Financial Analyst. | 145 |

(1) Mr. Schwertfeger is an "interested person" of the Funds, as defined in the Investment Company Act of 1940, because he is an officer and trustee of the Adviser.

(2) Trustees serve an indefinite term until his/her successor is elected. The year first elected or appointed represents the year in which the Trustee was first elected or appointed to any fund in the Nuveen Complex.

(3) Officers serve one year terms through July of each year. The year first elected or appointed represents the year in which the Officer was first elected or appointed to any fund in the Nuveen Complex.

# Fund Information

**Fund Manager**
Nuveen Institutional Advisory Corp.
333 West Wacker Drive
Chicago, IL 60606

**Sub-Advisers**
NWQ Investment Management
Company, LLC
2049 Century Park East
Los Angeles, CA 90067

Rittenhouse Asset Management, Inc.
Five Radnor Corporate Center
Radnor, PA 19087

**Legal Counsel**
Chapman and Cutler LLP
Chicago, IL

**Independent Registered
Public Accounting Firm**
PricewaterhouseCoopers LLP
Chicago, IL

**Custodian**
State Street Bank & Trust
Boston, MA

**Transfer Agent and
Shareholder Services**
Boston Financial
Data Services, Inc.
Nuveen Investor Services
P.O. Box 8530
Boston, MA 02266-8530
(800) 257-8787

---

**Glossary of Terms Used in this Report**

**Average Annual Total Return:** This is a commonly used method to express an investment's performance over a particular, usually multi-year time period. It expresses the return (including change in NAV and reinvested dividends) that would have been necessary on an annual basis to equal the investment's actual performance over the time period being considered.

**Average Market Capitalization:** The market capitalization of a company is equal to the number of the company's common shares outstanding multiplied by the current price of the company's stock. The average market capitalization of a mutual fund's portfolio gives a measure of the size of the companies in which the fund invests.

**Net Asset Value (NAV):** A Fund's NAV is the dollar value of one share in the fund. It is calculated by subtracting the liabilities of the fund from its total assets and then dividing the remainder by the number of shares outstanding. Fund NAVs are calculated at the end of each business day.

---

**Quarterly Portfolio of Investments and Proxy Voting Information:** Each Fund's quarterly portfolio of investments and information regarding how the Funds voted proxies relating to portfolio securities held during the most recent 12-month period ended June 30 are available without charge, upon request, by calling Nuveen Investments at (800) 257-8787 or on Nuveen's website at www.nuveen.com.

You may also obtain this and other fund information directly from the Securities and Exchange Commission ("SEC"). The SEC may charge a copying fee for this information. Visit the SEC on-line at http://www.sec.gov or in person at the SEC's Public Reference Room in Washington, D.C. Call the SEC at 1-202-942-8090 for room hours and operation. You may also request fund information by sending an e-mail request to publicinfo@sec.gov or by writing to the SEC's Public Reference Section at 450 Fifth Street NW, Washington, D.C. 20549.

---

NASD Regulation, Inc. provides a Public Disclosure Program which supplies certain information regarding the disciplinary history of NASD members and their associated persons in response to either telephone inquiries at (800) 289-9999 or written inquiries at www.nasdr.com. NASD Regulation, Inc. also provides an investor brochure that includes information describing the Public Disclosure Program.

# Serving
## Investors
### for Generations

Since 1898, financial advisors and their clients have relied on Nuveen Investments to provide dependable investment solutions. For the past century, Nuveen Investments has adhered to the belief that the best approach to investing is to apply conservative risk-management principles to help minimize volatility.

Managing $102 billion in assets, Nuveen Investments provides high-quality investment services that contribute to the building of well diversified investment portfolios. The Company serves institutional clients, financial advisors and high-net-worth investors. The firm's asset management capabilities are marketed through four distinct brands, each with an independent investment team and area of expertise; Nuveen, focused on fixed-income investments; NWQ, specializing in value-style equities; Rittenhouse, dedicated to conservative growth-style equities; and Symphony, with expertise in alternative investment portfolios.

To learn more about the products and services Nuveen Investments offers, talk to your financial advisor, or call us at **(800) 257-8787**.

MAN-GRW-0704D

Appendix -- Copies of Unreported Decisions

# Appendix -- Copies of Unreported Decisions

Not Reported in N.E.2d
18 Mass.L.Rptr. 130
(Cite as: 2004 WL 1895052 (Mass.Super.))
<KeyCite History>

**Page 23**

Superior Court of Massachusetts.

**Arthur S. DEMOULAS, individually and derivatively on behalf of Demoulas Super Markets, Inc.**
v.
**DEMOULAS SUPER MARKETS, INC. et al. [FN1]**

FN1. Arthur T. Demoulas, individually and as Trustee of the Arthur T. Demoulas Revocable Trust; Sumner Darman; Edward H. Pendergast; J. Terrence Carleton; Charles Roazen; and William J. Shea.

**No. 033741BLS.**

Aug. 2, 2004.

FINDINGS AND RULINGS AFTER EVIDENTIARY HEARING

ALLAN VAN GESTEL, Justice of the Superior Court.

*1 This matter is before the Court after a bifurcated evidentiary hearing on the issue of whether the directors, or at least a majority of the directors, of Demoulas Supermarkets, Inc. were "interested" when acting on the matters in issue. See Memorandum and Order on Rule 16 Conference, dated October 14, 2003. The matters in issue and the procedural and legal posture warrant explication before the Court sets forth its findings and rulings on the matters considered.

PROCEDURAL AND LEGAL BACKGROUND

This is a Mass.R.Civ.P. Rule 23.1 derivative action, basically between Arthur S. Demoulas ("Arthur S.") and his cousin Arthur T. Demoulas ("Arthur T."), with allegations spilling over against the directors of Demoulas Super Markets, Inc. ("DSM"). The amended complaint characterizes the case as a "demand excused" case. [FN2]

FN2. The defendant directors insist that there was a demand, and that it was denied. That issue, so far, has only been raised on a motion to dismiss. It remains open for another day.

In general, before filing a derivative action on behalf of a corporation, a plaintiff "must establish that ... all available means to obtain relief through the corporation itself" are exhausted by making a demand on the corporation's board of directors to prosecute the litigation ... The rationale behind the demand requirement is that, as a basic principle of corporate governance, the board of directors or a majority of shareholders should set the corporation's business policy, including decisions whether to pursue a lawsuit ... However, if a majority of directors are alleged to have participated in the wrongdoing, or are otherwise interested, a plaintiff may seek to have the demand on the board excused as futile. This is referred to as a "demand excused" case.
Harhen v. Brown, 431 Mass. 838, 844 (2000).

The demand requirement is found in Mass.R.Civ.P. Rule 23.1 wherein it is said, "The complaint shall also allege with particularity the efforts, if any, made by the plaintiff to obtain the action he desires from the directors or comparable authority, and the reasons for his failure to obtain the action or for not making the effort."

This case was filed in 2003, prior to the enactment of the new Massachusetts Business Corporation Act, G.L.c. 156D. See Chapter 127 of the Acts of 2003. This new law did not become effective until July 1, 2004. [FN3] It is prior to the date of filing a derivative claim that any demand must be made. Consequently, the law that will be applied to the present evidentiary proceeding--at least insofar as it relates to pre-suit demand requirements--will be that in place prior to the new Act.

FN3. The Court makes this observation because, at least for certain purposes, it may now be dealing with a creature that is about to become extinct. Under G.L.c. 156D, the new Massachusetts Corporation Act, in Sec. 7.42, a demand must be made prior to the commencement of every derivative case, whether or not the directors are independent with respect to the matter subject to the demand.

A demand on the directors may be excused as futile if the directors are "otherwise interested." Harhen, supra, 431 Mass. at 844.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Wo



Not Reported in N.E.2d
(Cite as: 2004 WL 1895052, *1 (Mass.Super.))

In Demoulas v. Demoulas Super Markets, Inc., 424 Mass. 501, 523 (1997), the SJC affirmed a finding by the trial judge that the then directors of DSM were "interested" in that they "had a business or financial relationship with Telemachus [Demoulas]'s family, were subject to his controlling influence, or stood to benefit personally from the transactions at issue."

**\*2** This Court has already determined that in the present situation a majority of the current directors are not shown by the amended complaint to have any business or financial relationship with Arthur T. or his side of the Demoulas family, nor have they been shown to stand to benefit personally from the transaction at issue. Thus, unless they are shown to be subject to Arthur T.'s controlling influence, under the standards for determining interestedness set out in Demoulas [, supra, 424 Mass.] at 523-24 and Harhen [, supra, 431 Mass.] at 842-43 and n. 5, they must be considered and treated ... as disinterested." Memorandum and Order on Motions to Dismiss, September 22, 2003 [16 Mass. L. Rptr. 701].

The triggering event for this lawsuit is a September 9, 2002, memorandum request from Arthur T. addressed to the DSM directors, asking them to facilitate his "desire to have the freedom to pursue [his] own interests within the same type of business as DSM or any other type of business. To have such freedom of action, [he] would need to end any fiduciary duty [he has] to DSM in any capacity." Arthur T. advised the DSM board, "In order to accomplish this, I propose to resign my position with the company if [the board will] permit me to transfer my shares of the company's Class B common stock to my wife Maureen, who will then transfer them to an irrevocable voting trust." By so doing, Arthur T. said, his wife "will receive the economic benefits associated with the shares, but the trustee will have sole voting power."

Arthur S., by his complaint, seeks a declaration pursuant to Mass.G.L.c. 231A, Sec. 1, that "Arthur T. has fiduciary obligations to DSM and to Arthur S., that he may not extinguish by nominally transferring the economic benefits associated with his DSM stock to his wife, and voting rights relating to that stock to a 'trustee' selected by Arthur T. and who will be paid, and subject to removal at regular intervals, by his wife."

Arthur S. also seeks related declaratory and injunctive relief, as well as "all damages caused by [the defendant directors'] waiver of the existing restrictions upon the transfer of Arthur T.'s shares, and their failure and refusal to impose meaningful restrictions on Arthur T.'s rights to compete with, solicit the employees of, usurp the corporate opportunities of, or misappropriate the confidential information of, DSM, in breach of their fiduciary duties to DSM."

DSM is a close corporation under Massachusetts law. It "was initially formed as a Delaware corporation in 1964; in 1982, a new Massachusetts corporation was formed and the Delaware corporation was merged into it." Demoulas, supra, 424 Mass. at 511.

DSM's Articles of Organization prevent the transfer of any shares in the company to anyone unless those shares are first offered for sale to DSM. If offered, the market value of the shares is to be determined by an expert appraisal. Upon completion of the appraisal, the DSM board may then choose to purchase, or not to purchase, those shares. If the board elects not to purchase the shares, they then may be sold to any third party or entity. The Articles further provide that the directors may waive DSM's right to insist upon the foregoing procedure. Arthur T.'s memorandum to the directors of September 9, 2002, sought such a waiver.

**\*3** The directors held a number of meetings at which they considered Arthur T.'s request. [FN4] At the first meeting, on September 18, 2002, the proposal was defeated by a vote of four to two, with one director abstaining. At the second meeting, on November 13, 2002, after a presentation by Arthur T., the directors voted five to two to approve the waiver. The five voting in favor included the directors who are named as defendants in this action. This latter vote was conditioned upon Arthur T.'s willingness to enter into an agreement that, according to Arthur S., would leave Arthur T. "free to compete [with DSM] in the Real Estate Business and would impose restrictions of little practical significance on his ability to compete with DSM in the Supermarket Business, to solicit DSM employees, or to utilize DSM's corporate opportunities."

FN4. Apparently, since the resolution of Demoulas,



Not Reported in N.E.2d
(Cite as: 2004 WL 1895052, *3 (Mass.Super.))

supra, 424 Mass. 501, all meetings of the DSM board of directors have been stenographically transcribed. Thus, this Court has been provided with and has reviewed the transcripts of each directors' meeting at which Arthur T.'s request for a waiver was discussed and acted upon.

The situation regarding the demand and the question of interestedness or bias on the part of certain DSM directors breaks into two different parts. First, there is the action by the defendant directors in ultimately voting in favor of Arthur T.'s request for a waiver, coupled with the demand that the corporation sue, among others, those directors for whatever damages, if any, may accrue therefrom. Second, there is the issue of whether the corporation should proceed with Arthur S.'s demand for a declaratory judgment relating to whether Arthur T., after his proposed transfer of his stock to his wife, and then to a voting trust, still retains any fiduciary duties to DSM. While not ripe for determination at this time, each of those situations appears burdened with substantive weaknesses, and the second, relating to the declaratory judgment, has a potential procedural limitation; both it appears should be kept in mind when assessing the various directors' status.

On the issue of voting to grant the waiver, this Court has some difficulty in understanding what it is that constitutes legally redressable "wrongdoing" on the part of Arthur T. in requesting, and the various defendant directors in considering and acting upon, a waiver that is expressly provided for and included in the DSM Articles of Organization. Was it wrong for the directors to act upon Arthur T.'s request? If they refused to act, could Arthur T. have brought his own derivative suit against them for not acting? Indeed, could Arthur S. himself have brought a somewhat differently focused derivative suit against the directors if they failed to act and deny Arthur T.'s request? In short, it really appears to be the business judgments exercised by the directors in voting contrary to Arthur S.'s wishes that he is complaining about. Should a disagreement with the exercise of business judgment be found to state a claim upon which relief may be granted and excuse Arthur S. from the demand requirement?

What may--or may not, depending upon things that have not yet occurred--become a wrongdoing on Arthur T.'s part depends upon the extent to which,

despite his transfer of stock that he holds in a closely held Massachusetts corporation, he may still retain fiduciary duties to DSM. Those issues, however, seem quite premature, at least until a Court has before it the facts about what he has done. So far as this Court knows, Arthur T. has not even made the transfer of his stock at this time. Thus, how can the interestedness or bias of the directors affecting their actions with regard to a declaratory judgment suit be measured if what is before the Court is nothing more than a hypothetical proposition on which the determinative facts have not yet occurred?

*4 These concerns cannot be ignored and should be included in the blend of the stew that relates to whether a demand can be excused.

There are two cases that provide some--but far from total--guidance on how to proceed and what to look for, Harhen, supra, 431 Mass. 838, mentioned above, and Houle v. Low, 407 Mass. 810 (1990). Both cases dealt with the status of special litigation committees and are incomplete in their teachings because of the situational and procedural postures in which they were decided.

Harhen came up after allowance of a motion to dismiss. It involved, basically, whether a special litigation committee, appointed by admittedly disinterested directors, was sufficiently alleged in the complaint to be interested. If the allegations of interestedness were adequate, then the committee's determination not to proceed with the litigation would not be governed by the business judgment rule; and if the allegations were insufficient, then the business judgment rule would apply. The SJC determined that the allegations in the complaint did not meet the Rule 23.1 pleading-with-particularity standard and affirmed the dismissal.

Houle came up after the allowance of a motion for summary judgment in which the trial court determined that there were no material factual matters in dispute on the issue of the disinterestedness of a one-person special litigation committee appointed by clearly interested directors in a closely-held corporation. The SJC in Houle determined that there were disputed factual matters on the issue and remanded for a hearing.

Neither Harhen nor Houle presents the same legal

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Wo



or procedural issues as are presented here. Thus, while there is language in those cases that provides some indication as to what the law may be, they are far from conclusive on the points in issue here.

The Court embraces two things from Harhen and Houle.

From Harhen it follows the teaching that the SJC has adopted 1 ALI Principles of Corporate Governance: Analysis and Recommendations Secs. 1.15 and 1.23 (1994) for purposes of determining whether a director is "interested" in a matter presented in a derivative action. Harhen, supra, 431 Mass. at 842-43 and n. 5; Demoulas, supra, 424 Mass. at 523-24. Only one of the four ALI principles is applicable in this case. It is found in sec. 1.23(a)(4) which reads:

  (a) A director ... is "interested" in a transaction or conduct if
  ...
  (4) The director ... is subject to a controlling influence by a party to the transaction or conduct or a person who has a material pecuniary interest in the transaction or conduct, and that controlling influence could reasonably be expected to affect the director's ... judgment with respect to the transaction or conduct in a manner adverse to the corporation.

From Houle this Court adopts the SJC's direction that there needs to be "an evidentiary hearing before [the Court] without a jury to determine whether ... [the directors] were independent and unbiased." Houle, supra, 407 Mass. at 824.

  *5 What, then, is the "transaction" on which Arthur T.'s controlling influence "could reasonably be expected to affect ... director[s'] judgment ... in a manner adverse to the corporation"? This Court, as noted above, sees two issues: (1) the action ultimately favoring Arthur T.'s request for a waiver; and (2) whether, after the waiver is granted and the stock is transferred, Arthur T. still retains any fiduciary duties.

The Judgment Following Rescript entered in the underlying case in Demoulas v. Demoulas Supermarkets, Inc., Middlesex Superior Court # 90-2344-B, dated February 4, 1999, in Section 20 thereof, reads as follows:

  The shareholders [of DSM shall] elect a new board of directors that shall henceforth consist of:

i. Two members of the George Demoulas family or their nominees, including Arthur S. Demoulas;

ii. Two members of the Telemachus Demoulas family or their nominees [,] excluding Telemachus Demoulas, D. Harold Sullivan and James T. Curtis; and

iii. Three disinterested, independent directors who meet the standards of independence as published by the New York Stock Exchange ("NYSE").

It is in the context of the previous procedural and substantive issues that this Court conducted an evidentiary hearing on the DSM directors' interestedness and bias, and now makes the following findings of fact and rulings of law.

## FINDINGS OF FACT

All of DSM's stock is owned, in various ways, by different members of the Demoulas family. The heirs of George Demoulas constitute the "Class A" shareholder group. Arthur S., a son of George Demoulas, is a Class A shareholder. The wife and children of the late Telemachus A. Demoulas are members of the "Class B" shareholder group. Arthur T., a son of Telemachus Demoulas, is a Class B shareholder.

Rafaele Demoulas ("Rafaele") is the widow and administratrix of the estate of Evan Demoulas, another son of George Demoulas and a Class A shareholder. In an arrangement alluded to but not explained to the Court, Rafaele recently has been permitted by the Class B shareholders to propose one of the B directors of DSM, and Rafaele votes the estate's shares with the Class B shareholder group when selecting A-B directors.

The Court in the earlier Demoulas litigation mentioned above awarded control of 2,500 shares of DSM to what is now Arthur S.'s branch of the family and who are entitled to select and vote for A directors and 2,450 shares to what is now Arthur T.'s branch of the family and who are entitled to select and vote for B directors. However, because of a dispute between Arthur S. and his sister-in-law Rafaele, and with litigation thereon pending in the Middlesex Probate and Family Court, 75 of the A shares are not voted.

There is nothing that compels any A or B shareholder to vote his or her shares in any particular way or block, except that only A

Not Reported in N.E.2d
(Cite as: 2004 WL 1895052, *5 (Mass.Super.))

shareholders can vote for A directors and only B shareholders can vote for B directors. Despite the absence of any requirements therefor, however, the two branches of the Demoulas family tend to vote in blocks, except occasionally for Rafaele. Without the 75 shares that are subject to the Arthur S./Rafaele dispute, voting control in connection with the A-B directors is in Arthur T.'s side of the family if they all vote the same way.

**6** Currently, and at all times material to this proceeding, the Class A directors are and have been Gerard J. Levins ("Levins") and Arthur S. The Class B directors are and have been Sumner Darman ("Darman") and Edward H. Pendergast ("Pendergast"). Pendergast, however, was selected by Rafaele, although he was elected exclusively by the Class B shareholders. The A-B directors are and have been J. Terrence Carleton ("Carleton"), Charles Roazen ("Roazen") and William J. Shea ("Shea"). Shea serves and always has served as chairman.

The Court observes that Arthur S. is not charging Levins, who appears to be an attorney in the significant employ of Arthur S. and Arthur S.'s regular supporter in DSM corporate matters, with being interested or biased in connection with the issues for which demand is claimed to be excused. Levins has not been named as a defendant by Arthur S. in this litigation. No evidence was presented by anyone charging Levins with disqualifying interest or bias. Perhaps this clarifies Arthur S.'s position that it is not whether a director acts upon and votes on Arthur T.'s request that is wrongdoing; it is instead how that director votes, which, of course, seems to be a matter of business judgment. In any event, this Court finds that, for these purposes, Levins is not shown to be an interested or biased director.

Arthur S., while certainly interested in the outcome, is not interested and biased against himself and the interests of the other A shareholders, except perhaps Rafaele, in any way such as to legally be disqualified from acting on his own demand or to enable him to claim that any demand on the directors was excused.

For all purposes of this case, the same seven directors have been in office. Thus, if any two of the remaining five A-B or B directors are

disinterested and unbiased, there will be, along with Levins and Arthur S., a disinterested and unbiased majority on the board and a demand by Arthur S. ought not be excused.

Next the Court will find the facts regarding the three A-B directors, Carleton, Roazen and Shea. None of these three directors, indeed none of the five remaining directors, has any financial relationship to Arthur T. or his side of the family.

J. Terrence Carleton is a 49-year-old graduate of Bentley College and holds an MBA from Suffolk University. His employment history includes two years at Bache, Halsey, Stuart and Shields as a securities analyst; eight years as a senior analyst and institutional investor at Kidder, Peabody, the final two years being after General Electric Credit Corporation acquired Kidder, Peabody; and his last fifteen years have been in charge of the Technology Communications practice and as a senior corporate executive at the Boston advertising firm of Hill, Holliday, Connors, Cosmopoulos. Carleton serves on the boards of other companies as well.

Carleton was selected for board membership by Arthur T. He was first elected to the board on June 17, 2002.

**7** Carleton met Arthur T. many years ago when they both were undergraduate students at Bentley College. The two men were not close friends in college, nor were they enemies. Thereafter, Carleton and Arthur T. would cross paths infrequently at Bentley College alumni gatherings, but they were not otherwise social acquaintances. Carleton had a somewhat similar Bentley College-related relationship with Evan Demoulas, Rafaele's late husband.

Carleton is a Trustee of Bentley College, and in that capacity he became aware that Arthur T. was considering a relatively large gift to the college. Although Carleton was involved in Bentley's fund-raising campaign, he was not a participant in any discussions with Arthur T. regarding the gift. The gift, which was actually from the Telemachus and Irene Demoulas Family Foundation, was in the amount of $1 million, and the check, dated July 1, 2003, was signed by Arthur T. In that same year the Telemachus and Irene Demoulas Family Foundation made a similar $1 million gift to Boston College.

(C) 2005 Thomson/West. No Claim to Orig. U.S. Govt. Wo

Westlaw.

Carleton never discussed Arthur T.'s waiver request or any other DSM corporate matters with Arthur T. outside of the DSM board meetings.

On the first occasion that the waiver request was brought before the board in September 2002, Carleton abstained from voting because he was new to the board and wanted further information on which to make a judgment.

Charles Roazen received his MBA in 1954 from the Harvard Graduate School of Business Administration. Thereafter, he became employed by Standard Auto Gear Co., Inc., a family-owned company started by his grandfather in 1910. From 1956 to 1988, Roazen served as the President of Parts Distributors, Inc., another closely-held family business in the automotive aftermarket. Parts Distributors, Inc. operated several distribution centers and 30 auto parts stores in eastern New England.

Roazen also became a co-owner and director of Carquest, Inc., the second-largest national marketer in the automotive aftermarket. Between 1982 and 1983 Roazen served as chairman of AIS, Inc., which was involved in selling insurance to trade associations. In 1982, Roazen cofounded Counterworks, Inc., which provided turnkey computer systems for point-of-sale applications in inventory-intensive retail businesses. In 1988 Roazen founded, and still serves as chair of, First Management Services, Inc., a closely-held family enterprise providing financial and real estate management services.

Roazen, through his wife's position as a beneficiary of a substantial family trust, has available to him resources worth approximately $10 million.

Prior to joining the DSM board, Roazen had never met any members of the Demoulas family. He was asked to join the board by Sumner Darman, a longtime friend and lawyer who did legal work for the Roazen family.

Roazen has no social relationship with Arthur T., and he never discussed Arthur T.'s waiver request with him outside of a directors meeting.

*8 Roazen was first elected to the board in June 1999.

William J. Shea is 56 years old and serves as chair of the DSM board. Shea received a Master's Degree from Northeastern University in 1972. After receiving his degree, Shea began his employment with the national accounting firm, Coopers & Lybrand. At Coopers & Lybrand, Shea rose to partner and subsequently became the firm's Vice Chairman.

In 1993 Shea joined BankBoston Corporation, where he became Vice Chairman and Chief Financial Officer. At BankBoston, Shea had oversight for financial operations, treasury operations, capital markets, international operations, and national consumer financing activities. In 2001 Shea became the Chief Operating Officer of Conseco, Inc., a large insurance and financial services company in Indiana. A year later Shea was elected President and Chief Executive Officer of Conseco, and in 2003 he was elected to its board of directors.

Shea did not know any member of the Demoulas family before coming on the DSM board. He was, however, acquainted with Robert Farnham, Arthur T.'s brother-in-law, through meetings at youth hockey games played by Shea's and Farnham's sons.

Shea has no social relationship with Arthur T., and he never discussed Arthur T.'s waiver request with him outside of a directors meeting.

Shea, like Roazen, was first elected to the DSM board in June 1999.

There is nothing in Carleton's, Roazen's or Shea's introduction to the DSM board of directors that in any way demonstrates that any of them, when they arrived, were subject to Arthur T.'s controlling influence. Further, their personal business histories compel the inference that they would not likely submit to such control.

The same certainly can be said of Edward H. Pendergast, one of the two B directors. For approximately 38 years Pendergast has worked as a Certified Public Accountant in the Boston area. He has served on the boards of numerous companies and is actively involved in the accounting profession. For many years Pendergast has served as



director of the Boston Chapter of the National Association of Corporate Directors, an entity of which he also has been Vice President. Pendergast also has moderated an orientation program for newly elected directors sponsored by the Boston Chapter of the NACD, which program includes emphasis on director "disinterestedness."

Since 1989 Pendergast has operated his own firm, Pendergast & Company, providing corporate financial services to entrepreneurially driven businesses. He assists clients in developing and implementing financial strategies, in securing equity or debt financing, in taking businesses public, in developing strategic alliances, in valuing businesses and in assisting in key negotiations.

As noted above, Pendergast was suggested for a DSM board seat by Rafaele Demoulas, an A director. He was elected as a B director in June of 2001.

The remaining B director, Sumner Darman, is in a somewhat different position from that of the rest-- except, perhaps, for Gerard Levins. He, too, is a lawyer, and he has performed a significant amount of legal work for DSM and Arthur T. at times when DSM was under the control of Arthur T.'s father, Telemachus Demoulas. Darman also has represented Arthur T.'s interests in real estate and trust and estate matters from time to time. While this does not necessarily cloak Darman with a mantel of interestedness or bias, it gets him closer than all the rest--again, except, perhaps, for Levins.

*9 Given the foregoing, the Court must next make findings on those issues raised by Arthur S. about the defendant directors, aside from their initial invitation or nomination to the DSM board, that could be seen as making any of Carleton, Roazen, Shea or Pendergast interested or biased in the matters at hand.

The Court begins not with findings, but rather with allegations by Arthur S. in his complaint. Each of these allegations will then be explicated by particular findings. The allegations may be summarized as follows:

1. The Class B shareholders, in alliance with Class A shareholder Rafaele Demoulas, have selected the A-B directors. (Complaint Paras. 15 & 16.)

2. The A-B directors were "selected by, or requested to act as directors by Telemachus Demoulas, Arthur T. or a person acting on their behalf." "Their continuing status and substantial compensation as directors of DSM is wholly dependent on the continuing support of Arthur T. and his branch of the Demoulas family." (Complaint Para. 16.)

3. The five defendant directors "have consistently advanced the interests of Arthur T.'s branch of the Demoulas family at the expense of DSM and its other shareholders." (Complaint Para. 17.)
Examples of these actions are: allowing DSM to pay Telemachus Demoulas a $1,000,000-per-year consulting fee and to make "substantial annual contributions" to his DSM Profit Sharing Plan, and providing him a company car; allowing Arthur T. to remain as a high-paid executive of DSM; allowing Telemachus Demoulas and Arthur T. to serve as trustees of the DSM Profit Sharing Plan; allowing Darman to serve as counsel to DSM while also serving as personal counsel to Arthur T., to serve as intermediary between DSM's independent counsel and Arthur T. over the matter in issue, and giving improper advice regarding the consequences of Arthur T.'s proposal; allowing the same accounting firm that serves Arthur T. and his side of the family to also serve as accountants for DSM; and ignoring alleged evidence that Arthur T. had invested in a spring water company that was a corporate opportunity for DSM. (Complaint Para. 17, sub-paras. a through f.)

4. The defendant directors voted in favor of Arthur T.'s proposal to waive the limitations on his transfer of stock despite Arthur T.'s stated intention to compete with and harm DSM. (Complaint Paras. 20, 23, 24 & 33.)

5. The defendant directors voted to approve an agreement with Arthur T. that was grossly favorable to Arthur T. in his ability to compete with DSM, acquire its corporate opportunities and solicit away its employees. (Complaint Para. 27.)

6. The defendant directors failed to seek appropriate independent legal advice before voting on Arthur T.'s proposal and contract. (Complaint Para. 29.)

7. The defendant directors attempted to justify their actions on Arthur T.'s proposal by proffering "entirely pretextual" comments. (Complaint Para. 32.)
With regard to the first allegation, as noted above,

(C) 2005 Thomson/West. No Claim to Orig. U.S. Govt. Wo

Westlaw.

Not Reported in N.E.2d
(Cite as: 2004 WL 1895052, *9 (Mass.Super.))

there is insufficient evidence of an "alliance" between Class A shareholder Rafaele and the Class B shareholders for this Court to make findings thereof. Nevertheless, with respect to each of the A-B directors involved here, Rafaele did vote for their election in the same way as all of the B shareholders.

**\*10** On the second allegation, the Court finds that of the three A-B directors and the two B directors, only Carleton, Shea and Darman were suggested for their positions by some person who is a member of Arthur T.'s side of the family. Even Shea's connection, however, was only with Farnham, a brother-in-law of Arthur T. Roazen and Pendergast were not selected by any member of Arthur T.'s side of the family.

Further, as alleged, given the current status of the stock available to vote, the B shareholders hold a majority of voting stock and, if they all voted in a block, could remove all of the A-B directors, or any one of them, on short notice. Such a vote, if made, would, of course, remove any director from his status as such and deprive him of his compensation as a director. The extent to which Arthur T. has sufficient control over the votes of the remaining B shareholders, however, was not the subject of any evidentiary presentation to this Court. Certainly, as witnessed by the Arthur S./Rafaele dispute, Arthur S. does not have control over all of the A shareholders. None of the other B shareholders, nor Rafaele, the A shareholder said to be in alliance with the B shareholders, testified or submitted any affidavit evidence.

The third allegation asserts that the A-B and B directors "have consistently advanced the interests of Arthur T.'s branch of the Demoulas family at the expense of DSM and its other shareholders." As a generalized statement, this Court was not presented with sufficient evidence to make such a finding. No evidence was presented on all votes on all issues to enable a finding that the votes consistently favored Arthur T.'s branch of the family, as opposed to the best interests of DSM as a corporation. Arthur S. does, however, provide evidence on certain particular actions which are said by him to be examples of favoritism to the Arthur T. side. The Court will, therefore, address each example proffered.

The first of these issues relates to the compensation afforded to Telemachus Demoulas during the time of the defendant directors' terms in office and prior to his death. The evidence supports the following findings: Telemachus was in the employ of DSM for more than 60 years, although at the end, and particularly after the decision in Demoulas v. Demoulas Supermarkets, Inc., 424 Mass. 501 (1997), his day-to-day involvement with the company was greatly diminished; his compensation of $1 million per year, however, was set by management, not the directors; when questions were raised at directors meetings by Arthur S. about Telemachus's compensation, the board designated a committee consisting of Levins and a now former director named Behrakis to review the matter; after presenting the results of that review to the directors on October 23, 2001, Levins moved that Telemachus Demoulas's compensation be eliminated, and directors Darman, Shea, Roazen and Pendergast voted against it; next Behrakis presented a motion to reduce Telemachus Demoulas's salary to $300,000 per year; the Behrakis motion did not receive a second, including by either Arthur S. or Levins; no further action was taken on the subject at the October 23, 2001, meeting; later, at a meeting on May 15, 2002, Levins again moved to eliminate Telemachus Demoulas's salary, but to pay him a reasonable consulting fee for the time he actually consulted with any member of the management team, which vote failed two to five, with Darman, Shea, Roazen and Pendergast, along with Behrakis, voting in the negative; [FN5] the subject did not come up again prior to Telemachus Demoulas's death in 2003.

> FN5. Carleton did not become a director until June 2002, and, therefore, he did not participate in this, or several of the other matters complained of

**\*11** Arthur S. next charges the defendant directors with failure to question Arthur T.'s salary. The evidence supports the following findings on this issue: Arthur T. has worked for DSM for about 27 years; his compensation is not set by the directors, but rather by management; members of management reported to the directors that Arthur T. has been "a great asset to the company"; Arthur T.'s compensation is significant, but less than each of the four vice presidents of DSM; in or around October 2001, Arthur T.'s salary was increased by management from $520,000 per year to $750,000

(C) 2005 Thomson/West. No Claim to Orig. U.S. Govt. Wo

Westlaw.

per year; on several occasions, various directors and members of management made statements to the effect that Arthur T. was not really an important employee at DSM and that the company would not suffer if he left; no board vote on Arthur T.'s compensation was presented at the evidentiary hearing.

While the amount of compensation for Telemachus Demoulas and Arthur T. might seem large to many, when viewed within the backdrop of what DSM produces generally, and has produced recently for shareholders like Arthur S. specifically, a vastly different portrait emerges.

The gross annual income of DSM was said by Arthur S. to be "a little less than" $2 billion dollars a year. The approximate annual net income, he suggested, is around $180 million.

In November 2002, DSM distributed $545 million to its shareholders. The directors' vote for that distribution came at the same September 18, 2002, meeting that Arthur T. first presented his request for a waiver. Arthur S.'s share of that distribution was "in the ballpark of 54 and a half million dollars."

Arthur S. charges the defendant directors with failure to properly supervise the activities of Arthur T. with regard to the DSM profit sharing plan. The evidence supports the following findings on this issue: Arthur T. and D. Harold Sullivan have been trustees of the profit sharing plan since 1986; the directors appoint the trustees; the plan is for the DSM employees and, at the time of the hearing, had approximately $250 million in assets; no person suggested by Arthur S. or his family has ever been a trustee of the plan; there was a history of litigation and Department of Labor issues regarding the plan, all of which was resolved long before any of the present directors were elected; at a March 27, 2001, directors meeting, the trustees of the plan were directed to report to the board at the next meeting with respect to the management, assets and related matters involving the plan; the directors engaged the law firm of McDermott, Will & Emery to advise them on their duties regarding the plan; on advice of McDermott, Will & Emery to director chair Shea, the trustees of the plan were excused from coming to the next meeting because of, Shea said, the law firm's concern that their appearance might subject the board to duties with respect to the plan; no

McDermott, Will & Emery witness testified at the evidentiary hearing; again, at the October 23, 2001, directors meeting, the directors defeated a vote to request the plan trustees to appear and decided instead to hire a consultant to review the trustees' performance; Mercer Consulting, however, was not engaged as that consultant until after the filing of this law suit; there is no evidence of poor performance by the plan, in which company profits of approximately 15% of DSM's payroll are invested yearly, yielding a fund currently well in excess of $200 million; the trustees retain professional investment advisers to manage the plan assets, which include both State Street Bank and Goldman, Sachs; the plan is audited yearly by an independent accounting firm.

*12 Arthur S. complains that the defendant directors have improperly continued to retain Sullivan & Bille, the accounting firm that also acts for members of Arthur T.'s family. The evidence supports the following findings on this issue: Sullivan & Bille has performed accounting work for DSM for many years; D. Harold Sullivan of that firm was a close personal friend of Telemachus Demoulas for 40 years; Sullivan was criticized for his activities in support of Telemachus Demoulas against the interests of DSM in the prior lawsuit; Deloitte & Touche currently reviews Sullivan & Bille's work for DSM, pursuant to a court order, and has not identified any material problems with that audit work; there was an effort to switch the accounting work to KPMG, but a motion to do so was defeated by Darman, Roazen, Carleton and Shea.

During the course of consideration of Arthur T.'s request, and on advice of the then President of the Massachusetts Bar Association, the directors engaged attorney James Wallace of Bowditch & Dewey to advise them and to negotiate terms with Arthur T. regarding his situation after the transfer of his stock. The Court does not find the engagement of Mr. Wallace to be, as charged by Arthur S., a failure to seek appropriate legal advice on Arthur T.'s proposal and contract.

The coordinator or intermediary from the directors to Mr. Wallace was Darman, who also acted as counsel for DSM. Arthur S. charges that Darman, because he also served as counsel to Arthur T., had conflicts of interest that made his role as

Westlaw

intermediary with Mr. Wallace inappropriate.

It seems appropriate to recite Mr. Wallace's final conclusions to the directors after his review of the situation. Mr. Wallace provided to the directors a letter dated June 13, 2003, containing his opinions on certain issues. The letter is attached to the complaint as Exhibit E. In the letter he opined that, in the absence of a noncompetition agreement, an at-will employee like Arthur T. may leave his employment and, subject to certain restrictions, engage in competition with his former employer, but he could not misappropriate trade secrets or use confidential information for his own interests. Mr. Wallace also observed, however, that Arthur T. is a minority shareholder as well as an employee and therefore has fiduciary duties--explained in the letter--running to DSM arising from that status. Mr. Wallace's letter concludes with the following two paragraphs addressing the proposed agreement with Arthur T.:

Absent controlling case law, it cannot be said with certainty that Arthur T.'s transfer of the DSM shares to Maureen and Maureen's subsequent transfer of the shares to the voting trust release Arthur T. of his fiduciary duties to DSM and the other shareholders. Therefore, with respect to the issue of corporate opportunities, we cannot advise DSM and its Board of Directors that entering into the proposed agreement with Arthur T. provides DSM with greater protections than DSM is entitled to under common law. On the other hand, the non-competition and non-solicitation provisions of the proposed agreement clearly afford DSM greater protection than it would have vis-a-vis Arthur T. as a former employee.

*13 Given the uncertain state of the law and the dynamics of the parties, the Board must make a business judgment and take the action that it believes is in the best interests of the company.

After the discussions at the August 4, 2003, directors meeting, by a vote of five to two, the proposed transfer of Arthur T.'s shares and the agreement negotiated by Mr. Wallace were approved. It was the five defendant directors who voted in favor.

Whatever may be the legal or ethical issues relating to Darman serving as the intermediary with Mr. Wallace--a subject upon which this Court makes no ruling here--it seems quite clear, and this Court finds, that Mr. Wallace was not inhibited in any

way in his work, and his advice to the directors was clearly spelled out. Whether he would have opined differently had he known more about Darman's representation of Arthur T. or had he known that Arthur T. also had a controlling interest in more than just the stock standing in his name, at this time, at least, remains unknown because Mr. Wallace was not a witness, nor did he submit any affidavit, at the evidentiary hearing. This Court, therefore, finds that the directors were not misled or ill advised by Mr. Wallace as a result of Darman's professional relationship with Arthur T.

Arthur S. also alleged that the defendant directors ignored evidence that Arthur T. had invested in a spring water company that was said by Arthur S. to be a corporate opportunity for DSM. The Court makes no findings on this issue. It recalls no evidence on the point. Arthur S. makes no request for findings on this issue, perhaps for the same reason.

Arthur S. charges that the defendant directors voted to approve the agreement with Arthur T. and grant his requested waiver despite Arthur T.'s stated intention to compete with DSM. This Court does not find differently. Arthur T.'s reasoning for seeking the waiver are clearly spelled out in his initial memorandum of September 9, 2002, quoted above, in pertinent part, on p. 3.

The last claim in the complaint is that the defendant directors' stated reasons justifying their vote on Arthur T.'s proposal were "entirely pretextual." This Court makes no finding or ruling on this charge because whatever the directors' stated reasons were does not constitute evidence that they were under the "controlling influence" of Arthur T.

RULINGS OF LAW

The Court begins these rulings of law with some general comments regarding matters of corporate governance and the role of the Court in connection therewith.

The purpose of the distinction between interested and disinterested directors is to ensure that the directors voting on a plaintiff's demand can exercise their business judgment in the best interests of the corporation, free from significant contrary personal interests and apart from the domination and control of those who are alleged

(C) 2005 Thomson/West. No Claim to Orig. U.S. Govt. Wo

to have participated in wrongdoing. See Rales v. Blasband, 634 A.2d 927, 936 (Del.1993). If the plaintiff has failed to allege facts that meet this standard with regard to particular board members for purposes of a ruling on a motion to dismiss, that member is deemed "disinterested."

**\*14** Harhen, supra, 431 Mass. at 843-44.

As stated earlier,
The rationale behind the demand requirement is that, as a basic principle of corporate governance, the board of directors or a majority of shareholders should set the corporation's policy, including the decision whether to pursue a lawsuit. See Bartlett v. New York, NH and H.R.R., [221 Mass. 530, 532 (1915) ]; Dunphy v. Traveller Newspaper Ass'n, 146 Mass. 495, 497 (1888) ( "It would be contrary to the fundamental principles of corporate organization, to hold that a single shareholder can at any time launch the corporation into litigation ... to prevent methods of management which [he or she] thinks unwise").
Id. at 844.
The fact that the procedural requirement of a demand is excused in a given case ... does not extinguish the substantive principle that the decision as to what is in the corporation's best interest is a matter of business judgment. An independent and unbiased committee can weigh and balance the divers factors in a given case and make a business judgment as to the proper course of action.
Houle, supra, 407 Mass. at 821.

"[C]ourts must be careful not to usurp the committee's valuable role in exercising business judgment." Id. at 822.
The judge must determine, on the basis of the evidence presented, whether the committee reached a reasonable and principled decision. Even in those cases where a committee is independent and conducts a thorough investigation, the judge may conclude that the committee's decision is contrary to the great weight of the evidence. In conducting its review, the court should look to factors such as those identified by ALI, which include the likelihood of a judgment in the plaintiff's favor, the expected recovery as compared to the out-of-pocket costs, whether the corporation itself took corrective action, whether the balance of corporate interests

warrants dismissal, and whether dismissal would allow any defendant who has control of the corporation to retain a significant improper benefit. See ALI Principles of Corporate Governance, sec. 7.08 (Tent. Draft No. 8, 1988).
Id. at 824-25.

Houle, in footnote 10, counsels that the "evidence" referred to "will often constitute policy factors which bear on the propriety, in a business sense, of pursuing the derivative suit. The judge should weigh such considerations along with all others to determine whether they fairly support the committee's ultimate decision." And in footnote 11, the Houle court states, without explaining how, that "[t]he factors which contribute to making a corporation a close corporation may ... bear on the independence and good faith of a committee in such a corporation," and "a reviewing court should consider those factors in its inquiry."

As said above, Harhen and Houle each were focused on special litigation committees appointed by boards of directors, which appointing-directors were in one instance disinterested and in the other interested. This Court, in this case, sees no valid reason to treat the directors themselves any differently, and it will not.

**\*15** This Court detects in Harhen and Houle, two very recent decisions, a distinct and strong message that the SJC wants trial judges to recognize that it is directors that determine issues and exercise business judgments for corporations, not judges whose total knowledge of what makes good business sense is enormously limited. Arthur S. brushes aside Dunphy v. Traveller Newspaper Ass'n, 146 Mass. 495, 497 (1888), as a 19th-century relic. He seems to overlook the fact that Dunphy was cited with approval in Harhen, a 21st-century decision.

Corporations, it must be remembered, are not institutions established to ponder and make judgments on matters of morality and purity; they exist primarily to make money for the shareholders. The "raised eyebrow" is said to be the compass to find liability by someone inured to the rough and tumble of the world of commerce; rascality, not an absence of purity, is what is seen as wrongdoing in the business world. See, e.g., Levings v. Forbes & Wallace, Inc ., 8 Mass.App.Ct. 498, 504 (1981). Nor should this case metamorphose into a form of

(C) 2005 Thomson/West. No Claim to Orig. U.S. Govt. Wo

Not Reported in N.E.2d
(Cite as: 2004 WL 1895052, *15 (Mass.Super.))

Page 34

Dickensian Christmas Carol, replete with ghosts from Christmases past providing grounds for litigation over every perceived slight.

The mere fact that directors were selected, nominated and elected by a particular shareholder has long been rejected as insufficient to establish a director's lack of independence or disinterestedness. Dunphy, supra, 146 Mass. at 498. See also Aronson v. Lewis, 473 A.2d 805, 815 (Del.1984); White v. Panic, 793 A.2d 356, 366 (Del.Ch.2000).

Arthur T. may be grasping for a vehicle that freed him from fiduciary obligations to DSM, a company that has made him a very wealthy man. Arthur S., in an identical economic position from the same DSM, may well want to build a high barricade to thwart his cousin's desire. But their personal animosity--well demonstrated in the annals of Massachusetts law--is not what should be the controlling feature here. Rather, what is important is the best interests of DSM and how that is achieved by those asked to direct it. The test of whether the directors have failed, or have favored Arthur T. over Arthur S., is not dressed in absolute perfection, but rather in whether they acted in good faith, unfettered by the controlling influence of Arthur T.

Arthur S. and the Court disagree over who, as between him and the defendant directors, has the burden of proof in the present situation. One can read Houle and Harhen over and over again and still be left with doubt. Consequently, this Court, having now seen and heard the antagonists on the witness stand, under oath, and reviewed the documentary evidence, will proceed to decide the issue without being controlled by any burden of proof position.

What was presented by the evidentiary hearing and the briefing that followed revealed a tacit admission by Arthur S. that no single act or factor is sufficient to establish that Arthur T. maintained a controlling influence over the unbiased business judgment of any of the directors, particularly Carleton, Roazen, Shea and Pendergast. Thus, Arthur S. asks this Court to aggregate events and find bias from an array of separate incidents and past decisions claimed to favor Arthur T. and his side of the family as "powerful evidence of a controlling interest." See Plaintiff's Post-Hearing Reply Memorandum, p. 5. These other facts, however,

must "raise a significant prospect that the directors would be adjudged liable to the corporation or its shareholders." ALI Principles, sec. 1.23(c).

*16 On the very next page of Arthur S.'s Post-Hearing Memorandum, he lays out the essence of his position:

A single decision favorable to a control group might have been on the merits. However, it is highly unlikely that an unbroken succession of decisions that protect or advance the interests of a control group is the product of unfettered business judgment--particularly in the absence of any decision that was opposed by the control group or that favored other stockholders over the control group. That is a pattern that exists in this case.

Even as an abstract statement, this Court finds the foregoing hard to credit under the circumstances presented here. But when examined more closely, it fails completely.

First, the use of the phrase "highly unlikely" suggests something that means that the Court must presume the defendant directors were under the controlling interest of Arthur T. This Court declines to rest this case on such a presumption.

Next, Arthur S.'s case is grounded on two propositions upon which any evidence was lacking: (1) "an unbroken succession of decisions that protect or advance the interests of a control group"; and (2) the existence of a "control group."

As stated above, the Court was not presented with "an unbroken succession of decisions"; nor were the events that were presented shown to protect or advance the interests of any control group, as opposed to addressing issues in the interest of DSM. It is the latter that is the duty of directors, not the favoring of one shareholder over another. Here, some of the decisions challenged were the product of events that occurred before any of the defendant directors held their positions. See for example, the setting of Telemachus Demoulas's compensation, the employment of the trustees for the DSM Profit Sharing Plan and the engagement of Sullivan & Bille as accountants. The fact that the new directors only discussed, but did not take determinative action on these points, hardly can be said to be "an unbroken succession of decisions" favoring anyone. Further, on several of the matters occurring before June 2002, Carleton was not even a board member. On

Westlaw.

Not Reported in N.E.2d
(Cite as: 2004 WL 1895052, *16 (Mass.Super.))

others, who but DSM is favored? See the matters relating to the trustees and their action with regard to the DSM Profit Sharing Plan or the retention of Sullivan & Bille as accountants.

Perhaps the factor that shatters this whole theory is the issue of what is meant by the phrase "control group." Of course the Court understands Arthur S. to mean those people who own a majority of the votable stock in DSM. But the phrase "control group" has a special meaning in corporate law. It refers to a group with authority to direct the corporation's actions. See, e.g., Upjohn Co. v. United States, 449 U.S. 383 (1981). Persons in a control group of certain corporations are subject to special obligations under the securities laws. See, e.g., In re Fidelity/Micron Securities Litigation, 964 F.Supp. 204 (D.Mass.1997).

*17 Arthur S. has alluded to, but presented no explanatory information regarding, some form of "arrangement" between his sister-in-law, Rafaele, an A shareholder and the B shareholders. Absent such an arrangement--indeed, even with it--the A shareholders control 2,500 shares of DSM, and the B shareholders control only 2,450 shares. This should put the A shareholders in control. What prevents the A shareholders from exercising their controlling vote--assuming, of course, they could agree among themselves to vote as a block--is the dispute between Arthur S. and Rafaele. This does not make the B shareholders a control group--other than potentially, unless there is something that has not been shown that binds them to vote as a group, and even then only as long as Arthur S. and Rafaele continue to squabble. In short, it would seem that voting control, which is what Arthur S. appears to be equating with the phrase "control group," is within the A shareholders' ability to achieve if they would only resolve their own internal dispute. They, thus, seem like Shakespeare's "enginer ... hoist with his own petar." [FN6] This does not make a control group of the various B shareholders in a way that makes the directors, or some of them, appear to have produced a succession of decisions favorable to that group.

FN6. The Tragicall Historie of Hamlet Prince of Denmarke, Act III, Scene iv, lines 206-07.

Recently, the Delaware Chancery Court stated the issue now before this Court as follows: "At bottom,

the question of independence turns on whether a director is, for any reason, incapable of making a decision with the best interests of the corporation in mind." In re Oracle Corp. Derivative Litigation, 824 A.2d 917, 938 (Del.Ch.2003). "The primary basis upon which a director's independence must be measured is whether the director's decision is based on the corporate merits of the subject before the Board, rather than extraneous considerations or influences." Beam v. Stewart, 845 A.2d 1040, 1049 (Del.2004). Having these principles in mind, this Court concludes and rules that, to the extent it may be their burden to prove, the DSM directors Carleton, Roazen, Shea and Pendergast, at least, have established that they were not "interested" or "biased," nor were they under the controlling influence of Arthur T. in acting upon his request for a waiver for the transfer of his stock in DSM to his wife Maureen, and then for her subsequent transfer of such stock to an irrevocable voting trust.

Further, and to the extent relevant to this issue, this Court rules that the decision by the DSM directors to grant the waiver was not lacking in rational business judgment. The process, from September 2002 through August 2003, as revealed in the verbatim transcripts of the directors meetings, demonstrates to the reader the careful and extensive attention given by the DSM directors to the matter in issue and the lack of bias in the process. Such a reading also reflects the difficulty faced by this particular board in attempting to run a company in the midst of the family shareholders' immense animosity. Every director's act or word is suspected of having an ulterior motive at its base.

*18 The denial--given the opportunity--to proceed to a trial seeking damages, which seem ephemeral at this time, or a declaratory judgment, which seems premature at this time, would not be an aberrant exercise of business judgment by those directors.

This board was faced with several options that it could not--and did not--avoid considering. On Arthur T.'s request for a waiver it could: (1) refuse to act and run the risk that it would be sued by Arthur T., or that he would consider any refusal to act to be a de facto denial to set in motion the appraisal and purchase option, thereby freeing him to transfer his stock as he saw fit; (2) act on the request, and deny it, thereby setting up the same scenario as in the first option; (3) act, conduct the

Not Reported in N.E.2d

**(Cite as: 2004 WL 1895052, \*18 (Mass.Super.))**

appraisal and buy his stock, thereby freeing him from any fiduciary obligations and providing him with a large sum of money with which to compete; (4) act and allow the request, with an attempt to obtain some protection from future competition and the acquisition of corporate opportunities, and get sued by Arthur S., as it was. Indeed, there may be other options as well. But key to all this is Mr. Wallace's closing words in his letter of June 13, 2003: "Given the uncertain state of the law and the dynamics of the parties, the Board must make a business judgment and take the action that it believes is in the best interests of the company."

The courts of Massachusetts have contributed substantial time and effort to sort out the issues relating to ownership and control of DSM by and among the members of the Demoulas family. Judge Lopez, in splitting the stock ownership with 2,500 for Arthus S.'s side and 2,450 for Arthur T.'s side, directed a massive shift in control. It is not the Massachusetts courts' fault that a rift between two of the A shareholders now has, for the present at least, nullified Judge Lopez's efforts.

Similarly, Judge Lopez rendered a significant ruling when she established a basis whereby a board of directors for DSM could be split equally with two each between the A and B shareholders, and with an additional three disinterested directors to be elected by all shareholders choosing to vote. Again, it is not the Massachusetts courts' fault that the affected parties' own inability to agree has resulted in a shift in that balance.

Nor, however, are those shifts in any way proof of disqualifying interest or lack of good faith by those directors who struggle to act in DSM's best interest in the midst of a familial rugby scrum that greatly impedes their efforts.

In so ruling, this Court makes no determination whatsoever regarding the effect of such a stock transfer as sought by Arthur T., in the manner proposed, on any continuing fiduciary duties he may continue to have to DSM, a closely-held Massachusetts corporation.

18 Mass.L.Rptr. 130, 2004 WL 1895052 (Mass.Super.)

END OF DOCUMENT

© 2005 Thomson/West. **No Claim to Orig.** U.S. Govt. Wo

Westlaw.

Not Reported in N.E.2d
(Cite as: 1999 WL 823656 (Mass.Super.))
< KeyCite Citations >

Page  5

Only the Westlaw citation is currently available.

Superior Court of Massachusetts.

**FARRAGUT MORTGAGE CO., INC., and others, [FN1]**

FN1. John R. Lakian, Andrea Lakian, The Lakian Foundation, Edward D. Lagarde, David C. Keating as Trustee of the Robin Trust, Alice Trust, Christopher Trust, and Joshua Vernaglia, Carolyn Vernaglia, George R. Begley, Barbara Begley, Kenneth J. Macleod, Leonard A. Zoll, Roger J. Stone and Nydia Stone.

v.

**Arthur ANDERSEN LLP, and another, [FN2] third party plaintiffs,**

FN2. Michael K. Devlin.

v.

**J.I. KISLAK, INC., and another, [FN3] third party defendants.**

FN3. KPMG Peat Marwick LLP.

**No. 95-6231-B.**

Aug. 5, 1999.

MEMORANDUM OF DECISION AND ORDER ON:

BURNES.

*1 I. PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AGAINST DEFENDANTS;

II. DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AGAINST PLAINTIFFS;
III. PLAINTIFFS' MOTION FOR PARTIAL SUMMARY AGAINST THIRD-PARTY DEFENDANTS;
IV. THIRD-PARTY DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AGAINST PLAINTIFFS; AND
V. THIRD-PARTY DEFENDANTS MOTION FOR SUMMARY JUDGMENT AGAINST THIRD-PARTY PLAINTIFFS

INTRODUCTION

Plaintiffs Farragut Mortgage Co., Inc. ("Farragut") and the Farragut Shareholders ("Farragut Shareholders") filed this action against defendants Arthur Andersen LLP and Michael Devlin, a partner (collectively "Arthur Andersen"), for misrepresenting and providing erroneous accounting advice with respect to a contemplated merger transaction between Farragut and J.I. Kislak, Inc. ("Kislak").

Arthur Andersen brought a third-party claim against Kislak and KPMG Peat Marwick LLP ("KPMG"), the accounting firm that represented Kislak in the proposed merger, for negligently providing Arthur Andersen with an erroneous opinion and misrepresenting Kislak's eligibility and qualification to merge using pooling-of-interests accounting.

The Farragut Shareholders subsequently filed a claim against third-party defendant KPMG for negligently misrepresenting Kislak's eligibility and qualifications to merge using pooling-of-interests accounting.

Farragut now moves for partial summary judgment against defendants Arthur Andersen and third-party defendant KPMG; Arthur Andersen moves for summary judgment against Farragut; the Farragut Shareholders move for summary judgment against KPMG; and third-party defendant KPMG moves for summary judgment against the Farragut Shareholders and third-party plaintiffs Arthur Andersen.

For the reasons set forth below: (i) Farragut's motion for partial summary judgment against Arthur Andersen is DENIED ; (ii) Arthur Andersen's motion for summary judgment against Farragut is ALLOWED in part, and DENIED in part; (iii) Farragut Shareholders' motion for partial summary judgment against KPMG is DENIED ; (iv) KPMG's motion for summary judgment against the Farragut Shareholders is ALLOWED ; and (v) KPMG's motion for summary judgment against Arthur Andersen is ALLOWED.

BACKGROUND

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Wo

Westlaw

Not Reported in N.E.2d
(Cite as: 1999 WL 823656, *1 (Mass.Super.))

Page 6

Farragut Mortgage Co., Inc, a business incorporated in Massachusetts, was engaged in the residential mortgage banking business. This involved the origination, purchase, sale and servicing of residential mortgage loans. In early 1993, Farragut sought to increase shareholder value and to minimize the recent losses the company incurred. Farragut hired an investment bank, Adams & Co., to solicit proposals to find a buyer. Adams & Co. targeted 250 different parties, of which 38 companies expressed an interest and responded to the solicitation. Farragut eventually executed a confidentiality agreement with the interested parties and four prospective bidders emerged. Some of the bidders offered to purchase the company for approximately $5.00 per share. J.I. Kislak, Inc., a privately held mortgage company, incorporated in New Jersey and headquartered in Florida, proposed a merger deal with Farragut. Similar to Farragut, Kislak also engaged in the mortgage banking business. The proposed merger would leave Kislak, to be named Kislak Financial, Inc., as the surviving entity. Farragut terminated negotiations with the other bidders to pursue the merger proposed by Kislak.

*2 In the Spring of 1993, Kislak and Farragut began negotiating a merger agreement. The merger was to be accomplished by the issuance of new shares of Farragut stock to Kislak's shareholders in exchange for their shares of Kislak stock. Kislak offered the Farragut Shareholders $6.00 per share. The exchange would give Kislak shareholders an 88.8% ownership interest in the combined entity, and the Farragut shareholders would own the remaining 11.2% of the combined entity. One of the conditions of the merger, as established by Kislak, is that the deal must qualify for "pooling-of-interests" accounting.

The criteria for the pooling method accounting relate to the attributes of the combining enterprises before the combination, the manner of combining the enterprises, and the absence of certain planned transactions after the combination. See generally Financial Accounting Standards Board, Current Text, Accounting Standards June 1, 1996, Section B50 (1996). The pooling-of-interest method accounts for a business combination as the uniting of the ownership interests of two or more companies by exchange of equity securities. No acquisition is recognized because the combination is accomplished

without disbursing resources of the constituents. Ownership interests continue and the former bases of accounting shall be retained. The recorded assets and liabilities of the constituents shall be carried forward to the combined corporation at their recorded amounts. Income of the combined corporation shall include income of the constituents for the entire fiscal period in which the combination occurs. The reported income of the constituents for prior periods shall be combined and restated as income of the combined corporation.

The pooling-of-interests method of accounting is intended to present as a single interest two or more common stockholder interests that were previously independent and the combined rights and risks represented by those interests. Id. at B50.104. That method shows that stockholder groups neither withdraw nor invest assets but in effect exchange voting common stock in a ratio that determines their respective interests in the combined enterprise. "A business combination that meets all of the conditions specified and explained in paragraphs B50.105 through B50.107 shall be accounted for by the pooling-of-interests method." Id. (Emphasis in the original).

Under this method of accounting, the surviving entity will not have to take on to its balance sheet the good will created in the other company as a result of the merger. If the surviving entity did have to take that good will on to its balance sheet, it would have write down that good will in the future, negatively affecting the reported earnings of the surviving entity.

According to the Financial Accounting Standards Board, there are two essential attributes for combining enterprises: (1) each of the combining enterprises should be autonomous and not been a subsidiary or division of another enterprise within two years before the plan of combination is initiated; and (2) each of the combining enterprises should be independent of the other combining enterprises. Id. at B50.105.

*3 Farragut hired the public accounting firm Arthur Andersen to review the merger between Farragut and Kislak. In order to evaluate whether the merger between Farragut and Kislak could be accounted for as a pooling-of-interests, it was necessary to evaluate: (i) the pre-combination

(C) 2005 Thomson/West. No Claim to Orig. U.S. Govt. Wo

Westlaw.

attributes of Farragut; (ii) the pre-combination attributes of Kislak; and (iii) the structure of the merger. Prior to signing the Merger Agreement on July 2, 1993, Farragut relied on Arthur Andersen's representation that the merger between Kislak and Farragut should qualify for pooling-of-interests accounting.

As Farragut's accountant, Arthur Andersen was to conduct two functions. First, Arthur Andersen was to advise Farragut regarding the pre-merger pooling evaluation of the deal, pursuant to Section 5.15 of the Merger Agreement, and determine, based on the facts and circumstances known to it at the time, as to whether Farragut could participate in the merger transaction and if that merger would qualify for pooling-of-interests accounting. In essence, Arthur Andersen was to advise Farragut, prior to the signing of the Merger Agreement on July 2, 1993, whether the merger as contemplated would qualify for pooling-of-interests accounting. Section 5.15 states as follows:

> Pooling-of-interests Accounting. [Farragut] has requested its auditors, Arthur Andersen & Co., to review [Farragut's] statements of financial condition, results of operations and stockholder's equity for the past two years (including, without limitation, the ownership of and transactions in capital stock of [Farragut] ), together with this Agreement, the Stock Agreement, the KISLAK Shares Agreement and the transactions contemplated hereby and thereby, for the purpose of evaluating and determining whether there is any reason why the Merger, as provided for under the terms and provisions of this Agreement, may not be accounted for as a "pooling-of-interests".

Second, Arthur Andersen was to render a final written opinion at the close of the merger which indicated that the deal would qualify for pooling-of-interests accounting. See Section 8.2 of the Merger Agreement. Section 8.2 states as follows:

> Conditions to Obligations of the Company to Effect the Merger. The obligation of [Farragut] to effect the Merger shall be subject to the satisfaction at or prior to the Effective Time of the following additional conditions:
> (c) Accountants' Pooling Letter. [Farragut] shall have received a letter, dated the Effective Time, from the Company's auditors [Arthur Andersen], addressed to the Company and reasonably satisfactory to them, to the effect that the Merger

will qualify for "pooling-of-interests" accounting treatment under generally accepted accounting principles.

Commencing shortly after May 21, 1993, Arthur Andersen reviewed drafts of the merger agreement, which contained a requirement that the merger qualify for pooling-of-interests accounting. The deal would proceed so long as the accounting firms for both parties agreed that the merger would be treated as pooling-of-interests accounting.

*4 Similarly, Kislak retained KPMG, its outside auditor of several years, to review the merger transaction and provide a pre-merger pooling opinion and evaluate whether the proposed merger deal would qualify for pooling-of-interests accounting, pursuant to section 4.8 of the Merger Agreement. Section 4.8 of the Merger Agreement states part:

> In order to induce [Farragut] to enter into this Agreement, KISLAK represents and warrants to, and agrees with [Farragut] as follows:
> Pooling-of-interests Accounting. KISLAK has requested its auditors, KPMG ..., to review KISLAK's statements of financial condition, results of operations and stockholder's equity for the past two years (including, without limitation, the ownership of and transactions in capital stock of KISLAK), together with this Agreement, the Stock Agreement, the KISLAK Shares Agreement and the transactions contemplated hereby and thereby, for the purpose of evaluating and determining whether there is any reason why the Merger, as provided for under the terms and provisions of this Agreement, may not be accounted for as a "pooling-of-interests".

In accordance with section 8.3(c) of the Merger agreement, KPMG was also required to render a final written opinion at the merger closing which would confirm that the deal qualified for pooling-of-interests accounting. Section 8.3(c) states as follows:

> Conditions to Obligations of the Company to Effect the Merger. The obligation of [Kislak] to effect the Merger shall be subject to the satisfaction at or prior to the Effective Time of the following additional conditions:
> (c) Accountants' Pooling Letter. [Kislak] shall have received a letter, dated the Effective Time, from the Company's auditors [KPMG], addressed

Westlaw.

Not Reported in N.E.2d
(Cite as: 1999 WL 823656, *4 (Mass.Super.))

to the Company and reasonably satisfactory to them, to the effect that the Merger will qualify for "pooling-of-interests" accounting treatment under generally accepted accounting principles.

KPMG and Arthur Andersen were not parties to the Merger Agreement. However, if either of the accounting firms believed that the merger would not qualify for pooling-of-interests accounting, then the deal could be terminated. Both accounting firms represented to their respective clients, that "based upon all the facts and circumstances known to them as of July 2, 1993, the merger should qualify for pooling-of-interests accounting treatment under generally accepted accounting principles." The Merger Agreement was signed by Kislak and Farragut on July 2, 1993.

The Merger Agreement contained several conditions which the parties had to comply with prior to the closing of the deal. The conditions included: (i) that the merger be accounted for as a "pooling-of-interests" between Kislak and Farragut; (ii) Farragut could not sell off assets during the pendency of the deal, other than in the course of ordinary business; and likewise, Jay Kislak, the majority shareholder of Kislak, [FN4] could not dispose of shares of Kislak stock until after the consummation of the proposed merger (shareholder lock-up agreement); (iii) Farragut's corporate value must meet a certain "net worth" at the time of the closing; and (iv) the closing of the proposed merger was to be completed by November 30, 1993. Farragut entered into this agreement under the presumption that the merger proposal would qualify for pooling-of-interests accounting because the opinions given by Arthur Andersen and KPMG indicated that the pre-qualification attributes of Farragut and Kislak would allow the merger to be accounted for as a pooling-of-interests.

> FN4. The Kislak Shares Agreement reveals that Jay Kislak owned 3,683 shares of Kislak stock. The Shares Agreement did not disclose what percentage of the outstanding shares was owned by Jay Kislak.

*5 After the Merger Agreement was executed, market events caused Farragut to suffer financial losses. In particular, Farragut's most important asset, its loan servicing portfolio, was significantly reduced. Consequently, Farragut issued a press release indicating it had suffered financial losses of

$1.9 million for the six months ended June 30, 1993. [FN5]

> FN5. As of June 30, 1993, Farragut's mortgage servicing portfolio was valued at $11.7 million, and Farragut common stock was traded at 6 1/8 per share on July 2, 1993.

During this market downturn, the parties agreed to amend the Merger Agreement. On August 27, 1993, the parties amended the Merger Agreement to include a "minimum net worth" test. Kislak could terminate the merger in the event that Farragut suffered a "material adverse" change to its financial condition and failed to meet a minimum net worth. A change in Farragut's financial condition would not be considered material so long as the stockholders' equity of Farragut equaled or exceeded $10.3 million and the Adjusted Tangible Net Worth of Farragut equaled or exceeded $9.0 million. The parties also amended the closing date, and changed it from November 30, 1993 to December 31, 1993.

In addition, during this period, the parties also undertook, with their counsel, to draft the Farragut S-4 Registration Statement to submit to the Securities and Exchange Commission ("SEC"). In accordance with the requirements of the Securities Act of 1933, the proposed merger could not close unless the SEC declared the Registration Statement effective. The Registration Statement had to be deemed effective by the SEC before it could be issued to the public, and it had to be issued to the public at least 20 days before the transaction could be consummated. Before declaring the Registration Statement effective, the SEC had to approve pooling-of-interests accounting in the proposed merger; but it could also preclude the proposed merger from pooling treatment. The SEC also had the authority to require Farragut to re-state the S-4 Registration Statement until the SEC was satisfied with the terms and disclosures of the Registration Statement. On August 31, 1993, the companies submitted a draft S-4 Registration Statement to the SEC for comments.

The S-4 Registration Statement included statements that explained the recent market events that caused a deterioration in Farragut's financial conditions. The S-4 characterized the deterioration in Farragut's financial status as "recent" changes and

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Wo

Westlaw.

also disclosed that Farragut was projecting further losses. The Registration Statement stated that: (i) certain of Kislak's existing shareholders were also shareholders of Kislak National Bank (KNB); (ii) the majority shareholder of Kislak was identified as Jay Kislak, with a controlling 51.4% beneficial interest; and (iii) Jay Kislak was also Chairman of KNB's Board of Directors. [FN6]

FN6. The S-4 Registration Statement states in part: "Certain of Kislak's existing shareholders are also shareholders of Kislak National Bank ("KNB"), a commercial bank with assets of approximately $400 million. KNB provides Kislak with a warehouse facility, in addition to being a depository institution for a portion of the servicing related trust funds controlled by Kislak and cash operating accounts. Kislak provides KNB with various administrative and other services related to mortgage loans pursuant to a sub-servicing contract, as well as certain management training, consulting and other services not related to mortgage loans. The post-Merger entity expects to continue to provide such services to KNB following the Merger, for which it will receive a compensation at competitive rates. While the post-Merger entity expects to be able to maintain existing financing arrangements with KNB, or to obtain replacement financing (as to which there are no restrictions) as its lending arrangements with KNB mature or are terminated for any other reason, there can be no assurance that such financing will be available on favorable terms. The ability of Kislak's existing shareholders to significantly influence the affairs of the post-Merger entity, as well as the degree to which existing shareholders of Kislak have a controlling interest in KNB may give rise to conflicts of interests."

On October 14, 1993, the SEC responded to the draft S-4 Registration Statement and raised 108 questions. Five questions related to pooling treatment. The SEC indicated that "it appears that the merger would not qualify for pooling treatment." The SEC raised issues regarding the eligibility of Farragut to participate in a pooling of interest transaction. The SEC also raised questions about whether Jay Kislak, Kislak, and Kislak National Bank (KNB) were autonomous. [FN7]

FN7. The undisputed facts from the record indicate that: (i) Kislak serves as program administrator and/or master of servicing and Kislak receives revenues

from KNB for loan production and processing in the amount of $7.3 million; (ii) Kislak maintains deposits with KNB of $122 million; (iii) Kislak provides sub-servicing of mortgage loans for KNB for a total of $2.6 billion; (iv) Kislak receives loan production revenues from KNB of $4.3 million; (v) Kislak maintained deposits at KNB aggregating $154.2 million; (vi) nine officers/directors of Kislak and its subsidiaries are officers or directors of KNB; (vii) the combined statements for Kislak and KNB are presented to Kislak's Board of Directors on a quarterly basis; (viii) Kislak's compensation committee reviews KNB's performance and makes recommendations for Jay Kislak's bonus at KNB; and (ix) Kislak and KNB also share common facilities, with their headquarters located in the same place.

**6** On or about October 27, 1993, the parties responded to the SEC comments. The response letter indicated that prior to filing the S-4 Registration Statement, meetings were held by both companies, with their respective external accountants, to "discuss the applicability of pooling-of-interests accounting," and "both ... independent certified public accountants believe that ... the proposed merger qualifies [for pooling treatment]."

Additionally, for the period ended October 31, 1993, the record shows that the Farragut shareholders' equity fell below $10.3 million and its Adjusted Tangible Net Worth was below $9.0 million--Farragut's net worth was approximately $2.9 million below the requisite amount needed to close the deal. Concerned that Farragut might not meet the minimum net worth as required by the Amended Merger Agreement, on October 28, 1993, Kislak contacted Farragut by letter and "solicited" its views as to whether Farragut would be able to meet the minimum "net worth test" as set forth in the "material adverse change" clause.

On November 17, 1993, the SEC issued another comment letter regarding the proposed merger. The SEC specifically requested that the parties' response discuss "all other significant matters that were identified by both [Kislak and Farragut] and the external auditors that could lead to the preclusion of the pooling of interest method of accounting." The SEC wanted a more detailed explanation of how the proposed merger would qualify for pooling-of-interests accounting, and not just a listing of the

Westlaw.

Not Reported in N.E.2d
(Cite as: 1999 WL 823656, *6 (Mass.Super.))

criteria used by the accounting firms.

At this time, KPMG also discussed with Kislak that the SEC might take the position that: (i) Jay Kislak, the majority shareholder of Kislak, could be considered a personal holding company of Kislak, as well as of the other entities in which Jay Kislak had an ownership interest--particularly KNB and Skylake Bank; and (ii) KNB and/or Skylake Bank also engaged in the mortgage business. Due to the significant transactions between Kislak and KNB, and the common ownership, there existed a potential issue as to whether Jay Kislak would be considered a "parent" with two "subsidiaries" (Kislak and KNB)-- thus calling into question whether they were autonomous so as to qualify for pooling-of-interests accounting. KPMG opined that if the SEC took the position that Jay Kislak was the "parent" of Kislak and KNB, then the SEC might conclude that the Kislak did not satisfy the autonomy requirement for pooling-of-interests method of accounting. The autonomy attribute requires that the each of the combining companies be autonomous and not have a subsidiary of another company within two years prior to the proposed transaction. The SEC, therefore, could potentially preclude the pooling-of-interests accounting treatment for these reasons.

By letter dated November 17, 1993, Kislak informed Farragut that KPMG, for the first time, brought to Kislak's attention that there may be issues which may adversely impact the opinion that the companies would qualify for pooling treatment. Specifically, Kislak informed Farragut that KPMG had raised concerns regarding Kislak's autonomy.

*7 By letter dated November 23, 1993, Arthur Andersen requested information from KPMG regarding KPMG's "expressed concerns" that the merger would not qualify for pooling treatment. During the pendency of this deal, Arthur Andersen did not investigate Kislak's eligibility to qualify for pooling-of-interests accounting; Arthur Andersen looked only at Farragut's eligibility to qualify for pooling-of-interests accounting.

As of December 3, 1993, 23 of the 108 comments raised by the SEC remained unanswered. A draft response to the SEC comments of November 17, 1993 was completed December 9, 1993.

On December 15, 1993, Arthur Andersen informed Farragut of the uncertainty of Kislak's eligibility to meet the pooling requirement, and advised Farragut to seek SEC pre-clearance approval. [FN8] Similarly, KPMG advised Kislak to seek SEC pre-clearance. KPMG also prepared a draft response to the SEC comments and stated that "Kislak believes that ... Jay Kislak should not be considered a 'parent' of Kislak and KNB under the autonomy condition for pooling-of-interests accounting because the two entities are [in] two separate 'lines of business'." The proposed merger requires that both accounting firms agree that the deal would qualify under a method of pooling-of-interests accounting.

> FN8. In its December 15, 1993 memorandum, Arthur Andersen wrote: "Based on the facts supplied to us by KPMG ... the issue of whether Kislak Mortgage is autonomous and, accordingly, eligible to be merged with Farragut in a transaction qualifying for use of the pooling-of interests method of accounting is a matter of judgment. However, given the uncertainty of the eligibility of the pooling-of-interests method in this situation, we would recommend proceeding with the proposed Farragut/ Kislak transaction only after pre-clearing with the SEC their opinion on whether Kislak meets the autonomy criteria set forth in APB No. 16."

On December 17, 1993, Farragut and Kislak entered into a termination agreement. [FN9] The termination agreement indicated that the deal was terminated because the transaction could not be completed by December 31, 1993, as stipulated in the Merger Agreement. As of December 17, 1993, Farragut common stock, as traded on the American Stock Exchange, was listed at 1 3/4 per share.

> FN9. The December 17, 1993 Termination Agreement states in part: "Except for the representations, warranties, agreements and covenants set forth in this Agreement, Farragut does hereby remit, release, acquit, satisfy and discharge Kislak, ... and any other person or entity who together with such released parties may be jointly liable therewith to Farragut, of and from all actions, causes, suits, ... claims and demands whatsoever, in law or in equity, which Farragut ... ever had ... against Kislak ... and any other person or entity who together with such released parties may be jointly liable therewith to Farragut ..."

(C) 2005 Thomson/West. No Claim to Orig. U.S. Govt. Wo



Not Reported in N.E.2d
(Cite as: 1999 WL 823656, *7 (Mass.Super.))

On November 10, 1995, Farragut, acting with the authority of the Bankruptcy Court as a debtor in possession, initiated this action against Arthur Andersen.

On May 2, 1996, Arthur Andersen filed a third-party claim against Kislak and KPMG.

On November 15, 1996, this court (Kottmyer, J.) denied Arthur Andersen's motion to dismiss Farragut's claims for (i) breach of contract, (ii) breach of the implied covenant of good faith and fair dealing, (iii) negligent misrepresentations, (iv) negligence and (v) violations of Chapter 93A.

On January 14, 1997, Farragut and the Shareholders filed, pursuant to Mass.R.Civ.P. 14, a claim against third-party defendant KPMG. On July 21, 1997, this court (Welch, J.) dismissed Farragut's claims against KPMG under the broad release agreement executed by Farragut in the Termination Agreement, but let stand the Shareholders' claims for (i) negligent misrepresentations, (ii) negligence and (iii) violations of Chapter 93A.

This action is before this court on (i) Farragut's motion for partial summary judgment against Arthur Andersen; (ii) Arthur Andersen's motion for summary judgment against Farragut; (iii) the Farragut Shareholders' motion for partial summary judgment against KPMG; (iv) KPMG's motion for summary judgement against the Farragut Shareholders; and (v) KPMG's motion for summary judgment against Arthur Andersen.

### DISCUSSION

*8 1. Summary Judgment Standard

The standard of review of a grant for summary judgment is whether, viewing the evidence in the light most favorable to the nonmoving party, all material facts have been established and the moving party is entitled to a judgment as matter of law. Baybank v. Bornhofft, 427 Mass. 571, 573, 694 N.E.2d 854 (1998), citing Augut, Inc. v. Liberty Mutual Ins. Co., 410 Mass. 117, 120, 571 N.E.2d 357 (1991). A party moving for summary judgment which does not bear the burden of proof at trial may show the absence of a triable issue either by submitting affirmative evidence negating an essential element of the moving party's case or by showing that the nonmoving party has no reasonable expectation of proving an essential element of its case at trial. Flesner v. Technical Communications Corp., 410 Mass. 805, 809, 575 N.E.2d 1107 (1991); Kourouvacilis v. General Motors Corp., 410 Mass. 706, 716, 575 N.E.2d 734 (1991).

The party opposing summary judgment must adequately bring any factual disputes to the attention of the trial judge. Dupont v. Dracut, 41 Mass.App.Ct. 293, 297, 670 N.E.2d 183 (1996), citing Berry v. Dawes, 34 Mass.App.Ct. 506, 508 n. 3 (1993). These disputed facts must be supported by affidavits or other documents. Mass.R.Civ.P. 56. See also Dupont v. Dracut, supra at 297, 670 N.E.2d 183. [B]are assertions and conclusions regarding [an individual's] understandings, beliefs, and assumptions are not enough to withstand a well-pleaded motion for summary judgment." Polaroid Corp. v. Rollins Envtl. Servs. (N.J.), Inc., 416 Mass. 684, 696, 624 N.E.2d 959 (1993).

II. Farragut's Motion For Partial Summary Judgment Against Arthur Andersen and Arthur Andersen's Motion for Summary Judgment Against Farragut

Farragut argues that it is entitled to partial summary judgment against Arthur Andersen on the following issues: (i) breach of contract; (ii) breach of the implied covenant of good faith and fair dealing; (iii) negligent misrepresentations; (iv) negligence; and (v) violation of Chapter 93A.

Conversely, Arthur Andersen argues it is entitled to summary judgment on those same issues. In addition, Arthur Andersen argues that Farragut released Arthur Andersen from any and all claims as set forth in the Termination Agreement the parties made on December 17, 1993. Furthermore, Arthur Andersen asserts that Begley's [FN10] claim should be dismissed because he was not a shareholder at the time of the alleged wrongful act.

> FN10. George Begley is identified as an individual plaintiff as he is a shareholder of Farragut.

A. Breach of Contract

Farragut contends that this court should find Arthur Andersen liable as a matter of law on its claim that Arthur Andersen breached its contract.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Wo

Westlaw.

Farragut argues that Arthur Andersen was hired to review the Merger Agreement and the documents relating to the proposed merger deal and to determine whether there were any reasons why the merger might not be accounted for as a pooling-of-interests, but Arthur Andersen breached its contract when it failed to look at the full scope of the merger transaction. Specifically, Arthur Andersen breached its duty when it failed to look into the pooling eligibility of Kislak. Farragut argues that the Merger Agreement required Arthur Andersen to review the Merger Agreement, the Stock Agreement, the Kislak Shares Agreement and the transactions contemplated hereby and thereby, and, therefore, it required that Arthur Andersen review not only Farragut's pre-merger pooling attributes but also Kislak's pre-merger pooling attributes.

*9 Farragut further contends that Arthur Andersen breached its duty by not discovering the potential autonomy problem Kislak might have because of Jay Kislak's majority control over Kislak, KNB, and Skylake Bank. Farragut argues that had Arthur Andersen investigated Kislak and reviewed the Kislak Shares Agreement, Arthur Andersen would have seen the "red flag" and known of the potential problems for accounting for the merger as a pooling-of-interests.

Arthur Andersen, however, asserts that the agreement did not require it to provide an opinion as to Kislak's pooling attribute. Arthur Andersen maintains that it was hired to review Farragut's pre-merger pooling eligibility and not Kislak's pre-merger pooling eligibility--KPMG was the accounting firm hired by Kislak and, therefore, was responsible for evaluating Kislak's pooling attribute and eligibility. Arthur Andersen contends that since it was not hired to evaluate Kislak's pooling attribute, it did not breach its contract with Farragut.

The terms of the agreement reads, in part, as follows:

[Arthur Andersen shall review] [Farragut's] statements of financial condition, results of operations and stockholder's equity for the past two years (including, without limitation, the ownership of and transactions in capital stock of [Farragut] ), together with this Agreement, the Stock Agreement, the KISLAK Shares Agreement and the transactions contemplated hereby and

thereby, for the purpose of evaluating and determining whether there is any reason why the Merger, as provided for under the terms and provisions of this Agreement, may not be accounted for as a "pooling-of-interests".

The interpretation of a contract presents a question of law for the court, except to the extent disputed facts bear upon such interpretation. Lumber Mutual Ins., Co. v. Zoltek Corp., 419 Mass. 704, 707, 647 N.E.2d 395 (1995); USM Corp. v. Arthur D. Little Systems, Inc., 28 Mass.App.Ct. 108, 116, 546 N.E.2d 888 (1989). The essential elements of a contract must be sufficiently definite so that the nature and obligations of the parties are ascertainable. Mass Cash Register, Inc. v. Comtrex Sys. Corp., 901 F.Supp. 404, 417 (D.Mass.1995). The court cannot ignore the basic rule of construction and must give effect to the parties' intentions and construe the language to give it reasonable meaning whenever possible. Shea v. Bay State Gas Co., 383 Mass. 218, 224-225, 418 N.E.2d 597 (1981)(a contract should not be interpreted so as to render any of its terms meaningless). In interpreting the words and conduct of the parties to a contract, a court seeks to put itself in the position the parties occupied at the time the contract was made. See Restatement (Second) on Contracts, § 202, comment b.

Both Farragut and Arthur Andersen argue that the terms of the agreement are unambiguous and should be given their plain meaning. However, both parties construe the terms of the agreement differently, and the record does not shed light as to the scope of Arthur Andersen's obligations. Farragut argues that the terms of the agreement required Arthur Andersen to look at Farragut's financial condition together with the "[Merger] Agreement, the Stock Agreement, the KISLAK Shares Agreement and the transactions contemplated hereby and thereby," which, as Farragut argues, required that Arthur Andersen also review the Kislak documents and records which pertain to the merger transaction. (Emphasis added.) Conversely, Arthur Andersen argues that the agreement only required Arthur Andersen to review Farragut's pooling eligibility and Farragut's side of the merger, while KPMG was hired to look at Kislak's pooling eligibility and Kislak's side of the transaction. There exists a triable issue as to the scope of the contractual obligation Arthur Andersen owed to Farragut as

(C) 2005 Thomson/West. No Claim to Orig. U.S. Govt. Wo

Westlaw.

contemplated by the agreement.

**\*10** Furthermore, a determination of a breach of contract, if any, is properly reserved for the fact finder to resolve at trial. "[W]hether a party substantially complied with the terms of a contract or whether the actions of a party constitute a material breach is a question of fact." O'Connell Management Co. v. Carlyle-XIII Managers, Inc., 765 F.Supp. 779, 783 (D.Mass.1991), citing Cetrone v. Paul Livoli, Inc., 337 Mass. 607, 610, 150 N.E.2d 732 (1958). Farragut's partial motion for summary judgment against Arthur Andersen for breach of contract is denied. Likewise, Arthur Andersen's motion for summary judgment in opposition to Farragut's claim for breach of contract is also denied.

**B. Breach of The Implied Covenant of Good Faith and Fair Dealing**

Farragut argues that this court should find as a matter of law that Arthur Andersen breached the implied covenant of good faith and fair dealing when it failed: (1) to investigate and evaluate Kislak's autonomy and eligibility to participate in a pooling transaction, and (2) to inform Farragut that Kislak might not be eligible for pooling-of-interests accounting, when it should have know of this potential problem based upon the information disclosed in the Kislak Shares Agreement and the S-4 Registration Statement.

Arthur Andersen argues that its actions were not made in bad faith, nor did it act dishonestly or for a fraudulent purpose. Furthermore, Arthur Andersen contends that gross negligence is not sufficient to maintain a claim for breach of the implied covenant of good faith and fair dealing. Arthur Andersen also contends that there cannot be a finding of gross negligence when KPMG also opined that the merger would qualify for pooling-of-interests accounting, and the SEC did not conclude that the merger would not qualify for pooling treatment.

Under Massachusetts law, parties to a contract are required to abide by the strictures of good faith and fair dealing that are implied in every contract. Anthony's Pier Four, Inc. v. HBC Associates, 411 Mass. 451, 471-472, 583 N.E.2d 806 (1991). The covenant requires that "neither party shall do anything that will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." Id.

The undisputed record shows that Arthur Andersen did not investigate into Kislak's side of the merger transaction. Arthur Andersen made a representation to Farragut that it believes the deal should qualify for pooling-of-interests based upon Arthur Andersen's review of the Merger Agreement, the Stock Agreement, the Kislak Shares Agreement and the transaction contemplated hereby and thereby. A triable issue exists as to whether Arthur Andersen violated the implied covenant of good faith and fair dealing by not looking at the Kislak's side of the merger.

Farragut's motion for partial summary judgment against Arthur Andersen claiming that Arthur Andersen breached the implied covenant of good faith and fair dealing as a matter of law is denied. Arthur Andersen's motion for summary judgment as to its claim that as a matter of law it did not violate the covenant of good faith and fair dealing is also denied.

**\*11 C. Negligent Misrepresentations**

Farragut claims that as a matter of law Arthur Andersen is liable to Farragut because it made negligent misrepresentations when it falsely represented to Farragut that: (i) it reviewed the Kislak Shares Agreement and "the transactions contemplated hereby and thereby, for the purpose of evaluating and determining whether there is any reason why the merger would not qualify for as a 'pooling-of-interests;' " and (ii) the merger would qualify for "pooling-of-interests" accounting treatment under generally accepted accounting principles. Farragut argues that Arthur Andersen's representations were untrue because it failed to review a significant part of the "transactions as contemplated," because it did not review whether Kislak was autonomous, and that Arthur Andersen knew or should have known the reasons why the merger may not be accounted for as a pooling-of-interests, yet Arthur Andersen still represented that the merger would so qualify.

In order to recover for negligent misrepresentations the plaintiffs must prove that the defendants (1) in the course of business, (2) supplied false information for the guidance of others (3) in their business or transactions, (4) causing and

Not Reported in N.E.2d
(Cite as: 1999 WL 823656, *11 (Mass.Super.))

resulting in pecuniary loss to those others (5) by their justifiable reliance upon the information, and that they (6) failed to exercise reasonable care or competence in obtaining or communicating the information. Golber v. BayBank Valley Trust Company, 46 Mass.App.Ct. 256, 257, 704 N.E.2d 1191 (1999); See also Nycal Corporation v. KPMG Peat Marwick LLP, 426 Mass. 491, 496, 688 N.E.2d 1368 (1998)(the Supreme Judicial Court adopts the liability standards for negligent misrepresentations embodied by the Restatement (Second) of Torts § 552 (1977) [FN11]). "A person who makes representations under circumstances where he knows that the person receiving the representations will be relying on them, has a duty to exercise reasonable care in making the representations." Golber supra at 258, 704 N.E.2d 1191.

FN11. The Restatement (Second) of Torts § 552, states in part: "(1) One who, in the course in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information. Comment a: "Honesty requires only that the maker of a representation speak in good faith and without consciousness of a lack of any basis for belief in the truth or accuracy of what he says. The standard of honesty is unequivocal and ascertainable without regard to the character of the transaction in which the information will ultimately be relied upon or the situation of the party relying upon it." Comment b: "This Section applies not only to information given as to the existence of facts but also to an opinion given upon facts equally well known to both the supplier and the recipient." Comment e: "When the information concerns a fact not known to the recipient, he is entitled to expect that the supplier will exercise that care and competence in its ascertainment which the supplier's business or profession requires and which, therefore, the supplier professes to have by engaging in it.... When the information consists of an opinion upon facts supplied by the recipient or otherwise known to him, the recipient is entitled to expect a careful consideration of the facts and competence in arriving at an intelligent judgment." Comment f: "If

the matter is one that requires investigation, the supplier of the information must exercise reasonable care and competence to ascertain the facts on which his statement is based. He must exercise the competence reasonably expected of one in his business or professional position in drawing inferences from facts not stated in the information." Comment j: "Under this Section, the liability of the maker of a negligent misrepresentation is limited to the transaction that he intends, or knows that the recipient intends, to influence, or to substantially similar transaction."

In some circumstances, "a statement that in form is one of opinion may constitute a statement of fact if it may reasonably be understood by the recipient as implying that there are facts to justify the opinion or at least that there are no facts that are incompatible with it." McEneaney v. Chestnut Hill Realty Corp., 38 Mass.App.Ct. 573, 575, 650 N.E.2d 93 (1995); Restatement (Second) of Torts § 539. [FN12] See also Restatement (Second) of Torts § 538A. [FN13] "This is particularly true where the maker is understood to have special knowledge of facts unknown to the recipient." Id. A claim for negligent misrepresentations is ordinarily one for a jury, unless the undisputed facts are so clear as to permit only one conclusion. Fox v. F & J Gattozi Corp., 41 Mass.App.Ct. 581, 588, 672 N.E.2d 547 (1996).

FN12. Restatement (Second) of Torts § 539, Representation of Opinion Implying Justifying Facts, states in part: "(1) A statement of opinion as to facts not disclosed and not otherwise known to the recipient may, if it is reasonable to do so, be interpreted by him as an implied statement (a) that the facts known to the maker are not incompatible with his opinion; or (b) that he knows facts sufficient to justify him in forming it. "(2) In determining whether a statement of opinion may reasonably be so interpreted, the recipient's belief as to whether the maker has an adverse interest is important.

FN13. Restatement (Second) of Torts § 538A states in part: "A representation is one of opinion if it expresses only (a) the belief of the maker, without certainty, as to the existence of a fact; or (b) his judgment as to quality, value, authenticity, or other matters of judgement. "Comment b. Fact and opinion. A representation of fact is a positive

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Wo

Westlaw.

Not Reported in N.E.2d
(Cite as: 1999 WL 823656, *11 (Mass.Super.))

assertion that the fact is true. It implies that the maker has definite knowledge or information which justifies the positive assertion. A representation of opinion, on the other hand, is only one of the maker's belief as to the fact. It implies that he does not have definite knowledge, that he is not sufficiently certain of what he says to make a the positive statement, or at most, ... that he knows of no facts incompatible with the belief, or that he does know some facts that justify him in forming it.

**\*12** In this action, there is no doubt that Arthur Andersen was aware that it was rendering an opinion which it knew Farragut would rely upon--Farragut hired Arthur Andersen to provide an opinion on the issue of pooling-of-interests accounting. However, Arthur Andersen did not supply any false information that would allow a claim for negligent misrepresentations. (Emphasis added). Arthur Andersen's representations were one of an unactionable opinion. See Restatement (Second) of Torts § 538A, comment b.

Arthur Andersen was hired to review the corporate financial records and other documents and transactions as contemplated by the proposed merger. Arthur Andersen issued an opinion as to whether, in its professional judgment, the Farragut/ Kislak merger would qualify for pooling-of-interests accounting. Arthur Andersen opined that the merger should qualify for pooling-of-interests accounting.

Although Arthur Andersen represented that the merger should be treated as a pooling of interest, it is the SEC which ultimately issues the final decision on that matter. It is the SEC which will declare the Registration Statement effective or not. It is also the SEC which ultimately decides whether the merger would qualify for pooling-of-interests treatment. Arthur Andersen's representation is only an opinion, that in its professional judgment, it believes the Farragut/Kislak merger should qualify for pooling-of-interests accounting and that the SEC would agree with that opinion. Although Arthur Andersen's representation may be based on facts-- the information disclosed in the company's financial records and documents--it is no more than its belief on how the SEC would ultimately decide the issue of treating the proposed merger as a pooling-of-interests. The fact is, the accounting firms can only predict how the SEC would ultimately decide the

pooling-of-interests accounting issue. It is a matter of judgment and opinion. The SEC's decision to declare that the merger would qualify for pooling-of-interests accounting is not something that the accounting firm can predict with absolute certainty.

Furthermore, the record does not show that Arthur Andersen's opinion was an actionable misrepresentation. Arthur Andersen provided an opinion that it believed the merger should qualify for pooling treatment. KPMG, likewise, represented to its client, Kislak, that the merger should qualify for pooling-of-interests accounting. Although the SEC raised questions regarding Kislak's autonomy, which may effect the poolability of the merger, it did not state that the merger would not qualify for pooling treatment. Arthur Andersen's representation was one of an opinion, in which the falsity or truthfulness cannot be ascertained. In this present action, there was no false representation, nor a negligent misrepresentation--KPMG did not disagree with Arthur Andersen nor did the SEC determine that the deal was not poolable.

Farragut's claim that Arthur Andersen made negligent misrepresentations as a matter of law is denied. Arthur Andersen's motion that it is entitled to judgment as a matter of law in its opposition to Farragut's negligent misrepresentation claim is allowed.

**\*13** D. Negligence

Farragut argues that Arthur Andersen, as a matter of law, negligently represented Farragut in the merger transaction. Farragut argues that Arthur Andersen was negligent because it failed to bring to Farragut's attention the reasons why the merger might not qualify for pooling-of-interests accounting. Arthur Andersen owed a duty of care to Farragut (1) to evaluate the pooling criteria applicable to the merger, including the Kislak's eligibility to participate, and (2) to inform Farragut of all the reasons Arthur Andersen knew or should have known that would interfere with the merger's pooling qualifications.

It is undisputed that Farragut hired Arthur Andersen to represent it in the proposed merger transaction with Kislak. This court finds, as a matter of law, that Arthur Andersen owed Farragut a duty to use due care in representing Farragut's interest in the merger deal. See Wallace v. Wilson, 411 Mass.

(C) 2005 Thomson/West. No Claim to Orig. U.S. Govt. Wo

Not Reported in N.E.2d
(Cite as: 1999 WL 823656, *13 (Mass.Super.))

8, 12, 575 N.E.2d 1134 (1991) (a determination of duty is a question of law). The record also shows that Arthur Andersen only reviewed Farragut's statement of financial conditions and the records and the documents relating to Farragut's side of the deal, but did not investigate into Kislak's side of the merger. Farragut contends that Arthur Andersen breached its duty because it did not investigate or review Kislak's side of the transaction. Arthur Andersen maintains that the Merger Agreement did not require it to investigate Kislak's pre-merger pooling attributes and that it was hired to review only Farragut's pre-merger pooling attributes, while KPMG was hired by Kislak to review Kislak's pre-merger pooling attributes. This dispute raises questions of fact.

The scope of Arthur Andersen's duty and whether Arthur Andersen breached that duty is reserved for trial.

Farragut's claim that this court should find summary judgment in its favor and against Arthur Andersen for negligence is denied. Similarly, Arthur Andersen's claim that it is entitled to summary judgment on Farragut's negligence claim is also denied.

E. Violations of Chapter 93A, Unfair or Deceptive Acts

Farragut argues that Arthur Andersen engaged in unfair or deceptive acts in violation of G.L. c. 93A when it mislead Farragut into believing that it reviewed the transactions contemplated by the proposed merger to evaluate and determine whether the deal qualified for pooling. Farragut asserts that Arthur Andersen's alleged gross indifference and conscious disregard of the potential pooling problems, which Arthur Andersen knew or should have known based upon the information provided to it in the Kislak Shares Agreement and the S-4 Registration Statement, constitutes the kind of misconduct which Chapter 93A is designed to redress.

To be actionable under Massachusetts statute prohibiting unfair trade practices, objectionable conduct must attain a level of rascality that would raise an eyebrow of someone inured to the rough and tumble world of commerce. Johnson v. Koplosky Foods Inc., 5 F.Supp.2d 48, 55 (D.Mass.1998). A Chapter 93A plaintiff must show

that defendant's actions fell within at least the penumbra of some common-law, statutory or other established concept of fairness, or were immoral, unethical, oppressive or unscrupulous, and resulted in substantial injury. Id. Whether a given trade practice is unfair or deceptive must be determined from the circumstances of each case. Noyes v. Quincy Mutual Fire Ins., Co., 7 Mass.App.Ct. 723, 726, 389 N.E.2d 1046 (1979).

*14 An act is "deceptive" if it could reasonably be found to have caused the person to act differently from the way he otherwise would have acted. Lowell Gas Co. v. Attorney General, 377 Mass. 37, 51, 385 N.E.2d 240 (1979). A mere breach of contract does not, in and of itself, rise to the level of a violation of Chapter 93A. Whitinsville Plaza, Inc. v. Kotseas 378 Mass. 85, 100-01, 390 N.E.2d 243 (1979). See also Framingham Auto Sales, Inc. v. Workers' Credit Union, 41 Mass.App.Ct. 416, 418, 671 N.E.2d 963 (1996)(mere breach of legal obligation, without more, does not amount to unfair an deceptive trade practice). A negligent act, standing by itself, does not give rise to a claim under unfair or deceptive acts or practices; there must in addition be evidence that negligence resulted in unfair and deceptive act or practice. Squeri v. McCarrick, 32 Mass.App.Ct. 203, 207, 588 N.E.2d 22 (1992).

Farragut argues that Arthur Andersen's gross indifference and conscious disregard of the pooling problem constituted an unfair and deceptive act or practice in violation of Chapter 93A. Farragut further argues that Arthur Andersen's "gross negligence" in the performance of its professional services also violated Chapter 93A.

A question of fact exists as to whether it was an unfair and deceptive act or practice, and in violation of Chapter 93A, for Arthur Andersen to opine that the proposed merger qualified for pooling treatment after Arthur Andersen reviewed the Merger Agreement and the "transaction [as] contemplated hereby and thereby," when the record shows that Arthur Andersen did not look at Kislak's side of the merger deal. Farragut's motion for partial summary judgment claiming that Arthur Andersen violated Chapter 93A as a matter of law is denied. Likewise, Arthur Andersen's motion for summary judgment dismissing Farragut's claim for violation of Chapter 93A is also denied.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Wo

F. Farragut Released Its Claim Against Arthur Andersen In The Termination Agreement

Arthur Andersen argues that it is entitled to summary judgment because the Termination Agreement entered into on December 17, 1993 by Farragut and Kislak discharges Arthur Andersen from any liability. The Termination Agreement states in part:

Farragut does hereby ... discharge Kislak, ... and any other person or entity who together with such released parties may be jointly liable therewith to Farragut, ... from all actions, ... [or] claims ... which Farragut ... ever had ... against Kislak ... and any other person or entity who together with such released parties may be jointly liable therewith to Farragut ..."

The interpretation of a contract presents a question of law for the court, except to the extent disputed facts bear upon such interpretation. Lumber Mutual Ins., Co. v. Zoltek Corp., 419 Mass. 704, 707, 647 N.E.2d 395 (1995). The terms of the release clearly discharges Kislak and those who may be jointly liable with Kislak. Arthur Andersen, however, would not be jointly liable--the agreement does not release Arthur Andersen, whom Farragut hired to represent it in the merger transaction.

*15 Arthur Andersen's motion for summary judgment based on its contention that it was released from liability is denied.

G. George Begley's Claim Should Be Dismissed As A Matter of Law

Arthur Andersen contends that it is entitled to summary judgment as to the claim of George Begley ("Begley") because he was not a shareholder at the time of the alleged misconduct and therefore has no standing to bring a claim against Arthur Andersen.

The undisputed facts show that Begley was not the record owner of any Farragut stock, and any stock owned by Begley was owned by Begley's wife. Begley, therefore, has no standing to bring this action as a matter of law.

III. Farragut Shareholders' Motion for Partial Summary Judgment Against Third-Party Defendant KPMG and KMPG's Motion for Summary Judgment Against Farragut

The Farragut Shareholders [FN14] argue that they are entitled to partial summary judgment against KPMG for (i) negligent misrepresentation, (ii) negligence and (iii) violations of Chapter 93A.

FN14. On July 21, 1997, this court (J. Welch) dismissed Farragut's claims against KPMG based upon the Termination Agreement of December 17, 1993. The claims that remain are those of the individual Farragut Shareholders.

Conversely, KPMG argues that it is entitled to summary judgment on those same claims. KPMG also argues that it is entitled to summary judgment against the plaintiffs because (i) the Farragut Shareholders' claims are derivative of those of the Farragut corporation and therefore should be dismissed and (ii) the claims were brought after the expiration of the statute of limitations and are therefore time barred.

A. Farragut Shareholders' Claim Against KPMG for Negligent Misrepresentation

The Farragut Shareholders assert that KPMG negligently misrepresented the pooling treatment of the merger, and that they should have known of the Kislak autonomy problem which would have raised the "red flag" as to whether the proposed merger could be accounted as a pooling-of-interests. The Farragut Shareholders further argue that KPMG knew, or should have known, that Farragut and Arthur Andersen would rely on KPMG's opinion regarding the pooling treatment.

As discussed, supra in section II-C, the standard for bringing an action for negligent misrepresentation is set forth in Nycal Corp. v. KPMG Peat Marwick LLP, 426 Mass. 491, 688 N.E.2d 1368 (1998). Under the Nycal standard, an accountant's potential liability, in a noncontractual third party case, is limited to those noncontractual third parties who can demonstrate "actual knowledge on the part of the accountants of the limited--though unnamed--group of potential [third parties] that will rely upon the [report], as well as actual knowledge of the particular financial transaction that such information is designed to influence." 426 Mass. at 498, 688 N.E.2d 1368, quoting First Nat'l Bank of Commerce v. Monaco Agency, Inc., 911 F.2d 1053, 1062 (5 th Cir.1990). "The accountant's knowledge is to be measured 'at the moment the audit [report] is published, not by the foreseeable path of harm envisioned by [litigants] years

Westlaw.

Not Reported in N.E.2d
(Cite as: 1999 WL 823656, *15 (Mass.Super.))

following an unfortunate business decision.' " Id., quoting First Nat'l Bank of Commerce v. Monaco Agency, Inc., supra at 1059.

*16 In this action, the record shows that KPMG was aware that the proposed merger required that both accounting firms issue an opinion as to whether the merger would qualify for pooling-of-interests accounting--KPMG was to issue a pooling opinion in conjunction with Arthur Andersen's issuance of a pooling opinion--and that KPMG was aware that the deal was structured in a way that both accounting firms needed to agree as to poolability or the deal would be terminated. KPMG, therefore, knew that the merger transaction relied on KPMG's pooling opinion.

However, as discussed supra in section II-C, similar to Arthur Andersen's representation, KPMG's representation that the merger should qualify for pooling-of-interests accounting is a nonactionable opinion. KPMG's professional judgment was that it believed the SEC would allow for pooling-of-interests accounting. KPMG's opinion as to how the SEC would rule with respect to the pooling-of-interests issue is not a false statement, but merely a prediction as to the SEC's future determination.

Furthermore, and as KPMG argues, KPMG did not make any false statement or a misrepresentation. KPMG opined that the merger should qualify for pooling-of-interests accounting. Arthur Andersen also opined that the merger should qualify for pooling of interest accounting. The SEC did not rule that the merger would not qualify for pooling-of-interests accounting. Therefore, there were no false statements or misrepresentations.

The Farragut Shareholders' motion for partial summary judgement for negligent misrepresentation is denied. KPMG's motion for summary judgement is allowed.

B. Negligence Claim Against KPMG

The Farragut Shareholders claim KPMG was negligent in issuing its pooling opinion.

A claim for negligence requires that the defendant owe the plaintiff a legal duty, and a breach of that duty proximately caused the plaintiff injury. See O'Gorman v. Antonio Rubinaccio & Sons, 408

Mass. 758, 760, 563 N.E.2d 231 (1990). Whether such a duty exists is a question of law. Wallace v. Wilson, 411 Mass. 8, 12, 575 N.E.2d 1134 (1991). Here, as a matter of law, KPMG did not owe Farragut a legal duty.

KPMG was hired by Kislak to represent Kislak in the proposed merger. Any duty KPMG owed was that to Kislak and not Farragut or its shareholders. The record shows that any dealings KPMG may have had with Farragut was at arms length. Although the deal was dependent on KPMG issuing an opinion that the merger was poolable, that opinion was to be given to Kislak--KPMG owed no duty to Farragut to issue an opinion. This court will not imply a duty when to do so would place the party in a position of conflict. See Spinner v. Nutt, 417 Mass. 549, 553-54, 631 N.E.2d 542 (1994). Therefore, KPMG did not owe a legal duty to Farragut and, therefore, was not negligent as a matter of law.

The Farragut Shareholders' motion for summary judgment against KPMG for negligence is denied. KPMG's motion for summary judgment in opposition to the Shareholders' claim of negligence is allowed.

*17 C. Farragut Shareholders' Chapter 93A Claim Against KPMG

The Farragut Shareholders' claim against KPMG for violation of Chapter 93A is denied as a matter of law. The Shareholders do not have a viable claim against KPMG for negligence or negligent misrepresentation. Although, a 93A claim can be brought as a separate cause of action, KPMG did not engage in any acts against Farragut or its shareholders that were unfair or deceptive--KPMG did not owe the Farragut Shareholders any duty. Therefore, the Farragut Shareholders cannot maintain a claim against KPMG for violation of Chapter 93A.

KPMG's motion for summary judgment in opposition to the Shareholders Chapter 93A claim is allowed.

D. The Farragut Shareholders' Claim Against KPMG Are Derivative of the Farragut Corporation

"The general principles of corporate law provide that a shareholder may not sue either the corporation

(C) 2005 Thomson/West. No Claim to Orig. U.S. Govt. Wo

Westlaw.

Not Reported in N.E.2d
(Cite as: 1999 WL 823656, *17 (Mass.Super.))

or some other wrongdoer if the only injury alleged is a diminution of corporation's net worth. In such circumstances the corporation is the injured party, and it alone may sue the wrongdoer for the damage caused." Hurley v. Federal Deposit Ins. Corp., 719 F.Supp. 27, 30 (D.Mass.1989). See also 12B W. Fletcher, Cyclopedia of the Law Private Corporations, § 5907 et seq ("Fletcher"); Municipal Light Co. Of Ashburnham v. Commonwealth, 34 Mass.App.Ct. 162, 170-71, 608 N.E.2d 743 (1993)(stockholders may not in their own names bring an action for damage to the corporation in which they hold stock; they may bring a derivative action in the name of the corporation). "Corporate mismanagement, or even fraud perpetrated on the corporation, resulting in lower stock prices cannot form the basis for an individual shareholder lawsuit against the wrongdoer or against the corporation." Hurley, supra at 30.

Only where the shareholders themselves have been defrauded, may they sue the wrongdoer. See 12B Fletcher, § 5923.2 ("[d]efrauded purchasers or sellers of stock may maintain an action either individually or as a class action unless the corporation was the purchaser or seller.") That is true even if all the shareholders are victims of the fraud. Id. "If the wrong is primarily against the corporation, the redress for it must be sought by the corporation, ... and a shareholder cannot sue as an individual." Id. at § 5911.

In determining the nature of the wrong alleged, the court must look to the body of the complaint, not to the plaintiff's designation or stated intention. Id. The action is derivative if the gravamen of the complaint is injury to the corporation, or to the whole body of its stock or property without any severance or distribution among individual shareholders, or if it seeks to recover assets for the corporation or to prevent the dissipation of its assets. Id. "If a plaintiff alleges mismanagement of funds, embezzlement or breach of fiduciary duty resulting in a diminution of the value of the corporate stock or assets, the claim is one held by the corporation itself, and is thus derivative if brought by an investor." Blasberg v. Oxbow Power Corp., 934 F.Supp. 21, 26 (D.Mass.1996).

*18 In contrast, "if a plaintiff alleges that she, as an individual investor, was misled or defrauded in the purchase of her investment, this kind of claim is

a "direct" one ... [t]hat many investors might have been misled, or that the plaintiff might only be minimally injured, does not convert the claim to a derivative one." Id. See also Barger v. McCoy Hillard Parks, 346 N.C. 650, 488 S.E.2d 215, 219 (N.C.1997)(a shareholder may maintain an individual action against a third party for an injury that directly affects the shareholder, even if the corporation also has a cause of action arising form the same wrong, if the shareholder can show that the wrongdoer owed him a special duty or that the injury suffered by the shareholder is separate and distinct from the injury sustained by the other shareholders or the corporation itself).

The essence of the Farragut Shareholders' complaint against KPMG is that KPMG negligently represented that the proposed merger should qualify for pooling-of-interests accounting, and that the Farragut Shareholders relied on that representation and entered into the merger agreement on July 2, 1993. As a result, the Shareholders' stock was tied up in a lock-up agreement and when market conditions caused Farragut shares to drop in value, the Shareholders were allegedly injured when they could not sell their shares.

The only injuries the Shareholders allege is the diminution or destruction of the value of their shares of Farragut stock as a result of KPMG's alleged negligent misrepresentations of Kislak's poolability in the merger. This is an injury suffered by the corporation itself. See Barger, supra, 488 S.E.2d at 220.

The Shareholders entered into the merger agreement on behalf of Farragut, so that the merger transaction could be consummated. The Shareholders contend that they were individually and directly harmed by KPMG's actions, but the record does not support that contention. The facts from the record indicate that some of the Shareholders did not know that KPMG represented Kislak. The record also fails to support the individual shareholders' contention that they were individually misled or defrauded by KPMG. The individual investors do not have a distinct and separate claim from that of the Farragut corporate entity.

The Shareholders' claims against KPMG, as a matter of law, are a derivative claim of Farragut,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Wo



Not Reported in N.E.2d
(Cite as: 1999 WL 823656, *18 (Mass.Super.))

and not a "direct" one for individual injuries. Since, Farragut's claims against Kislak and KPMG were released by the Termination Agreement, the Shareholders' claims against KPMG are likewise released by the Termination Agreement. KPMG's motion for summary judgment for reason that the Shareholders lack standing is allowed.

IV. KPMG's Motion For Summary Judgment Against Arthur Andersen

KPMG moves for summary judgment against Arthur Andersen's claim that (i) KPMG made negligent misrepresentations to Arthur Andersen that Kislak should qualify for pooling-of-interests accounting; (ii) KPMG must indemnify Arthur Andersen for any damages it might pay to its client Farragut and the Farragut Shareholders; and (iii) KPMG is liable to Arthur Andersen for contribution for any damages Arthur Andersen might pay to Farragut and the Shareholders.

*19 A. Negligent Misrepresentation

Arthur Andersen argues that KPMG made negligent misrepresentations to Arthur Andersen when KPMG represented that Kislak qualified for pooling-of-interests accounting. As discussed supra in section III-A, KPMG's representation is an unactionable opinion. KPMG's representation was an opinion as to its belief, and in its professional judgement, whether the SEC would conclude that merger transaction should qualify for pooling-of-interests accounting. This representation is not an actionable statement of fact or opinion, but it is rather an opinion--a prediction--as to how the SEC might rule on some future date.

KPMG's motion for summary judgment on Arthur Andersen's claim of negligent misrepresentation is allowed, and Arthur Andersen's opposition is denied.

B. Arthur Andersen's Claim for Indemnification

KPMG argues that as a matter of law it is entitled to summary judgment on Arthur Andersen's claim for indemnification. Arthur Andersen proceeds under two theories (i) it is entitled to indemnification under a tort based theory and (ii) it is entitled to indemnification under an implied in contract theory.

Three different sets of circumstances may give rise to a right to indemnification. First, an express agreement may create a right to indemnification. [FN15] See Araujo v. Woods Hole, Martha's Vineyard, Nantucket S.S. Auth., 693 F.2d 1, 2-3 (1st Cir.1982). See also W. Prosser, Law of Torts § 51 (4th ed.1971). Second, a contractual right to indemnification may be implied from the nature of the relationship between the parties. See Decker v. The Black & Decker Manufacturing Co., 389 Mass. 35, 38-39, 449 N.E.2d 641 (1983). Third, a tort-based right to indemnification may be found where there is a great disparity in the fault of the parties. W. Prosser, Law of Torts § 51 (1971). Indemnity is permitted only when the would-be indemnitee does not join in the negligent act. See Decker v. The Black & Decker Manufacturing Co., 389 Mass. 35, 40, 449 N.E.2d 641 (1983), and cases cited. "The right to indemnity is limited to those cases in which the would-be indemnitee is held derivatively or vicariously liable for the wrongful act of another." Id., citing Stewart v. Roy Bros., 358, Mass. 446, 459 (1970). The court has inferred the existence of indemnity agreements only when the terms of the contract themselves contemplated such indemnification. Larkin v. Ralph O. Porter, Inc., 405 Mass. 179, 184, 539 N.E.2d 529 (1989). See e.g., Monadnock Display Fireworks, Inc. v. Andover, 388 Mass. 153, 158, 445 N.E.2d 1053 (1983)(where town agreed to furnish necessary police for crowd control, it was responsible to indemnify for damages arising from its failure to do so); Great Atlantic & Pacific Tea Co. v. Yanofsky, 380 Mass. 326, 331-332, 403 N.E.2d 370 (1980)(where a lessor agreed to make all outside repairs, such an express agreement should be construed to require the lessor to indemnify for damages arising from the failure to make repairs).

FN15. Arthur Andersen does not have an express indemnification right.

*20 The tort-based theory of indemnification is designed to shift the whole loss upon the more guilty of the two tortfeasors. Araujo, supra at 3, citing Zapico v. Bucyrus-Erie Co., 579 F.2d 714, 718 (2d Cir.1978). Generally, it has been available only when the party seeking indemnification was merely passively negligent while the would be indemnitor was at fault. Araujo, supra, citing Loose v. Offshore Navigation Inc., 670 F.2d 493, 499 (5th Cir.1982). Tort-based indemnification is inappropriate where the party seeking indemnification was itself guilty of acts or omissions



proximately causing the plaintiff's injury. See Araujo, supra, citing Wedlock v. Gulf Mississippi Marine Corp., 554 F.2d 240, 243 (5 th Cir.1977).

In this action, KPMG, as a matter of law, is not liable for any alleged negligent misrepresentations or negligent acts. KPMG's representations regarding Kislak's pooling of attributes eligibility are unactionable opinions. Furthermore, as a matter of law, KPMG did not owe a legal duty to the Shareholders. Therefore, KPMG cannot be found more guilty than Arthur Andersen for any potential harm or injury that may found against Arthur Andersen and in favor of Farragut and the Shareholders.

In addition, a contractual right to indemnification will only be implied when there are unique "special factors" surrounding the contractual relationship which indicate an intention by one party to indemnify another in a particular situation. Fall River Housing Auth. v. H.V. Collins Co., 414 Mass. 10, 14, 604 N.E.2d 1310 (1992)(citing as persuasive Araujo, supra at 2-3). Farragut does not allege that any special factors exist. Furthermore, the record does not show that KPMG intended to indemnify Arthur Andersen for harm that may result to its client Farragut. Moreover, the relationships between KPMG and Arthur Andersen were at arms' length. KPMG did not contract with Arthur Andersen, nor did KPMG owe a legal duty to the Farragut Shareholders.

The record fails to support Arthur Andersen's claim that KPMG must indemnify Arthur Andersen for any damages that Farragut may be entitled to from Arthur Andersen. KPMG's motion for summary judgement on Arthur Andersen's claim of indemnification is allowed.

C. Arthur Andersen's Claim for Contribution

KPMG moves for summary judgment on Arthur Andersen's claim for contribution. KPMG argues that since it is not liable to Farragut--Farragut's claim against KPMG has been dismissed--nor the Farragut Shareholders, Arthur Andersen cannot seek a claim of contribution from KPMG.

A claim for contribution is available "where two or more persons become jointly liable in tort for the same injury to person or property." G.L. c. 231B, § 1. The right of contribution is derived from the

plaintiff's primary cause of action and is not recoverable from a third party against whom the plaintiff has no cause of action." Berube v. City of Northampton, 413 Mass. 635, 639, 602 N.E.2d 560 (1992).

*21 There is no joint liability here. KPMG did not owe a legal duty to Farragut; therefore, Arthur Andersen cannot seek contribution from KPMG for any damages that may be assessed against Arthur Andersen and in favor of Farragut and its Shareholders.

KPMG's motion for summary judgment on Arthur Andersen's claim for contribution is allowed.

### ORDER

For the foregoing reasons, it is hereby ORDERED that (i) plaintiff Farragut's motion for partial summary judgment against defendant Arthur Andersen is DENIED; (ii) defendant Arthur Andersen's motion for summary judgment is DENIED in part, and ALLOWED in part; (iii) plaintiff Farragut Shareholders' motion for partial summary judgment against third-party defendant KPMG is DENIED ; (iv) third-party defendant KPMG's motion for summary judgment against the Farragut Shareholders is ALLOWED ; and (v) third-party defendant KPMG's motion for summary judgment against third-party plaintiff Arthur Andersen is ALLOWED.

1999 WL 823656 (Mass.Super.)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Wo



Not Reported in F.Supp.
(Cite as: 1996 WL 224515 (N.D.Ill.))
< KeyCite Citations >

Page 3

Only the Westlaw citation is currently available.

United States District Court, N.D. Illinois, Eastern Division.

Michael J. LAMBERT, Timothy Anderson, William Lopez, Richard Newell, Carol Suchocki, and Cheryl Suchocki, Plaintiffs,
v.
CALPROTRACK, INC., Michael O'Malley, Jr., Terrence O'Malley, Daniel O'Malley, Timothy Monahan, Midwest Gas Energy, Inc., Midwest Gas Storage, Midwest Energy Holding and #1 G.B. Hamilton Well, Defendants.

No. 95 C 4076.

May 1, 1996.

MEMORANDUM OPINION AND ORDER

ZAGEL, District Judge:

*1 Plaintiffs are six individuals who purchased an aggregate $183,000 of joint venture interests in an unsuccessful oil and gas venture known as the #1 G.B. Hamilton Well (Hamilton Well). Plaintiffs claim they were induced by false and misleading statements to invest in Hamilton Well. Plaintiffs purchased their interests in Hamilton Well through defendant Calprotrack, Inc., the selling agent, an entity in which defendant, Timothy Monahan, is the president, and defendant, Michael O'Malley, is a principal. When plaintiffs' investment went belly-up, they demanded that Monahan and Michael O'Malley refund their monies. Monahan agreed to do so by August 15, 1994, and executed an agreement by which he pledged his shares in Midwest Gas Storage to guarantee his performance. Monahan defaulted on that agreement. Plaintiffs then filed this action suing these defendants for primary liability under the federal securities laws. Plaintiffs claim to have relied upon false and misleading statements contained in a collection of documents known as the "Offering Materials." In addition, plaintiffs have sued defendants Terrence O'Malley, Daniel O'Malley, Midwest Gas Energy, Inc., Midwest Gas Storage, and Midwest Energy Holding (collectively the Midwest Corporations) for secondary liability as "controlling persons" of Hamilton Well under Section 20(a) of the Securities

Exchange Act. 15 U.S.C. § 78t. Defendants Terrence O'Malley, Daniel O'Malley and the Midwest Corporations have moved to dismiss the complaint for failure to allege any facts sufficient to support an inference that they controlled the operations of Hamilton Well or that they had any power or ability to exercise control over the sale of interests in Hamilton Well to plaintiffs. [FN1]

Discussion

A complaint should not be dismissed under Rule 12(b)(6) for failure to state a claim upon which relief may be granted unless "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Leahy v. Board of Trustees of Community College Dist. No. 508, County of Cook, State of Ill., 912 F.2d 917, 921 (7th Cir. 1990), quoting Conley v. Gibson, 355 U.S. 41, 45-46 (1957). In analyzing the sufficiency of plaintiffs' complaint, the court must accept as true all well-pleaded factual allegations and draw all reasonable inferences in favor of the plaintiff. Prince v. Rescorp Realty, 940 F.2d 1104, 1106 (7th Cir. 1991). However, "[c]onclusory allegations unsupported by any factual assertions will not withstand a motion to dismiss." Cushing v. City of Chicago, 3 F.3d 1156, 1160-61 n.5 (7th Cir. 1993), quoting, Briscoe v. LaHue, 663 F.2d 713, 723 (7th Cir. 1981), aff'd 460 U.S. 325 (1983).

To establish a violation of Section 20(a) for secondary liability as "controlling persons" of Hamilton Well, plaintiffs must meet a two-pronged test. First, the alleged control-person must actually participate in, that is, exercise control over the operations of the person in general. Second, the alleged control-person must have possessed the power or ability to control the specific transaction or activity upon which the primary violation was predicated, whether or not the power was exercised. Harrison v. Dean Witter Reynolds, Inc., 974 F.2d 873, 881 (7th Cir. 1992), cert. denied, 113 S.Ct. 2994 (1993).

*2 Defendants claim that the First Amended Complaint contains no allegations of fact to support the assertion that they controlled the operations of Hamilton Well. Plaintiffs claim they have evidence to support the fact that the Midwest Corporations

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Wo



Not Reported in F.Supp.
(Cite as: 1996 WL 224515, *2 (N.D.Ill.))

directly and indirectly controlled Hamilton Well and that Terrence O'Malley and Daniel O'Malley controlled Hamilton Well through their positions at defendant Midwest Gas Energy, Inc.

Plaintiffs offer the Financing Memorandum for Midwest Gas Energy, Inc. to establish direct control of Hamilton Well by the Midwest Corporations. The Financing Memorandum states: "The G.B. Hamilton #1 is a prime example of the type of target acquisition by which Midwest Gas Production will expand its natural gas production reserve base." The memorandum also states that non-defendant Midwest Gas Production has a 20% working interest in Hamilton Well. Plaintiffs contend that a 20% working interest does not mean that Midwest Gas Production or one of the other Midwest Corporations did not have another type of interest in Hamilton Well such as a joint venture or management interest and, in any event, that a 20% interest can evidence control.

The quoted sentence does not aid plaintiffs in proving direct control by the Midwest Corporations. The quote refers to non-defendant Midwest Gas Production, a subsidiary of defendant Midwest Gas Energy, Inc. and non-defendant Midwest Gas Production has only a 20% interest in Hamilton Well. The cases which plaintiffs cite only hold that a significant minority interest can or may evidence control, and none of the cases are binding in this district. Furthermore, a 20% interest by a subsidiary of a defendant corporation is not enough to establish control. See Schlifke v. Seafirst Corp., 866 F.2d 935, 949 (7th Cir. 1989), citing Metge v. Baehler, 762 F.2d 621, 631 (8th Cir. 1985) ("lending bank not a controlling person of an investment company selling limited shares in real estate programs despite facts that the bank was the company's primary lender, held nearly 20% of the company's stock, held a proxy on a 51% block of the company's subsidiary, sent personnel to the company's board meetings and had certain authority over the company's issuance of capital stock"). This claim, that the Midwest Corporations may have additional interests in Hamilton Well, is wholly speculative and cannot withstand a motion to dismiss. Cushing v. City of Chicago, 3 F.3d 1156, 1160-61 n.5 (7th Cir. 1993).

Plaintiffs allege indirect control in two ways, through the Midwest Corporations' control of Calprotrack, which owned Hamilton Well, and Midwest Energy Holding's controlling interest in Calprotrack, Hamilton Well and Midwest Gas Storage.

Plaintiffs again turn to the Financing Memorandum which describes Calprotrack as the "consultant and operations company for Midwest Gas Storage." Defendants argue that the Financing Memorandum's organizational chart does not indicate ownership of Calprotrack by any of the Midwest Corporations. Defendants' argument fails. The fact that Calprotrack owned Hamilton Well and the Financing Memorandum sets Calprotrack out as the operations company for Midwest Gas Storage, indicates Midwest Gas Storage's ability to exercise control over the operations of the Hamilton Well. However, it does not indicate control by all the Midwest Corporations.

*3 Plaintiffs state in their complaint that Midwest Energy Holding acquired its controlling interests in Calprotrack, Hamilton Well and Midwest Gas Storage prior to February 1993. Defendants submitted a copy of the Delaware Corporation/ Limited Partnership Record which establishes that Midwest Energy Holding was not even incorporated until November 24, 1993. While the district court is not to look beyond the pleadings in a motion to dismiss, the court may take judicial notice of matters of public record. United States v. Wood, 925 F.2d 1580, 1581-82 (7th Cir. 1991). "[S]ection 20(a) requires control at the time of the alleged violation; activities and events that occur later cannot support a claim of liability." Schlifke v. Seafirst Corp., 866 F.2d 935, 949 (7th Cir. 1989). Therefore, I find defendant Midwest Energy Holding could not have had control prior to February 1993.

Plaintiffs finally allege that Terrence O'Malley, as President and Chief Operating Officer, and Daniel O'Malley, as Chief Financial Officer, of Midwest Gas Energy controlled Hamilton Well. Plaintiffs assert, "[t]he prominent positioning of these individuals in a sales memorandum alongside a discussion of the Hamilton Well certainly suggests a power to control all aspects of the Hamilton Well, including sales of its interests." I doubt the value of this argument based on semiotic theory. Furthermore, it is not enough to establish control by merely claiming the person occupies a position of control within an organization. Koplin v. Labe

(C) 2005 Thomson/West. No Claim to Orig. U.S. Govt. Wo



Not Reported in F.Supp.
(Cite as: 1996 WL 224515, *3 (N.D.Ill.))

Page 5

Federal Sav. and Loan, 748 F. Supp. 1336, 1341 (N.D. Ill. 1990).

Plaintiffs have satisfied the first prong of the control test solely as to Midwest Gas Storage. However, to survive the motion to dismiss, plaintiffs must further allege that the control-person possessed the power or ability to control the specific transaction or activity upon which the primary violation was predicated, whether or not the power was exercised. Harrison v. Dean Witter Reynolds, Inc., 974 F.2d 873, 881 (7th Cir. 1992). Plaintiffs must thus allege that Midwest Gas Storage possessed the power or ability to control the sale of interest in the Hamilton Well to plaintiffs. Plaintiffs have failed to satisfy the second prong of the test with any factual assertions. Rather, plaintiffs simply state that the Midwest Corporations "had the power to control the underlying parties who were liable." Again, this is a conclusory allegation that cannot withstand a motion to dismiss. Cushing v. City of Chicago, 3 F.3d 1156, 1160-61 n.5 (7th Cir. 1993).

The motion to dismiss is granted.

FN1. Defendants also move to dismiss on the grounds plaintiffs have failed to allege any primary violation by the alleged controlled persons. "A defendant may be liable as a 'controlling person' under § 20(a) only if a primary violation of the securities laws is adequately alleged." FMC Corp. v. Boesky, 727 F. Supp. 1182, 1199 n. 19 (N.D. Ill. 1989). For purposes of this motion, I assume plaintiffs have adequately alleged a primary violation of the securities laws.

1996 WL 224515 (N.D.Ill.)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Wo



Slip Copy
(Cite as: 2004 WL 2392169 (N.D.Ill.))

Only the Westlaw citation is currently available.

United States District Court,
N.D. Illinois, Eastern Division.

William R. MCDONNELL, Plaintiff,
v.
ALLSTATE LIFE INSURANCE COMPANY, f/
k/a Northbrook Life Insurance Company,
Defendant.

No. 04 C 3076.

Oct. 25, 2004.

Jon D. Cohen, Schoenberg, Fisher, Newman & Rosenberg, Ltd., Chicago, IL, for Plaintiff.

David C. Jacobson, Robert H. King, Jr., Nicole Shane Pakkala, David B. Singer, Sonnenschein, Nath & Rosenthal, LLP, Chicago, IL, for Defendant.

## MEMORANDUM OPINION AND ORDER

ST. EVE, J.

*1 Plaintiff William McDonnell alleges that Defendant Allstate Life Insurance Company ("Allstate") wrongfully changed its policies regarding the transfer of monies between his investment alternatives in his variable annuity. Plaintiff brings a five-count complaint alleging two counts of breach of contract (Counts I and II), breach of good faith and fair dealing (Count III), conversion (Count IV), and breach of fiduciary duty (Count V). Defendant moves to dismiss Counts III, IV, and V of the Complaint. For the reasons set forth below, the Court partially grants and partially denies Defendant's motion to dismiss.

## BACKGROUND

On or about January 20, 1998, Plaintiff and Allstate entered into a variable annuity contract. (R. 1-1, Compl.¶ 9). Because no transfer restrictions existed under the original variable annuity contract, Plaintiff chose Allstate for the flexibility it provided him in moving his monies between various mutual funds and a money market account. (Id. at ¶¶ 7, 11). Initially, Plaintiff invested approximately $365,666 and invested additional monies later. (Id.

at ¶ 13).

In December of 2002, Allstate imposed certain restrictions, including a $50,000 cap on the amount of funds that an investor could transfer in a single day to certain mutual funds. (Id. at ¶ 18). In October of 2003, Allstate again refused to allow Plaintiff to move his investment funds into a certain group of investment alternatives. (Id. at ¶ 20). Finally, in January of 2004, Allstate further restricted Plaintiff's ability to transfer monies into another group of mutual funds. (Id. at ¶ 24). Plaintiff consequently alleges that these restrictions on his ability to freely transfer his funds violated his variable annuity contract and resulted in lost profits. (Id. at ¶¶ 7, 23).

In addition, Plaintiff attempted to transfer the majority of his monies to another annuity product controlled by a Prudential Financial Company, American Skandia. (Id. at ¶ 30). Plaintiff claims that Allstate failed to comply with his transfer request for nearly a month at which time the value his annuity dropped over $100,000. (Id. at ¶ 33).

## MOTION TO DISMISS STANDARD

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) challenges the sufficiency of the complaint, not the merits of the case. Gibson v. City of Chicago, 910 F.2d 1510, 1520 (7th Cir.1990). The Court will only grant a motion to dismiss if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Conley v. Gibson, 355 U.S. 41, 45-46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957). When reviewing a motion to dismiss, the Court is restricted to reviewing the pleadings, which consist of the complaint, any attached exhibits, and the supporting briefs. See Thompson v. Illinois Dept. of Prof'l Regulation, 300 F.3d 750, 753 (7th Cir.2002). In making its determination, the Court must assume the truth of the facts alleged in the pleadings, construe the allegations liberally, and view them in the light most favorable to the plaintiff. Jet, Inc. v. Shell Oil Co., 381 F.3d 627, 629 (7 th Cir.2004).

## ANALYSIS

I. Breach of Covenant of Good Faith and Fair Dealing (Count III)

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Wo



**\*2** Under Illinois law, the covenant of good faith and fair dealing has never been an independent source of duties for the parties to a contract, but instead guides the construction of explicit terms in an agreement. APS Sports Collectibles, Inc. v. Sports Time, Inc., 299 F.3d 624, 628 (7th Cir.2002) (citation and quotation omitted). As such, a breach of the covenant of good faith and fair dealing is not an independent cause of action except "in the narrow context of cases involving an insurer's obligation to settle with a third party who has sued the policy holder." Id. (quoting Voyles v. Sandia Mortgage Corp., 196 Ill.2d 288, 296, 256 Ill.Dec. 289, 751 N.E.2d 1126 (2001)). Plaintiff does not argue that his claim fits under this narrow exception, and therefore fails to state a claim.

Plaintiff attempts to characterize his claim as a breach of duty that derives when one party to a contract is given broad discretion in performing certain obligations under the contract and acts in bad faith. See Oil Express Nat'l, Inc. v. Burgstone, 958 F.Supp. 366, 369 (N.D.Ill.1997); BA Mortgage & Int'l Realty Corp. v. American Nat'l Bank & Trust Co., 706 F.Supp. 1364, 1373 (N.D.Ill.1989). Even if such exception existed, Plaintiff has not allege that Allstate had broad discretion in performing its obligations under this nondiscretionary variable annuity contract. Instead, under the contract, Allstate's obligations consisted of managing the transfers between accounts per Plaintiff's instructions. Therefore, Plaintiff's allegations do not fit within the Oil Express parameters.

## II. Conversion (Count IV)

To state a claim for conversion in Illinois, Plaintiff must allege: (1) he has a right to the property at issue; (2) he has an absolute and unconditional right to the immediate possession of that property; (3) he made a demand on the defendant for possession of the property; and (4) the defendant wrongfully and without authorization assumed control, dominion, or ownership over the property. Cirrincione v. Johnson, 184 Ill.2d 109, 114, 234 Ill.Dec. 455, 458, 703 N.E.2d 67, 70 (1998). Illinois law limits the situations where a plaintiff may maintain an action for the conversion of money. 3Com Corp. v. Electronic Recovery Specialists, Inc., 104 F.Supp.2d 932, 939 (N.D.Ill.2000). "[T]he general rule is that conversion will not lie for money represented by a general debt or obligation. It must be shown that the money claimed, or its equivalent, at all times belonged to the plaintiff and that the defendant converted it to his own use." In re Thebus, 108 Ill.2d 255, 261, 91 Ill.Dec. 623, 483 N.E.2d 1258, 1261 (1985).

The money at issue here does not fall within the limited circumstances under which Illinois provides for a claim for conversion. Plaintiff alleges that it took Allstate nearly a month to honor his request to transfer the majority of his monies held in the variable annuity account to an account controlled by American Skandia. Plaintiff, however, does not allege that during this one month period, Allstate converted the money to its own use. In addition, when Plaintiff requested that Allstate transfer his monies to another account, Allstate had the obligation to transfer the money. Because an action for conversion of funds may not be maintained to satisfy the mere obligation to pay money. see In re Thebus, 108 Ill.2d at 261, 91 Ill.Dec. 623, 483 N.E.2d 1258, the Court grants Defendant's motion to dismiss Count IV.

## III. Breach of Fiduciary Duty (Count V) [FN1]

> FN1. Plaintiff has failed to allege a claim for breach of fiduciary duty under the Investment Company Act of 1940. First, Plaintiff did not allege facts of Allstate's self-dealing or personal impropriety, thus he has failed to state a claim under 15 U.S.C. § 36(a). See In re Nuveen Fund Litig., No. 94 C 0360, 1996 WL 328006, at \*10-11 (N.D. Ill. June 11, 1996). Further, Plaintiff has not sufficiently alleged a claim under § 36(b), due to his failure to allege that Allstate's compensation was disproportionate to services rendered. See id. at \*14.

**\*3** To allege a breach of fiduciary duty under Illinois law, a plaintiff must establish the following elements: (1) the existence of a fiduciary duty; (2) a breach of that duty; and (3) damages proximately resulting from the breach. Romanek v. Connelly, 324 Ill.App.3d 393, 404, 257 Ill.Dec. 436, 753 N.E.2d 1062, 1072 (2001). A fiduciary relationship may arise as a matter of law by virtue of the relationship between the parties, such as an attorney-client relationship. In re Estate of Rothenberg, 176 Ill.App.3d 176, 179, 125 Ill.Dec. 739, 741, 530 N.E.2d 1148, 1150 (1988). It may also "arise from

(C) 2005 Thomson/West. No Claim to Orig. U.S. Govt. Wo



the facts of a particular situation, for example, where there is trust reposed on one side and resulting superiority and influence on the other." Id.

To determine whether a fiduciary duty exists under the circumstances, the Court must examine the nature of the parties' annuity contract. Annuity contracts are not ordinary insurance contracts, as the Defendant suggests, because such contracts contain aspects of both securities and insurance products. See Patenaude v. Equitable Life Assurance Soc'y, 290 F.3d 1020, 1027 (9th Cir.2002); Lander v. Hartford Life & Annuity Ins., 251 F.3d 101, 105 (2d Cir.2001). The Court's review of the annuity agreement attached to the Complaint, along with the Plaintiff's allegations, reveals that the parties' contract is a tax-deferred variable annuity as opposed to a fixed deferred annuity. In a tax-deferred variable annuity, the rate of return is not guaranteed. See Patenaude, 290 F.3d at 1027. Instead, the purchaser invests in professionally managed investment products, such as mutual funds, and receives a rate of return contingent on the success of the underlying investments. See id.; see also Lander, 251 F.3d at 105 ("many consumers use variable annuities as a tool for accumulating greater retirement funds through market speculation"). Due to the securities-related component of variable annuities, they must be registered with the Securities and Exchange Commission under the Securities Act of 1933. See SEC v. Variable Annuity Life Ins. Co., 359 U.S. 65, 69-73, 79 S.Ct. 618, 3 L.Ed.2d 640 (1959).

Based on the nature of the parties' contract, Allstate is more than a mere party to the contract. Under Illinois law, brokers who receive fees or commissions for executing investment transactions can serve as agents to their customers, and thus have a fiduciary duty to their customers that is limited to actions occurring within the scope of their agency. See Martin v. Heinhold Commodities, Inc. ., 117 Ill.2d 67, 78, 109 Ill.Dec. 772, 510 N.E.2d 840 (1987); Index Futures Group, Inc. v. Ross, 199 Ill.App.3d 468, 475, 145 Ill.Dec. 574, 557 N.E.2d 344 (Ill.App.1990). "The duty of care owed by a broker carrying a nondiscretionary account for a customer is an exceedingly narrow one, consisting at most of a duty to properly carry out transactions ordered by the customer." Index Futures Group, 199 Ill.App.3d at 475, 145 Ill.Dec. 574, 557 N.E.2d 344.

*4 Here, Plaintiff alleges that Allstate was responsible for transferring funds between the various investment options pursuant to Plaintiff's request, yet failed to do so. Plaintiff further alleges that Allstate's failure to transfer funds resulted in lost profits. Viewing the allegations in a light most favorable to Plaintiff, the Court concludes that he has sufficiently alleged a claim for breach of fiduciary duty under Illinois law. Count V stands.

2004 WL 2392169 (N.D.Ill.)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Wo

Westlaw.

Not Reported in F.Supp.
**(Cite as: 1996 WL 328006 (N.D.Ill.))**
< KeyCite Yellow Flag >

Only the Westlaw citation is currently available.

United States District Court, N.D. Illinois, Eastern
Division.

**IN re NUVEEN FUND LITIGATION.**

**No. 94 C 360.**

June 11, 1996.

MEMORANDUM AND ORDER

MANNING, District Judge.

**\*1** This matter comes before the court on
objections by defendants John Nuveen & Company,
Inc. ("Nuveen"), Nuveen Advisory Corporation
("Advisor"), Richard J. Franke, and Donald E.
Sveen to Magistrate Judge Edward E. Bobrick's
report and recommendation proposing that the court
deny their motion to dismiss. For the reasons set
forth below, the court modifies the magistrate
judge's recommendation and denies the defendants'
motion to dismiss as to Counts VIII and IX, and
grants the defendants' motion to dismiss as to
Counts X and XI [FN1].

> FN1. Because the court does not dismiss all of the
> plaintiffs' federal claims, the court rejects
> defendants' additional argument to dismiss the
> plaintiffs' state law counts pursuant to 28 U.S.C. §
> 1367(c).

This Memorandum and Order is one of four
issued concerning the instant case. Plaintiffs bring
this derivative suit on behalf of all persons who
owned shares of the Nuveen Municipal Value Fund,
Inc. ("NUV Fund") or the Nuveen Premium Income
Municipal Fund, Inc. ("NPI Fund") on November
6, 1993. Plaintiffs allege that the issuance of new
shares of stock in the NUV Fund and NPI Fund
("Funds") violated the Funds' respective articles of
incorporation, diluted plaintiffs' interests in the
Funds and was made only for the purpose of
generating fees for the Funds' investment adviser
and its controlling parent corporation. Plaintiffs'
bring this Complaint [FN2] in twelve counts:
Counts I through VII and XII allege claims for sales
of shares under fair value, acts ultra vires, and
illegal distribution of rights, all in violation of

Minnesota state law; Counts VIII through XI allege
violations of the Investment Company Act of 1940
("ICA"), 15 U.S.C. 80a-1 et seq. Defendants
include the Funds' unaffiliated directors, the Funds'
investment advisor, Nuveen Advisory Corporation
("Advisor"), the Funds' inside directors, Richard J.
Franke and Donald E. Sveen, the Advisor's
controlling parent corporation, John Nuveen &
Company, Inc. ("Nuveen"), the officers for both the
Funds and the Advisor, James J. Wesolowski and
Larry W. Martin, and the Funds' outside counsel,
Michael Meyer.

> FN2. In this suit, plaintiffs have filed two separate
> but related complaints containing allegations against
> defendants James J. Wesolowski, Larry W. Martin
> and Michael Meyer.

Both the defendants and the Funds have moved to
dismiss the plaintiffs' action on a variety of
grounds. The matter was referred to Magistrate
Judge Bobrick who issued five separate reports and
recommendations in order to insure consideration of
points. This Order only addresses the defendants'
objections to the magistrate judge's report
concerning the motion to dismiss by Nuveen, the
Advisor, Franke and Sveen.

BACKGROUND

The court adopts the facts and history as
comprehensively provided by the magistrate judge in
his report and recommendation. Nuveen is a multi-
million dollar investment banking and investment
advisory firm whose growth was, and is dependent
on its ability to continually create and market new
closed-end funds. Closed-end bond funds, unlike
open-end funds, generally do not issue new shares
after their initial offering; expansion is usually
through the gradual increase in the value of the
underlying portfolio. The NUV and NPI funds are
both closed-end, diversified management investment
companies registered under the ICA in the state of
Minnesota.

**\*2** Nuveen's closed-end municipal bond funds
account for at least 75% of Nuveen's business.
Nuveen profits on the closed-end funds in two ways:
(1) underwriting fees for new funds and (2)
management fees based on a percentage of the assets
managed by the Advisor, its wholly-owned

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Wo

Not Reported in F.Supp.

**Page 39**

(Cite as: 1996 WL 328006, *2 (N.D.Ill.))

subsidiary. In the recent past, Nuveen has been able to sustain growth by creating and marketing an average of one new, closed-end fund a month. Plaintiffs claim that Nuveen's future growth through the creation of new closed-end funds has been threatened by market saturation, declining investor interest, and high bond prices. By the fall of 1993, Nuveen's performance had stagnated along with the closed-end bond fund market. Earnings fell below analysts' projections, Nuveen's stock was downgraded, and industry publications noted the slowdown. Due to the impact of the downturn, plaintiffs allege that the Funds resorted to raising capital from the shareholders of its existing Nuveen funds through rights offerings.

On November 8, 1993, the Funds announced the offering of rights to new shares enabling Funds' shareholders to purchase additional shares ("Rights Offerings"). Specifically, the Rights Offerings allowed each NUV or NPI funds shareholder to purchase one additional share for every three shares already owned. Thus, each Fund could have increased its outstanding shares by up to 33%. According to plaintiffs, the Rights Offerings were instituted for Nuveen's benefit rather than for the benefit of the Funds' shareholders. They claim that Nuveen directly benefited from the Offerings by receiving substantial underwriting fees and indirectly benefited from the Offerings because the Advisor would receive significantly greater management fees due to the Funds' increased assets under Advisor's management. Plaintiffs submit that the shareholders were harmed rather than benefited as a result. The price for the new shares was set at:

the lesser of (A) the net asset value per common share as of the date of the expiration of the offering ("pricing date") or (B) 95% of the average of the last reported sale prices of a common share on the New York Stock Exchange on the pricing date and the four (4) preceding business days.

Plaintiffs explain that defendants knew or should have known that this pricing structure guaranteed that the new shares would be sold at a price below both the Funds' per share net asset value ("NAV"). Plaintiffs allege that analysis presented to the directors predicted that the announcement of the Offerings placed a downward pressure on the trading price for the Nuveen funds' shares in the weeks before the final price was determined.

Plaintiffs also contend that the challenged offerings were designed to give the Funds' shareholders a "Hobson's Choice" among three alternatives, each of which caused the shareholders harm: (1) invest more money in the Funds and minimize their NAV dilution; (2) refrain from investing more money and suffer dilution from the addition of new shares and the deduction of underwriting fees; or (3) sell their shares in an intentionally depressed market and suffer losses.

*3 The Complaint calls into question several aspects of the Offerings. First, plaintiffs claim the Offerings were ultra vires because the Funds' articles of incorporation expressly prohibit the sale of shares below NAV. Given the formula for pricing the shares, plaintiffs claim that the Offerings were designed to occur as less than NAV. Second, plaintiffs claim that the Offerings resulted in a waste of corporate assets. According to the Complaint, the Advisor's analysis indicated that the Offerings would not produce even marginal benefits to the Funds' performance. In fact, the Complaint alleges that the directors expected, or should have expected, that the Offerings would worsen the Funds' long-term performance. In addition, the Complaint alleges that the Advisor's predictions explicitly presumed that the Offerings would occur at NAV even though the Advisor and directors knew, or should have known, that the Offerings would occur below NAV.

Third, plaintiffs allege that the Funds employed false and misleading prospectuses in connection with the Offerings. The Complaint alleges that prospectuses failed to disclose that the Rights Offerings constituted an "interest-rate-gamble" as any rise in interest rates would worsen the Funds' performance in relationship to if the Offerings never took place. Plaintiffs assert that the prospectuses did not even suggest the effect rising interest rates would have on the Funds. Plaintiffs also allege that the prospectuses misrepresented that the Offerings would create long-term benefits to the Funds, even though the Advisor's financial analysis indicated that the best-case scenario would be that the Funds' performance would not be worsened by the Offerings. The Complaint also alleges that the directors were self-interested and biased in conducting the Rights Offerings.

In considering the Offerings, the directors relied

(C) 2005 Thomson/West. No Claim to Orig. U.S. Govt. Wo



Not Reported in F.Supp.
(Cite as: 1996 WL 328006, *3 (N.D.Ill.))

solely on information and analysis from Nuveen and the Advisor. Of the Funds' seven directors, two have significant relationships with Nuveen and cannot be considered independent in regard to the Offerings in this case. Of the remaining five directors, two have stated in attached depositions that they would not entertain the possibility that information from Nuveen or the Advisor would reflect bias or self-interest.

Nuveen, the Advisor, Franke and Sveen ("Nuveen Defendants") move to dismiss plaintiffs' counts under federal law, and the remaining state counts for lack of jurisdiction. Count VIII is brought under ICA § 34(b), 15 U.S.C. § 80a-33(b), and alleges that defendants violated the ICA through their use of false and materially misleading statements in the offering prospectuses. Count XI alleges that the directors and Advisor breached their fiduciary duties in violation of ICA § 36(a), 15 U.S.C. § 80a-35(a). Count X alleges that Nuveen aided and abetted the foregoing violation. Count XI, brought under ICA § 36(b), 15 U.S.C. § 80a-35(b), seeks to recover underwriting and management fees that Nuveen and the Advisor realized from the Rights Offerings.

*4 In their motion, defendants first argue that there is no private cause of action under § 34(b) and § 36(a). Assuming arguendo, however, that these causes of action do exist, defendants contend that the Complaint fails to allege the elements of claims under those sections. Defendants also argue that ICA § 23(b)(1), 15 U.S.C. § 80a-23(b), authorized the Offerings at issue. Finally, defendants submit that the plaintiffs' allegations do not state a cause of action under § 36(b).

### DISCUSSION

In considering the defendants' motion to dismiss, the court accepts as true all well-pleaded factual allegations and draws all possible inferences in favor of the plaintiffs. Thomas v. Boggs, 33 F.3d 847, 852 (7th Cir.1994).

I. Private Causes of Action under the ICA.

Defendants first object that Magistrate Judge Bobrick incorrectly implied private rights of action under § 36(a) and § 34(b) of the Investment Company Act ("ICA"). § 34(b) states in pertinent part that:

[i]t shall be unlawful for any person to make any untrue statement of material fact in any registration statement, application, report, account, record, or other document filed or transmitted pursuant to this subchapter ... It shall be unlawful for any person so filing [or] transmitting ... any such document to omit to state therein any fact necessary in order to prevent the statements made therein, in light of the circumstances under which they are made, from being materially misleading.

15 U.S.C. § 80a-33(b). § 36(a) provides that:

[t]he [Securities and Exchange Commission] is authorized to bring an action ... alleging that a person serving or acting in one or more of the following capacities has engaged ... or is about to engage in any act or practice constituting a breach of fiduciary duty involving personal misconduct in respect of any registered investment company for which such person serves or acts.

15 U.S.C. § 80a-35(a). In light of the ICA's remedial purposes, the substantial line of precedent recognizing implied private rights under the ICA, and the legislative intent attendant to two subsequent amendments to the ICA, Magistrate Judge Bobrick concluded that implied private rights of action do exist under § 34(b) and § 36(a).

Although defendants correctly assert that "a strong presumption exists against the creation of [ ] implied rights of action." West Allis Memorial Hosp., Inc. v. Bowen, 852 F.2d 251, 254 (7th Cir.1988), this presumption does not require an explicit statement of congressional intent in the text or legislative history. See Community & Economic Deve. Ass'n v. Suburban Cook County, 770 F.2d 662, 664 (7th Cir.1985). Cases cited by defendants reveal that "the failure of Congress expressly to consider a private remedy is not inevitably inconsistent with an intent on its part to make such a remedy available." Id. (quoting Transamerica Mortgage Advisors, Inc. v. Lewis, 444 U.S. 11, 18, 100 S.Ct. 242, 246 (1979)). The decisive question is whether Congress intended to provide such a right in enacting the statute. West Allis, 852 F.2d at 255. Such congressional intent is inferred from the language and structure of the statute, its legislative history, as well as by whether such a cause of action would be consistent with the statute's underlying scheme. Spicer v. Chicago Bd. of Options Exchange, Inc., 977 F.2d 255, 258 (7th Cir.1992).

(C) 2005 Thomson/West. No Claim to Orig. U.S. Govt. Wo

Westlaw

Not Reported in F.Supp.                                                    **Page 41**
**(Cite as: 1996 WL 328006, \*5 (N.D.Ill.))**

**\*5** Defendants first argue that the Supreme Court's refusal to imply a private right for damages under the fiduciary rights created by § 206 of the Investment Advisor Act ("IAA") precludes the court from implying a private action under similar provisions in the ICA. See Transamerica, 444 U.S. 11, 100 S.Ct. 242. In Transamerica, however, the court relied in large part upon the fact that Congress had consciously omitted references to "actions at law" or "liability" from the IAA's jurisdictional provisions, reflecting an intent to not provide private causes of action under the IAA. Id. at 24-25, at 249. In contrast, the ICA grants jurisdiction in "all suits in equity and actions at law brought to enforce any liability or duty created by ... regulations or orders thereunder. 15 U.S.C. § 80a-43. Furthermore, ICA § 1(b) explicitly directs the courts to interpret its provisions to "mitigate and, so far as is feasible, to eliminate the conditions enumerated in this section which adversely affect the national public interest and the interest of investors." 15 U.S.C. § 80a-1(b).

More importantly, subsequent legislative history arising from amendments to the ICA indicates that Congress contemplated that the courts should imply private causes of action. Federal courts have widely implied private causes of action under the ICA for over thirty years. See, e.g., Lessler v. Little, 857 F.2d 866 (1st Cir.1988), cert. denied, 489 U.S. 1016, 109 S.Ct. 1130 (1989); Bancroft Convertible Fund, Inc. v. Zico Inv. Holdings, 825 F.2d 731, 734 n. 1 (3d Cir.1987); Fogel v. Chestnutt, 668 F.2d 100, 110-11 (2d Cir.1981) (recounting precedent implying private right under ICA § 36). Even though the Congress has revisited the ICA three times since courts began to imply such causes of action, it has never indicated its dissatisfaction with this practice. See Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran, 456 U.S. 353, 380-81, 102 S.Ct. 1825, 1839-40 (1982).

Defendants respond that congressional silence or inaction does not provide evidence of congressional approval of an implied right. See Central Bank v. First Interstate Bank, 114 S.Ct. 1439, 1453 (1994). However, when Congress amended the ICA through the Small Business Investment Incentive Act of 1980, the House Committee reported:

The rationale for implying private rights of action under the securities laws beyond those actions expressly provided for had been well articulated

by the Supreme Court when it observed that implied rights of action allowing shareholders to sue to remedy their losses would significantly assist the congressional goal of promoting fair corporate suffrage. But in recent years, the Supreme Court has turned its focus toward a strict construction of statutory language and expressed intent.
The Committee wishes to make plain that it expects the courts to imply private rights of action under this legislation, where the plaintiff falls within the class protected by the statutory provision in question. Such a right would be consistent with and further Congress' intent in enacting that provision, and where such action would not improperly occupy an area traditionally a concern of state law. In appropriate instances, for example, breaches of fiduciary duty involving personal misconduct should be remedied under Section 36(a) of the Investment Company Act. With respect to business development companies, the Committee contemplates suits by shareholders as well as by the Commission, since these are the persons the provision is designed to protect, and such private rights of action will assist in carrying out the remedial purposes of Section 36.
**\*6** H.R.Rep. No. 1341, 96th Cong., 2d Sess. 28-29 (1980), reprinted in 1980 U.S.C.C.A.N. 4800, 4810-11 (footnotes omitted). The court finds that this enthusiastic expression of intent provides more than mere silence or legislative inaction.

The defendants protest that the interpretation that one Congress applies to an earlier statute is of limited relevance in determining the meaning of an unamended section of a statute. Central Bank, 114 S.Ct. at 1452. However, as the magistrate judge noted, Central Bank was concerned with the scope of conduct prohibited by a statute, and did not directly address the question of implying private causes of action. See id. at ----. In addition, Central Bank rejected the plaintiffs' arguments that Securities and Exchange Act of 1934 § 10(b) included aiding and abetting liability based upon oblique references to such liability in later reports by congressional committees. Central Bank, 114 S.Ct. at 1452; see also Aaron v. SEC, 446 U.S. 680, 695 n. 11, 100 S.Ct. 1945, 1955 n. 11 (1980) (finding irrelevant to requirement of scienter under SEA § 10(b) subsequent legislative history that never directly addressed issue). In contrast, the above cited reference to implied private rights of

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Wo

action under the ICA is anything but oblique, particularly in regards to ICA § 36(a). In the course of considering substantial changes to the ICA, the report reveals that the House Committee determined the required changes to the ICA with implied private rights of action in mind.

Most importantly, defendants ignore Congress' amendment of ICA § 36 in 1970. By enacting the separate provision of ICA § 36(b), Congress provided shareholders with a direct cause of action in order to correct the limited effectiveness of the original provision. See Fogel, 668 F.2d 111-112. Congress also retained the previous fiduciary duty under ICA § 36(a), only altering the language to strengthen the standard of care imposed and to provide the courts with greater remedial flexibility. S.R.Rep. No. 91-184, 91st Cong., 1st Sess. 16, reprinted in 1970 U.S.C.C.A.N. 4897, 4931 (hereinafter "Senate Report"). As the Second Circuit has persuasively explained, the legislative history behind this amendment does not indicate any intent on the part of Congress to eliminate the private right of action previously recognized under § 36. Id. Rather, the Senate Report attendant to this amendment explicitly directed that the creation of a private right of action under 36(b) "should not be read by implication to affect subsection (a)." Senate Report at 4911. The court agrees with the magistrate judge's interpretation of these comments as indicating a congressional intent to leave the state of implied remedies under subsection § 36(a) as they were.

Accordingly, the court accepts Magistrate Judge Bobrick's recommendation to imply private rights of action under ICA § 34(b) and ICA § 36(a) [FN3].

> FN3. In light of Central Bank, however, the court accepts the magistrate judge's recommendation to grant defendants' motion to dismiss Count X for aiding and abetting a violation of ICA § 36(a).

II. Plaintiffs' Claim under ICA § 34(b).

*7 Defendants object to the magistrate judge's recommendation that Count VIII of the Complaint states a claim under ICA § 34(b). In Count VIII, plaintiffs allege that the defendants violated § 34(b) through misrepresentations and material omissions in the prospectuses used for the Rights Offerings. Specifically, the Complaint asserts that the

prospectuses (1) failed to disclose that the Rights Offerings depended upon stable or lowering interest rates merely to permit the Funds to break even, (2) misrepresented that the Funds would obtain long-term benefits in performance from the Rights Offerings, and (3) failed to disclose that NAV dilution from the Rights Offerings would potentially worsen the Funds' performance so that investors would not obtain NAV benefits for several years. In his report, Magistrate Judge Bobrick concluded that these pleadings adequately allege a material misrepresentation and omission under § 34(b). In addition, the magistrate judge recommended that, in contrast to § 10(b) of the Securities and Exchange Act of 1934 ("SEA"), § 34(b) does not require a plaintiff to demonstrate that the alleged violation caused his asserted injury.

Defendants first argue that the Complaint fails to allege a material omission because the asserted omitted information only constitutes public, non-firm specific information. See Wielgos v. Commonwealth Edison Co., 892 F.2d 509, 515 (7th Cir.1989) (Securities and Exchange Act imposes no duty to release public non-firm specific information); see also In re RAC Mortgage Inv. Corp. Sec. Litig., 765 F.Supp. 860, 864 (D.Md.1991) (no duty to disclose basic economic principles of interest rates). Although defendants present a compelling argument that the securities laws did not require them to disclose the consequences of rising interest rates for the Funds, their objection fails to dispose of all the plaintiffs' allegations. The Complaint charges that the defendants' own internal analysis clearly revealed that the Rights Offerings would not benefit the Funds' financial performance. Furthermore, in light of the price structure, the Complaint asserts that defendants knew or should have known that the Rights Offerings would actually harm the Funds' performance. Such information is neither public nor non-firm specific.

Defendants respond that they were not required to characterize the consequences of the Rights Offerings as long as the prospectuses did not misrepresent or omit the actual terms of the transaction. See Issen v. GSC Enterprises, Inc., 508 F.Supp. 1278, 1290 (N.D.Ill.1981). As a general matter, the securities laws do not require disclosure of internal projections or predictions of the outcome of a transaction. See id. But the attached

(C) 2005 Thomson/West. No Claim to Orig. U.S. Govt. Wo

Westlaw

Not Reported in F.Supp.
(Cite as: 1996 WL 328006, *7 (N.D.Ill.))

prospectuses reveal general statements representing that the Fund's Board of Directors had determined that the Rights Offerings would provide long term benefits for the Funds' financial performance that would outweigh any of the dilutive consequences for NAV, dividends or non-participating shareholders. The Complaint alleges that the Advisor's analysis directly contradicted these statements. General statements of opinion may be actionable where they may be objectively verifiable and the defendant had no reasonable basis in the opinion. See Wright v. IBM Corp., 796 F.Supp. 1120, 1125 (N.D.Ill.1992); In re Apple Computers Sec. Litig., 886 F.2d 1109, 1113 (9th Cir.1989). Assuming the plaintiffs' allegations as true, the prospectuses' assertions give rise to a potential material misrepresentation. It is uncertain whether plaintiffs can substantiate their allegations. However, a motion to dismiss does not impose this burden on the plaintiffs. The court cannot conclude that reasonable minds would not differ as to whether the alleged misrepresentations and omissions would be material to a reasonable investor. See TSC Industries, Inc. v. Northway, Inc., 426 U.S. 438, 449, 96 S.Ct. 2126, 2132 (1976).

*8 Defendants also argue that the magistrate judge incorrectly recommended that § 34(b) does not require the element of causation. Defendants contend that a private right of action under § 34(b) would require the same elements as required under SEA § 10(b). For their part, the plaintiffs propose that a claim under § 34(b) does not require causation because, in contrast to SEA § 10(b), § 34(b) does not require proof of a "manipulative or deceptive device": § 34(b) does not require proof of fraud. Rather, plaintiffs compare § 34(b) to SA § 11, § 12(2) and SEA § 14(a). Although the court rejects the contention that § 34(b) requires the same elements of SEA § 10(b), the court finds that causation is a required element of a private claim under § 34(b).

SA § 11 and § 12(2) are part of an express civil liability scheme that effectively employs the purchasers of securities in the effort to regulate misstatements made in the offering or sale of securities. See Nielsen v. Greenwood, 849 F.Supp. 1233, 1251-55 (N.D.Ill.1994). Each of these provisions provides explicit instructions and, consequently, limits on computing damages arising from an alleged breach [FN4]. 15 U.S.C. § 77k(e);

15 U.S.C. § 77l. In contrast, the text of § 34(b) does not provide any presumed damages or injury arising from a violation. Without such presumed and designated damages, it is inappropriate to permit potential claimants to raise a claim without alleging that he suffered an injury proximately caused by the alleged misstatement.

FN4. In fact, causation remains relevant to a claim under SA § 11. Even if a claimant demonstrates materiality, a defendant may still escape liability for damages to the extent that he establishes that other market factors in fact caused the claimant's injury. 15 U.S.C. § 77k(e).

In contrast to plaintiffs' argument, a private claim under SEA § 14(a) requires proof of causation. SEA § 14(a) and Rule 14a-9 prohibit misrepresentations and material omissions in any proxy statement. 15 U.S.C. § 77n; 17 C.F.R. § 240.14a-9. Because SEA § 14(a) does not focus on fraud, a mere material misstatement in a distributed proxy statement constitutes a violation. See Mills v. Electric Auto-Lite Co., 396 U.S. 375, 383, 90 S.Ct. 616, 621 (1970). Furthermore, in light of the policy interests behind SEA 14(a) and the difficulties of demonstrating third parties' reliance, courts will presume that a misrepresentation or material omission in a proxy statement affected the outcome of the proxy vote. See id. at 384-85, at 621-22. However, to obtain redress in court, a private claimant must still demonstrate that he suffered an injury that was proximately caused by the alleged misstatement. See Issen, 522 F.Supp. at 396 (claim under SEA § 14(a) requires that plaintiff establish casual relationship between asserted violation and injury). For instance, if the defendant can demonstrate that the alleged misstatement was not an essential link in the success of the proxy vote, then the claim must be dismissed. See Virginia Bankshares, Inc. v. Sandberg, 501 U.S. 1083, 111 S.Ct. 2749 (1991).

However, as under SEA § 14(a), a private claimant under § 34(b) need not demonstrate their personal reliance on the alleged misstatement. Because SEA § 10(b) prohibits "any manipulative or deceptive device" "in connection with the purchase or sale of any security," the elements of a private claim under SEA 10(b) are modeled upon the common law action of deceit. See Huddleston v. Herman & MacLean, 640 F.2d 534, 547 (5th

(C) 2005 Thomson/West. No Claim to Orig. U.S. Govt. Wo

Not Reported in F.Supp.
(Cite as: 1996 WL 328006, *8 (N.D.Ill.))

Page 44

Cir.1981), aff'd in part and rev'd in part on other grounds, 459 U.S. 375, 103 S.Ct. 683 (1983). Consequently, courts generally require a SEA § 10(b) claimant to demonstrate either actual or constructive personal reliance on the alleged misstatement as a necessary component of establishing causation. Basic Incorp. v. Levinson, 485 U.S. 224, 243, 108 S.Ct. 978, 989 (1988). But nothing in the text of § 34(b) reflects a similar element of fraud. As under SEA § 14(a), the mere material misstatement executed in a covered document constitutes a violation of § 34(b). Also like SEA § 14(a), § 34(b) does not "prohibit [ ] unlawful conduct in connection with a particular activity." See Cowin v. Bresler, 741 F.2d 410, 427 (D.C.Cir.1984) (finding that a private claim under SEA 14(a) does not require proof of personal reliance). Rather than regulate the sale or transfer of securities, § 34(b) is part of the ICA's general regulatory scheme intended to protect the investment company and its shareholders from the danger of self-dealing of management or other insiders that is particularly acute in the mutual fund industry. See Burks v. Lasker, 441 U.S. 471, 481-84, 99 S.Ct. 1831, 1839-40 (1979); see also Cowin, 741 F.2d at 427 (SEA 14(a)'s goal to "protect a shareholder's investment from self-serving designs of those at odds with the best interests of the corporation" indicates that a private claim does not require reliance). Accordingly, the court finds that a private claim under § 34(b) does not require the plaintiff to demonstrate personal reliance upon the alleged misstatement.

*9 Because there is not such a requirement, the Complaint adequately pleads proximate causation. In order to demonstrate loss causation under the securities laws, a plaintiff must show that a misrepresentation or material omission was a substantial factor in causing the plaintiffs' asserted injury. Herzfeld v. Laventhol, Krekstein, Horwath & Horwath, 540 F.2d 27, 33 (2d Cir.1976). As the Complaint presents a derivative suit, the alleged instant injury arises from damages flowing directly to the corporation in the form of its impaired financial performance. In such a claim, neither the plaintiff shareholders' reliance nor the Funds' reliance is at issue. Instead, causation arises from the fellow shareholders' reliance on the alleged misstatements in deciding to participate in the Rights Offerings. Loss causation derives from the common law tort concept of proximate causation.

Manufacturers Hanover Trust Co. v. Drysdale Sec. Corp., 801 F.2d 13, 20 (2d Cir.1986), cert. denied, 479 U.S. 1066, 107 S.Ct. 952 (1986). Accordingly, central to loss causation is the question whether the alleged injury was a reasonably foreseeable result of the purported misstatement. Id. at 20-21. In light of the pleadings, it is reasonable to infer that the defendants foresaw and, in fact, expected that the purported misstatement would stimulate participation in the Rights Offerings. From the allegations that the defendants knew or should have known that the Offerings would not benefit the Funds' performance, it is also reasonable to infer that the defendants could reasonably foresee the alleged injury. Consequently, the defendants' motion to dismiss Count VIII is denied.

III. Cause of Action under ICA § 36(a).

A. Implications of ICA § 23(b)(1).

Defendants object that plaintiffs' claim that a rights offering for less than net asset value may constitute a breach of fiduciary duty under ICA § 36(a) would render the exemption under ICA § 23(b)(1) superfluous. ICA § 23(b) states in pertinent part that:

No registered closed-end company shall sell any common stock of which it is the issuer at a price below the current net asset value ... except (1) in connection with an offering to the holders of one or more classes of its capital stock.

15 U.S.C. § 80a-22(b). Defendants argue that this language reflects Congress' conclusion that an offering below net asset value that is limited to current shareholders poses no substantial risk to those current shareholders. Defendants contend that such a price structure for a rights offering, if limited to current shareholders, cannot violate the duty of fiduciary care imposed by ICA § 36(a). Consequently, defendants argue that the Report's recommendation that the Rights Offerings may have violated ICA § 36(a) contradicts the plain meaning of ICA § 23(b)(1) and renders it superfluous.

The court rejects the defendants' position. ICA § 23(b)(1) expressly exempts a rights offerings restricted to current shareholders from the blanket prohibition of ICA § 23(b) against rights offerings at below net asset value. As defendants argue, this subsection implies that the decision to offer new shares at below net asset value to current

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Wo

Not Reported in F.Supp.
(Cite as: 1996 WL 328006, *9 (N.D.Ill.))

Page 45

shareholders does not necessarily violate the ICA under § 23(b). However, it does not imply that such a price structure may not violate the ICA's other constraints. The defendants concede that § 23(b)(1) does not provide a safe harbor for offerings to existing shareholders, but insinuate that it sanctions a price structure below net asset value as long as the shares are only offered to current shareholders. Magistrate Judge Bobrick correctly rejected this proposition. § 23(b) provides a general prohibition against below net asset value offerings. The plain language of § 23(b)(1) only states that offerings limited to current shareholders are not necessarily invalid. It does indicate that limiting below net asset value offerings to current shareholders guarantees that the directors' approval of that price structure satisfied other fiduciary duties to existing shareholders. Cf. Meyer v. Oppenheimer Management Corporation, 764 F.2d 76, 82-83 (2d Cir.1985) (rejecting directors' assertion that ICA § 36(b)'s fiduciary duties have no application to setting of fees under a Rule 12b-1 plan).

*10 As Magistrate Judge Bobrick explained, the Complaint alleges harm beyond the inherent immediate dilution arising from an offering at below net asset value. The pleadings also allege that the price structure of the Rights Offerings harmed both the short and long term performance of the Funds. Furthermore, the Complaint specifically pleads that, in light of the Funds' financial position and the current economic context, the Rights Offerings could only injure the Funds' financial performance. Finally, the Complaint alleges that the Advisor proposed these transactions solely to generate fees for itself regardless of the consequences to the Funds. Whether plaintiffs can substantiate these accusations is uncertain. However, the Complaint alleges misconduct beyond merely pricing an offering for a closed-end fund at below net asset value.

B. Personal Misconduct.

Defendants also object that ICA § 36(a) does not provide a cause of action for actions by a corporation or an entire board of directors. § 36(a) holds the directors, officers and investment adviser of an investment company liable for a "breach of fiduciary duty involving personal misconduct." 15 U.S.C. § 80a-35(a) (emphasis added). Defendants

argue that the legislative history surrounding the enactment of § 36(a) demonstrates that the modifying phrase, "involving personal misconduct," was intended only to limit the fiduciary duty under the subsection to reach only individual acts of dishonesty.

Congress adopted the ICA primarily to address the unique problems of investment adviser self-dealing in the investment fund industry. Daily Income Fund, Inc. v. Fox, 464 F.2d 523, 536, 104 S.Ct. 831, 838 (1984). Unlike most companies, an investment company is " 'mere shell,' a pool of assets consisting mostly of portfolio securities" that belong to the company's shareholders. Tannenbaum v. Zeller, 552 F.2d 402, 405 (2d Cir.1977). The investment adviser who creates the fund manages, operates and supervises most every aspect of the company. Id. This adviser is an independent entity, whose pecuniary interests may often come into conflict with those of its investment companies and their shareholders. Id. at 405-06. Because of the adviser's control over its funds, the danger of self-dealing is particularly acute. Burks, 441 U.S. at 481, 99 S.Ct. at 1839. To address this danger of self-dealing, the ICA imposes a number of structural and disclosure requirements on those who control investment companies. Tannenbaum, 552 F.2d at 406. However, the ICA primarily relies upon the unaffiliated directors of the investment company to assume the role of "independent watchdog" for the shareholders' interests. Id.

In 1970, Congress amended the ICA, and particularly § 36, in response to its failure to adequately regulate the investment adviser's influence and control over its investment company and their board of directors. See Burks, 483 U.S. at 483-84, 99 S.Ct. at 1839-40. Prior to 1970, § 36 imposed a general standard of "gross misconduct or gross abuse of trust" on the conduct of directors and investment advisers in exercising their control over their investment company. Decisions applying this "gross misconduct" standard involved some sort of element of self-dealing; the defendant engaged in a course of conduct or refrained from conduct for its own interests and at the expense of the investment company. See, e.g., Fogel v. Chestnutt, 533 F.2d 731, 750 (2d Cir.1979) (applying prior standard); Tannenbaum v. Zeller, 552 F.2d at 406. Congress eliminated the "gross misconduct" because the standard of proof of serious wrongdoing it imposed

Westlaw.

Not Reported in F.Supp.
(Cite as: 1996 WL 328006, *10 (N.D.Ill.))

Page 46

on plaintiffs was more onerous than Congress thought appropriate. Senate Report at 4931. In its place, Congress adopted the more traditional standard of "fiduciary duty". Predictably, the investment industry opposed this imposition arguing that it would permit suits based upon mere disagreements with the business judgment and investment decisions of the directors and advisers of mutual funds. See S. 1695, 90th Cong., 1st Sess. § 20 (1967), reprinted in Mutual Fund Legislation of 1967: Hearings on S. 1659 before the Senate Comm. on Banking and Currency, 90th Cong., 1st Sess.Pt. 2 (1967). In its place, the investment industry proposed a less onerous standard that would assure that the new § 36 only reach acts of personal dishonesty. Id. Ultimately, Congress enacted the current language.

*11 As an initial matter, even if the court were to accept that § 36(a) only reached acts of personal dishonesty, the Complaint adequately alleges a cause of action against Nuveen, the Advisor and the directors affiliated with those defendants, Richard J. Franke and Donald E. Sveen. Plaintiffs allege that Nuveen and the Advisor proposed the Rights Offerings, despite their knowledge that it would not benefit the Funds, in order to generate fees for itself. Defendants fail to explain how withholding information on the propriety of a transaction in order to benefit from that transaction would not constitute dishonesty. The fact that the Advisor revealed its general pecuniary interest in the transaction does not answer the charge that the Advisor provided only a partial analysis and dishonest advice. Moreover, Congress did not adopt the language of "personal dishonesty" advanced by the investment industry and used in the banking statutes [FN5]. Instead, Congress adopted the novel term of "personal misconduct." In light of the purpose of the amendments to strengthen the ICA, the court interprets this language to refer to misconduct that involves self-dealing by investment company or other insiders. Plaintiffs' allegations that the Advisor imposed the Rights Offerings for its own benefit at the expense of the Funds are precisely the type of self-dealing contemplated by § 36(a) [FN6].

FN5. Not only does "dishonesty" never appear in § 36(a), but the term also does not appear anywhere in the Senate Banking Committee's report explaining the 1970 amendments. See Senate

Report.

FN6. Similarly, the Complaint adequately pleads a cause of action under § 36(a) against defendants Franke and Sveen. The Complaint reveals that these directors are affiliated with Nuveen and Advisor and, as a legal matter, are not considered independent. Because the Complaint adequately pleads that these defendants are beholden to Nuveen and the Advisor, it also adequately pleads that their approval of the Rights Offerings constituted a breach of their duty of loyalty to the shareholders. See Cede & Co. v. Technocolor, Inc., 634 A.2d 345, 363 (Del.1993).

Because § 36(a) reaches only actions "involving personal misconduct", defendants argue that the subsection cannot prohibit a defendants' misconduct taken in as group action instead of in an individual capacity. Therefore, defendants contend that the directors cannot be held accountable under § 36(a) for their approval of the Rights Offerings. First, the court finds that it would be illogical to presume that "personal misconduct" cannot refer to conduct by a corporate body. The investment adviser, usually an independent corporation, is specifically listed as one of the parties bound by the subsection. 15 U.S.C. 80a-35(a)(1); see, e.g., Fogel v. Chestnutt, 668 F.2d 100 (affirming § 36(a) judgment against investment adviser). Regardless, a director's breach of his fiduciary duty through his participation in a board vote still may constitute an individual act.

Defendants protest that the duty under § 36(a) cannot reach all misconduct governed under a traditional fiduciary duty. Otherwise, the modifying language of "involving personal misconduct" would be superfluous. See Ratzlaf v. United States, 114 S.Ct. 655, 659 (1994) (statutory language should not be treated as surplusage). In addition, the Senate Banking Committee reiterated the investment industry's concerns when it stated that § 36(a) is not intended to provide a basis for "a general revision of the practices or structures of the investment company industry." See Senate Report at 4931. As defendants argue, this language indicates that Congress did not intend that § 36(a) reach all breaches of due care.

*12 However, the Committee also noted that "[i]n appropriate cases, nonfeasance of duty or abdication

(C) 2005 Thomson/West. No Claim to Orig. U.S. Govt. Wo



Not Reported in F.Supp.
(Cite as: 1996 WL 328006, *12 (N.D.Ill.))

Page 47

of responsibility would constitute a breach of fiduciary duty involving personal misconduct." Id. Congress enacted the ICA in order to insure against the investment adviser using its position of power to further its self-interest at the expense of the investment company it manages. In amending the ICA, Congress imposed the role of "independent watchdog" upon the unaffiliated directors to supervise the investment adviser's management of the funds and prevent adviser self-dealing. Burks, 441 U.S. at 483-84, 99 S.Ct. at 1839-40. Consequently, the court finds that § 36(a) contemplates allegations of a director's gross neglect of his responsibility to supervise and inform himself of the investment adviser's management of the fund [FN7]. The instant Complaint alleges that the Funds' directors blindly relied upon the Advisor's analysis and recommendations and thereby permitted the Advisor to impose a transaction for its own benefit at the cost of the Funds. Therefore, it alleges that the directors abdicated their responsibility to protect the shareholders' interests from the Advisor's self-dealing. Such allegations plead a "breach of fiduciary duty involving personal misconduct." Consequently, the court adopts the magistrate judge's recommendation and denies defendants' motion to dismiss Count IX in respect to all defendants.

FN7. When Congress amended the ICA in 1980, the House Committee applied a similar interpretation to § 36(a) in its report to Congress: [t]he Committee believes that the type of misconduct covered by [§ 36(a) ], as it applies to Business Development Companies, extends to personal misconduct evidenced by misfeasance or nonfeasance in carrying out legal responsibilities as well as self-dealing and other examples of unjust enrichment. Thus, the conduct of Business Development Company directors, in failing to engage in reasonable inquiry or supervision and thereby allowing other business development company affiliates to engage in improper or prohibited conduct, such as the misappropriation of company assets, falls well within the scope of section 36(a). H.Rep. 96-1341, 96th Cong., 2d Sess., reprinted in 1980 U.S.C.C.A.N. 4800, 4808 (footnote omitted). The Committee indicated that this interpretation of "personal misconduct" was consistent with breath of coverage intended under the 1970 amendment. See id. at n. 3.

IV. ICA § 36(b).

Defendants object to Magistrate Judge Bobrick's recommendation that the Complaint states a cause of action under ICA § 36(b). § 36(b) provides investment company shareholders with a direct cause of action against the company's investment adviser for its breach of fiduciary duty with "respect to the receipt of compensation for services." [FN8] In contrast to the plaintiffs' other claims against Nuveen and the Advisor, their claim under § 36(b) is not derivative. Defendants assert that this easier access is due to the narrow scope of the provision: § 36(b) only permits challenges to the fee arrangement between the investment adviser and the investment company.

FN8. § 36(b) provides in pertinent part: For the purposes of this subsection, the investment adviser of a registered investment company shall be deemed to have a fiduciary duty with respect to the receipt of compensation for services, or of payments of a material nature, paid by such registered investment company, or by the security holders thereof, to such investment adviser or any affiliated person of such investment adviser. An action may be brought under this subsection by the Commission, or by a security holder of such registered investment company on behalf of such company, against such investment adviser ... for breach of fiduciary duty in respect of such compensation or payments paid by such registered investment company or by the security holders thereof to such investment adviser or person. 15 U.S.C. § 80a-35(b).

In his report, Magistrate Judge Bobrick concluded that § 36(b) contemplates a claim that accuses an investment adviser of imposing a transaction on the investment company only to generate fees for itself. For the reasons stated below, the court rejects Magistrate Judge Bobrick's recommendation and finds that the Complaint fails to state a claim under § 36.

To determine whether ICA 36(b) proscribes the alleged conduct, the court first looks to the language of the statute. Fox, 464 U.S. at 534, 104 S.Ct. at 836. § 36(b) imposes a fiduciary duty on an investment company' adviser "with respect to the receipt of compensation for services" that the company has "paid" and provides a cause of action

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Wo

Westlaw

Not Reported in F.Supp.
(Cite as: 1996 WL 328006, *12 (N.D.Ill.))

Page 48

by either the Securities and Exchange Commission ("SEC") "or by a security holder of such registered investment company on behalf of such company" for a breach of such duty. 15 U.S.C. § 80a-35(b). This language indicates a standard of care that only runs to the terms and receipt of compensation and not one that broadly governs an investment adviser's performance. See Freidlob v Trustees of the Alpine Mut. Fund Trust, 905 F.Supp. 843, (D.Col.1995) ("This subsection does not expressly authorize the SEC or a security holder to bring an action challenging a fiduciary's general performance of duties.") Rather, by limiting this duty to "the receipt of compensation for services", § 36(b) creates a standard of care governing the relationship between the management fees that the adviser charges and the services that it provides.

*13 As the magistrate judge explained, Congress originally adopted the ICA out of concern for the inherent conflict of interest and potential for abuse in the relationship between an investment adviser and the investment companies that it manages. See Fox, 464 U.S. at 536, 104 S.Ct. at 838. In addition to imposing structural and disclosure requirements, the ICA relied upon the unaffiliated director to assume the role of "independent watchdog" over the investment adviser. Tannenbaum, 552 F.2d at 406. As noted, the original ICA § 36 imposed a fiduciary duty on both directors and the investment adviser providing liability for "gross misconduct or gross abuse of trust" against the investment company. In the face of continuing abuses, primarily due to the investment adviser's inordinate influence over their investment companies' directors, Congress amended the ICA in 1970. From this history of the ICA and the 1970 amendments, the magistrate judge concluded that § 36(b)'s direct cause of action encompasses allegations that investment advice or transactions were imposed merely in order to generate fees for the investment adviser.

However, Congress designed subsection § 36(b) to specifically address the failure of the previous ICA § 36 to "provide any mechanism by which the fairness of management contracts could be tested in court." See Senate Report at 4901. In amending the original § 36, Congress created two distinct subsections. Through each provision, Congress sought to enhance the standard of care for those in control of investment companies by imposing a

"fiduciary duty" rather than merely prohibiting "gross misconduct". § 36(a) continued to impose a general standard of care on the exercise of control over an investment company. 15 U.S.C. § 80a-35(a). § 36(b), however, provided "an unusual cause of action ... [that] ... differs significantly from those traditionally asserted in shareholder derivative suits." Fox, 464 U.S. at 535, 104 S.Ct. at 839. Most notably, § 36(b) provided shareholders with an express cause of action against the investment adviser that by-passed demand on the directors. Id. In shareholder suits under the previous § 36, the demand requirement proved an insurmountable barrier to challenges to the fee contracts in light of the presumption of validity that those contracts enjoyed when ratified by the unaffiliated directors. See Fox, 464 U.S. at 537, 104 S.Ct. at 839 (noting SEC conclusion that shareholder suits were ineffective in challenging the reasonableness of adviser fees" because of the legal standards courts applied to those fees). In its report to Congress, the SEC explained that "even the requirement that all of the directors of an externally managed investment company be persons unaffiliated with the company's adviser-underwriter [will] not be an effective check on advisory fees and other forms of management compensation." H.R.Rep. No. 2337, 89th Cong., 2d Sess. 147 (1966). Thus, it was unrealistic to rely upon the directors to adequately enforce or negotiate the terms of the investment company's direct contract with the adviser. Id. In light of the investment company directors' particular ineffectiveness in direct "dealings between the fund and its investment adviser," Congress provided a direct cause of action for shareholders against the investment adviser. See Fox, 464 U.S. at 537, 104 S.Ct. at 839. In sum, Congress enacted § 36(b) in order to address a narrow area of concern: the negotiation and enforcement of payment arrangements between the investment adviser and its fund.

*14 Accordingly, every court addressing a § 36(b) claim has required the plaintiff to demonstrate that the compensation or payment received by the investment adviser was disproportionate to the services rendered. See, e.g., Kalish v. Franklin Advisers, Inc., 928 F.2d 590, 592 (2d Cir.), cert. denied, 502 U.S. 818, 112 S.Ct. 75 (1991); Meyer v. Oppenheimer Management Corp., 895 F.2d 861, 866 (2d Cir.1990); Grossman v. Johnson, 674 F.2d 115, 119 (1st. Cir.1982); see also Barnett v. Van

(C) 2005 Thomson/West. No Claim to Orig. U.S. Govt. Wo



Not Reported in F.Supp.
(Cite as: 1996 WL 328006, *14 (N.D.Ill.))

Page 49

Kampen Merritt Inc., 1993 U.S.Dist. LEXIS 3936 (N.D.Ill. March 26, 1993). In light of this legislative history, the courts considered whether the fee "represents a charge within the range of what would have been negotiated at arm's length in the light of all surrounding circumstances." Gartenberg v. Merrill Lynch Asset Managaement, Inc., 694 F.2d 923, 928 (2d Cir.1982), cert. denied, 461 U.S. 906 (1983); see also Kamen v. Kemper Fin. Services, Inc., 908 F.2d 1338, 1339-40 (7th Cir.1990), rev'd on other grounds, 500 U.S. 90 (1991) ( § 36(b) requires courts "to decide whether the fees charged by investment advisers are 'excessive' ") (citation omitted). While these cases did not expressly delineate the limitations on such a claim, each clearly focused on the terms of the fee arrangement in order to discern if a violation of § 36(b) had occurred [FN9].

> FN9. The Second Circuit has interpreted § 36(b) to provide a cause of action against an investment adviser for inadequate disclosure of information regarding the fee arrangement. Galfand v. Chestnutt Corp., 545 F.2d 807, 811-12 (2d Cir.1976), aff'd, 573 F.2d 1290 (2d Cir.1977). In Galfand, however, the investment adviser withheld information concerning the approval of alterations to the terms of the fee arrangement with the fund. See id. at 811-14. Thus, the cause of action focused on the adviser's ability to dominate the board and win approval of the fee arrangement, not the adviser's ability to obtain approval of an investment or transaction.

Plaintiffs argue that § 36(b)(3) provides for damages up to "the amount of compensation or payments received from such investment company" by the defendant between the violation and the time of suit. See 15 U.S.C. § 80a-35(b)(3). Plaintiffs claim that such an allowance is meaningless if the provision provides only a limited claim for fees charged in excess of the services rendered. But this damages cap simply recognizes that possibility that an investment adviser may attempt to extract fees while essentially providing no services, at all.

Such was the case in Potomac Capital Markets v. Prudential-Bache, 726 F.Supp. 87, 94 (S.D.N.Y.1989), on which plaintiffs rely for the proposition that a shareholder may raise a suit under § 36(b) for receiving a fee for a challenged transaction. However, the allegations in Potomac

are inapposite to plaintiffs' instant claim. In Potomac, shareholders raised several counts, including a claim under ICA § 36(b), against the investment adviser to their mutual funds arising from the decision to liquidate the funds' investment portfolios. Id. at 87-88. While the shareholders also attacked the liquidation under other provisions of the ICA, their § 36(b) claim challenged neither the propriety of the liquidation nor the investment adviser's underlying motive for the liquidation. Id. at 94. Rather, the shareholders' § 36(b) claim rested on the investment adviser's receipt and retention of fees paid on the subsequently liquidated assets. Id. The adviser continued to collect management fees for cash that merely sat in accounts. The legality of the liquidation, itself, was irrelevant to the merits of this claim.

*15 Plaintiffs' instant § 36(b) claim, in contrast, relies upon their challenge to the propriety of the Rights Offerings. The plaintiffs neither assert that the Advisor failed to provide any services in relation to the Rights Offerings nor contend that the Advisor has not actively managed the securities obtained from the capital obtained thereunder. Instead, plaintiffs claim that the Advisor devised the Rights Offerings in order to generate fees for itself regardless of the harmful consequences for the Funds. Although plaintiffs allege that the Advisor withheld information from the Funds' directors, this information did not relate directly to receipt of compensation or the terms of the fee arrangement. Cf. Galfand, 545 F.2d at 811-12. Plaintiffs allege that the Advisor withheld information and analysis of the Rights Offerings' likely financial consequences for the Funds. In the opinion of the court, such allegations raise a cause of action under the rubric of ICA § 36(a)'s prohibition of personal misconduct by an investment advisor.

Consequently, the court respectfully rejects Magistrate Judge Bobrick's recommendation that the Complaint alleges a cause of action under ICA § 36(b). While § 36(b) may regulate more than the mere terms of the fee arrangement between the investment adviser and the investment company, the court does not believe that it regulates the propriety of the transactions for which fees are paid. Rather, § 36(b) only imposes a direct fiduciary duty on the investment adviser with "respect to the receipt of compensation or payment for services." It requires that the investment adviser not charge

Westlaw.

Not Reported in F.Supp.
**(Cite as: 1996 WL 328006, \*15 (N.D.Ill.))**

disproportionate fees for the services it provides, that it actually provides the services for which it obtains fees, and that it not withhold information regarding the compensation agreement. However, the text and legislative history of the provision indicate that it does not provide a cause of action challenging the propriety of an investment adviser's financial counsel. Because the Complaint does not challenge the fee arrangement between the Advisor and the Funds, but only challenges the underlying transaction, the defendants' motion to dismiss Count XI is granted.

CONCLUSION

For the reasons set forth above, the court accepts Magistrate Judge Bobrick's report and recommendation except as to the defendants' motion to dismiss Count XI of the plaintiffs' Complaint. It is hereby ordered that defendants motion to dismiss is denied as to Counts VIII and IX and granted as to Counts X and XI.

1996 WL 328006 (N.D.Ill.)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Wo

IN RE NUVEEN FUND LITIGATION

No. 94 C 360

UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

1995 U.S. Dist. LEXIS 19482

December 21, 1995, DATE
January 4, 1996, DOCKETED

**SUBSEQUENT HISTORY:** [*1] Adopting Order of June 5, 1996, Reported at: *1996 U.S. Dist. LEXIS 8077.*

## CASE SUMMARY

**PROCEDURAL POSTURE:** Plaintiff shareholders filed a derivative action against defendant corporate directors alleging that the issuance of rights to new shares of stock diluted their ownership interests and was made only to generate fees. The directors filed a motion to dismiss the complaint.

**OVERVIEW:** The shareholders filed an action against the directors alleging claims for sales of shares under fair value, acts ultra vires, and illegal distribution of rights, all in violation of Minnesota state law, as well as violations of the Investment Company Act of 1940, *15 U.S.C.S. § 80a-1* et seq. The directors filed a motion to dismiss the complaint, which the court granted in part and denied in part. The court held that a review of the shareholders' allegations demonstrated that there was a question regarding the reasonableness of the directors' reliance on outside opinions, and such an issue was beyond the scope of a motion to dismiss. Further, as to issues of culpability and gross negligence, the directors merely put forth issues of fact that could not be resolved in a dismissal motion. However, the court agreed with the directors that the offerings did not meet the statutory definition of distribution, and therefore the illegal distribution claim was not viable. Also, based on the applicable statute, the shareholders were not entitled to equitable relief, and thus the court also dismissed that count of the complaint.

**OUTCOME:** The court granted the directors' motion to dismiss on the claim alleging illegal distributions and the request for equitable relief. As to all other counts, the court denied the motion.

**CORE TERMS:** offering, advisor, shareholder, motion to dismiss, closed-end, per share, ultra vires, prospectuses, duty, interest rates, outstanding, pricing, gross negligence, management fees, underwriting, diluted, stock, net asset value, common share, articles of incorporation, negligent conduct, attachments, reporters, board of directors, plaintiffs claim, outside counsel, derivative suit, municipal bond, common stock, market price

**LexisNexis(TM) Headnotes**

*Banking Law > Federal Acts > Investment Company Act*
[HN1] *15 U.S.C.S. § 80-33*(b) provides that: it shall be unlawful for any person to make any untrue statement of material fact in any registration statement, application, report, account, record, or other document filed or transmitted pursuant to this subchapter. It shall be unlawful for any person so filing or transmitting any such document to omit to state therein any fact necessary in order to prevent the statements made therein, in light of the circumstances under which they were made, from being materially misleading.

*Banking Law > Federal Acts > Investment Company Act*
[HN2] *15 U.S.C.S. § 80a-35*(a) reads, in part: The Securities Exchange Commission is authorized to bring an action alleging that a person serving or acting in one or more of the following capacities has engaged or is about to engage in any act or practice constituting a breach of fiduciary duty involving personal misconduct in respect of any registered investment company for which such person serves or acts-- (1) officer, director, member of any advisory board, investment adviser, or depositor; or (2) as principal underwriter, if such registered company is an open-end company, unit investment trust, or face-amount certificate company.

*Civil Procedure > Pleading & Practice > Defenses, Objections & Demurrers > Motions to Dismiss*
[HN3] A motion to dismiss tests the sufficiency of a plaintiff's complaint, not the merits of the suit. In considering the defendants' motion to dismiss, the court accepts as true all well-pleaded factual allegations and draw all possible inferences in favor of the plaintiff. A complaint will not be dismissed unless it appears beyond a doubt that the plaintiff can prove no set of facts in support of her claim which would entitle her to relief.

*Business & Corporate Entities > Corporations > Directors & Officers > Management Duties & Liabilities*
[HN4] Minn. Stat. § 302A.251(2) provides in part: (a) A director is entitled to rely on information, opinions, reports, or statements, including financial state-

  

ments and other financial data, in each case prepared or presented by: (1) One or more officers or employees of the corporation whom the director reasonably believes to be reliable and competent in the matters presented; (2) Counsel, public accountants, or other persons as to matters that the director reasonably believes are within the person's professional or expert competence.(b) Paragraph (a) does not apply to a director who has knowledge concerning the matter in question that makes the reliance otherwise permitted by paragraph (a) unwarranted.

*Business & Corporate Entities > Corporations > Directors & Officers > Management Duties & Liabilities*

[HN5]Minn. Stat. § 302A.251(4) provides in relevant part that: no person who was or is a director of the corporation shall be personally liable to the corporation or its shareholders for monetary damages for any breach of fiduciary duty as a director except for liability (a) for any breach of the director's duty of loyalty to the corporation or its shareholders; (b) for acts or omissions not in good faith or that involve intentional misconduct or a knowing violation of law; (c) under § 302A.559 for distribution in violation of the articles.

*Business & Corporate Entities > Corporations > Directors & Officers > Management Duties & Liabilities*

*Banking Law > Federal Acts > Investment Company Act*

[HN6]Under the Investment Company Act, the directors are exculpated to the extent that their conduct does not amount to willful misfeasance, bad faith, gross negligence or reckless disregard of the duties involved in conduct of the office. *15 U.S.C.S. § 80a-17*(h).

*Torts > Negligence > Negligence Generally*

[HN7]Under Minnesota law, "gross negligence" is defined, most frequently in a criminal context, as very great negligence or the absence of even slight care. Ordinarily, the question of degree of negligence is a question of fact unamenable to summary judgment, let alone one to be resolved on a motion to dismiss.

*Business & Corporate Entities > Corporations > Directors & Officers > Management Duties & Liabilities*

[HN8]Minnesota law defines a "distribution" as: a direct or indirect transfer of money or other property, other than its own shares by a corporation to its shareholders in respect of its shares. Minn. Stat. § 302A.011(10). A director's authority to make such a distribution under Minnesota law is limited by the corporation's articles. Minn. Stat. § 302A.551(d).

*Business & Corporate Entities > Corporations > Shareholders & Other Constituents > Actions Against Corporations*

[HN9]An action under Minn. Stat. § 302A.751 is an individual action by the shareholder to gain relief in his own right, it is not a derivative right. The legislative history of § 302A.751 also indicates that it was designed as a remedy for individual shareholders--not to provide a remedy for an injury to the corporation itself.

**COUNSEL:** For JEROME JOINER (1), defendant: Lynn C. Hartfield, Federal Defender Program, Chicago, IL.

**U.S. Attorney:** Debra Riggs Bonamici, United States Attorney's Office, Chicago, IL.

**JUDGES:** EDWARD A. BOBRICK, United States Magistrate Judge. HONORABLE BLANCHE M. MANNING, JUDGE, UNITED STATES DISTRICT COURT

**OPINIONBY:** EDWARD A. BOBRICK

**OPINION: HONORABLE BLANCHE M. MANNING, JUDGE
UNITED STATES DISTRICT COURT**

**HONORABLE JUDGE:**

**REPORT AND RECOMMENDATION of Magistrate Judge Edward A. Bobrick**

Before the court is the motion of defendants Frank Wendt, Lawrence Brown, John O'Toole, Margaret Rosenheim, and Peter Sawers ("moving directors") to dismiss Counts I, III, V, VII-IX, and XII of the Third Consolidated and Amended Derivative Complaint of plaintiffs T.R.V. Holding Company and Seymour Specter. n1

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n1 The defendants herein are among many involved in the cases consolidated under the Nuveen Litigation banner. Although they would appear to be all related, they have filed six separate motions to dismiss the plaintiffs' lawsuit. Each motion alternately advances certain seemingly exclusive theories, while adopting arguments embodied in others. This tack has made it difficult to compile a single evaluation of all of the arguments defendants advance. As a result, the court has addressed the arguments exclusive to each group of defendants separately in order to insure consideration of all points. Where a group of defendants has adopted the arguments of another group, discussion of those arguments is found in the report addressing the argu-

  

ments specifically advanced by that group.

- - - - - - - - - - - End Footnotes- - - - - - - - - - - -

[*2]

Plaintiffs T.R.V. Holding Company and Seymour Specter bring this suit on behalf of all persons who owned shares of the Nuveen Municipal Value Fund, Inc. ("the NUV fund") or the Nuveen Premium Income Municipal Fund, Inc. ("the NPI fund") (collectively, "the Nuveen funds") on November 5, 1993. *(Third Consolidated and Amended Derivative Complaint* ("3AC"), P 14). They allege that the issuance of rights to new shares of stock in the Nuveen Municipal Value Fund, Inc. ("the NUV fund") and the Nuveen Premium Income Municipal Fund, Inc. ("the NPI fund") diluted plaintiffs' ownership interests in the Funds and was made only to generate fees for the Funds' investment advisor and its controlling parent corporation. The moving directors seek dismissal of those counts of plaintiffs' complaint naming them, essentially arguing that they fully discharged their duties and responsibilities as directors and that, in any event, plaintiff allegations describe no more than negligent conduct, which is not actionable under Minnesota law or the Investment Company Act of 1940 ("ICA"), *15 U.S.C. §§ 80a-1 et seq.*

## I. BACKGROUND

### A. Parties

Plaintiffs initiated this case as a class [*3] action in January of 1994. The court dismissed the original class action claims, finding them to be derivative, rather than direct, in nature. Accordingly, plaintiffs seek to maintain their third amended complaint as a shareholders' derivative suit. When this case is considered along with consolidated cases 94 C 415 and 95 C 5614, the roster of defendants include the Funds; the Funds' seven directors, Richard J. Franke, Donald E. Sveen, and the five moving herein: Frank P. Wendt, Lawrence H. Brown, John O'Toole, Margaret K. Rosenheim, and Peter R. Sawers; the Funds' investment advisor, Nuveen Advisory Corporation ("Advisor"), and the investment advisor's controlling parent corporation, John Nuveen & Company, Inc. ("Nuveen"); and the Funds' counsel, Michael Meyer.

Nuveen is the sole owner of the Advisor, and has the power to influence the Advisor's investment decisions. *(3AC,* PP 31, 33). In regard to the offerings at issue here, for example, the Funds' directors acted solely on information and analysis from Nuveen and its Advisor. *(Id.,* P 176-177, 180-182). Nuveen's four directors--Franke, Sveen, Timothy Schwertfeger, Anthony Dean--comprise the Advisor's entire board

of directors. [*4] *(Id.,* PP 22-23). Both Franke and Sveen have significant stock interests in Nuveen, and are, respectively, the chairman and president of both of the Funds. *(Id.,* PP 22-23). The Funds have seven directors; of these, Franke and Sveen cannot legally be considered independent in regard to the offerings in this case. *(Id.,* P 51). Wendt is a director for both Funds, and has been chairman of Nuveen and the Advisor. *(Id.,* P 24). Both Wendt and another of the Funds' directors, Brown, have stated that they would not entertain the possibility that information from Nuveen and the Advisor would reflect bias or self-interest. *(Id.,* PP 24-25, 181-182). These four individuals, along with O'Toole, Rosenheim, and Sawers, sit on the boards of all 82 of Nuveen's funds. *(Id.,* P 57).

Plaintiffs contend that the Funds' decision to issue rights to new shares of stock in the Funds diluted plaintiffs' ownership interests in the Funds and was made only to increase the Advisor's management fees and generate underwriting fees for Nuveen. *(Id.* P 5). Plaintiffs' bring their complaint in twelve counts: Counts I through VII and XII allege claims for sales of shares under fair value, acts [*5] *ultra vires,* and illegal distribution of rights all in violation of Minnesota state law; Counts VIII through XI allege violations of the Investment Company Act of 1940 ("ICA"), *15 U.S.C. §§ 80a-1 et seq.*

The defendants in this motion are named in the following counts:Count I--under *Minn.Stat.* § *302A.405* for the unreasonable pricing of the shares in the offerings;

Count III--under *Minn.Stat.* §§ *302A.401;* 409 for acting *ultra vires;*

Count V--under *Minn.Stat.* §§ *302A.551;* 559 for distribution of shares in violation of the articles of incorporation;

Count VII--under *Minn.Stat.* § *302A.251* for breach of fiduciary duties;

Count VIII--under Section 34(b) of the ICA, *15 U.S.C.* § *80a-33*(b) n2, for the use of false and misleading prospectuses;

Count IX--under Section 36(a) of the ICA, *15 U.S.C.* § *80a-35*(a) n3, for breach of fiduciary duties; and

Count XII--under *Minn.Stat.* §§ *302A.467;* 751 for illegal acts and waste of corporate assets.*(3AC).* The moving directors level several arguments against plaintiffs' allegations in support of their motion to dismiss. First, the moving directors argue that their actions are insulated from [*6] plaintiffs' attacks because they appropriately relied on the opinions of Nuveen and the

  

Advisor and outside counsel. Second, they contend that plaintiffs' allegations amount to mere claims of negligence which is not actionable under the ICA or Minnesota law. Third, the moving directors submit that plaintiffs have failed to state a claim for breach of duty of loyalty. Finally, they argue that the offerings at issue do not constitute an illegal distribution under Minnesota law.

- - - - - - - - - - - - Footnotes - - - - - - - - - - - - - -

n2 [HN1]Section 34(b) provides that: it shall be unlawful for any person to make any untrue statement of material fact in any registration statement, application, report, account, record, or other document filed or transmitted pursuant to this subchapter . . . It shall be unlawful for any person so filing [or] transmitting . . . any such document to omit to state therein any fact necessary in order to prevent the statements made therein, in light of the circumstances under which they were made, from being materially misleading.

n3 [HN2]Section 36(a) reads, in pertinent part: The [Securities Exchange Commission] is authorized to bring an action . . . alleging that a person serving or acting in one or more of the following capacities has engaged . . . or is about to engage in any act or practice constituting a breach of fiduciary duty involving personal misconduct in respect of any registered investment company for which such person serves or acts--(1) officer, director, member of any advisory board, investment adviser, or depositor; or

(2) as principal underwriter, if such registered company is an open-end company, unit investment trust, or face-amount certificate company.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

[*7]

## B. The Offerings at Issue

Nuveen is a multi-million dollar investment banking and investment advisory firm whose growth was, and is dependent on its ability to continually create and market new closed-end funds. (3AC, P 3). Closed-end bond funds, unlike open-end funds, generally do not issue new shares after their initial offering; expansion is usually through the gradual increase in the value of the underlying portfolio. (Id., P 68). The NUV and NPI funds are both closed-end, diversified man-

agement investment companies registered under the Investment Company Act in the State of Minnesota. (Id., PP 19-20). Prior to the offerings at issue here, the NUV fund, a $ 1.8 billion closed-end fund that invests in tax-exempt municipal bonds, had 166 million shares of common stock outstanding. (Id., PP 1, 19). Prior to the offerings at issue, the NPI fund, a $ 1.2 billion leveraged, closed-end fund that invests in tax-exempt municipal bonds, had 53 million shares of common and 3,500 shares of preferred stock outstanding. (Id., PP 1, 20).

Nuveen's closed-end municipal bond funds account for at least 78% of Nuveen's business. (Id., P 66). Nuveen profits on [*8] the closed-end municipal bond funds in two ways: (1) underwriting fees for new funds and (2) management fees based on a percentage of the assets managed by Advisor, its wholly-owned subsidiary. Id. The management fees generated by Advisor constitute approximately 75 percent of Nuveen's total revenues. (Id., P 66). In the recent past, between 1987 and 1993, Nuveen has been able to sustain growth by creating and marketing an average of one new, closed-end fund a month. (Id., P 67). Plaintiffs claim that Nuveen's future growth through the creation of new closed-end municipal bond funds has been threatened by market saturation, declining investor interest, and high bond prices. (Id., PP 69-75). By the fall of 1993, Nuveen's performance had stagnated already along with the closed-end bond fund market. (Id., P 77). Earnings fell below analysts' projections, Nuveen's stock was downgraded, and industry publications noted the slowdown. (Id., PP 80-85). Due to the impact of the downturn and resultant pressure to take action to turn the situation around, plaintiffs allege that the Funds resorted to raising capital from the shareholders of its existing Nuveen funds through rights [*9] offerings. (Id., PP 89-94).

On November 8, 1993, Funds announced the offer of rights to new shares enabling Funds' shareholders to purchase additional shares. (Id., P 89). Specifically, the offerings allowed each NUV or NPI fund shareholder to purchase one additional share for every three shares already owned. (Id.). Under the offerings, the NUV fund could have issued up to 55 million new shares, increasing its outstanding shares by 33 percent; the NPI fund could have issued up to 17.7 million new shares, increasing its outstanding shares by 33 percent. (Id., P 90). Approximately 28.3 percent of the NUV fund's shareholders exercised their rights, subscribing to 26.3 million new shares or 47.9 percent of the new shares offered. (Id., P 92). Similarly, approximately 32.4 percent of the NPI fund's shareholders exercised their rights, subscribing to 10 million shares or 57.2 percent of the new shares offered. (Id.).

According to plaintiffs, the Funds' November 8, 1993

  

announcement stemmed from pressure for growth and that the offerings were instituted for Nuveen's benefit rather than for the benefit of the Funds' shareholders. *(Id.,* P 100-108). They claim **[*10]** Nuveen directly benefited from the offerings by receiving substantial underwriting fees and indirectly benefited from the offerings because Advisor, Nuveen's wholly-owned subsidiary, would receive significantly greater management fees due to the Funds' increased assets under Advisor's management. *(Id.,* P 5). Plaintiffs submit that the shareholders, were harmed rather than benefitted as a result. The price for the new shares was set at the lesser of (A) the net asset value per common share as of the date of the expiration of the offering (the "pricing date") or (B) 95% of the average of the last reported sale prices of a common share on the New York Stock Exchange on the pricing date and the four (4) preceding business days. *(Id.,* P 91). Plaintiffs explain that this pricing structure guaranteed that the new shares would be sold at a price below both the Funds' per share net asset value ("NAV") and per share market price. *(Id.,* PP 94-97). Plaintiffs contend that the November 8, 1993 announcement of the offerings placed downward pressure on the trading price for the Nuveen funds' shares in the months before the final price was determined on January 21, 1994. **[*11]** *(Id.,* P 98). Plaintiffs also contend that the challenged offerings were designed to give, and gave, the Funds' shareholders a "Hobson's Choice" n4 among three alternatives, each of which caused shareholders harm: (1) invest more money in the Nuveen funds and minimize their net asset value dilution; (2) refrain from investing more money in the Nuveen funds and suffer dilution from the addition of new shares and the deduction of underwriting fees; or (3) sell their Nuveen fund shares in an intentionally depressed market and suffer losses. *(Id.,* P 105).

- - - - - - - - - - - - - - Footnotes - - - - - - -
- - - - - - - -

n4 Rather than a "Hobson's Choice," plaintiffs actually allege that shareholders were presented with a choice among three alternatives, each of which was bad. A "Hobson's Choice" more accurately refers to a situation in which an apparent choice is really no choice at all. The phrase is said to stem from the practice of Thomas Hobson, a 17th century English liveryman who allowed customers the "choice" of any of his horses, as long they selected the one closest to the door.

- - - - - - - - - - - End Footnotes - - - - -
- - - - - - - -

**[*12]**

At the completion of the offering, NUV fund sold the 26.3 million shares at $ 9.83 per share: $ 0.99 per share below NAV level and $ 0.42 per share below the average market price. *(Id.,* P 94).

The offering generated $ 8 million in fees and expenses that was deducted from the NUV fund. *(Id.,* P 95). The offering resulted in a 15.8% increase in outstanding shares and diluted the NAV by $ 0.19 per share for 192.3 million shares. *(Id.,* P 95). In all, NUV fund received $ 34.4 million less than it would have based on the pre-offering NAV level. *(Id.,* PP 94-95, 247). Similarly, the NPI fund sold 10 million new shares at $ 15.39 per share: $ 0.68 below NAV and $ 0.74 below average market. *(Id.,* P 96). The offering generated $ 4.6 million in fees and expenses that was deducted from the NPI fund. *(Id.,* P 97). The offering increased the outstanding shares by 18.2% and diluted the NAV by $ 0.20 per share for 63 million shares. *(Id.,* P 97). The difference between pre- and post-offering NAV was $ 11.8 million. *(Id.,* P 96-96, 247).

The plaintiffs' complaint calls into question several aspects of the offerings. First, plaintiffs claim the offerings at issue were **[*13]** *ultra vires.* (3AC, P 12). More specifically, the plaintiffs note that the Funds' articles of incorporation expressly prohibit the sale of shares below NAV. *(Id.,* PP 183-184). Given the formula for pricing the shares *(Id.,* P 91), plaintiffs claim that the offering was designed to be made at less than NAV. *(Id.,* P 94). Nuveen conceded as much in a July 25, 1994 press release. *(Id.,* P 185). These factors, plaintiffs contend, made the offering *ultra vires.*

Second, plaintiffs claim that the offerings resulted in a waste of corporate assets. *(Id.,* P 201-204, 228(c), 275, 289). According to the complaint, the Funds' directors and Advisor knew that the offerings would not produce even marginal benefits to the Funds' performance, and that they in fact expected, or should have expected, that the offerings would worsen the Funds' long-term performance. *(Id.,* P 202-203). In brief, the offering relied on interest rates declining or remaining stable in order for the Funds to break even. *(Id.,* P 187). If interest rates rose after the offering, the Funds' NAV levels would be injured because the Funds would have added a significant amount of low-rate bonds, the **[*14]** value of which would decline as rates rose. *(Id.,* P 124). At the time of the offering, long-term interest rates were at their lowest levels in a generation. *(Id.,* P 125). Nuveen's national sales manager even conceded that the Funds "would have been better off *obviously"* without the offering because the Funds were "perfectly positioned should interest rates rise dramatically." *(Id.,* P 124). An assistant portfolio

  



manager stated that, if rates rose after the offering, the Funds would be "toast." (Id.). Plaintiffs add that the Funds' directors and Advisor knew, or should have known, the offerings would injure the Funds by diluting: (1) the NAV of the common stock, (2) the market price of the common stock, and (3) the per share voting power of the common stock. (Id., P 203). As a result, the plaintiffs charge that the offerings could not be characterized as the exercise of reasonable business judgment. (Id., P 228(C)).

Third, plaintiffs allege that the Funds employed false and misleading prospectuses in connection with the offering. The prospectuses purportedly failed to disclose the aforementioned negative effects of the offering. (Id., PP 11, 186-192). [*15] More specifically, the plaintiffs also allege that the prospectuses failed to disclose the "interest-rate-gamble" involved in the offerings, which relied on the stability or decline of interest rates. (Id., P 187). Plaintiffs contend that the only discussion regarding the effect of interest rate levels concerned the effects of rates remaining at or near then current levels:Even with an Offering, if interest rates remain at or near current levels, the net asset value . . . per Common Share may be expected to decline as certain portfolio investments approach their call dates . . . In addition, it is anticipated that the Offering itself will result in a modest reduction of the Fund's earnings per Common Share to the extent that proceeds from the Offering are invested at rates lower than the current average earning rate of the Fund. (Id., P 187). The prospectuses did not suggest the effect rising rates would have on the Funds after the offerings. (Id., PP 187-188). The prospectuses also misrepresented that the offerings would create long-term benefits to the Funds. (Id., P 189). In fact, Nuveen and Advisor analysis indicated that the best-case scenario [*16] would be that the Funds' performance would not be worsened by the offerings. (Id., PP 132-139, 189). This conduct, according to plaintiffs, constituted a breach of the duty of candor.

Fourth, the plaintiffs claim that the directors were self-interested and biased in making and conducting the offering. (Id., PP 24(a), 25(a), 60-62, 172-175). According to plaintiffs, defendants Franke and Sveen, chairman and president of Nuveen and the Advisor, respectively, were financially self-interested in the offerings due to their control positions with Nuveen and the Advisor, and their financial stake in the two. The plaintiffs also allege that directors Brown and Wendt admitted that they could not conceive of circumstances where Nuveen or the Advisor would act improperly; in essence they would uncritically follow their lead. (Id., P 24(a), 25(a), 60-62, 172-175).

## II. ANALYSIS

### A. Motion to Dismiss

[HN3]A motion to dismiss tests the sufficiency of a plaintiff's complaint, not the merits of the suit. *Triad Assocs., Inc. v. Chicago Housing Auth., 892 F.2d 583, 586 (7th Cir. 1989).* In considering the defendants' motion to dismiss, we accept as true all well-pleaded [*17] factual allegations and draw all possible inferences in favor of the plaintiff. *Thompson v. Boggs, 33 F.3d 847, 852 (7th Cir. 1994).* A complaint will not be dismissed unless it appears beyond a doubt that the plaintiff can prove no set of facts in support of her claim which would entitle her to relief. *Id.*

In addition, the pleadings in this case include several documents which plaintiffs have either attached to, or referred to, in their complaint. *See Fed.R. Civ.P. 10(c); Venture Associates v. Zenith Data Systems, 987 F.2d 429, 431 (7th Cir. 1993).* The moving directors' arguments for dismissal of that complaint rely to a large extent on these documents, which include minutes of meetings, internal memoranda, and depositions. While the moving directors are able to mine these attachments for facts that support their positions, we must, at the outset of our analysis emphasize the matters that may appropriately be resolved on a motion to dismiss. The attachments will defeat plaintiffs' complaint only if they *unambiguously* undermine its allegations. *Palda v. General Dynamics Corp., 47 F.3d 872, 876 (7th Cir. 1995).* Accordingly, to the extent that the attachments upon [*18] which the moving directors rely raise issues of fact regarding their conduct, those issues are not amenable to resolution herein; indeed, they would not be the proper subject of a motion for summary judgment. With these factors in mind, we assess the allegations of plaintiff's complaint in the context of the defendants' arguments for dismissal.

### B. Directors' Reliance on Outside Opinions

The moving defendants submit that they are insulated from liability herein because they appropriately relied on the opinions of Nuveen and the Advisor and of outside counsel. According to the moving directors, they relied on the opinions of Nuveen and the Advisor and outside counsel, as the statute allows. Plaintiffs contend that their allegations show that the moving directors were not entitled to rely on the opinions and that, in fact, they did so blindly and uncritically. The statute involved [HN4]is *Minn.Stat.* § *302A.251*, which provides, in pertinent part:(a) A director is entitled to rely on information, opinions, reports, or statements, including financial statements and other financial data, in each case prepared or presented by:(1) One or more officers or employees [*19] of the corporation whom the director reasonably believes to be reliable and competent in the matters presented;

  

(2) Counsel, public accountants, or other persons as to matters that the director reasonably believes are within the person's professional or expert competence . . .

* * *

(b) Paragraph (a) does not apply to a director who has knowledge concerning the matter in question that makes the reliance otherwise permitted by paragraph (a) unwarranted. *Minn. Stat. § 302A.251(2)*. Review of plaintiffs' allegations demonstrate that there is, at the least, a question regarding the reasonableness of the directors' reliance in this case. Because such an issue is beyond the scope of a motion to dismiss, dismissal on this basis is inappropriate.

Minnesota courts have apparently had little occasion to consider § 302A.251, so the parties have turned to Delaware courts' interpretations of that states' similar provision, *8 Del.C. § 141(e)*. n5 In *Smith v. Van Gorkom, 488 A.2d 858, 875 (Del. 1985)*, the court emphasized that the reliance Section 141(e) contemplated was good faith, not blind, reliance. Here, plaintiffs allege facts that allow the inference that the moving **[*20]** directors did, in fact, blindly rely on the opinions of Nuveen and the Advisor. The moving directors submit that Nuveen made three presentations on the offerings, gave the directors detailed packets of information, and that the directors participated in discussions regarding the offerings. *(Memorandum of Law in Support of Motion ("Def Mem."),* at 12-13). This must be tempered, however, by plaintiffs' allegations regarding the opinion of at least two of the moving directors that they could not conceive of any information that Nuveen and the Advisor might present as being anything but reliable and unbiased. In addition, the directors concede that they considered no information other than that Nuveen and the advisor presented. There is a question, then, based on the complaint, as to whether the directors reliance was reasonable or blind.

- - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n5 Section 141(e) provides, in pertinent part: A member of the board of directors . . . shall, in the performance of his duties, be fully protected in relying in good faith upon the books of accounts or reports made to the corporation by any of its officers, or by an independent certified public accountant, or by an appraiser selected with reasonable care by the board of directors . . . or in relying in good faith upon other records of the corporation.

- - - - - - - - - - - End Footnotes - - - - - - - - - - - -

**[*21]**

The moving directors, however, submit that caselaw supports their position on this issue, citing *Moran v. Household Int'l, Inc., 500 A.2d 1346 (Del. 1985); Eisenberg v. Milwaukee Corp., 537 A.2d 1051 (Del. 1987);* and *Desert Partners, L.P. v. USG Corp., 686 F. Supp. 1289 (N.D.Ill. 1988)*. None of these cases involved a motion to dismiss, but were based on a developed factual record. None touched on Section 141(e) or discussed the issue of what constituted reasonable reliance on a financial opinion. None dealt with the kind of offerings at issue here but instead involved self-tender offers and hostile-takeover defense mechanisms. Consequently, none are particularly instructive herein.

The moving directors also maintain that they are insulated from liability through their reliance on the opinions of outside legal counsel, specifically Michael Meyer of the firm of Schiff Hardin & Waite ("Schiff"). Once again, however, such an argument leaves open the issue of whether reliance was reasonable. Beyond that, there are at least a couple of more specific problems with the moving directors' position.

The focus of the moving directors' legal advice argument **[*22]** is whether the acts of the moving directors were *ultra vires*. The moving directors point out that they received an opinion letter regarding this question from Schiff indicating the offerings were authorized. *(Def.Mem.,* at 22-23). The letter was dated December 27, 1993, well after the offerings and their attendant price structure were approved and announced on November 8, 1993. *(3AC,* P 91). In this regard, we note that the reporters comments to § 302A.251(2), explain that a director must have *actually* relied upon the advice in question. *Minn.Stat.Ann. § 302A.251* (Reporter's Notes--1981). It would be difficult for the moving directors to prove such reliance when the legal advice came in the wake of the challenged conduct.

In addition, the moving directors' argument would seem to ignore paragraph (b) of subdivision 2. The reliance provisions of § 302A.251 do "not apply to a director who has knowledge concerning the matter in question that makes the reliance otherwise permitted by paragraph (a) unwarranted." *Minn.Stat. § 302A.251(2)(b)*. This raises an issue as to whether the moving directors were aware of Article 5(b)(vi) that is, once again, not amenable to resolution on a motion to dismiss. **[*23]**

### C. Applicability of Exoneration Provision To Moving Directors' Conduct

The moving directors next argue that plaintiffs' allegations describe no worse than negligent conduct, for which they are exonerated under § 302A.251(4), the Articles of Incorporation, and the ICA. **[HN5]** Section 302A.251(4) provides, in relevant part, that: no person who was or is a director of the Corporation shall be

  

personally liable to the Corporation or its shareholders for monetary damages for any breach of fiduciary duty as a director except for liability(a) for any breach of the director's duty of loyalty to the Corporation or its shareholders;

(b) for acts or omissions not in good faith or that involve intentional misconduct or a knowing violation of law;

(c) under section 302A.559 [for distribution in violation of the articles] . . .These provisions are echoed in the Funds' articles. [HN6]Under the ICA, the directors are exculpated to the extent that their conduct does not amount to "willful misfeasance, bad faith, gross negligence or reckless disregard of the duties involved in conduct of [the] office." 15 U.S.C. § 80a-17(h). Accordingly, the moving directors [*24] argue that they are not liable for any wrongful conduct that is no worse than negligent, that does not constitute a breach of the duty of loyalty, or that amounts to a violation of § 302A.559.

It would appear that the parties agree that the exculpatory provisions of § 302A.251, the ICA, and the articles all apply to negligent conduct, but not to conduct which is grossly negligent or worse. The moving directors submit that plaintiffs' allegations amount to nothing more than charges of negligence, as opposed to gross negligence, and that they are, therefore, exonerated for their acts. When we assess the moving directors' contentions alongside plaintiffs' allegations, however, we cannot say as a matter of law that the moving directors were merely negligent.

[HN7]Under Minnesota law, "gross negligence" has been defined, most frequently in a criminal context, as "very great negligence or the absence of even slight care." State v. Miller, 471 N.W.2d 380, 383 (Minn.Ct.App. 1991). Ordinarily, the question of degree of negligence is a question of fact unamenable to summary judgment, Boop v. City of Lino Lakes, 502 N.W.2d 409, 411 (Minn.Ct.App. 1993), let alone one to be resolved on a [*25] motion to dismiss. Indeed, in arguing that their conduct was negligent, as opposed to grossly negligent the moving directors point to many of the "facts" upon which they relied in connection with their reliance argument. Supra, at 13-16. "Facts" which, as before, are offset by the plaintiffs' own allegations of facts. As a result, the moving directors, once again, merely put forth an issue of fact--this time regarding their level of culpability--that cannot be resolved in the context of this motion to dismiss. Accordingly, the plaintiffs' complaint, which arguably charges the moving directors with gross negligence, must stand. n6

- - - - - - - - - - - - - Footnotes - - - - - - -
- - - - - - - - -

n6 Because we find plaintiffs' allegations place the moving directors' conduct within § 302A.251(4)(b), we need not consider, in terms of exoneration, whether their conduct also meets subdivisions 4(a) and (c).

- - - - - - - - - - - - End Footnotes- - - - - -
- - - - - - - -

## D. The Offerings as Illegal Distributions

Under Count V, plaintiffs allege that the offerings at issue constituted illegal distributions under Minnesota [*26] law. The moving directors argue that this count must be dismissed because the offerings cannot be considered "illegal distributions" under §§ 302A.551 and 302A.559. [HN8]Minnesota law defines a "distribution" as:a direct or indirect transfer of money or other property, other than its own shares . . . by a corporation to its shareholders in respect of its shares.§ 302A.011(10). A director's authority to make such a distribution under Minnesota law is limited by the corporations articles. § 302A.551(d). Plaintiffs' Count V allegations are based on the fact that the offerings at issue were ultra vires--in contravention of the articles. In this instance, we must agree with the moving directors that the offerings do not meet the definition of distribution under § 302A.011(10).

The offerings in this case were either a transfer of the Funds own shares or an indirect transfer of those shares through the right to purchase them. Both types of transfers are excluded from the definition of distributions under § 302A.011(10). Plaintiffs contend that this interpretation of the definition fails to appreciate the distinction between the purchase of stock and the contractual right [*27] to purchase stock, citing §§ 302A.401 and 302A.409. (Plaintiffs' Memorandum in Opposition, at 20). While there may indeed be a distinction, the "direct or indirect" language covers both kinds of transfers. Further, the definition that plaintiffs seek to avoid is an "integral part" of §§ 302A.551 and 302A.559. Minn.Stat.Ann. § 302A.011(10) (Reporter's Notes--1981). As they choose to proceed under that section, they cannot rely on definitions outside their chosen context. Accordingly, we must find that plaintiffs have failed to state a claim under §§ 302A.551 and 302A.559. Count V must, therefore, be dismissed.

## E. Availability of Equitable Relief

Under Count XII, the plaintiffs seek equitable relief pursuant to §§ 302A.467 and 302A.751. The moving directors argue that such relief can only be sought through a direct or class action, as opposed to the

  

derivative suit plaintiffs have brought. They also argue that actions under § 302A.467 may only be brought in the state of Minnesota. Plaintiffs do not address these arguments, but because the moving directors raised them solely in a footnote, we cannot confidently interpret plaintiffs' absence of attention as concession. [*28]

There is little authority regarding the moving directors' contentions, but what is there supports their arguments. A law review article by one of the draftsmen of Minnesota's Business Corporation Act suggests that [HN9]"an action under section 751 is an individual action by the shareholder to gain relief in his own right, it is not a derivative right." J.Olson, *A Statutory Elixir for the Oppression Malady,* 36 Mercer L. Rev. 627, 635-36 (1985). The legislative history of § 302A.751 also indicates that it was designed as a remedy for individual shareholders--not to provide a remedy for an injury to the corporation itself. *PJ Acquisition Corp. v. Skoglund, 453 N.W.2d 1, 21 (Minn. 1990)* (Keith, J., concurring). Thus, we would agree with the moving directors, especially in the absence of any authority to the contrary, that the plaintiffs may not maintain a derivative suit under § 302A.751.

As for § 302A.467, we have only the language of the statute to guide us: "a court *in this state* may, in any action brought by a shareholder of the corporation, grant any equitable relief it deems just . . ." *Minn.Stat. § 302A.467* (emphasis added). As the moving directors suggest, this would [*29] appear to apply only to the courts of Minnesota. Our research has failed to reveal the application of this provision by a court outside that state. Given the language of the statute, we must once again agree with the moving directors that an action here, under § 302A.467, is not available to plaintiffs. Accordingly, Count XII must be dismissed.

## III. CONCLUSION

For the foregoing reasons, it is hereby recommended that the defendants' motion to dismiss the plaintiffs' Third Amended Consolidated Complaint be GRANTED as to Counts V and XII, but DENIED as to all other Counts.

Respectfully submitted,

EDWARD A. BOBRICK

United States Magistrate Judge

DATE: December 21, 1995

Any objections to this Report and Recommendation must be filed with the Clerk of the Court within ten (10) days of receipt of this notice. Failure to file objections within the specified time waives the right to appeal the District Court's order. *Thomas v. Arn, 474 U.S. 140, 88 L. Ed. 2d 435, 106 S. Ct. 466 (1985); The Provident Bank v. Manor Steel Corp., 882 F.2d 258 (7th Cir. 1989).*

 

Not Reported in F.Supp.
**(Cite as: 1995 WL 307172 (N.D.Ill.))**
<KeyCite Yellow Flag>

Page 7

Only the Westlaw citation is currently available.

United States District Court, N.D. Illinois, Eastern Division.

**RUCA HARDWARE, LTD., an Illinois Corporation, and Lincoln Architectural Hardware, Inc., an Illinois Corporation, Plaintiffs,**

v.

**Ruca CHIEN, Ruca Corporation, a Taiwan Corporation, Knape & Vogt Manufacturing Co., a Michigan Corporation, Tim Kuzma, and Al Perry, Defendants.**

No. 94 C 3635.

May 17, 1995.

MEMORANDUM OPINION AND ORDER

COAR, District Judge.

*1 This matter is before the court on defendants Ruca Chien ("Chien") and Ruca Corporation's ("Ruca Corp.") Motion for Reconsideration of Judge Conlon's Memorandum Opinion and Order dated September 30, 1994. [FN1] Defendants specifically move this court to reconsider Judge Conlon's decision to deny Ruca Corp.'s Motion to Dismiss Count II of plaintiffs' complaint. The allegations of plaintiffs' complaint are explained in detail in Judge Conlon's previously referenced opinion; accordingly, this court will only set forth the allegations necessary to resolve the pending motion.

I. Plaintiffs' Complaint and Prior History of Case

In Count II, plaintiff Ruca Hardware Ltd. ("RHL") alleges that Ruca Corp. breached its exclusive distributorship agreement with RHL, pursuant to which RHL sold "euro-style" drawer slides manufactured by Ruca Corp. The complaint alleges that principals of RHL and Ruca Corp. entered into an oral exclusive distributorship agreement at a meeting held in Ontario, California between March 1992 and July 22, 1992. (See Compl., at ¶¶13-14). The terms of this alleged exclusive distributorship agreement were as follows:

Ruca-Taiwan [Ruca Corp.] agreed to sell [to]

RHL drawer slides and other products at set prices established by Ruca-Taiwan on Exhibit B [a price list]; RHL would sell the products at slightly higher prices to customers within its exclusive territory and collect the payments for the orders from its customers; RHL would then remit payment back to Ruca-Taiwan within 90 days of the Hong Kong shipping date per the prices established on [the price list], plus 2%; and RHL would retain for itself any profits earned from the sale.

(Id. at ¶15). In addition, "the parties agreed and understood that the exclusive distributorship agreement would continue for as long as RHL was in existence." (Id.). RHL was subsequently incorporated on or about July 22, 1992. (Id. at ¶14). Plaintiffs neither allege that the agreement was reduced to writing nor have they produced a copy of any written agreement.

On August 27, 1993, Ruca Chien, on behalf of Ruca Corp., sent RHL a letter via facsimile in which he allegedly "attempted to terminate RHL's exclusive east coast distributorship." (Compl., at ¶31). Plaintiffs attached a copy of Chien's August 27, 1993 letter as an exhibit to the complaint. That letter stated in pertinent part:

  4. U.S.: The timing for us to open our west coast and mid-west operations was perfect. But, we have lost many opportunities in the last year to increase our market share and profits. And now its getting more and more difficult to increase the market share and profit. We just can't survie [sic, survive] on 1-2 containers per month from mid-west. And the future to me looks very dark. So, I have to state here that if you can't increase your monthly sales to 5-10 containers, we will have to close our operation in Chicago, as well as in Canada..., and both markets will be handled directly by Ruca Corporation in Taiwan.

*2 (Id., Exh. H.).

On September 3, 1993, Chien sent RHL a second letter via facsimile in which he allegedly confirmed the "purported 'termination.'" (Compl., at ¶31). A copy of this letter was also attached as an exhibit to the complaint. In this letter, Chien wrote as follows:

  2) Back to Memory, I have kept my promise of our meeting on Jun/92 in L.A.
  (A) Territorial division, Peggy [Chien] and I declined from your region.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Wo



Not Reported in F.Supp.
(Cite as: 1995 WL 307172, *2 (N.D.Ill.))

Page 8

(B) At beginning, payment is on 30 days term for 3-5 containers, but now is on 90 days term of 10 container (although with extra 2% interest as Tony's requested)

* * *

5) As the agreement, is on 5 containers per month. We have given you a year, but still can't reach up minimum requirement....

* * *

10) Re KV [Knape Vogt], If we have made a agreement with them, I will keep my promise with you (we all will be happy for that). If not, in my opinion that it will not be so easy.
(Id., Exh. J).

Ruca Corp. formally terminated RHL's exclusive distributorship agreement by letter dated November 2, 1993. (Id. at ¶32). This letter, from an attorney for Ruca Corp., stated in pertinent part, "[a]ny and all oral or written contracts that may have existed between Ruca Corporation and Ruca Hardware Ltd., is [sic] hereby terminated." (Id., Exh. K). Ruca Corp. allegedly terminated its exclusive distributorship agreement with RHL in order to enter into an exclusive distributorship agreement with Knape & Vogt Manufacturing, a codefendant in this case. (Id. at ¶46).

Ruca Corp. moved to dismiss Count II on three grounds. First, it argued that plaintiffs failed to establish an enforceable contract because they did not allege "a specific duration of the purported exclusive distributorship granted to RHL, the method by which the agreement could be terminated, the quantity of drawer slides and other products to be sold and distributed by RHL, or any other performance standards under the contract ...." (Def. Mem. to Dis., at 11) (emphasis in original). Second, it argued that the alleged contract was unenforceable under the Statute of Frauds. (Id. at 11-12). Finally, it argued that if a contract existed, the contract was terminable at will because it lacked a durational term; accordingly, Ruca Corp.'s decision to terminate any oral or written agreements with RHL could not have constituted a breach of contract. (Id. at 12-13).

Judge Conlon rejected all three arguments. First,

Judge Conlon concluded that the exclusive distributorship had an "identifiable durational term" based on plaintiffs' allegation that the agreement was "to remain in effect for as long as RHL was in existence." (Conlon, J., Mem. Op.. & Ord., at 21). As such, Judge Conlon concluded that if Ruca Corp. unilaterally withdrew from the distributorship agreement prior to the dissolution of RHL, Ruca would have breached the contract. (Id.). Second, Judge Conlon concluded that the alleged contract did not violate the Statute of Frauds pursuant to section 5/2-201(3)(b) of Illinois's Uniform Commercial Code, which provides that an oral agreement can satisfy the Statute of Frauds if the party against whom enforcement is sought admits the existence of the agreement in court or in a pleading. (Id. at 22). Judge Conlon concluded in this regard that an exclusive distributorship agreement existed between the parties based upon the allegations contained in Ruca Corp.'s counterclaim. (Id.). Finally, Judge Conlon concluded that due to the agreement's identifiable durational term, Ruca Corp. could not terminate the agreement prior to RHL's dissolution. (Id. at 21).

*3 Ruca Corp. advances three arguments in its motion to reconsider. First, Judge Conlon's opinion did not address its argument that the contract was too vague and indefinite to be enforced because it lacked a sales quota or quantity term. Second, Ruca Corp. did not admit in its counterclaim that an exclusive distributorship agreement existed but instead only admitted to the existence of contracts for goods sold and delivered by it to RHL. Accordingly, Ruca Corp. reasons that the exception to the Statute of Frauds applies only to the contracts for goods sold and not to the alleged exclusive distributorship agreement. Finally, Ruca Corp. argues that the duration of the contract -- for as long as RHL exists -- is so indefinite as to render the alleged distributorship agreement terminable at will.

## II. Standards of Review

### A. Motion for Reconsideration

"Motions for reconsideration serve a limited function: to correct manifest errors of law or fact or to present newly discovered evidence." [FN2] Keene Corp. v. International Fidelity Ins. Co., 561 F. Supp. 656, 665-66 (N.D. Ill. 1982), aff'd 736 F.2d 388 (7th Cir. 1988). A court should entertain a

(C) 2005 Thomson/West. No Claim to Orig. U.S. Govt. Wo



Not Reported in F. Supp.
(Cite as: 1995 WL 307172, *3 (N.D.Ill.))

motion of reconsideration under very limited circumstances:

where 'the Court has patently misunderstood a party, or has made a decision outside the adversarial issues presented to the Court by the parties, or has made an error not of reasoning but of apprehension. A further basis for a motion to reconsider would be a controlling or significant change in the law or facts since the submission of the issue to the Court. Such problems rarely arise and the motion to reconsider should be equally rare.'

Bank of Waunakee v. Rochester Cheese Sales, Inc., 906 F.2d 1185, 1191 (7th Cir. 1990) (quoting Above the Belt, Inc. v. Mel Bohannan Roofing, Inc., 99 F.R.D. 99, 101 (E.D. Va. 1983)). A motion for reconsideration thus may not be used "as a vehicle to introduce new evidence that could have been adduced during the pendency of the summary judgment motion" or "as the occasion to tender new legal theories for the first time." [FN3] Rothwell Cotton Co. v. Rosenthal & Co., 827 F.2d 246, 251 (7th Cir. 1987) (quoting Keene, 561 F. Supp. at 665-66); Publishers Resource, Inc. v. Walker-Davis Publications, Inc., 762 F.2d 557, 561 (7th Cir. 1985). The court will apply these standards more stringently where, as here, it has been asked to reconsider the ruling of one of its colleagues following the reassignment of this case to this court's calendar. See Kedziora v. Citicorp Nat'l Serv., Inc., No. 91 C 3428, 1995 WL 248433 (N.D. Ill. 1995) (Castillo, J.).

B. Motion to Dismiss

A motion to dismiss pursuant to Rule 12(b)(6) does not test whether the plaintiff will prevail on the merits but instead whether the claimant has properly stated a claim. See Scheuer v. Rhodes, 416 U.S. 232, 236, 94 S. Ct. 1683, 1686 (1974). The court may dismiss a complaint for failure to state a claim under Rule 12(b)(6) only if "it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." Hishon v. King & Spalding, 467 U.S. 69, 73, 104 S. Ct. 2229, 2232 (1984); see also Conley v. Gibson, 355 U.S. 41, 45-46, 78 S. Ct. 99, 102 (1957). The court must accept as true all well-plead allegations and draw all reasonable inferences from the allegations in favor of the plaintiff. Perkins v. Silverstein, 939 F.2d 463, 466 (7th Cir. 1991) (citing Scheuer, 416 U.S. at 236, 94 S. Ct. at 1686). However, the court

need not strain to find inferences favorable to the plaintiff which are not apparent on the face of the complaint. Coates v. Illinois St. Bd. of Educ., 559 F.2d 445, 447 (7th Cir. 1977). Similarly, the court is not required to accept legal conclusions either alleged or inferred from pleaded facts. Nelson v. Monroe Regional Medical Ctr., 925 F.2d 1555, 1559 (7th Cir. 1991). Finally, the complaint need not specify the correct legal theory nor point to the right statute to survive a Rule 12(b) motion to dismiss, provided that "relief is possible under any set of facts that could be established consistent with the allegations." Bartholet v. Reishauer A.G., 953 F.2d 1073, 1078 (7th Cir. 1992). The complaint must, however, state either direct or inferential allegations concerning all material elements necessary for recovery under the chosen legal theory. See Glatt v. Chicago Park Dist., 847 F.Supp. 101, 103 (N.D.Ill.1994).

III. Analysis

A. Quantity Term

*4 Ruca Corp.'s first argument that the alleged exclusive distributorship agreement was too indefinite to be enforced because it lacked a quantity term is incorrect. While it is true that plaintiffs did not specifically allege a sales quota or quantity term, a per month quantity term may be identified from Ruca Chien's letter to RHL dated September 3, 1993. [FN4] In that letter, Chien outlined some of the terms of the "promise" he made when he met with the principals of RHL in Los Angeles in June 1992. That promise included territorial protection and an agreement of "5 containers per month." (Compl., Exh. J, at 1-2). The alleged contract was thus not rendered indefinite due to the lack of a quantity term.

Ruca Corp.'s related argument that it cannot be held liable for breach of contract because RHL admitted that it breached the contract's quantity term through its admission that the "[a]ctual quantity ordered [by RHL] averaged 2 containers per month" likewise fails. Whether Ruca Corp. has a valid defense to plaintiffs' contract claim and whether Ruca Corp. waived that defense (see Ruca Chien's letter of August 27, 1994, at ¶4) are not issues to be resolved in a motion to dismiss. The issue raised in a motion to dismiss is whether the complaint properly alleges a cause of action. We agree with

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Wo

Not Reported in F. Supp.
(Cite as: 1995 WL 307172, *4 (N.D.Ill.))

Judge Conlon's conclusion that the complaint, through its allegations and exhibits, properly alleges the elements of an exclusive distributorship agreement. The remaining question is whether the exclusive distributorship agreement is enforceable.

B. Statute of Frauds

Ruca Corp. argues in that it did not admit in its counterclaim to the existence of an unwritten exclusive dealership agreement; rather, it contends that it only admitted to the existence of contracts for the goods it actually sold and delivered to RHL. Ruca Corp. maintains that these agreements for goods sold were separate and distinct from the exclusive distributorship agreement alleged in plaintiffs' complaint. Accordingly, Ruca Corp. argues that if the judicial admissions exception in section 5/2-201(3)(b) applies, it would only exempt from the Statute of Frauds the eight shipments identified in the counterclaim because the exception is expressly limited to the quantity of goods admitted. [FN5]

In its counterclaim, Ruca Corp. admits that RHL was formed to distribute drawer slides it manufactured. (Counterclaim, ¶¶8-9). Ruca Corp. further admits that shortly after the formation of RHL, it began selling drawer slides to RHL "pursuant to RHL's purchase orders." (Id. at ¶13). To that end, Ruca Corp. admits that from October 1992 through June 1993, it sold and delivered ten (10) separate shipments of drawer slides to RHL, which RHL accepted and paid for in full. (Id.). Ruca Corp. further alleges that it agreed to sell and in fact delivered eight (8) additional shipments of drawer slides to RHL from July 12, 1993 to September 20, 1993, but that RHL has refused to pay for these eight shipments. Ruca Corp. attached copies of the invoices for these unpaid eight shipments as exhibits to its counterclaim. Importantly, Ruca Corp. denied that it entered into an exclusive distributorship agreement with RHL in its Answer to plaintiffs' complaint. (See Answ., at ¶¶14-15).

*5 Ruca Corp. did not expressly admit to the existence of an exclusive distributorship agreement in its counterclaim. See Ray Dancer, Inc. v. DMC Corp., 175 Ill. App. 3d 997, 530 N.E.2d 605, 609 (2d Dist. 1988) ("while admissions made in the party's pleading bind that party throughout the course of the litigation ..., the pleader only admits what is specifically alleged;" applying this principle, the court concluded that because the defendant had admitted only to the existence of an exclusive sales contract, he had not necessarily admitted to the existence of an exclusive purchase contract so as to fall within the judicial admissions exception contained in section 5/2-201(3)(b)). Similarly, Ruca Corp.'s argument that section 5/2-201(c)(3) expressly limits the exception to the Statute of Frauds to the quantity admitted in the pleadings -- in this case, eighteen total shipments, eight of which are at issue -- is well founded. See 810 ILCS § 5/2-201(b)(3). We nonetheless conclude that Judge Conlon properly denied Ruca Corp.'s motion to dismiss on the Statute of Frauds issue, albeit for a different reason.

Drawing all reasonable inferences in favor of plaintiffs, defendants' counterclaim establishes that RHL was a distributor of Ruca Corp.'s drawer slides and had ordered eighteen (18) shipments of those slides from Ruca Corp. over a fourteen (14) month period. These allegations, without more, are insufficient to support a reasonable inference that RHL was an exclusive distributor of Ruca Corp.'s drawer slides. However, such an inference may be reasonably drawn when the allegations of the counterclaim are considered in conjunction with the September 3, 1993, letter of Ruca Chien, which is attached to plaintiffs' complaint as Exhibit J and is thus part of the pleadings. In that letter, Chien acknowledges that he made a promise to RHL at a meeting in June 1992 in Los Angeles in which sales territories were divided, possibly into exclusive territories. Chien further wrote that he had "declined from your region," a statement which supports an inference that the parties created exclusive distribution territories for the sale of Ruca Corp.'s drawer slides.

This court recognizes that Chien's letter is not the type of judicial admission that falls within the scope of section 5/2-201(c)(3)'s exception to the Statute of Frauds. However, this court considers it imprudent to dismiss plaintiffs' complaint on the basis of the Statute of Frauds when the pleadings contain a letter drafted by defendant Chien on behalf co-defendant Ruca Corp. which, in conjunction with the allegations of defendants' counterclaim, creates a reasonable inference that the parties may have entered into an exclusive distributorship agreement.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Wo



Not Reported in F.Supp.
(Cite as: 1995 WL 307172, *5 (N.D.Ill.))

Page 11

Under these circumstances, and in the absence of a sworn affidavit by defendants that an exclusive distribution agreement did not exist, this court concludes that the plaintiffs should have an opportunity to depose Ruca Chien and any other officers/agents of Ruca Corp. with knowledge on this issue to attempt to elicit an admission as to the existence of an exclusive distributorship agreement. See DF Activities Corp. v. Brown, 851 F.2d 920, 924-25 (7th Cir. 1988) (Flaum, J., dissenting) (to give full effect to both the statute of frauds and its exception for judicial admissions, the district courts must have discretion "to determine when additional discovery is likely to be fruitful and when it is being sought to improperly pursue a defendant who is clearly entitled to the protection of the statute of frauds"); [FN6] ALA, Inc. v. CCAir, Inc., 29 F.3d 855, 862-63 (3d Cir. 1994) (district court erred in dismissing complaint based upon statute of frauds defense without first having given the plaintiff an opportunity to elicit an admission from defendant concerning the existence of an oral agreement to sell a controlling block of defendant's common stock); George J. Priester Aviation Serv., Inc. v. Gates Learjet Corp., 1985 WL 5068, *4 (N.D. Ill. 1985) (where the court denied defendant's motion to dismiss based upon the statute of frauds to afford plaintiff an opportunity to conduct discovery on whether an oral agreement existed).

*6 If Mr. Chien and the officers/agents of Ruca Corp. who have personal knowledge of the RHL agreement deny under oath the existence of an exclusive distributorship agreement, then Ruca Corp. may properly move for summary judgment. See DF Activities Corp., 851 F.2d at 925-26 (Flaum, J., dissenting); ALA, Inc., 29 F.3d at 863. Permitting limited discovery in this fashion furthers the purpose of the Statute of Frauds because it preserves the defense against fraudulent contract claims, undertakes to prevent a party from avoiding enforcement of an oral contract it actually made, and seeks to minimize the costs of litigation borne by the defendant. See ALA, Inc., 29 F.3d at 863.

However, even if plaintiffs secured an admission from Ruca Chien or Ruca Corp. that exempted the alleged oral distributorship agreement from the Statute of Frauds, Count II must still be dismissed because the alleged agreement is terminable at will.

C. Terminable at Will [FN7]

Ruca Corp.'s final argument is that the exclusive distributorship agreement's durational term (i.e., for as long as RHL was in existence) created a perpetual contract that was terminable at will under Illinois law.

It is well established under Illinois law that an executory contract that does not contain a durational term is deemed perpetual in duration and is therefore terminable at will. See Ryan v. Wersi Elec. GmbH & Co., 3 F.3d 174, 181 (7th Cir. 1993); First Commodities Traders, Inc. v. Heinold Commodities, Inc., 766 F.2d 1007, 1012 (7th Cir. 1985); Kraftko Corp. v. Kolbus, 1 Ill. App. 3d 635, 640, 274 N.E.2d 153, 156 (4th Dist. 1971). However, a contract which does not contain a durational term but which nonetheless provides that it will terminate upon the occurrence of a specific, cognizable event is not deemed perpetual in duration and is not terminable at will. [FN8] See Peters v. Health & Hosp. Governing Comm. of Cook Co., 91 Ill. App. 3d 1104, 1107, 415 N.E.2d 653, 656 (1st Dist. 1980), rev'd on other grounds 88 Ill. 2d 316, 430 N.E.2d 1128 (1981); Consolidated Labs., Inc. v. Shandon Scientific Co., 413 F.2d 208, 211 (7th Cir. 1969). As such, a "duration term need not specify a date or period of time; it can identify some event which will terminate [the contract], even if it is not clear, ex ante, when that event will take place." Schenley Affiliated Brands Corp. v. Mar-Salle, Inc., 703 F. Supp. 744, 746 (N.D. Ill. 1989) (quoting H.L. Miller Machine Tools, Inc. v. Acroloc Inc., 679 F. Supp. 823, 825 (C.D. Ill. 1988)). A court must enforce a contract that terminates upon the occurrence of an event "according to its terms and the reasonable implications thereof." Ricke v. Ricke, 83 Ill. App. 3d 1115, 1120, 405 N.E.2d 351, 356 (2d Dist. 1980) (quoting Consolidated Labs., Inc., 413 F.2d at 211-12)).

The event upon which the contract will terminate must be an "objective event" so as to make the contract sufficiently definite in duration. See R.J.N. Corp. v. Connelly Food Prod., Inc., 175 Ill. App. 3d 655, 659, 529 N.E.2d 1184, 1187 (1st Dist. 1988). If the terminating event does not create a definite durational term, then the contract is deemed indefinite in duration and terminable at will. See id.

*7 In R.J.N. Corp., the parties entered into an agreement that was to "remain in effect for as long

(C) 2005 Thomson/West. No Claim to Orig. U.S. Govt. Wo



Not Reported in F. Supp.
(Cite as: 1995 WL 307172, *7 (N.D.Ill.))

Page 12

as Connelly serves Rich's [RJN's] customers." Id. at 657, 529 N.E.2d at 1185-86. The court concluded that this event --the service of RJN's customers -- "cannot be construed as an 'objective event,' " that would have had the effect of making the contract sufficiently definite in duration. Id. Rather, the court concluded:

a practical construction of the clause indicates an indefinite duration of the contract based upon CFP's apparent option/decision to not serve Rich's customers at some point in time. In other words, the contract would remain in effect only as long as CFP served Rich's customers and, therefore, when CFP would decide to no longer serve RJN's customers could not be ascertained, making the duration of the contract indefinite and terminable at will.

Id. (citing Gordon v. Matthew Bender & Co., 562 F. Supp. 1286 (N.D. Ill. 1983)).

Ruca Corp. argues that because corporations often exist indefinitely, an agreement for the life or existence of a corporation is so indefinite in duration as to render the agreement terminable at will. Accordingly, the question is whether such an agreement can be construed as terminating upon the occurrence of an objective event.

Initially, one court has argued that since Illinois law recognizes a presumption against lifetime employment contracts between employers and their employees, there "should be an even stronger presumption against similar contracts in the case of corporations and other artificial entities, since the existence of such entities often is of indefinite duration, and is not even limited by the bounds of human mortality." [FN9] First Commodity Traders, Inc. v. Heinold Commodities, Inc., 591 F. Supp. 812, 818 n.6 (N.D. Ill. 1984), aff'd on other grounds 766 F.2d 1007 (7th Cir. 1985). The district court in First Commodities did not create such a presumption because the duration of the agreement at issue in that case was not based upon the existence of a corporate entity. [FN10]

This court agrees with the District Court's observation in First Commodities that Illinois law should recognize a presumption that contracts which are to remain in effect "for as long as 'x' corporation is in existence" are indefinite in duration and therefore terminable at will. [FN11] The presumption is appropriate because this type of

durational term generally does not identify an objective event upon which the contract will terminate. [FN12] Under the Illinois Business Corporation Act, a corporation has perpetual duration unless otherwise noted in the corporation's articles of incorporation. See 805 ILCS § 5/2.10(d). Accordingly, if the articles of incorporation are silent as to the corporation's duration, a contract in effect for "as long as the corporation exists" may exist into perpetuity. The indefinite duration of such a contract renders its terminable at will. See R.J.N. Corp. v. Connelly Food Prod., Inc., 175 Ill. App. 3d 655, 659, 529 N.E.2d 1184, 1187 (1st Dist. 1988) (discussed supra); Universal Lite Distr., Inc. v. Northwest Indus., Inc., 602 F.2d 1173, 175 (4th Cir. 1979) (oral agreement which was to last "as long as UMC and ULD remained in the ballast business" was so indefinite in existence as to be terminable on reasonable notice); see also Spiering v. Fairmont Foods Co., 424 F.2d 337, 338 (7th Cir. 1970) (noting that plaintiff did not appeal the district court's summary judgment ruling that the original distributorship agreement which allegedly provided plaintiff with a price discount that was "to last as long as they remained milk vendors in Chicago" was terminable at will upon reasonable notice; the Seventh Circuit did not review this ruling on appeal).

*8 In this case, RHL has a perpetual existence because its articles of incorporation do not contain a durational limit. [FN13] In the absence of any other objective event upon which the agreement would terminate, the agreement between RHL and Ruca Corp. is deemed perpetual in existence and therefore terminable at will. [FN14] Since the agreement was terminable at will, Ruca Corp. could not have breached the agreement.

WHEREFORE, for the foregoing reasons, defendants' Motion to Reconsider is Granted and Count II is Dismissed against Ruca Corporation.

FN1. Defendants filed their Motion for Reconsideration on October 13, 1994. On November 8, 1994, this case was reassigned to this Court by order of the Executive Committee following my appointment to the bench. Two clerical errors in Judge Conlon's Memorandum Opinion and Order dated September 30, 1994, must be corrected. First, the Minute Order incorrectly stated that "Count I is dismissed as to Ruca Chien."

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Wo



Not Reported in F. Supp.
(Cite as: 1995 WL 307172, *8 (N.D.Ill.))

Page 13

The Minute Order should have stated that Count I is dismissed as to Ruca Corporation. (See Judge Conlon's Mem. Op & Ord., at 18, 20). Similarly, the Minute Order incorrectly stated that "Count II is dismissed as to Ruca Corp." The Minute Order should have stated that Count II is dismissed as to Ruca Chien. (See id. at 23). Judge Conlon's Memorandum Opinion and Order is so amended.

FN2. The federal rules do not provide for motions for reconsideration of interlocutory orders. See Shuff v. Consolidated Rail Corp., 865 F. Supp. 469, 472 (N.D. Ill. 1994) (citing National Union Fire Ins. Co. of Pittsburgh, Pa. v. Continental Ill. Corp., 116 F.R.D. 252, 253 (N.D. Ill. 1987). However, such motions are recognized under federal common law and "can play a legitimate role" in narrow circumstances. National Union, 116 F.R.D. at 253.

FN3. The district court's rulings are not to be viewed as "mere first drafts, subject to revision and reconsideration at a litigant's pleasure. Quaker Alloy Casting Co. V. Gulfco Indus., Inc., 123 F.R.D. 282, 288 (N.D. Ill. 1988).

FN4. The court may properly consider exhibits attached to the complaint for the purposes of ruling on a motion to dismiss. See Fed. R. Civ. Pro. 10(c) ("[a] copy of any written instrument which is an exhibit to a pleading is a part thereof for all purposes"); accord Beam v. Ipco Corp., 838 F.2d 242, 244 (7th Cir. 1988) (citing 5 C. Wright & A. Miller, Federal Practice & Procedure §1357, at 593 (1969)).

FN5. Section 5/2-201 states in pertinent part: 2-201. Formal Requirements; Statute of Frauds.

* * *

(3) A contract which does not satisfy the requirements of subsection (1) but which is valid in other respects is enforceable

* * *

(b) if the party against whom enforcement is sought admits in his pleading, testimony or otherwise in court that a contract for sale was made, but the contract is not enforceable under this provision beyond the quantity of goods admitted ... 810 ILCS

§5/2-201(3)(b).

FN6. In DF Activities Corp., the defendant attached a sworn affidavit to her 12(b)(6) motion to dismiss based upon the Statute of Frauds in which she denied that she had entered in an oral agreement with plaintiff concerning the sale of a Frank Lloyd Wright chair. Judge Posner, writing for the majority, affirmed the district court's dismissal because the defendant's sworn statement that there was no contract effectively foreclosed the applicability of the judicial admission's exception. 851 F.2d at 922-23. Judge Posner concluded in this regard, "[O]nce the defendant has denied the contract under oath, the safety valve of section 2-201(3)(b) is closed. The chance that at a deposition the defendant might be badgered into withdrawing his denial is too remote to justify prolonging an effort to enforce an oral contract in the teeth of the statute of frauds." Id. at 923-24. Importantly, Judge Posner did not conclude that discovery is inappropriate in all cases where a statute of frauds defense has been advanced via a motion to dismiss. Specifically, he wrote that "[w]e need not take sides on the conflict" of whether a defendant in a suit for breach of an oral contract can block discovery aimed at securing a judicial admission under section 5/2-201(3)(b) simply by moving to dismiss the complaint on the basis of the statute of frauds or by denying that a contract existed in his or her answer. Id. at 922. Rather, Judge Posner acknowledged that discovery may be appropriate in situations where the defendant has not denied under oath the existence of the alleged contract. Id. In the absence of a prohibition against discovery, this court elects to adopt the approach advocated by Judge Flaum in his dissent in DF Activities. According to Judge Flaum, the district courts should have discretion to determine when a statute of frauds defense raised in a 12(b)(6) motion bars discovery aimed at soliciting a judicial admission under section 5/2-201(3)(b) and when it does not. Because this court further agrees with Judge Flaum's observation that the judicial admissions exception -- which permits an admission to be in the form of a pleading, testimony or otherwise in court -- would be rendered virtually meaningless if a defendant's denial of the contract acted as a complete bar to additional discovery, see id. at 925 (emphasis in original), the court respectfully declines to follow Judge Shadur's opinion in Triangle Marketing, Inc. v. Action Industries, 630 F.Supp. 1578, 1583 (N.D. Ill.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Wo



Not Reported in F. Supp.
(Cite as: 1995 WL 307172, *8 (N.D.Ill.))

Page 14

1986) (holding that the judicial-admission exception is defeated where the defendant has answered and denied the existence of a contract; where such a denial has occurred, "section 2-201(3)(b) does not create an affirmative right for plaintiff to badger defendant through discovery and trial simply because of the possibility of obtaining an admission some time before proofs are closed").

FN7. At the court's request, the parties submitted additional memoranda on this issue.

FN8. If the contract does not contain a termination date, the court must look to the circumstances surrounding the contract to determine whether the parties intended that the contract terminate upon the occurrence of a specific event. See First Commodity Traders, Inc., 766 F.2d at 1012; Ricke v. Ricke, 83 Ill. App. 3d 1115, 1120, 405 N.E.2d 351, 356 (2d Dist. 1980).

FN9. The court cited Martin v. Federal Life Ins. Co., 109 Ill. App. 3d 596, 602, 440 N.E.2d 998, 1003 (1st Dist. 1982), for the proposition that Illinois law recognizes a presumption against lifetime employment contracts. That presumption remains valid today. See Jago v. Miller Fluid Power Corp., 245 Ill. App. 3d 876, 879, 615 N.E.2d 80, 83 (2d Dist. 1993) ("generally, a contract for 'permanent' employment is indefinite and considered to be terminable at will").

FN10. In First Commodities, the parties had entered into a written agreement wherein defendant Heinold provided the capital necessary to support the plaintiff's commodities trading business; plaintiffs, in turn, introduced their clients to Heinold and serviced the clients on behalf of Heinold. Heinold then divided the trading commissions with plaintiff. Paragraph 6 of the agreement provided that "Heinold shall pay compensation [ [to plaintiff] dependent upon the profitable operation of the branch office ....."; paragraph 17 of the agreement provided that "[e] ither party may unilaterally terminate this Agreement for a breach of any of the paragraphs of this Agreement." After two and one-half years of operating under this agreement, Heinold unilaterally terminated it. In defending against plaintiff's subsequent breach of contract suit, Heinold argued that the contract was terminable at will because it did not contain a durational term. Contrary to Ruca Corp.'s

argument, the agreement in First Commodity did not provide that it "would continue as long as it was profitable." The district court specifically rejected First Commodity's argument that the agreement's duration depended upon its profitability, concluding instead that paragraph 6 was directed at plaintiff's compensation and not the agreement's duration. 591 F. Supp. at 816. Although the district court observed that paragraph 17 might establish that the parties did not intend to create a contract terminable at will, it nonetheless concluded that the agreement was terminable at will because it lacked a durational term. Id. The court stated in this regard, "[i]n the absence of a cognizable durational term ... a contract will be terminable at will by operation of law, whether or not that was the parties' specific intent." Id. (emphasis in original). The Seventh Circuit disagreed with the district court's conclusion that the agreement was terminable at will and concluded instead that paragraph 17 of the agreement contained a cognizable event upon which the contract may be terminated; namely, a breach of the agreement by either party. 776 F.2d at 1012. As such, the contract was terminable upon a breach and not at will. The Seventh Circuit nonetheless affirmed the district court's entry of summary judgment in defendant's favor on the breach of contract claim because the undisputed evidence established that plaintiff had breached the agreement prior to Heinold's termination of same.

FN11. Federal Courts are bound to state court precedents in interpreting state law. L.S. Heath & Son, Inc. v. AT&T Info. Sys., Inc., 9 F.3d 561, 574 (7th Cir. 1993) (citing Erie R.R. Co. v. Tompkins, 304 U.S. 6, 58 S. Ct. 817 (1938)). "In the absence of a decision by the highest state court, we should decide the matter in the way we divine that the highest state court would rule if the issue were squarely presented to it. Decisions of intermediate appellate state courts generally control unless there are persuasive indications that the highest state court would decide the issue differently. Id. (citing Hicks v. Feiock, 485 U.S. 624, 630 n.3, 108 S. Ct. 1423, 1428 n.3 (1988)); see also Todd v. Societe BIC, S.A., 21 F.3d 1402, 1412 (7th Cir. 1994) ("[o]ur task in a diversity case is to predict what the state's highest court would do if presented with the same issue").

FN12. Plaintiffs cite W.P. Iverson & Co. v. Dunham Mfg. Co., 18 Ill. App. 2d 404, 152

(C) 2005 Thomson/West. No Claim to Orig. U.S. Govt. Wo



Not Reported in F. Supp.
(Cite as: 1995 WL 307172, *8 (N.D.Ill.))

Page 15

N.E.2d 615 (1st Dist. 1958), for the proposition that "contracts made for the period of the life of the corporation are not unreasonable or void." In **W.P. Iverson**, which involved a claim of tortious interference with contract, the written contract provided that it could be terminated upon the occurrence of certain conditions; in particular, the third condition permitted termination if "Motor elects to go out of the business of the promotion of PD and PD-F ...." Id. at 413, 152 N.E.2d at 619. The question before the court was whether this condition prevented a valid contract from coming into existence between the parties. Id. at 415, 152 N.E.2d at 620. The court concluded that this condition did not have "any effect upon the validity or enforceability of the contract." Id. The proposition established by the court in W.P. Iverson is correct: RHL's contact was not void because its durational term allegedly provided that the agreement would remain in effect for as long as RHL existed. The present question, however, is not whether a valid contract was formed but rather whether the contract is terminable at will due to the durational term. The court in W.P. Iverson did not address this latter issue and thus offers no guidance. The other cases cited plaintiffs, Peters v. Health & Hosp. Governing Comm. of Cook Co., and Consolidated Labs, Inc. v. Shandon Scientific Co., 413 F.2d 208 (7th Cir. 1969), are distinguishable. In both cases, the contracts identified specific cognizable events upon which the contracts would terminate. In Peters, the union election agreement was to terminate either if the union lost its status as a representative of the majority of affected employees or if the parties failed to comply with an arbitration award. 91 Ill. App. 3d at 1107, 415 N.E.2d at 656. In Consolidated Laboratories, the contract was to terminate upon the defendant's appointment of a new main distributor. 413 F.2d at 211-12. In neither case did the contracts contain a specific termination date. Nevertheless, the courts determined that the agreements were not terminable at will because the future occurrence of the terminating event could be reasonably foreseen. For example, the court in Peters observed that the union could fail "for any number of reasons" to represent its membership and thereby cause the agreement to terminate, see 91 Ill. App. at 1109, 415 N.E.2d at 657; similarly, in Consolidated Laboratories, the court could reasonably foresee that a new distributor would be appointed. See 413 F.2d at 211. Unlike these cases, the alleged RHL exclusive

dealership -- from the moment of its inception -- existed in perpetuity as a result of section 5/2-10(d) of the Illinois Business Corporation Act. Because RHL, by statute, exists into perpetuity, the court cannot reasonably foresee the occurrence of the terminating event. The cases are therefore distinguishable.

FN13. The court has taken judicial notice of RHL's Articles of Incorporation, which plaintiffs attached as an exhibit to their response to defendants' initial motion to dismiss. In ruling on a 12(b)(6) motion to dismiss, the court may take judicial notice of matters of public record. United States v. Woods, 925 F.2d 1580, 1582 (7th Cir. 1991); see also Intermedics, Inc. v. Ventritex, Inc., 775 F. Supp. 1258, 1261 (N.D. Cal. 1991) ("[f]acts properly held the object of judicial notice in the context of a motion to dismiss under 12(b)(6) include, among others, records and reports of administrative bodies ... items in the record of the case or matters of general public record, .. and copies of a document (i.e., a contract) attached to the complaint as an exhibit.") (citations omitted).

FN14. In the absence of a provision permitting termination for good cause or breach, Ruca Corp. was bound to the contract for as long as RHL elected to remain in existence. From a practical standpoint, the duration of the exclusive distributorship agreement was thus solely within the control of RHL. Several courts have concluded that contracts which provide the party seeking to enforce the contract with complete discretion over the contract's duration are terminable at will due to a lack of mutuality, provided the contract otherwise lacks consideration. In this case, the exclusive distributorship agreement was properly supported by consideration (i.e., an exclusive distributorship was granted in exchange for a promise to order a minimum of five (5) containers of drawer slides per month) such that the contract was not terminable at will due to a lack of mutuality. Nonetheless, the cases in which the courts held the contracts were terminable at will due to a lack of mutuality support this court's conclusion that the agreement was terminable at will due to its indefinite durational term. See, e.g., All Line, Inc. v. Rabar Corp., 919 F.2d 475, 479 (7th Cir. 1990) (under non-compete agreement, distributor agreed to buy rope from manufacturer as long as manufacturer did not sell to the distributor's customers, and manufacturer

(C) 2005 Thomson/West. No Claim to Orig. U.S. Govt. Wo



Not Reported in F. Supp.
(Cite as: 1995 WL 307172, *8 (N.D.Ill.))

Page 16

agreed not to sell directly to the distributor's customers as long as the distributor bought rope from the manufacturer; the court concluded that the executory agreement was terminable at will because the contract lacked mutuality -- the contract's duration depended upon the distributor's continued purchase of rope but the contract did not impose an obligation on the distributor to purchase any rope); Kraftco Corp. v. Kolbus, 1 Ill. App. 3d 635, 274 N.E.2d 153, 155 (4th Dist. 1971) (distributorship contract which did not contain a durational term but required distributor to use his "best efforts" to distribute the product was unenforceable due to a lack of mutuality because the operation of the contract depended entirely upon the distributor's actions); Goodman v. Motor Products Corp., 9 Ill. App. 2d 57, 132 N.E.2d 356 (2d Dist. 1956) (oral agreement which allegedly was to remain in effect unless and until plaintiff "ceased to personally devote his time and efforts to effect the sale and distribution" of the product lacked mutuality and was terminable at will because the contract was binding upon defendant until plaintiff elected not to so devote his time).

1995 WL 307172 (N.D.Ill.)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Wo



Not Reported in N.E.2d
16 Mass.L.Rptr. 383
(Cite as: 2003 WL 21528509 (Mass.Super.))
<KeyCite History >

**Page 18**

Superior Court of Massachusetts.

**Lawrence B. SEIDMAN et al., [FN1]**

FN1. Seidman and Associates, L.L.C.; Seidman Investment Partnership, L.L.P.; Seidman Investment Partnership II, L.L.P.; Federal Holdings, L.L.C.; Pollack Investment Partnership, L.P.; and Kerrimatt, L.P.

v.

**CENTRAL BANCORP, INC. et al. [FN2]**

FN2. Nancy D. Neri; Gregory W. Boulos; Paul E. Bulman; John D. Doherty; Joseph R. Doherty; Terrence D. Kenney; and John G. Quinn.

**PL Capital, LLC et al., [FN3]**

FN3. Richard Lashley; John W. Palmer; Richard J. Fates; and Garrett Goodbody.

v.

**Central Bancorp, Inc. et al., [FN4]**

FN4. Nancy D. Neri; Gregory W. Boulos; Paul E. Bulman; John D. Doherty; Joseph R. Doherty; and Terrence D. Kenney.

**Central Bancorp, Inc. et al., [FN5]**

FN5. Nancy D. Neri; Gregory W. Boulos; and Paul E. Bulman.

v.

**PL Capital, LLC et al. [FN6]**

FN6. Richard Lashley; Lawrence B. Seidman; Garrett Goodbody; Richard J. Fates; Financial Edge Fund, L.P.; Financial Edge-Strategic Fund, L.P.; Goodbody/PL Capital L.P.; Goodbody/PL Capital LLC; John W. Palmer; Seidman and Associates, L.L.C.; Seidman Investment Partnership, L.P.; Seidman Investment Partnership II, L.P.; Kerrimatt, L.P.; Federal Holdings, L.L.C.; Pollack Investment Partnership, L.P.; Dennis Pollack; and Robert Williamson.

Nos. 030547BLS, 030554BLS, 032287BLS.

June 30, 2003.

MEMORANDUM AND ORDER ON MOTIONS
FOR SUMMARY JUDGMENT

ALLAN VAN GESTEL, Justice of the Superior Court.

**\*1** These three consolidated cases are before the Court on two motions for summary judgment filed by each of the plaintiffs in the first two cases captioned above (Nos. 03-0547 BLS and 03-0554 BLS). The motions seek relief in each of the three pending cases.

BACKGROUND

The underlying complaints in cases Nos. 03-0547 BLS and 03-0554 BLS seek declaratory relief regarding the propriety of the implementation by the corporate defendant Central Bancorp, Inc. ("Central Bancorp") of the provisions of a certain Shareholder Rights Agreement ("SRA"), referred to generally as a "Poison Pill ." The plaintiffs in those cases, along with certain others, were designated as an "Acquiring Person" or as an "Adverse Person" under the Shareholder Rights Agreement and thereby possibly could suffer a dilution of their shareholder interests in Central Bancorp.

The complaint in case No. 03-0547 BLS (hereafter the "Seidman Claim") was filed on January 30, 2003. At that time, ex parte, the plaintiffs received a temporary restraining order ("TRO") from the Emergency Judge then on duty, thus keeping matters in status quo until both sides could have an opportunity to be heard without the occurrence of any irreparable action such as that threatened by the defendants. [FN7]

> FN7. The Emergency Judge was advised that Thomas J. Dougherty, counsel for Central Bancorp, had, in writing, threatened to trigger the Poison Pill process "should [the plaintiffs] ... file legal action against the Company or any of its directors in regard to this demand."

The complaint in case No. 03-0554 BLS (hereafter the "PL Capital Claim") was filed the next day, on January 31, 2003. This Court directed that the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Wo



Not Reported in N.E.2d
(Cite as: 2003 WL 21528509, *1 (Mass.Super.))

temporary relief sought in this second case be heard along with the various forms of relief requested in the first case.

On January 31, 2003, the defendants in the Seidman Claim filed a motion to dismiss that case and vacate the temporary restraining order. This Court scheduled a hearing on that motion for the same time as the hearing on the return of the order of notice on the TRO. The Court also considered the essence of the motion to dismiss to apply to the PL Capital Claim as well.

The basis for the motion to dismiss was the filing on January 28, 2003, by the members of a "Special Committee" of the Board of Directors of Central Bancorp, of an action in the United States District Court for the District of Massachusetts captioned Nancy D. Neri et al. v. PL Capital, LLC et al., Civil Action No. 03-10179-EFH (the "Federal Action"). All of the plaintiffs, except one, in both actions here were named among the defendants in the Federal Action. [FN8]

> FN8. It does not appear that the Emergency Judge who granted the TRO in the Seidman Claim was made aware of the prior filed Federal Action or its relationship to this action.

The complaint in the Seidman Claim is in one count seeking a declaratory judgment and related relief determining "whether, under Mass. [G.L.]c. 156B, Sec. 65, the determination by Central Bancorp's 'Special Committee' made on January 24, 2003 was made in good faith and in a manner reasonably believed to be in the best interests of the corporation, with the exercise of such care as an ordinarily prudent person in a like position would use under similar circumstances." Complaint, para. 38.

The complaint as originally filed in the Federal Action [FN9] also was in just one count, seeking a declaration that "under Mass.Gen.L.ch. 156B, Sec. 65, the Board's determinations concerning the defendants were made in good faith and in a manner reasonably believed to be in the best interests of the corporation, with the exercise of such care as an ordinarily prudent person in a like position would use under similar circumstances." Federal Complaint. para. 44.

> FN9. This Court was advised earlier that the Federal complaint was amended to add a count under one of the Federal securities laws and to add another party defendant. Since that time, however, the Federal claim has been dismissed or withdrawn.

*2 The Federal Action and the Seidman Claim sought essentially identical declaratory relief regarding the same actions by the Special Committee of the Central Bancorp Board and the Board itself considering the same stock acquisitions, but, of course, leading to quite different results.

The complaint in the PL Capital Claim relates to the same situation also, but seeks injunctive relief as well as a declaration that the plaintiffs there are not an "Acquiring Person" or an "Adverse Person."

This Court, in deference to the case first filed in the Federal Court, stayed all activity in the two cases then before it, pending action in the Federal Court.

Recently, this Court was advised that Judge Harrington has stayed the Federal Action, pending a resolution by this Court of Massachusetts state law issues that predominate and which are said to be matters of first impression.

All parties agreed that the stay previously issued in the Seidman Claim and the PL Capital Claim be lifted.

Further, all parties agreed that the third case captioned above, case No. 03-2287 BLS (hereafter the "Central Bancorp Claim"), be consolidated for all purposes with the previously consolidated Seidman Claim and PL Capital Claim. The complaint in the Central Bancorp Claim is also in a single count seeking declaratory relief to the effect that the actions of the Central Bancorp Board of Directors and its Special Committee were consistent with G.L.c. 156B, Sec. 65. Complaint, paras. 133-34.

Still further, all parties agreed that all discovery conducted to date in the Federal Action may be used in these three consolidated Superior Court cases as if taken therein. The parties also reserved their rights to conduct further discovery, if appropriate.

All parties urged upon this Court its prompt

(C) 2005 Thomson/West. No Claim to Orig. U.S. Govt. Wo



Not Reported in N.E.2d
(Cite as: 2003 WL 21528509, *2 (Mass.Super.))

Page 20

attention to two issues that they say will significantly assist in the further litigation of these cases. Indeed, the plaintiffs in the original two cases suggest that the Court's action on these issues should be dispositive of all three cases. The two issues are: (1) an argument that the matters in issue have become moot by recent actions taken by some of the parties with regard to their disposition of certain Central Bancorp stock; and (2) questions regarding the standard of review to be applied, and the application of that standard, to the actions of the Special Committee and the Board of Central Bancorp that precipitated these actions.

Central Bancorp is a Massachusetts publicly traded, registered bank holding company. At issue is the Shareholder Rights Agreement, dated as of October 11, 2001, as amended, by and between Central Bancorp and EquiServe Trust Company, N.A. as Rights Agent. The SRA is said "to provide the stockholders of Central Bancorp, Inc. (the 'Company') the opportunity to benefit from the long-term prospects and value of the Company and to ensure that stockholders of the Company receive fair and equal treatment in the event of any proposed takeover of the Company."

*3 The SRA includes certain provisions, some of which are material, as follows:
"Acquiring Person" shall mean any Person who is a Beneficial Owner of 10% or more of the outstanding shares of Common Stock [with certain exceptions not here material] ...
"Adverse Person" shall mean a Person declared as such by the Board of Directors of the Company, upon (i) a determination that such Person, alone or together with its Affiliates and Associates, has become the Beneficial Owner of 10% or more of the outstanding shares of Common Stock and (ii) a determination by the Board of Directors, including at least a majority of the Disinterested Directors, after reasonable inquiry and investigation ... that (A) such Beneficial Ownership by such Person is intended to cause, is reasonably likely to cause or will cause the Company to repurchase the Common Stock beneficially owned by such Person or to cause pressure on the Company to take action or enter into a transaction or series of transactions which would provide such Person with short-term financial gain under circumstances where the Board of Directors determines that the best long-

term interests of the Company and its stockholders, but for the actions and possible actions of such Person, would not be served by taking such action or entering into such transactions or series of such transactions at that time or (B) such Beneficial Ownership is having or is reasonably likely to have a material adverse impact ... on the business or prospects of the Company ...
A Person shall be deemed the "Beneficial Owner," and to have "Beneficial Ownership," of and to "Beneficially Own" ... any securities which such Person or any of such Person's Affiliates or Associates beneficially owns, directly or indirectly, for purposes of Section 13(d) of the Exchange Act or Rules 13d-3 and 13d-5 promulgated thereunder ... in each case as in effect on the date hereof ...
"Distribution Date" shall mean (i) the first date of public announcement by the Company (by any means) or by an Acquiring Person (by means of filing a Schedule 13D under the Exchange Act or any comparable successor report or schedule or amendment thereto) that an Acquiring Person has become such or (ii) the first date of public announcement by the Company (by any means) that an Adverse Person has become such.
It is recited in the SRA that Central Bancorp's Board of Directors has authorized and declared a dividend of one Right in respect of each share of Common Stock held as of record as of the close of business on October 24, 2001, and authorized the issuance of one Right in respect of each share of Common Stock issued after that date and prior to the earlier of the Separation Time or the Expiration Time as defined in the SRA.

Article III of the SRA, in Sections 3.1(a) and (b), provides for adjustments to "Rights" in the event of certain transactions.
3.1 Distribution Date. (a) In the event that prior to the Expiration Time a Distribution Date shall occur, then, if applicable law does not preclude Rights owned by certain Persons referred to in Section 3.1(b) hereof to become void pursuant to the provisions hereof, the Company shall take such action as shall be necessary to ensure and provide that, except as provided below, each Right shall constitute the right to purchase from the Company ... that number of shares of Common Stock ... [as thereafter defined] ...
*4 (b) Notwithstanding the foregoing, to the

(C) 2005 Thomson/West. No Claim to Orig. U.S. Govt. Wo



Not Reported in N.E.2d
(Cite as: 2003 WL 21528509, *4 (Mass.Super.))

extent permitted by applicable law, any Rights that are or were Beneficially Owned on or after the Distribution Date by an Acquiring Person, an Adverse Person, or an Affiliate or Associate thereof or by a transferee, direct or indirect, of any of the foregoing shall become void and any holder of such Rights (including transferees) shall thereafter have no rights to exercise or transfer such Rights. For purposes of the preceding sentence, a transferee of an Acquiring Person, Adverse Person or Affiliate or Associate thereof shall include only a person who (i) becomes a transferee after the Acquiring Person, Adverse Person becomes such or (ii) becomes a transferee prior to or concurrently with the Acquiring Person or Adverse Person becoming such and receives such Rights [under certain specified conditions] ...
The SRA is recited to be "a contract made under the laws of the Commonwealth of Massachusetts and for all purposes shall be governed by and construed in accordance with the laws of the Commonwealth."

A Special Committee of Independent Directors of Central Bancorp, after an investigation, made a report and recommendation to the full Board of Directors on January 22, 2003, that PL Capital and its affiliates were an "Acquiring Person" under the SRA because they had acted in concert to acquire over 10% of Central Bancorp's common stock without board approval. The affiliates include the other plaintiffs in the PL Capital Claim, as well as all of the plaintiffs in the Seidman Claim. For purposes of addressing the present motions only, the Court will assume the correctness of the Special Committee's determinations.

The Central Bancorp full Board of Directors, on January 28, 2003, adopted the report and recommendation of the Special Committee, and this and the Federal litigation followed almost immediately.

Central Bancorp's Board of Directors, at all material times, including the present, consisted of eight members, of whom five--Paul Bulman, Nancy Neri, Gregory Boulos, Richard Fates and Garrett Goodbody [FN10]--have no financial or employment relationship with Central Bancorp beyond their service on the Board. The Special Committee, at all times, has consisted of Ms. Neri and Messrs. Boulos and Bulman.

FN10. Mr. Goodbody passed away unexpectedly on May 2, 2003. He has since been replaced on the Central Bancorp Board by James Linnehan. Mr. Linnehan is also an independent director.

On February 11, 2003, Central Bancorp purported to amend the SRA to include the following provision:
Notwithstanding any other provision hereof, no public announcement or statement made by the Company (by any means) regarding the determination of the Board of Directors made on January 28, 2003, that the PL Capital-Stilwell-Seidman-Reichenbach Group constitutes an Acquiring Person shall be deemed to constitute a Distribution Date or in any other way trigger or attempt to trigger this Agreement prior to such time as no court order precludes announcement of a Distribution Date or other triggering of this Agreement.
Then, between May 8 and 12, 2003, certain of the parties said by the Special Committee to be included within the Acquiring Person group--the Seidman parties--claim to have sold all of their shares of Central Bancorp on the open market. [FN11] As a result, from the time of those sales to date, the alleged Acquiring Person group has held, and now holds, fewer than 10% of the shares of common stock of Central Bancorp.

FN11. Central Bancorp, without any affidavits or other record support, suggests that these sales, in some way, may have been to parties in league with Seidman. There being no record evidence to support Central Bancorp's speculation, this Court cannot rely thereon in making its present rulings.

*5 To date, in significant part because of the preliminary injunctive relief issued by this Court and the Federal Court, there has been no "public announcement by the Company (by any means) or by an Acquiring Person (by means of filing a Schedule 13D under the Exchange Act or any comparable successor report or schedule or amendment thereto) that an Acquiring Person has become such" or any "public announcement by the Company (by any means) that an Adverse Person has become such."

It is in the foregoing posture that the Court addresses the issues raised by the pending motions.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Wo



Not Reported in N.E.2d
(Cite as: 2003 WL 21528509, *5 (Mass.Super.))

## DISCUSSION

Summary judgment is granted where there are no issues of genuine material fact, and the moving party is entitled to judgment as a matter of law. Hakim v. Massachusetts Insurers' Insolvency Fund, 424 Mass. 275, 281 (1997); Kourouvacilis v. General Motors Corp., 410 Mass. 706, 716 (1991); Cassesso v. Commissioner of Correction, 390 Mass. 419, 422 (1983); Mass.R.Civ.P. 56(c). The moving party bears the burden of affirmatively demonstrating that there is no triable issue of fact. Pederson v. Time, Inc., 404 Mass. 14, 17 (1989).

The parties and their counsel involved in this corporate tug-of-war are extremely sophisticated. This Court, therefore, will presume full understanding by all with respect to both the SRA and the statutory issues involved, as well as the purposes behind them.

What is presented to the Court is an array of legislation and an agreement, and actions taken purporting to comply therewith, somewhat obscured by the fog of mootness, that must be interpreted, construed and applied.

As recently as May 8, 2003, the Supreme Judicial Court restated and reaffirmed long-held principles of statutory construction. In Commonwealth v. Clerk-Magistrate of the West Roxbury Div. of the Dist. Court Dep't, 439 Mass. 352, 355-56 (2003), the SJC said:

It is a standard canon of statutory construction that "the primary source of insight into the intent of the Legislature is the language of the statute." International Fid. Ins. Co. v. Wilson, 387 Mass. 841, 853 (1983). A court may not add words to a statute that the Legislature did not put there. See General Elec. Co. v. Department of Envtl. Protection, 429 Mass. 798, 803 (1999), and cases cited. "Statutory language should be given effect consistent with its plain meaning and in light of the aim of the Legislature unless to do so would achieve an illogical result." Sullivan v. Brookline, 435 Mass. 353, 360 (2001). See O'Brien v. Massachusetts Bay Transp. Auth., 405 Mass. 439, 443-44 (1989). Where, as here, the language of the statute is clear and unambiguous, it is conclusive as to the intent of the Legislature. See Pyle v. School Comn. of So. Hadley, 423 Mass. 283, 285 (1996).

Similarly, the interpretation of an unambiguous agreement is an issue of law for the Court. Lumbermans Mut. Cas. Co. v. Zoltek Corp., 419 Mass. 704, 707 (1995). Contract language must be construed in its usual and ordinary sense. 116 Commonwealth Condominium Trust v. Aetna Cas. & Surety Co., 433 Mass. 373, 376 (2001); Citation Ins. Co. v. Gomez, 426 Mass. 379, 381 (1998). A contract provision is ambiguous "only if it is susceptible of more than one meaning and reasonably intelligent persons would differ as to which meaning is the proper one." Id. The mere fact that parties disagree on the proper construction of contractual language, however, does not necessarily establish ambiguity. Lumbermans Mut. Cas. Co. v. Offices Unlimited, Inc., 419 Mass. 462, 466 (1995).

*6 Generally, "[t]he object of the court is to construe the contract as a whole, in a reasonable and practical way, consistent with its language, background and purpose." USM Corp. v. Arthur D. Little Systems, Inc., 28 Mass.App.Ct. 108, 116 (1989). The Court must act in a way to give effect to an agreement as a rational instrument in order to carry out the intent of the parties. Starr v. Fordham, 420 Mass. 178, 192 (1990). Even in the case of an ambiguous agreement, interpretation is a matter of law for the Court except insofar as it may turn on facts in genuine dispute. Gross v. Prudential Ins. Co. of America, Inc., 48 Mass.App.Ct. 115, 119 (1999).

Justice, common sense and the probable intention of the parties upon consideration of the words in question are guides to the construction of a written contract. City of Haverhill v. George Brox, Inc., 47 Mass.App.Ct. 717, 720 (1999).

In construing the Shareholder Rights Agreement, the Court must give effect to the intentions of the parties, as expressed in the language employed, considered in the light of the context of the situation and the purposes to be accomplished. Starr, supra, 420 Mass. at 190; Shea v. Bay State Gas Co., 383 Mass. 218, 224-25 (1981).

"The Declaratory Judgment Statute should be liberally construed and administered. See G.L.c. 231A, Sec. 9. A judge enjoys some discretion in deciding whether a case is appropriate for declaratory relief." Pazolt v. Director of the Div. of Marine Fisheries, 417 Mass. 565, 569 (1994).

(C) 2005 Thomson/West. No Claim to Orig. U.S. Govt. Wo



Proceedings for declaratory relief should normally culminate in a declaration of rights rather than dismissal. Nawn v. Board of Selectmen of Tewksbury, 4 Mass.App.Ct. 715, 718-19 (1976). On the other hand, a Court may refuse to enter declaratory relief when such a judgment, if entered, will not terminate the controversy. But if on that ground alone, the reasons for a refusal should be stated in the record. Weinstein v. Chief of Police of Fall River, 344 Mass. 314, 317 (1962).

Where the case does not reduce to solely an issue of law without dispute as to the facts, maintenance of a declaratory judgment action is not favored. Ralph's Wonder, Inc. v. Commissioner of Internal Revenue, 19 Mass.App.Ct. 928, 929 (1984).

A declaration of rights, duties and status under a statute is clearly a matter within the Declaratory Judgment Statute. See, e.g., City of Boston v. MBTA, 373 Mass. 819, 829 (1977). Also, a Rule 56 motion for summary judgment is an appropriate way to raise declaratory judgment issues. Farm Family Mut. Ins. Co. v. Whelpley, 54 Mass.App.Ct. 743, 747 (2002).

If the matters in issue are of public importance and they are likely to arise again, or if they are of general concern to corporations formed in Massachusetts, a Court may address those issues even in the face of some degree of mootness. See Ott v. Boston Edison Co., 413 Mass. 680, 684-85 (1992). It is the duty of the Court to declare as much of the rights of the parties as possible. [FN12] First Nat. Bank of Cape Cod v. North Adams Hoosac Sav. Bank, 7 Mass.App.Ct. 790, 797 (1979).

FN12. Here it is not just the litigating parties that seek declaratory relief. Judge Harrington in the Federal Action has stayed the proceedings before him until the State law issues are resolved.

*7 The Court first will consider the two statutes involved, G.L.c. 156B, Sec. 32A and Sec. 65. Thereafter, the Court will explore the governing language of the SRA and conclude with the mootness issue.

The Statutory Provisions

Neither G.L.c. 156B, Sec. 32A nor Sec. 65 appears yet to have been interpreted by any appellate court. To that extent, their meaning and reach is a matter of first impression.

General Laws, c. 156B, Sec. 32A, first added by St.1989, c. 242, Sec. 11, reads in its entirety as follows:

The terms and conditions of any rights or options issued by the corporation, including those outstanding on the effective date of this section, may include, without limitation, restrictions or conditions that preclude or limit the exercise, transfer, receipt or holding of such rights or options by any person owning or offering to acquire a specified number or percentage of the outstanding stock or other securities of the corporation, or any transferees of any such persons, or that preclude or limit such action based on such other factors, including the nature or identity of such persons, as the directors determine to be reasonable and in the best interests of the corporation. Nothing contained in this section shall affect the duties or standard of care of a director pursuant to section sixty-five of this chapter.

The Legislature spoke clearly and without ambiguity in Sec. 32A. Thus, a review of the SRA, read against the provisions of Sec. 32A, reveals that there can be no doubt that it was adopted, and contains provisions, wholly consistent with this statute. There is no need to parse the wording of the SRA or to further extend the discussion of this issue.

What does require explication, however, is the extent to which G.L.c. 156B, Sec. 65 affects the actions of directors taken pursuant to a properly created Sec. 32A shareholder rights agreement. The second sentence of Sec. 65 [FN13] was added by St.1989, c. 242, Sec. 13. Again, a full quotation of Sec. 65 is provided.

FN13. Sec. 65 was rewritten in 1980. See St.1980, c. 265. Also, there was a minor amendment, dropping a comma after the word "officer" in the third sentence, added by St.1996, c. 450, Sec. 196.

A director, officer or incorporator of a corporation shall perform his duties as such, including, in the case of a director, his duties as a member of a committee of the board upon which he may serve, in good faith and in a manner he reasonably believes to be in the best interests of the corporation, and with such care as an ordinary

(C) 2005 Thomson/West. No Claim to Orig. U.S. Govt. Wo

Westlaw

prudent person in a like position would use under similar circumstances. In determining what he reasonably believes to be in the best interests of the corporation, a director may consider the interests of the corporation's employees, suppliers, creditors and customers, the economy of the state, region and nation, community and societal considerations, and the long-term and short-term interests of the corporation and its stockholders, including the possibility that these interests may be best served by the continued independence of the corporation. In performing his duties, a director, officer or incorporator shall be entitled to rely on information, opinions, reports or records, including financial statements, books of account and other financial records, in each case presented by or prepared by or under the supervision of (1) one or more officers or employees of the corporation whom the director, officer or incorporator reasonably believes to be reliable and competent in the matters presented, or (2) counsel, public accountants or other persons as to matters which the director, officer or incorporator reasonably believe to be within such person's professional or expert competence, or (3) in the case of a director, a duly constituted committee of the board upon which he does not serve, as to matters within its delegated authority, which committee the director reasonably believes to merit confidence, but he shall not be considered to be acting in good faith if he has knowledge concerning the matter in question that would cause such reliance to be unwarranted. The fact that a director, officer or incorporator so performed his duties shall be a complete defense to any claim asserted against him, whether under sections sixty to sixty-four, inclusive, or otherwise, except as expressly provided by statute, by reason of his being or having been a director, officer or incorporator of the corporation.

*8 Section 65 can be seen as setting forth in Legislative words what is generally referred to as the business judgment rule. See S. Solomont & Sons Trust, Inc. v. New England Theatres Operating Corp., 326 Mass. 99, 113-15 (1950). See also, Harhen v. Brown, 431 Mass. 838, 842-45 (2000), wherein the Supreme Judicial Court discussed the business judgment rule without specifically citing to G.L.c. 156B, Sec. 65.

G.L.c. 156B, Sec. 32A and Sec. 65, as enacted

and amended in 1980 and 1989, are specifically intended by the Legislature to give protection to Massachusetts corporations from abusive takeovers which challenge the long-term growth of the Commonwealth's economy, the creation of new jobs and the long-term interests of shareholders. The Governor, in submitting the legislation to the Senate and House of Representatives on May 24, 1989, included in his Message the following commentary:

Enactment of the proposed legislation will provide Massachusetts corporations the security they need to make the long-term investments in research and development, product, market and human resource development and plant modernization essential to meeting the challenges of competition in the world marketplace. Enactment will also facilitate the transition of employees affected by takeovers by ensuring that collective bargaining agreements negotiated with prior management are honored and that employees who lose their jobs as a result of takeovers receive severance. By deterring speculative takeovers, this initiative will foster the long-term investments that are essential to a dynamic and growing economy and to the economic well-being of all Massachusetts citizens. Governor's Message to the Senate and House of Representatives, May 24, 1989.

Governor's Messages are often quite helpful in understanding the reason for certain legislation. See, e.g., Conners v. Northeast Hospital Corporation, 439 Mass. 469, 473 (2003).

"It can be presumed that new legislation alters existing law." Morrison v. Lennett, 415 Mass. 857, 863 (1993). At the same time, a statute should not be interpreted as effecting a material change in the common law unless the intent to do so is clearly expressed. See, e.g., Taygeta Corporation v. Varian Associates, Inc., 436 Mass. 217, 226 (2002). When, however, the nature and purpose of a statute specially applicable to a particular situation provides no justification for a Court to qualify its wording by importing conditions or limitations not expressed therein or deemed to give effect to its main purpose, then a Court should not do so. General Electric Company v. Department of Environmental Protection, 429 Mass. 798, 802 (1999). See also Direct-Mail Service, Inc. v. Registry of Motor Vehicles, 296 Mass. 353, 356 (1937).

Here, Sec. 65 clearly states that the "fact that a

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Wo



director ... performed his duties [in a manner consistent with that section] shall be a complete defense to any claim asserted against him, whether under sections sixty to sixty-four, inclusive, or otherwise, except as expressly provided by statute, by reason of his being or having been a director ... of the corporation." This language clearly expresses the Legislative intent that it is compliance with Sec. 65, and nothing else, that is the complete defense. To that extent the common law has been changed.

*9 This is the context in which this Court assesses G.L.c. 156B, Secs. 32A and 65.

Here, as seen in the Background Section above, the Central Bancorp Board is comprised of a majority of independent directors. See Harhen, supra, 431 Mass. at 842-43. That Board included, at the time of appointing the Special Committee, two directors elected at the urging of the PL Capital parties. [FN14] The Special Committee is itself made up solely of three of the independent directors, and was charged with the duty to investigate, report and recommend appropriate action on the matters in issue. This Court, therefore, reads Harhen, supra, 431 Mass. at 844-45, to mandate that when there is a matter considered by a committee of independent directors appointed to act by a board itself consisting of a majority of independent directors, the business judgment rule affords complete protection to the business decisions of the directors because they are presumed to act in the best interests of the corporation. This seems particularly so when the action taken is specifically permitted by legislation.

FN14. Garrett Goodbody and Richard J. Fates.

Consequently, G.L.c. 156B, Sec. 65, containing the Legislature's formulation of the business judgment rule for purposes of shareholder rights agreements, among others, must be read as the sole controlling statute in connection with the actions pursuant to the SRA taken by the Directors here. In the situation presented to this Court, it should not add words to Sec. 65 "that the Legislature did not see fit to put there." General Electric Company, supra, 429 Mass. at 803. Nor should this Court cause the Legislative language chosen to be modified or altered by imposing thereon common-law concepts or the law of other jurisdictions. See, e.g., Piemonte v. New Boston Garden Corp., 377 Mass. 719, 723 and n. 4 (1979). [FN15] Particularly given

the history leading to the enactment of the anti-takeover legislation in the Commonwealth, any alteration or gloss thereon must be the work of the Legislature itself, not a Trial Court judge.

FN15. Whether some heightened scrutiny should apply to a board of directors that does not consist of a majority of independent directors, such as in Houle v. Low, 407 Mass. 810 (1990), is not for a Trial Court to muse upon on a record such as that before it here, where all the directors are conceded to be independent on the Special Committee and a majority thereof are conceded to be independent on the full Board.

In Sec. 65, the Legislature has stated clearly what it is that constitutes a fair exercise in good faith of the power with which directors of Massachusetts corporations are clothed when dealing with a Sec. 32A shareholder rights agreement. The legislature is presumed to have known fully the holdings in Elliot v. Baker, 194 Mass. 518 (1907), Albert E. Touchet, Inc. v. Touchet, 264 Mass. 499 (1928), and Andersen v. Albeit & J.M. Anderson Mfg. Co., 325 Mass. 343 (1950), when it made its statement in Sec. 65. It did not choose to incorporate the concepts in those cases in Sec. 65.

This Court should not "add words to a statute that the Legislature did not put there, either by inadvertent omission or by design." Fafard v. Lincoln Pharmacy of Milford, Inc., 439 Mass. 512, 515 (2003). "A statutory expression of one thing is an implied exclusion of other things omitted from the statute." Id.

In responding to the arguments by the PL Capital Group that this Court should either import the proportionality doctrine in Unocal Corp. v. Mesa Petroleum Co., 493 A.2d 946, 955 (Del.1985), or aspects of the Massachusetts common law relating to fiduciary duties of directors, as a gloss on the protective reach of Sec. 65, the Court is reminded of Justice Cardozo's eloquent comments on the role of the judge, particularly at the trial level:

*10 The judge, even when he is free, still is not wholly free. He is not to innovate at pleasure. He is not a knight-errant, roaming at will in pursuit of his own ideal of beauty or of goodness. He is to draw inspiration from consecrated principles. He is not to yield to spasmodic sentiment, to vague and unregulated benevolence. He is to

(C) 2005 Thomson/West. No Claim to Orig. U.S. Govt. Wo

Not Reported in N.E.2d
(Cite as: 2003 WL 21528509, *10 (Mass.Super.))

exercise discretion informed by tradition, methodized by analogy, disciplined by system, and subordinated to "the primordial necessity of order in the social life."
Cardozo, Nature of Judicial Process, p. 141 (1921).

The Shareholder Rights Agreement and Mootness

The SRA established a two-step process to trigger the Rights created by it. The first step consists of a determination by the Directors of the existence of an Acquiring Person or an Adverse Person, as those words are defined in the SRA. Among other things, neither an Acquiring Person nor an Adverse Person can exist without that Person being a Beneficial Owner of 10% or more of the outstanding shares of the common stock of Central Bancorp.

The second step requires that after the existence of an Acquiring Person or an Adverse Person is determined, there must come into being a Distribution Date. As described above in the Background Section, a Distribution Date is established, among other ways, when there occurs the first public announcement by Central Bancorp (by any means) that an Acquiring Person has become such or the first public announcement by Central Bancorp (by any means) that an Adverse Person has become such.

At this time, neither of such public announcements has occurred.

Further, although the Special Committee, and the full Board of Directors of Central Bancorp, may have made the necessary determination that a certain group was an Acquiring Person or an Adverse Person in January 2003, and again in early May 2003, no such Person exists today because the May 8-12, 2003, sales of stock by the Seidman parties reduced the shareholdings of the particular group so determined below 10%. Consequently, in the three cases before it, regardless of any action taken by this Court to vacate the preliminary injunctive relief outstanding, a Distribution Date cannot be established because there is not now, as there must be, either an extant Acquiring Person or an extant Adverse Person.

In construing the SRA, this Court must, among other things, give weight and meaning to the words and the grammatical structure used. See, e.g.,

Moulton v. Brookline Rent Control Bd., 385 Mass. 228, 230-32 (1982). The missing public announcement that a person "has become" an Acquiring or Adverse Person employs the present perfect grammatical structure. Consequently, it includes the concept of an action which is continuing up to the present time. Were the announcement to include events that occurred in the past and are no longer existing, the proper tense would be the simple past, and the language would have spoken of when the Acquiring or Adverse Person "became" such.

*11 The present perfect tense "indicates action that was started in the past and has recently been completed or is continuing up to the present time." Sabin, ed., The Gregg Reference Manual (9th Edition). It makes no sense to construe this language other than to relate to a condition started in the past that "is continuing up to the present" time. After all, it is the impact of the Acquiring or Adverse Person on the corporation now or in the future that the SRA is designed to protect against. Given the purpose of the SRA, what difference would it make if there had been an Acquiring or Adverse Person at some time in the past, now no longer existing, who never had any impact on the corporation? And why should that person or his transferees now suffer a dilution in their current shareholdings?

The wording selected in the definitions of Acquiring or Adverse Persons themselves speaks in the present tense. The words used are "any Person who is a Beneficial Owner," or a "Person declared as such ... [who] has become the Beneficial Owner ... and is intended to cause, is reasonably likely to cause or will cause " certain action by Central Bancorp to take place, "or such Beneficial Ownership is having or is reasonably likely to have a material adverse impact ..." (Emphasis added.)

Other aspects of the SRA similarly speak of the present and actions that may occur in the future. In short, the Poison Pill involved here looks to the present and the future impact of the Acquiring or Adverse Person on Central Bancorp.

Nothing in the February 11, 2003, amendment to the SRA alters this situation.

Central Bancorp may not hereafter trigger the Poison Pill--at least until some new Acquiring

(C) 2005 Thomson/West. No Claim to Orig. U.S. Govt. Wo



Person or Adverse Person is determined to exist. The Special Committee and the Central Bancorp Board have not, at this time, determined that the PL Capital Group and the Seidman transferees--whoever the latter may be--constitute an Acquiring or Adverse Person. What the Special Committee determined and recommended, and the full Board acted upon, was the "result of a block trade on November 4, 2002," whereby "the PL Capital Group, Joseph Stilwell, Lawrence B. Seidman and Robert Reichenbach" became beneficial owners of 17.7% of Central Bancorp's outstanding stock. The persons who once may have constituted an Acquiring or an Adverse Person--the PL Capital Group, Joseph Stilwell, Lawrence B. Seidman and Robert Reichenbach--no longer exist as a Beneficial Owner. This is because Joseph Stilwell, Lawrence B. Seidman and Robert Reichenbach are no longer owners of any Central Bancorp stock and, therefore, the combined group consisting of "the PL Capital Group, Joseph Stilwell, Lawrence B. Seidman and Robert Reichenbach" no longer constitutes an Acquiring or Adverse Person. Nor can they pose any threat or have any impact on Central Bancorp.

Many of the issues in all three of these cases have become moot. For the Court to issue a declaratory judgment, "the question presented must be a live one and not one which is moot." Nolan, Civil Practice, 9A M.P.S. Sec. 1109. See also Jefferson Const. Corp. v. Commonwealth, 386 Mass. 142, 143-44 (1982).

**\*12** " 'The duty of this [C]ourt ... is to decide actual controversies by a judgment which can be carried into effect, and not to give opinions upon moot questions or abstract propositions ...' Caputo v. Board of Appeals of Somerville, 330 Mass. 107, 111 (1953), quoting from Mills v. Green, 159 U.S. 651, 653 (1895)." Id. at 143. See also Brown v. Neelon, 335 Mass. 357, 360 (1957).

Thus, a Court may properly refuse total declaratory relief where, as here, some parts of the controversy have become moot in significant part. Clinton Housing Authority v. Finance Committee of Clinton, 329 Mass. 495, 499 (1952).

Here, there are three basic issues about which this Court must consider rendering declaratory relief. First is the issue of what is the legal standard to be applied to the Massachusetts statutes that permit the

adoption and execution of a shareholder rights agreement. Second, in two parts, is an application of that law which includes, in order, (a) whether there was, or hereafter can be, a determination of an Acquiring or Adverse Person, and (b) whether the Central Bancorp Board of Directors acted consistent with the law in the process.

This Court concludes that it can--and should-- enter declaratory relief regarding the first issue and the first part of the second issue. It should not, however, make a declaration regarding the second part of the second issue because to do so would be to render an opinion on what has become a moot issue.

### ORDER

For the foregoing reasons, the Plaintiffs' Motion for Partial Summary Judgment in Case No. 03-0547 BLS and the Motion for Summary Judgment in Case No. 03-0554 BLS are each ALLOWED in part and DENIED in part, as to all three of these consolidated cases. However, on the parts of the motions that are denied, it is nevertheless proper for the Court to grant summary judgment for the opposing Central Bancorp parties. See Mass.R.Civ.P. Rule 56(c).

A final judgment is to be entered in each of these three cases reading, declaring and ordering as follows:

The standards set forth in Mass.G.L.c. 156B, secs. 32A and 65, with no additional or heightened judicial scrutiny, are the standards that apply to actions taken with respect to a shareholder rights agreement of a Massachusetts corporate entity adopted pursuant to Sec. 32A, either directly or on a recommendation of a special committee of a board of directors, of which board a majority is independent and which special committee itself is made up solely of independent directors;

Although the Board of Directors of Central Bancorp, Inc. may have determined in January 2003, and again in May 2003, that an Acquiring or an Adverse Person, as those terms are used in its October 11, 2001, Shareholder Rights Agreement, as amended, once existed, it cannot now establish a Distribution Date with respect thereto because no such Acquiring or Adverse Person continues to exist

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Wo



at present and the Board cannot make a new determination in the absence of evidence that such an Acquiring or Adverse Person exists at the time such determination is made; and

**\*13** On mootness grounds, it would be inappropriate for this Court to determine whether, on the facts before it, the Central Bancorp Board of Directors acted in a manner consistent with the applicable law with respect to the parties involved in these three cases. Consequently, except for the two preceding declarations, judgment shall enter dismissing each of these actions, including both the complaints and any counterclaims, with prejudice, each party to bear his, her or its own costs.

16 Mass.L.Rptr. 383, 2003 WL 21528509 (Mass.Super.)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Wo



Not Reported in F.Supp.2d
(Cite as: 2003 WL 22964376 (N.D.Ill.))

Page 3

Only the Westlaw citation is currently available.

United States District Court,
N.D. Illinois, Eastern Division.

**Datren WILLIAMS, individually, et al.,**
**Plaintiffs,**
**v.**
**BANK ONE CORP., et al., Defendants.**

**No. 03 C 8561.**

Dec. 15, 2003.

Clinton A. Krislov, Krislov & Associates, Ltd., Chicago, IL, for Plaintiff.

MEMORANDUM ORDER

SHADUR, Senior J.

**\*1** This Court's brief November 26, 2003 memorandum order ("Order") directed counsel for plaintiff Datren Williams ("Williams") to explain the predicate on which Williams could bring a derivative shareholder claim not only on behalf of Large Capital Growth Fund and Equity Index Fund (in each of which funds Williams says he is a shareholder) but also "on behalf of ... the One Group Investment Trust and each of the One Group Funds." Although the Order gave counsel ample time to provide such submission (until December 8), that date came and went without any filing--but one has now been tendered on December 10. [FN1]

> FN1. That minor delay of course involves no prejudice to anyone, and if a request for such a brief extension had been made this Court would surely have granted it with alacrity. But what is troublesome is the report by this Court's minute clerk that one of Williams' lawyers has represented to her that "his partner had spoken personally with Judge Shadur, who agreed to an extension." This Court has no recollection of any such conversation, and some further explanation is called for as to who engaged in the asserted conversation, when, and under what circumstances.

In any event, Williams' counsel now says that Complaint ¶ 20 (referred to in the Order) was mistaken--that instead (quoting from a filing made before the MDL Panel in MDL No. 1586, In re

Mutual Funds Investment Litigation ):
One Group Mutual Funds is a Massachusetts business trust.

\* \* \*

Each of the One Group Funds ... are [sic] not separately incorporated, but instead each represents a separate series of beneficial interests in One Group Mutual Funds.
Even so, that correction does not justify what Williams and his counsel seek to do here.

There is no precise parallel to the described arrangement in the corporate world, but the closest analogy still seems to be that of separate subsidiaries (the various mutual funds) that share a common parent (the Massachusetts business trust). What controls over the other factors identified in counsel's submission is the total separateness of the beneficial interest in the funds, with Williams being a shareholder in only two of them. Williams' small holdings in those two funds provide no justification for using them as a springboard for him to act on behalf of the umbrella Massachusetts trust--indeed, any allegation of Williams' ownership interest in that entity is conspicuously absent from the Derivative Complaint. And as for the other One Group Funds, any notion of Williams being able to bootstrap upstream to the business trust and thence downstream to the other separate funds clearly has nothing at all to commend it.

Accordingly, any purported derivative action "on behalf of the One Group Investment Trust and each of the One Group Funds," as asserted in the Derivative Complaint's opening paragraph, is rejected. Just how that may impact on other allegations in the Derivative Complaint, or on the propriety of Williams' having included one or more of the named defendants as targets in this litigation, will remain for future resolution as and when defendants are served and become represented by counsel.

2003 WL 22964376 (N.D.Ill.)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Wo

